**FILED**

FEB 0 4 2008

NF   FEB 0 4 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LESLIE J. LEFF and RONNIE H. LEFF,<br><br>           Plaintiffs,<br><br>       v.<br><br>DEUTSCHE BANK AG, and DEUTSCHE BANK<br>SECURITIES, INC., D/B/A DEUTSCHE BANK<br>ALEX. BROWN, a DIVISION of DEUTSCHE<br>BANK SECURITIES, INC.;<br><br>           Defendants. | 08CV733<br>JUDGE DOW<br>MAGISTRATE JUDGE KEYS<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

### JURY TRIAL DEMANDED

Plaintiffs Leslie J. Leff and Ronnie H. Leff (collectively "the Leffs" or "Plaintiffs"),

through their undersigned attorneys, as and for their Complaint against Defendants Deutsche

Bank AG ("Deutsche Bank") and Deutsche Bank Securities, Inc. d/b/a Deutsche Bank Alex.

Brown or BT Alex. Brown ("DB Alex. Brown") (collectively, the "Defendants"), allege as

follows on the basis of personal knowledge as to their own acts and upon information and belief

as to the acts of others:

## TABLE OF CONTENTS

*Page*

Nature of the Claims ................................................................................................................. 1

Parties.................................................................................................................................4

Jenkens & Gilchrist..........................................................................................................5

Jurisdiction and Venue......................................................................................................6

Background ........................................................................................................................6

A.    Terminology.............................................................................................................7

B.    Development of a Scheme to Sell and Market Digital Options and Securities ...................9

    1.    The COBRA Transaction.........................................................................11

    2.    The PICO Transaction ............................................................................14

C.    The Marketing Programs ........................................................................................20

    1.    The Marketing Program for COBRA .....................................................20

    2.    The Marketing Program for PICO ..........................................................22

D.    Plaintiffs Engage In The COBRA Transactions ...................................................23

E.    Plaintiffs Engage In The PICO Transaction .........................................................29

F.    IRS Notice 99-59 ...................................................................................................35

G.    IRS Notice 2000-44 ...............................................................................................37

H.    Registration Requirements......................................................................................39

I.    PICO as "Listed Transaction"................................................................................40

J.    The Amnesty Programs..........................................................................................40

K.    Plaintiffs Uncover the Fraud ..................................................................................41

L.    2003 Pronouncement by the IRS ...........................................................................41

M.      Injury to Plaintiffs ................................................................................................ 44

COUNT I .................................................................................................................... 45

COUNT II ................................................................................................................... 47

COUNT III .................................................................................................................. 50

COUNT IV .................................................................................................................. 52

COUNT V .................................................................................................................... 56

COUNT VI .................................................................................................................. 57

## Nature of the Claims

1.      This case arises out of Defendants' marketing and sale of illegal tax shelters to the Leffs in the years 1999 and 2000.

2.      Defendants, in concert with Jenkens & Gilchrist ("Jenkens"), a now-defunct law firm, first approached the Leffs in 1998 and offered them what they said was a legitimate transaction that took advantage of a legal "loophole" in the Federal Tax Code ("Tax Code").

3.      Despite the fact that the transactions that underlay all of the tax shelters that Defendants sold to the Leffs lacked economic substance entirely, Defendants and their cohorts in the scheme nonetheless made or endorsed representations that:

- The capital and/or ordinary losses created by the shelters were legitimate, proper and in accordance with all applicable tax laws, rules and regulations; and

- The design of the transactions made economic and investment sense, could generate a profit and therefore had business purpose and economic substance; and

- The legitimacy of the shelters would be verified by a legal opinion provided by respected and purportedly independent law firms.

4.      In fact, however, the transactions in which Defendants encouraged the Leffs to engage were nothing more than illegitimate tax shelters. In direct contravention of established rules, regulations and laws governing tax shelters, the shelters involved the establishment of entities to engage in transactions that were economically valueless.

5.      In 1999, on the advice of Defendants and their coconspirators, the Leffs engaged in a so-called COBRA foreign options trading strategy. Defendants and their coconspirators artificially generated substantial tax losses for the Leffs, though no real losses had occurred and though there was never any real economic risk involved in the transactions. This loss was deducted from the Leffs' taxable income and generated significant tax savings.

6.　　When the IRS issued a notice that described COBRA as an abusive tax shelter, Defendants were undeterred. They formulated another strategy, known as PICO, which deferred gains and substituted the creation of an S corporation instead of a partnership. But just like COBRA, the transactions involved in PICO lacked economic substance. And, just like COBRA, the Leffs were led to believe that PICO was a legitimate tax strategy, when in fact it was not.

7.　　Defendants knew that in light of the well-established legal doctrine disallowing the recognition of losses from transactions that lacked "economic substance," the tax shelters would not withstand an audit by the IRS.

8.　　Not only was this "economic substance doctrine" established in case law, it was also confirmed in several IRS Notices, including IRS Notice 99-59 and 2000-44, the former having been published prior to the filing of the Leffs' 1999 tax returns and the latter having been published prior to the filing of the Leffs' 2000 tax returns and prior to the IRS's December 2001 announcement of an Amnesty Program, described more fully below, that would have allowed the Leffs to amend their tax returns and avoid the assessment of accuracy-related penalties by the IRS.

9.　　Instead of correcting the Leffs' 1999 or 2000 tax returns or amending both the returns pursuant to the Amnesty Program, however, Defendants, acting in concert with others as described below, counseled the Leffs to stay the course. The Leffs followed that advice and, as a result, when the Leffs were audited by the IRS, the IRS found that the Leffs had entered into illegal tax shelters for the years 1999 and 2000. The IRS assessed taxes, interest and penalties on the Leffs for those years, and a settlement for those amounts was reached in the fall of 2004 and executed in January 2005.

10.    Defendants developed COBRA with Jenkens and other entities for the express purpose of generating fees. Indeed, Defendants, along with Jenkens and other entities, developed a fee sharing arrangement that remained undisclosed to the Leffs throughout the transactions. Defendants entered into a similar fee sharing arrangement with Proskauer Rose LLP ("Proskauer") and Bricolage Capital LLC, and its principals and affiliates, regarding the PICO transactions.

11.    Defendants also failed to disclose that it was Jenkens—the law firm that would purportedly provide an "independent review" of the tax shelters—that was pivotal in helping devise the COBRA tax strategy. Defendants knew that Jenkens admitted undisclosed role in developing, marketing and promoting the shelters both compromised its objectivity could be deemed fraudulent and would lead the taxing authorities to disregard the opinion letters provided by Jenkens and thereby facilitate the assessment of penalties.

12.    Nevertheless, Defendants entered into an agreement with Jenkens that each of them, acting together in concert with the other during the solicitation of prospective participants, would knowingly support the overstatement of what those opinion letters would conclude regarding the legitimacy of the tax scheme being promoted, and would knowingly support the understatement of the scheme's risks and the likelihood of an audit. Defendants also agreed with Jenkens that the taxpayer would not receive the opinion letters issued by Jenkens until after it had engaged in the promoted transactions.

13.    Jenkens, which is now in the process of closing its doors as a result of its illicit Chicago tax practice, has since admitted to the United States Attorney's Office that it "develop[ed] and market[ed] fraudulent tax shelters, as well as issu[ed] fraudulent opinion letters." Jenkens further stated that its development and marketing of these fraudulent tax

3

shelters and tax opinions "wrongly deprived the U.S. Treasury of significant tax revenues." Defendants here knowingly and intentionally participated in this very misconduct.

14.    Other law firms entered the market for opinion letters for tax shelters, including Proskauer. As Defendants were aware, the Leffs' received a pre-arranged favorable opinion letter from Proskauer for the PICO transactions despite the clear IRS restrictions and prohibitions against such schemes.

15.    Plaintiffs seek recovery for back taxes, interest, fees and costs against Defendants for breach of fiduciary duty, negligence, common law fraud, violation of the Illinois Consumer Fraud & Deceptive Trade Practices Act, breach of contract, breach of the duty of good faith and fair dealing, conspiracy to defraud and negligent misrepresentation.

### Parties

14.    Plaintiff Leslie J. Leff is an individual and at all relevant times was a resident of Pennsylvania. Leslie Leff is currently a resident of Hawaii.

15.    Plaintiff Ronnie H. Leff is an individual and resident of Pennsylvania.

16.    Defendant Deutsche Bank AG ("Deutsche Bank" or "DB") is a German corporation with its principal place of business at Taunusanlage 12, 60325 Frankfurt am Main, Germany. Deutsche Bank is a leading banking institution in Germany and the rest of the world with 2006 profits of 5.9 billion Euros ($8.6 billion) on revenues of 18.7 billion Euros ($27.4 billion). DB offers various investment, financial and related products and services to consumer and corporate clients worldwide. DB has some 82,000 employees and more than 12 million customers in 75 countries worldwide. Deutsche Bank has a leading position in international foreign exchange, fixed-income and equities trading, and is a recognized leader in all aspects of foreign exchange. DB is one of the top global foreign exchange providers. DB has offices

4

located at 222 South Riverside Plaza, Chicago, Illinois, 60606 and/or its agents are continuously and systematically engaged in business in Cook County, Illinois, as further described herein.

17.     DB Alex. Brown is a division of Deutsche Bank Securities, Inc., which is, in turn, a wholly owned subsidiary of Deutsche Bank AG and a member firm of the New York Stock Exchange ("NYSE"). DB Alex. Brown was formed as the result of Deutsche Bank's acquisition of BT Alex. Brown, Inc., the United States' oldest brokerage firm. Defendant Deutsche Bank Alex. Brown also has offices in Cook County, Illinois and/or its agents are continuously and systematically engaged in business in Cook County, Illinois, as further described herein.

18.     At all times relevant hereto, Defendants knowingly participated in and benefited from the tax shelter marketing scheme described herein.

## Jenkens & Gilchrist[1]

19.     At the time of the events in question, non-party Jenkens was a thriving law firm with over six hundred attorneys and offices in nine major cities throughout the United States. It claimed expertise in a variety of industries and market segments, including antitrust, bankruptcy, construction, securities, financial institutions, financial services, environmental, franchise and distribution, health, immigration, intellectual property, international tax, litigation, technology, and real estate law. At its peak in 2001, the firm's gross revenue was $312 million.

20.     On or about March 29, 2007, however, what was once one of the nation's largest, highest-earning law firms disclosed that it would be permanently closing its doors because of the "serious damage to its reputation, revenues and stability" caused by its fraudulent tax shelter practice. Indeed, according to a March 29, 2007 press release (the "Press Release") issued by the

---

[1] Jenkens and its current or former employees are not named as defendants herein due to the settlement agreement entered into between Jenkens and Plaintiffs.

United States Attorney for the Southern District of New York, Jenkens "admitted to developing and marketing fraudulent tax shelters, as well as issuing fraudulent opinion letters."

21.    According to the Press Release, in a statement to the United States Attorney's Office concerning the criminal investigation into the tax shelters, Jenkens admitted:

> We believe certain Jenkens attorneys developed and marketed fraudulent tax shelters, with fraudulent tax opinions, that wrongly deprived the U.S. Treasury of significant tax revenues. The firm's tax shelter practice was spearheaded by the tax practitioners in Jenkens's Chicago office who are no longer with the firm.  Those responsible for overseeing the Chicago tax practice placed unwarranted trust in the judgment and integrity of the attorneys principally responsible for that practice, and failed to exercise effective oversight and control over the firm's tax shelter practice.  Unfortunately, that misplaced trust and reliance extended to our initial response to the IRS and led to public statements we issued in support of our legal opinions.

### Jurisdiction and Venue

22.    This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332. Complete diversity exists between the parties and the amount in controversy is over $75,000 exclusive of costs and interest.

23.    This Court has personal jurisdiction over Defendants, which have offices in Illinois and are continuously and systematically engaged in business in Illinois.

24.    Venue is proper in this Court under 28 U.S.C. § 1391(a) and (a)(2) because a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district.

### Background

25.    A tax shelter is a method or device used to reduce or eliminate tax liability.  Some tax shelters advance a legitimate endeavor and are therefore lawful.  The IRS deems a shelter illegal if its economic purpose is tax avoidance.

6

26.     In the late 1990s, several of Defendants' employees, along with several lawyers from Jenkens, developed and began marketing a tax shelter referred to as "Currency Options Bring Reward Alternative," or "COBRA." COBRA is an illegal tax shelter because the underlying transaction involved lacks economic substance, and it was designed and used for the sole purpose of avoiding taxes. COBRA was later modified into "Personal Investment Company," or "PICO," which remained an illegal tax shelter in that it lacked economic substance and was created for the sole purpose of tax avoidance.

27.     The Leffs each entered into tax shelters under Defendants' and their coconspirators' guidance. The first was in 1998, which involved US Treasury securities. The second was in 1999 and involved European-style digital foreign currency options, referred to as COBRA. The third was in 2000 and involved PICO.

28.     Defendants knew or should have known that the IRS would disallow the COBRA and the PICO strategies because they were, at their core, a means to generate artificial deductible tax losses. Despite Defendants' knowledge of the scheme's illegality, however, they sought out and convinced the Leffs to enter into various illegal shelters, including COBRA and PICO, and in the process collected substantial fees from the Leffs.

## A.     Terminology

29.     There are a number of different ways one can invest in securities. In one of the simplest types of transactions, an individual or an entity can purchase a security outright. In this instance, the purchaser is considered "long", and can only profit by an increase in the price of the purchased security. Alternatively, the investor can borrow the security, sell it immediately, wait, expecting the price of the stock to drop, and then buy it back to repay the loan. In this case, the

purchaser is considered "short", and can only profit by a decline in the market price of the borrowed security.

30.     An option, on the other hand, is not an outright purchase. Instead, it gives a buyer the right to buy or sell a security at a definite price for a definite period of time, regardless of that item's future market price on the open market. That security may be stocks, bonds, commodities, or intangible market valuations such as the Standard & Poors' Index. Options are said to be "in the money" if the market price of the underlying security makes exercising the option profitable. Similarly, options are said to be "out of the money" when exercising the option would result in no gain or a loss.

31.     An option position is "long" if the holder's profit is dependent on a rise in the value of an underlying item, while an option position is "short" if the holder's profit is dependent on a decrease in the value of an underlying item.

32.     Options are said to be "covered" when the seller of the option owns the item against which the option is made. Correspondingly, an option is "naked" when the seller does not own the item against which the option is made.

33.     Options may also be either "American" or "European." The key difference between American and European options relates to when the options can be exercised. A European option may be exercised only at the expiry date of the option, i.e. at a single pre-defined point in time. An American option, on the other hand, may be exercised at any time before the expiry date.

34.     For example, an investor buys a "call" option on 1000 shares of ABC stock with a "strike price" of $100 and an expiration date of July 16, 2003. This option gives the investor the right to purchase 1000 shares of ABC for $100. Under an American option, the option holder

8

can exercise the option by purchasing the shares at any time he chooses prior to July 16, 2003.

Under a European option, the option holder can only elect to exercise the option at a certain time

on July 16, 2003.

35.    European option contracts are "digital" in the sense that the investor wins or loses

a pre-determined amount in full, but only if the strike price is met. Thus, the option is either

"on" or "off", like a digital (binary) 1 or 0. As a result, European digital options contracts

provide an investor with the same payout no matter how far the value of the underlying item

rises above the strike price of the option. For example, a digital option may state that an investor

will receive $1,000 if ABC Corp. closes at or above $12 per share on a certain date. If the price

of ABC Corp. is at or above $12 per share on the closing date, the investor is paid $1,000. If

ABC does not close at or above $12 per share, the investor gets nothing and loses what he

originally paid for the option. European digital options contracts are thus essentially wagers that

a certain commodity or equity price will be above or beneath a given price on a certain date.

36.    European or digital options contracts are ordinarily less expensive to purchase

than American or standard options, as the exposure of the seller and potential profit by the buyer

are limited to a pre-set amount that does not vary, regardless of the degree of fluctuation in the

value of the underlying item. An American option, by contrast, gives the holder a wider range of

risk and profit potential.

37.    A "straddle" involves the use of offsetting positions in forward contracts wherein

the value of one position generally varies inversely with the value of the other position.

**B.    Development of a Scheme to Sell and Market Digital Options and Securities**

38.    In the late-1990s, Defendants, together with others, developed the plan to market

digital options contracts as part of tax shelters. Upon information and belief, the participants

included Paul Daugerdas, a partner at Jenkens; David Parse, Craig Brubaker and other individuals employed by Defendants; and Robert Coplan, a partner at Ernst & Young. The plan later grew to include individuals at other legal and accounting firms, such as KPMG and Proskauer, and financial planners.

39.    Prior to 1994, Paul Daugerdas was employed in Chicago by Arthur Anderson as a partner in charge of its tax practice. From 1994 to December 28, 1998, he was a partner at the law firm of Altheimer & Gray, where he was Chairman of its Tax Department. Beginning on or about December 29, 1998, Daugerdas was a Partner in Jenkens' Chicago office.

40.    Paul Daugerdas had professional and social relationships with both David Parse and Craig Brubaker prior to the design and marketing of the COBRA strategy. Parse was Daugerdas' personal stockbroker, and Brubaker was employed at Arthur Andersen at the same time that Daugerdas was there.

41.    From 1991, Daugerdas marketed a tax strategy in which a prospective client borrowed a U.S. Treasury security, sold the security short, and then contributed the proceeds to a partnership in exchange for a partnership interest.

42.    Upon information and belief, in the fall of 1999, Dan Brooks of Deutsche Bank visited Daugerdas in Chicago to present the idea of a tax shelter using foreign currency digital options. Brooks informed Daugerdas that Defendants had substantial experience in designing and implementing foreign currency options for tax shelters with Bricolage Capital Management. Brooks expressed a strong interest in Defendants working with Jenkens in foreign options transactions and explained the types of options Defendants would design and execute, the contract, and the pricing. Around the same time, Brubaker met with Erwin Mayer at Jenkens to discuss the use of foreign option contracts as part of tax shelters.

10

43.    Upon information and belief, in October 1999, Daugerdas recommended Defendants be used as the investment firm in foreign option tax shelters through Ernst & Young ("E&Y"). Daugerdas and Defendants also began working on foreign option transactions with KPMG.

44.    Daugerdas officially substituted options for Treasuries after consultation with Robert Coplan of E&Y and officials of Defendants. Thereafter, foreign currency options were used so that the loss claimed could be either capital or ordinary under a provision of the Internal Revenue Code.

### 1.    The COBRA Transaction

45.    Under the COBRA strategy, a taxpayer purchased and wrote foreign digital options or went both long and short on such options, then transferred the positions to a partnership. The taxpayer claimed that the basis of the partnership interest was increased by the cost of the purchased options or the long options, but was not reduced by the taxpayer's obligation with regard to the options written or short options. The use of European-style digital options in this transaction permitted significant leverage to be obtained at a relatively modest cost and risk.

46.    To minimize the risk and the profit potential, Defendants, along with Jenkens and Daugerdas, structured all of the digital options contracts as follows: Each client entered into two counterbalancing transactions—one where the client would profit if the spot rate on a particular foreign currency was at or below a certain rate, and one where the client would lose if the spot rate was at or below a nearly identical rate. The two rates that were set (one where the client would profit and one where the client would lose) were different by only fractions of a penny. The "trigger" occurred when the spot rate on the underlying currency pair was at or below a

11

specific spot rate on a certain date at a certain time. Thus, there was almost no chance of only one position being acted upon. Either the spot rate would be above both (so neither was acted upon) or the spot rate would be below both (so both were acted upon).

47. Following the transaction, the taxpayer had almost nothing at risk, because the cost of the long position was almost entirely offset by the proceeds from the sale of the corresponding short position. Defendants took the position that, despite the lack of significant real economic risk, a series of "paper" transactions could result in the generation of enormous tax losses bearing no relationship to the economic or financial reality faced by the taxpayer.

48. The strategy was partly based on Treasury Regulation 1.1233-1(a)(1), which states that "for income tax purposes a short sale is not deemed to be consummated until delivery of property to close the short sale." Defendants and its coconspirators used this regulation to promote the idea that entering into a securities borrowing transaction and realizing cash proceeds from the sale of the borrowed securities was not a taxable event.

49. Each client and Defendants entered into one contract memorializing both what was bought and what was sold. Without providing further collateral, the client could not transfer the positions separately. Further, the digital options contracts were not something traded on any recognized exchange, but were a private contract between the participants.

50. As a result, the digital options contracts amounted, in actuality, to a contractual wager based on movements in foreign currency prices, without any real possibility of foreign currency ever changing hands.

51. To ensure control of the options transaction (i.e., that either both or neither digital options contracts were acted upon), the ability to determine when and if the event was triggered

was given to Defendants, with the stipulation that Defendants, as the "calculating agent", could choose to accept or disregard any spot rate.

52.     These two features (the close proximity of the trigger spot rates and the ability to select the spot rate that determined if the trigger occurred) guaranteed that there was no risk of only one of the paired transactions being exercised.

53.     Defendants designed the features of the foreign option contracts, including the "European" style of the option, the digital aspect of the option, the use of foreign currency in general and the choice of the specific foreign currency to use in each transaction, the direction of the "bets," the spot rate, the spread between long and short positions, and the use of a corporation as the entity purchasing the contract from Defendants.

54.     Defendants and Jenkens structured the transactions such that the total of fees was a percent of the expected tax savings. Of that amount, part was paid to Defendants as the "spread" between the two positions in the contract (i.e., the difference between what was paid for buying one position and what was received for selling the other); some was paid to Jenkens for having "developed" the tax strategy and for writing a tax opinion letter for the taxpayer; and up to twenty percent was paid in referral fees to "Marketing Participants" who introduced clients and recommended the tax strategies.

55.     Upon information and belief, the fee splitting arrangement for a nearly identical transaction between Defendants, E&Y, and Jenkens was that the total fee was to be nine and a half percent of the loss generated by COBRA, whereby three percent went to Jenkens, one and half percent went to E&Y, and five percent went to Defendants, the latter of which came from the "net premium" the client paid for the options. As a result of Defendants' large flat fee from

each transaction, Defendants had a strong incentive to make sure each client lost the "bet" on the option, or at least keep the profit to a minimum, otherwise Defendants' fee would decrease.

56.     In 1999, Defendants sold the Leffs a COBRA transaction structured similarly, if not identically, to those described herein. Both options expired "out of the money," thus allowing Defendants to retain the fees they had received.

### 2.     The PICO Transaction

57.     In August 2000, the IRS published Notice 2000-44. That Notice, described more fully below, clearly established that the IRS believed that the COBRA transaction was an illegal tax shelter.

58.     Defendants and their collaborators needed a new tax shelter to market or they would lose the enormous fees they had been making with COBRA. Therefore, Defendants assisted in creating new tax shelters—essentially modified versions of COBRA—intended to circumvent Notice 2000-44 and (it was hoped) avoid IRS notice.

59.     Defendants worked with Bricolage Capital and its subsidiaries Counterpoint Capital, LLC ("Counterpoint"), Delta Currency Trading ("Delta"), as well as E&Y to create a new strategy, entitled "Personal Investment Corporation" or "Personal Investment Company." Andrew D. Beer and Samyak Veera controlled Bricolage Capital and its affiliates, including Counterpoint, Delta, as well as ASA Trading, LLC ("ASA") and JJC Trading, LLC ("JJC") (Bricolage Capital, Counterpoint, Delta, Andrew D. Beer, Samyak Veera, ASA, and JJC, will collectively be referred to herein as "Bricolage").

60.     Defendants, Bricolage, and E&Y put out a promotional report explaining the PICO strategy. Beer soon became concerned about Bricolage's involvement with PICO marketing and promotional efforts. On May 26, 2000, Beer emailed Richard Shapiro, a national

14

tax partner at E&Y and someone who had been involved with past marketing efforts for

COBRA, and copied Veera, that:

> As I mentioned to you, in light of the sensitive marketing issues involved in marketing such products, I think it makes more sense for the PICO to be marketed by Counterpoint Capital, LLC, an affiliated entity that we created early this year. This should help to insulate the product from our other activities.

61.    Upon information and belief, Beer and Veera created Delta for the same purpose

as Counterpoint—to market and execute PICO strategies. This separation was created to insulate

other Bricolage entities from the presumably foreseeable liabilities associated with the tax shelter

scheme.

62.    Defendants were involved in the creation of the PICO strategy and were

responsible for acting as custodian for each of the entities created to engage in the sham PICO

transactions, and as counter-parties to the Bricolage entities for the foreign currency straddles

involved in those transactions that Bricolage and Defendants marketed as the new PICO strategy

to the Leffs.

63.    Though the PICO transaction was similar to the COBRA transaction in that the

investor took long and short positions on foreign option contracts, the particulars of the

transactions were different. In PICO transactions, the investor[2] created an S corporation (as

opposed to the initial partnership that was created in COBRA transactions), which allowed for

even more advantageous tax treatment related to the closing of the books of an S corporation

upon transfer of shareholder interests.

64.    The investor and a Bricolage-affiliated party, acting as a straw-man, would

become shareholders in the S corporation. Counterpoint was designated as the investment

---

[2] Although participants in the PICO transactions are referred to as "investors" herein for convenience, as set forth elsewhere there was no real economic substance to the transactions involved in the PICO strategy.

manager and would acquire on behalf of the corporation a long and a short position in foreign option contracts. This was a "straddle" position, wherein offsetting positions are used so that the value of one position offsets the value of the other positions.

65.    Any profits on the contracts would belong to the shareholders, including the Bricolage traders and the investor, in proportion to their ownership interests. However, any profit was artificial because as currency fluctuates, one side of the straddle will generally be profitable and one side will be in a loss position.

66.    The investor would then make a loan to the S corporation in order to create basis in the corporation. The investment gains would be allocated to the Bricolage straw-man and the investor in accordance with their respective percentage interests in the S corporation. The new S corporation would execute an agreement with David Jay Diamond on behalf of Bricolage, Counterpoint, or Delta to manage and trade the forward contracts and would pay an initial fee to Bricolage or an affiliate. Also, Defendants were officially engaged at this point to hold the custodial account of the S corporation.

67.    After a ninety-day period, the investor would redeem the Bricolage affiliate's stock. At this point, the profitability of the corporation would be established. When this happened, the S corporation would choose to treat its taxable year as if there were two separate periods—the first period ending on the date of redemption and the second ending at the end of the calendar year. As a result, the unrealized losses on the long and short transaction, or straddle, would not be realized until the second period when the investor would then be the sole shareholder of the S corporation and losses could be claimed as the investor's ordinary loss to the extent of the basis in the S corporation. At the end of the calendar year, the investor could claim 100% of gross losses realized by the S corporation. Therefore, the investor would realize the

16

loss after the withdrawal of the Bricolage affiliate from the S corporation and would alone take advantage of the tax loss.

68.     The S corporation structure allowed this additional advantageous tax treatment. Under the Internal Revenue Code Section 1377(a)(2), if a shareholder of a S corporation terminates his interest during a taxable year, the remaining shareholders can choose to treat that taxable year as if there were two separate taxable years, the first of which ends on the date the shareholder terminated his interest.

69.     The investor could then contribute funds to the S corporation in order to provide a tax basis so that investment losses could be used by the investor. A unique aspect of the PICO transaction is that the remaining S corporation could continue indefinitely, or rather, until the death of the investor when the heirs would then be eligible under estate tax law to receive a stepped-up basis in the S corporation, wiping out the deferred capital gain, assuming tax law provisions provided for stepped-up tax basis to continue in effect. In most states, on the death of an S corporation shareholder, the shareholder's heirs will get a stepped-up in basis in the assets, bringing them to the fair market value of the stock as of the date of death so that if the heirs sell the assets of the S, the sale will be largely tax-free to the heirs.

70.     New law firms were also retained, including Proskauer, which later issued a form opinion letter to the Leffs regarding the PICO transactions. E&Y helped in seeking out the new law firms, and ensured that the firms would issue pre-arranged favorable opinions to those engaging in PICO transactions. The independent law firm opinion letter was a key focus in the marketing effort, as it could be used to convince the buyer that he or she would be protected against IRS penalties.

17

71.    Defendants and their coconspirators failed to disclose to the Leffs that the S corporation had no legitimate purpose other than as a medium for tax avoidance, and therefore the IRS would deem the losses generated within the S corporation as illegitimate tax shelter losses. The loans provided by the investor to the S corporation were needed only to establish artificial basis in the S corporation. The involvement of Bricolage affiliates or other Counterpoint straw-men, was merely to show a pattern of trading in foreign currency straddles to create the false picture of economic substance.

72.    Similar to the COBRA transaction, any profitability in the trading was artificial. The short and long positions in foreign currency transactions were used so that one position would end profitably while the other would result in a loss, thereby offsetting each other.

73.    Generally, any gain can be recorded by closing a profitable "side" of the straddle. The value of the unrealized loss can be locked in and avoid further risk by negotiating a termination payment or entering into another transaction. By investors repeatedly entering into these offsetting transactions, gains can be recorded (by closing the position) and losses may be left unrealized at will. As a result, the PICO strategy was controllable.

74.    To avoid the IRS claiming the straddles were offsetting or mirror positions, Defendants and their coconspirators would buy the forward contracts with only slightly varied duration and strike price. This was similar to the strategy used in the COBRA transactions. Therefore, as with COBRA, there was no true likelihood that the trading would be profitable, particularly given the immense transaction fees.

75.    Marketing materials explained that Counterpoint would provide structuring advice, investment of portfolio, including investment management and advice, and direct the options trading.

18

76.    Deutsche Bank's responsibility was to execute trades and maintain accounts. Deutsche Bank was engaged to hold the custodial account for the S corporation. The Leffs were advised by Defendants and others that Defendants had a great deal of expertise in this area, were highly confident in the product, and would use their skill and experience in executing the trades. Defendants asserted that their skill and expertise would virtually assure that the Leffs would not lose money in the transactions, and that they had a chance of making substantial profits in them.

77.    The PICO transactions, similar to the COBRA transactions, were pre-packaged collaborations between Defendants and others. The fee structure was again based on a percentage of the tax losses suffered by the investor. Upon information and belief, Deutsche Bank received 1% (included within the total 2.5% fee paid to Bricolage) for acting as counter party in straddle. This fee structure deviated from the industry norm of charging by the hour or individual transaction, and instead charged billing contingent on desired outcome—in this case, the generation of the investor's loss.

78.    Defendants acted as counter-parties for Bricolage and its affiliates in the foreign currency transactions for PICO despite the fact that the transactions were merely paper transactions designed only to create the appearance of profits and losses even though there was no legitimate business purpose. Nonetheless, Defendants collected part of the enormous fees shared by the collaborating entities.

79.    Defendants knew or should have known that the offsetting transactions in the PICO transaction lacked economic substance. Defendants attempted to circumvent IRS rules by having Bricolage entities buy the contracts and vary them in duration and strike price. However, Defendant knew that engaging in numerous transactions would never be profitable due both to the small variations between the offsetting positions and to the transaction fees.

80.    Defendants and their coconspirators on the PICO transactions represented that, regardless of the securities chosen as the basis for the tax shelter, the probable outcome was an opportunity to make a profit on the investment at the conclusion of a minimal holding period. Contrary to this representation, upon information and belief, as Defendants were well aware, no one ever made a profit on theses transactions, after accounting for the fees and transaction costs.

## C.    The Marketing Programs

81.    Deutsche Bank recruited other entities to assist in marketing tax shelters generally, and COBRA and PICO specifically, to wealthy clients and others (in return for a substantial volume of tax preparation business and undisclosed fees). In turn, the other entities recruited others in marketing the tax shelters to other clients. As a result of these arrangements, Defendants, along with the other entities, generated millions of dollars.

### 1.    The Marketing Program for COBRA

82.    Jenkens, KPMG and Defendants entered into an arrangement for COBRA where each would receive a certain portion of the fee for each transaction sold. As described above, the fee to each of these Defendants was not based on an hourly rate or time spent; rather, the fee was based solely on "the size" of the transaction. Thus, Defendants had a motive to sell as many tax shelters as possible and to make them as large as possible, and they proceeded to do so.

83.    Jenkens prepared a standardized opinion letter opining as to the propriety of their tax shelters long before they and the other marketing participants engaged specific clients. The opinion letter was a computerized, "fill in the blanks" form that was used, with minor changes, for every tax shelter sold.

84.    Upon information and belief, Defendants made requests to Daugerdas to forward the Jenkens opinion letter to Defendants' lawyers, but Daugerdas did not agree because

Defendants were known as aggressive marketers and could have used the letter to market tax shelters independently.

85.    The group devised and implemented a sales strategy that focused on leveraging trust and confidence in a major law firm, an international bank, and the KPMG brand name to sell tax shelters to clients.

86.    The coconspirators identified the potential clients and set up meetings to discuss the tax shelters. The centerpiece of the presentation was that Jenkens would prepare an "independent" opinion letter confirming the propriety of the COBRA transaction, which would provide insurance against the imposition of penalties and the assessment of back taxes in the event of an audit. No one ever disclosed that (as the conspirators knew) Jenkens was a promoter of the tax shelter, and that its opinion was worthless for purposes of defeating the imposition of penalties or validating the legality of the shelter.

87.    Jenkens advised clients (on behalf of themselves and other participants in the scheme), including the Leffs, that the chance of an audit was minimal, and that there were safeguards, in addition to the fundamental legitimacy of the transactions, against any liability. *First*, they advised that it was highly unlikely that an IRS auditor would see through the complexity of the shelter structure. *Second*, they advised that the supposedly "independent" opinion letter would validate the legality of the shelter and prevent the imposition of accuracy-related penalties by the IRS.

88.    Indeed, Defendants affirmatively acted to avoid IRS questioning. For example, upon information and belief, Defendants agreed to change the title of the trade confirmation from "Foreign Exchange Link Swap" to "Foreign Exchange Digital Option," to allay concerns that a short option could not be treated as a contingent liability.

21

89.     Once Defendants and their cohorts convinced the clients to purchase the tax shelters, Jenkens produced a prefabricated, computer-generated and entirely worthless legal opinion confirming the propriety of its tax strategy as described above without disclosing that Jenkens was the promoter of the transaction.

## 2.     The Marketing Program for PICO

90.     Bricolage and Defendants also made similar presentations regarding the PICO transaction as those made regarding COBRA. The Bricolage presentation included an explanation of how the transactions would work, how a profit could be made, and how tax losses could be generated. Defendants' representatives were active participants in these presentations, including those to the Leffs. The presentation and marketing materials of PICO transactions consistently downplayed the risk of the investment while falsely underscoring the legitimacy of the transactions. Defendants' enormous expertise in the supposedly sophisticated trading strategy involved in PICO and its status as a large, respected international bank were major parts of the sales effort for PICO.

91.     Defendants failed to disclose that every step in a PICO transaction was open to IRS challenge. The S corporation's only purpose was tax avoidance and the loans to the corporation only functioned to create an artificial basis in the corporation. The involvement of the Bricolage affiliates as shareholders was only to establish a pattern of straddles and enforce the fiction of economic substance. Indeed, nearly every step of the transaction as well as the overall transaction was without the economic substance mandated by IRS rules.

92.     Proskauer was engaged to produce the prefabricated, computer-generated and entirely worthless legal opinion confirming the propriety of the tax strategy, equally as worthless as the Jenkens opinion on the COBRA transactions.

22

93.    Again, Defendants used this purportedly independent tax opinion to convince prospective investors that the tax shelter would be protected against IRS penalties. Proskauer was not only responsible for issuing the pre-arranged opinion but also formed the S corporation through which the PICO strategy was executed.

94.    Defendants also knew and failed to disclose that the PICO strategy, like the COBRA strategy, was controllable and that chances for anything other than insignificant profits from the trading strategies undertaken were non-existent.

95.    In light of the fact that both COBRA and PICO were exceedingly complex investment and tax strategies, investors, such as the Leffs, presented with such marketing programs run by respected investment, accounting, and law firms, relied on the representations and promises of the firms.

96.    Upon information and belief, all of the marketing partners knew that the underlying tax strategy was invalid. For example, Deutsche Bank obtained opinions from prominent New York law firms that discredited the plan while internal memoranda at E&Y questioned the validity of the shelters. Nonetheless, the participants in the marketing scheme, motivated by the huge fees that the tax shelters promised to yield, sold the shelters to unsuspecting members of the public.

97.    Defendants knew, recklessly ignored, or should have known that the sole purpose of both the COBRA and PICO strategies was to produce artificial tax losses where there was no legitimate business purpose or economic substance.

**D.    Plaintiffs Engage in the COBRA Transactions**

98.    Beginning in 1998, the Leffs were approached by Mark Klopfenstein ("Klopfenstein"), a financial advisor in Atlanta, and President of InterStar Capital Group, LLC, a

23

Georgia limited liability company (who was not an attorney). Unbeknownst to the Leffs, Mark Klopfenstein was a marketing participant in the COBRA scheme involving options for U.S. Treasuries and had an undisclosed fee-splitting agreement with Daugerdas and his previous law firm, Altheimer & Gray, whereby Altheimer & Gray paid Klopfenstein a percentage of any fee paid to the firm by clients who he referred. After a series of meetings and other discussions, the Leffs were convinced into engaging in a series of transactions that resulted in tax losses for the 1998 tax year.

99.    In the midst of those 1998 transactions, Paul Daugerdas and Donna Guerin left Altheimer & Gray and joined the tax department at Jenkens in Chicago.

100.    Armed with the knowledge that the Leffs expected substantial capital gains and/or income in 1999, Klopfenstein, Daugerdas and Jenkens maintained a relationship with the Leffs and commenced to introduce to them their newest tax shelter, this time the COBRA shelter.

101.    In a meeting between the Leffs, Daugerdas and Guerin in or around November 1999, Daugerdas and Guerin stated that the digital options transactions would function in much the same way as the 1998 transactions, with the same net effect.

102.    According to Daugerdas, the digital options transaction would involve the formation of a partnership that would engage in offsetting securities transactions. The 1999 transactions would be designed to offset the Leffs' capital gain and/or ordinary income through the creation of large capital and/or ordinary losses for tax purposes.

103.    Daugerdas and DB Alex. Brown further explained the steps and goals involved with the COBRA transaction,

- The basis of the Leffs' interest in the partnership would be increased for tax purposes by the purchase cost of the long positions, but it would not be decreased by the premium earned on the sale of the short positions; and

- Upon the contribution of the partnership interest to the S Corporation and the sale by the S Corporation of its assets, the S Corporation would realize large capital and/or ordinary losses that could be applied to either substantially reduce or eliminate the large capital gains and/or ordinary income realized by the Leffs in 1999, thus reducing or eliminating the Leffs' tax liability; and

- Depending on the exchange rate between the U.S. dollar and the foreign currencies involved in the options transactions, there was a reasonable chance of realizing a pre-tax gain upon the expiration of the options, although a pre-tax loss might also occur. However, both DB Alex. Brown and Daugerdas assured the Leffs that the tax benefits of the transactions far outweighed any losses that might be incurred as a result of the digital options transactions; and

- The transaction would be substantiated by an "independent" legal opinion from Jenkens that would attest to the legality and validity of the tax shelter, as well as to the legitimacy of the resulting capital and/or ordinary losses that the Leffs would claim on their tax returns. The Leffs would thus be protected from any attempt by the IRS to assess accuracy-related penalties against them.

104.   Daugerdas and Defendants again failed to mention that the Jenkens opinion was anything but independent and that, in fact, the tax shelter lacked economic substance entirely.

105.   Defendants also failed to disclose that, in implementing the COBRA transactions, Defendants and Jenkens would and did calculate the capital and ordinary losses that the Leffs needed and the positions (including the "strike prices" to be used) necessary to achieve the loss before the options were purchased. Thus, the digital options were neither open-market investments, nor were they covered by a specific group of assets (i.e., that the instruments were "private market" "naked options"). Indeed, Defendants never disclosed that the option contracts were merely contractual wagers with Defendants, and Defendants had the power to control the outcome of the wager by picking the particular spot rate it wished to use in order to determine whether the options were "in" or "out" "of the money." As a result, Defendants could disregard any spot rate that would result in the Leffs "winning" on the options. In addition, the contracts gave Defendants the sole discretion to establish the "bid" and "ask" prices on all purchases and sales of options contracts.

25

106.    Defendants also failed to inform the Leffs that, as a result of the foregoing, their realistic chance of making a profit on the digital option contracts, taking into account fees and costs, was virtually nonexistent.

107.    Unaware of the numerous undisclosed pitfalls of the transaction and based on Defendants' repeated assurances of the legitimacy of the transactions, in November 1999 the Leffs decided to engage in the COBRA transactions. In particular, the Leffs relied on Defendants' advice (including specific, tax-related representations by Kevin Lynch and other employees of DB Alex. Brown's Chicago office during telephone conversations in or around November 1999) and the representations and recommendations of Defendants during the initial presentations and thereafter.

108.    The Leffs again retained Jenkens to provide them with legal advice relating to the propriety and tax consequences of the transactions, and opened accounts with DB Alex. Brown to effectuate the purchase and sale of digital options.

109.    In December 1999, the Leffs, also based on the direction of and upon the advice of Defendants and their coconspirators, agreed to form partnerships, limited liability companies, and controlled corporations for the purpose of carrying out the transactions. Jenkens took all necessary steps for the formation of these entities.

110.    On December 3, 1999 a Leslie Leff-controlled entity, LJL Catherine Investments LLC, bought digital options through Deutsche Bank (the "Leslie Leff 1999 Transaction"). The long position had a payoff amount of $15,000,000, for which Mr. Leff paid a premium of $7,500,000. The short position generated a premium of $7,425,000, and a payoff amount of $14,850,000. The long position strike price was U.S. $.9763 per 1.0 Eurodollars; while the strike price of the short position was U.S. $.9761 per 1.0 Eurodollars.

26

111.    On December 6, 1999, LJL Catherine Investments LLC contributed the options to a partnership, as contributions to capital.  Leslie Leff then contributed cash and his interests in the Partnership to Leff Partners, as contributions to capital.

112.    On December 17, 1999, Leslie Leff's options positions were terminated.

113.    Pursuant to the directions of Defendants, Leslie Leff declared a resulting loss of some $15,000,000 on his federal and state income tax returns.

114.    On December 3, 1999, a Ronnie Leff-controlled entity, RHL Chapel Investments LLC, bought digital options through Deutsche Bank (the "Ronnie Leff 1999 Transaction").  The long position had a payoff amount of $15,000,000, for which Mr. Leff paid a premium of $7,500,000.  The short position generated a premium of $7,425,000, and a payoff amount of $14,850,000.  The long position strike price was U.S. $.9763 per 1.0 Eurodollars; while the strike price of the short position was U.S. $.9761 per 1.0 Eurodollars.

115.    On December 6, 1999, RHL Chapel Investments LLC contributed the options to a partnership as contributions to capital.  Ronnie Leff then contributed cash and his interests in the Partnership to RHL Chapel Partners, as contributions to capital.

116.    On December 17, 1999, Ronnie Leff's options positions were terminated.

117.    Pursuant to the directions of Defendants, Ronnie Leff declared a loss of some $15,000,000 on his federal and state income tax returns.

118.    The Leffs paid Defendants commissions for the COBRA transaction.  Defendants took their fees out of the accounts that the Leffs held with DB Alex. Brown without disclosure of the fee structure to the Leffs.  The general fee structure was approximately 3.4% that went directly to Jenkens who subsequently paid all other parties, including Defendants, from that amount.

27

119.    On or about January 31, 2000, well after the COBRA transactions were

completed, Jenkens sent the Leffs opinion letters regarding the propriety of the transactions. As

described above, the opinion letters were a critical component of the COBRA scheme, and all

Defendants were aware of their importance and their various deficiencies. The Leffs were still

under the mistaken belief that the opinion letters set forth the "independent" opinion of a major

law firm on the propriety of the tax strategy.

120.    In the opinion letters, Jenkens advised the Leffs that, among other things:

- The Leffs' limited liability companies would be treated as partnerships for Federal income tax purposes;

- Investing in the options and Treasury Notes would not be taxable and that the securities would be treated as separate instruments for federal income tax purposes;

- The Leffs' contributions of long positions to limited liability companies and partnerships would not result in a taxable gain or loss;

- The short position would not be a liability within the meaning of § 752 of the Internal Revenue Code of 1986, as amended (the "Code");

- The Leffs' basis in their interests in the respective partnerships, after the contribution of the long positions, would include the cost of the long positions, without adjustment for the short positions;

- The disposition of the securities would result in deductions against income for Plaintiffs during the tax year 1999;

- The step transaction, sham transaction, and economic substance doctrines—any one of which would eliminate the tax benefit to the transactions—would not apply to disallow the results of the transactions;

- Various Code sections (Sections707(a)(2)(B), 165(c), 465, 469 and 1092) that could disallow any tax benefit from the transactions would not apply to the transactions;

- Treasury Regulation section 1.701-2 would not apply to the transactions;

28

- Each of the various steps of the transaction was meaningful and imbued with non-tax considerations, and that the transaction was primarily motivated by a desire for profit; and

- The entire cost of the Leffs' long positions could be claimed as short-term capital loss and/or ordinary loss on the Leffs' income tax returns, after the various other steps of the transaction were executed.

121.    The Jenkens opinion letters failed to adequately disclose and/or discuss authority that was contrary to the legal conclusion they drew.  The opinion letters also failed adequately to disclose and/or discuss the likelihood that the IRS would impose accuracy-related penalties on the Leffs as a result of the tax shelter scheme. The opinions failed to disclose and discuss Jenkens' status as a promoter of the shelter, and that its opinion would be worthless for validating the transaction or resisting the imposition of accuracy-related penalties.

122.    The Jenkens opinions assumed the central issue related to the validity of the tax shelter; *i.e.*, whether a substantial business purpose existed for the transaction, and whether it had independent economic significance.

123.    Defendants conspired with Jenkens and participated, either directly or indirectly, in the creation and dissemination of the contents in the Jenkens' opinion letters.  Defendants also conspired with and participated in, either directly or indirectly, Jenkens, Daugerdas and others' efforts to solicit the Leffs and market the COBRA scheme to them.

## E.    Plaintiffs Engage in the PICO Transaction

124.    Concerned about the size of the fees that Daugerdas was charging and attracted by the prospect of working with a company with a smaller client base, better client service and professional affiliations with sophisticated organizations such as Defendants, in 2000 the Leffs looked into working with Bricolage.

29

125.    The Leffs were introduced to Andrew D. Beer, one of the individuals who controlled Bricolage, in or around April 2000, and Mr. Beer visited the Leffs' place of business in Philadelphia on or about April 18, 2000.

126.    Beer was aware that the Leffs had been represented by Mr. Daugerdas in connection with the COBRA strategy in the prior two years. He was also aware that Defendants had been a central participant in executing that strategy. As part of his "sales pitch" to the Leffs, Beer explained that Defendants' involvement was critically important to the PICO strategy he was proposing, in light of their knowledge and expertise in executed the proposed trading strategy. Moreover, Beer emphasized Defendants' status as one of the largest banks in the word to enhance the credibility of his proposed strategy. Beer also underscored the superiority of the PICO produce because each transaction was tailored to the specific investor.

127.    Beer's presentation impressed the Leffs, and they agreed to discuss the matter further. The Leffs subsequently met with Beer and his colleagues and representatives of Defendants at Defendants' New York offices, and at the Leffs' place of business in Philadelphia. At these meetings, Defendants made presentations explaining PICO and Defendants' role in the transaction, which was to execute what was represented to be a very sophisticated trading strategy. Materials regarding both Defendants and this strategy, produced by Defendants, were provided during the meetings, although the Leffs were told that they could not be given detailed written materials regarding PICO because of its supposedly highly confidential nature.

128.    During the presentations, Deutsche Bank representatives were the ones who described the execution of the trading strategy itself. Defendants represented that they were continually refining and improving their trading strategies, and that PICO was the result of those efforts, as well as Deutsche Bank's long experience in such trading, as to which it had world-

30

class expertise. Defendants' representatives asserted that they were very confident in the PICO strategy, which they had worked hard to develop. Beer and Defendants' representatives further noted that the Leffs had previous experience in dealing with them in connection with COBRA. Because the Leffs had only dealt with Defendants' Chicago office of DB Alex. Brown previously, one of their personnel from the Chicago office who had dealt with the Leffs on COBRA, Kevin Lynch, reached out to the Leffs to assure them that Defendants would continue to provide the same world-class financial service in connection with PICO that were provided in connection with COBRA. In essence, Lynch's involvement was intended to smooth the transition from Jenkins to Bricolage, and to encourage the Leffs to engage in the PICO transaction by assuring the Leffs that there would be a continuity of service as the result of Defendants' continued involvement.

129.    Throughout these meetings, Defendants and Beer continually emphasized Defendants' expertise, and its role as one of the premier financial institutions in the world to convince the Leffs that the PICO strategy was a legitimate trading strategy that could result in a substantial, actual gain, with very little risk, as well as providing substantial tax benefits.

130.    As a result of these efforts, the Leffs agreed to engage in the PICO strategy.

131.    On November 10, 2000, the Leffs entered into a Strategic Consulting Investment Advisory Agreement with Counterpoint and R. Leff, Inc. agreed to pay Counterpoint a fee of $50,000. The Leffs also entered into an Investment Management Agreement with Counterpoint the same day.

132.    Under Bricolage's and Defendants' direction, Ronnie Leff executed documentation he was provided and R. Leff, Inc. was created to facilitate the scheme. The original capital contributors were Mr. Chai, a principal of Counterpoint, and the Leffs. Mr. Chai

31

contributed 80% of the equity capital and in turn received 800 shares of Series B common stock, but did not receive voting rights. The Leffs contributed 20% of the equity capital in exchange for 200 shares of Series A common stock, which included voting rights. Acting on Bricolage's and Defendants' direction, R. Leff, Inc. and its shareholders elected to treat it as an S corporation.

133.    The Leffs were then instructed to loan funds to R. Leff, Inc. The aggregate principal amount of the loans equaled four times the value of all shares. Counterpoint loaned Mr. Chai some, but not all, of the funds used for the investment, and any income from foreign currency trading was used to pay the debt and if extra to divide between shareholders in proportion with interests.

134.    On December 19, 2000, Mr. Chai requested that his interest in the corporation be redeemed. Upon direction from Bricolage and Defendants, on December 20, 2000, Ronnie Leff as the sole director gave written consent to approve Mr. Chai's request and his interests were subsequently redeemed.

135.    On that same day, Counterpoint forwarded to the Leffs respective mark-to-market valuations indicating positions as of that date for the respective accounts (L. Leff, Inc. and R. Leff, Inc.) with Defendants in New York.

136.    Also in December 2000, the Leffs were instructed to enter into a consulting contract with Delta, a Counterpoint currency trading affiliate organized under Bricolage. Delta offered R. Leff, Inc. asset management services and ability to use Delta's trading services without additional charge for one year and a below-market fee for subsequent years, in return for a fee of $43,750 per quarter, for a period of eight quarters, totaling $350,000, which Delta requested in payment at a later date.

137.    At this point, Bricolage and Defendants began entering R. Leff, Inc. into straddle transactions in foreign currency.

138.    The agreement with Counterpoint was terminated on or about December 19, 2000 and the agreement with Delta was terminated on or about September 18, 2001.

139.    An identical process was undertaken in the creation of L. Leff, Inc. by Leslie Leff at the direction of Bricolage and Defendants and L. Leff, Inc. engaged in an identical transaction.

140.    Pursuant to the directions of Defendants, Ronnie Leff declared a foreign currency loss of $10,200,846 on his federal and state income tax returns (deducting the full amount on 2000 tax returns), while Leslie Leff declared a foreign currency loss of $10,200,846 on his federal and state income tax returns (deducting $9,884,850 on 2000 tax return due to at-risk limitations, carried forward $315,996 loss to 2001 and deducted the full amount carried forward on 2001 tax returns).

141.    The Leffs paid Defendants commissions for the PICO transaction.  Defendants took their fees out of the accounts that the Leffs held with Defendants without disclosure of the fee structure to the Leffs.  The general fee structure was approximately 2.5% that went directly to Bricolage who subsequently paid all other parties from that amount—upon information and belief Defendants received 1%, which was a portion of the 2.5% total fee.

142.    On or about August 1, 2001, well after the PICO transaction was completed, Proskauer sent the Leffs opinion letters regarding the propriety of the transactions.  As described above, the opinion letters were a critical component of the COBRA and PICO scheme, and all Defendants were aware of their importance and their various deficiencies.  The Leffs were still under the mistaken belief that the opinion letters set forth the "independent" opinion of a major law firm on the propriety of the tax strategy.

143.    In the opinion letters, Proskauer advised the Leffs that, among other things:

- R. Leff, Inc. / L. Leff, Inc. would be treated for Federal income tax purposes as S corporations;

- Neither the formation of either R. Leff, Inc. / L. Leff, Inc. nor the retirement or redemption of stock held by Mr. Chai, which would leave the Leffs in control of R. Leff, Inc. / L. Leff, Inc., would be treated as an acquisition made to evade or avoid tax under Section 269;

- Section 382 would not apply to limit the Leffs' use of built-in-losses, if any, realized by R. Leff, Inc. / L. Leff, Inc. after the Leffs assume full control of R. Leff, Inc. / L. Leff, Inc. ;

- The subchapter S loss limitation rules would not limit the Leffs' ability to take their share of the S corporations' losses as long as the Leffs have sufficient basis in R. Leff, Inc. / L. Leff, Inc. stock and basis in indebtedness owed by R. Leff, Inc. / L. Leff, Inc. to the Leffs. The Leffs' basis in stock and in indebtedness owed by the S corporation to the Leffs would be reduced, but not below zero, by the amount of losses allocated to the Leffs;

- Loan repayments made by R. Leff, Inc. / L. Leff, Inc. to the Leffs after the Leffs reduce basis in indebtedness from R. Leff, Inc. / L. Leff, Inc. would be treated as capital gains to the Leffs;

- Distributions made by R. Leff, Inc. / L. Leff, Inc. to the Leffs after they reduce their stock basis to zero would be taxable to the Leffs as capital gains.

- The passive activity loss rules would not limit the Leffs' ability to deduct their share of R. Leff, Inc.'s / L. Leff, Inc.'s losses.

- Gain or loss realized on the forward contracts would be ordinary gain or loss under Section 988.

- The Leffs' investment in the S corporations and its transactions in forward contracts would be regarded as undertaken for profit and not lacking in economic reality.

- Each forward contract would be accorded independent economic significance.

- The forward contract transactions would not be disregarded under the general "economic substance" doctrine.

- The forward contract transactions would not be disregarded under the "profit motive" tests applied to straddles.

144.    Proskauer's "ultimate conclusion" was that "it is more likely than not that, to the extent that there are losses from [the S corporations'] investment, the Leffs would be able to recognize and deduct such losses on Forward Contracts that are closed after the Leffs have sole ownership of [the S corporations]."

145.    Proskauer's opinions failed adequately to disclose and/or discuss authority that was contrary to the legal conclusion they drew. Proskauer's opinions also failed to adequately disclose and/or discuss the likelihood that the IRS would impose accuracy-related penalties on the Leffs as a result of the tax shelter scheme.

146.    Proskauer's opinions assumed (incorrectly) that the central issue related to the validity of the tax shelter; *i.e.*, whether a substantial business purpose existed for the transaction, and whether it had independent economic significance.

147.    Defendants conspired with Proskauer and participated, either directly or indirectly, in the creation and dissemination of the contents in the Proskauer opinion letter. Defendants also conspired with and participated in, either directly or indirectly, Bricolage, Proskauer and others' efforts to solicit the Leffs and market the PICO scheme to them.

**F.    IRS Notice 99-59**

148.    On December 27, 1999, just a few weeks after the Leffs entered into the COBRA transaction, but before the filing of Plaintiffs' tax returns, the IRS published IRS Notice 1999-59, entitled "Tax Avoidance Using Distribution of Encumbered Property." In this Notice, the IRS made it clear that tax shelters that lacked economic substance — such as COBRA and PICO — were not properly allowable for federal income tax purposes and would be challenged:

[t]he Internal Revenue Service and Treasury Department have become aware of certain types of transactions, as described below, that are being marketed to taxpayers for the purpose of generating tax losses. This notice is being issued to alert taxpayers and their representatives that the purported losses arising from such transactions are not properly allowable for federal income tax purposes.

\* \* \*

A loss is allowable as a deduction for federal income tax purposes only if it is bona fide and reflects actual economic consequences. An artificial loss lacking economic substance is not allowable. See *ACM Partnership v. Commissioner*, 157 F.3d 231, 252 (3d. Cir. 1998), *cert denied*, 119 S. Ct. 1251 (1999) ("Tax losses such as these . . . which do not correspond to any actual economic losses, do not constitute the type of 'bona fide' losses that are deductible under the Internal Revenue code and regulations."); *Scully v. United States*, 840 F.2d 478,486 (7th Cir. 1988) (to be deductible, a loss must be a "genuine economic loss"); *Shoenberg v. Commissioner*, 77 F.2d 446, 448 (8th Cir. 1935) (to be deductible, a loss must be "actual and real"); § 1.165-1(b) ("Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss.").

In the view of the Service and the Treasury Department, the arrangement described above (or any similar arrangement) does not produce an allowable loss. Through a series of contrived steps, taxpayers claimed tax losses for capital outlays that they have in fact recovered. Such artificial losses are not allowable for federal income tax purposes.

The purported tax benefits from these transactions may also be subject to challenge under other provisions of the Code and regulations, including but not limited to §§ 269, 301, 331, 446, 475, 482, 752, and 1001 of the Code.

Additionally, the Service may impose penalties on participants in these transactions or, as applicable, on persons who participate in the promotion or reporting of these transactions, including the accuracy-related penalty under § 6662, the return preparer penalty under § 6700, and the aiding and abetting penalty under § 6701.

149.    Despite the issuance of Notice 1999-59, the Jenkens "independent" opinion was never amended to discuss and analyze the effect and significance of the Notice on the Leffs' tax situation. Instead, Defendants and their coconspirators simply ignored this Notice.

150.    As a result of Notice 99-59, Defendants knew or should have known that the IRS would assert that the purported losses arising from both COBRA and PICO were improper and not allowable for tax purposes. Defendants and their coconspirators, however, intentionally did not disclose this information to the Leffs and, indeed, told them the opposite.

**G.    IRS Notice 2000-44**

151.    On August 11, 2000, the IRS published Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis", and concerned "transactions that purport to generate tax losses for taxpayers." Through Notice 2000-44, accountants and tax attorneys were informed that, based on long-established precedents, tax shelters, such as COBRA and PICO, were illegal. Although Notice 2000-44 was issued after Jenkens had issued its opinion letters and the Leffs had filed their 1999 tax returns, it was published before the opportunity to amend their tax returns had passed. Furthermore, it was issued before the Leffs entered into the PICO transactions.

152.    Notice 2000-44 described the transaction marketed by Defendants to the Leffs whereby a taxpayer purchases and sells offsetting securities or options, transfers the positions to a partnership, and claims that the basis in his partnership interest "is increased by the cost of the purchased call options but is not reduced under §752 as a result of the partnership's assumption of the taxpayer's obligation[.]"

153.    The IRS stated that "[t]he purported losses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating

basis in partnership interests) are not allowable as deductions for federal income tax purposes."
Defendants, however, ignored the IRS and this Notice to the detriment of the Leffs.

154.    Although IRS Notices 1999-59 and 2000-44 (the "Notices")—which made clear
that the tax shelters that Defendants sold to the Leffs were not legitimate—were published
subsequent to the issuance of the Jenkens opinion letter (and, in the case of IRS Notice 99-59,
was published only a few weeks after the Leffs' entered into the COBRA transactions, but before
the Leffs had filed their taxes), the Leffs never received amended opinions.

155.    Moreover, even though these releases did not directly address the PICO
transactions, their implication for the PICO transaction was clear: the IRS would not permit tax
losses resulting from the type of convoluted but economically meaningless transactions as was
involved in the PICO transactions.

156.    Thus, Defendants and their coconspirators knew or should have known as a result
of both Notices that the alleged losses from the Leffs' participation in COBRA and PICO
transactions was not allowable for tax purposes. But Defendants intentionally failed to mention,
discuss, and analyze the effect of the Notices. To the Leffs' detriment, Defendants either ignored
the clear implications of the Notices or intentionally misled and deceived the Leffs.

157.    Shortly after the IRS issued Notice 2000-44, Defendants distributed an internal
memorandum, dated September 15, 2000, instructing Defendants' employees against promoting
the type of tax shelters identified in Notice 2000-44, such as COBRA. Yet, despite the formal
internal memo and Notice 2000-44, Defendants' actual practice was to continue to promote,
market and execute tax shelters using digital options. Upon information and belief, Brubaker
sent Mayer at Jenkens various emails as late as November 2000 regarding individuals to which
Brubaker had promoted the tax shelter and the amount of capital and/or loss each individual

needed to shelter. More importantly, Defendants failed to inform the Leffs as to this internal memorandum.

## H.    Registration Requirements

158.    Beginning in 2001, the IRS required tax shelter promoters to obtain registration numbers for each tax shelters and register with the IRS as well as keep user lists and copies of promotional materials. Defendants designed COBRA and PICO and marketed the transactions to individuals to avoid IRS detection. Even though the IRS expanded the requirement to individuals in 2001, Defendants and Bricolage never registered the PICO strategy. Later in 2001, the IRS continued to identify disallowed transactions as "listed transactions." For example, the IRS issued Notice 2001-45, identifying a basis shifting tax shelter being marketed by KPMG to corporations.

159.    In June 2002, the IRS announced further disclosure requirements for individual taxpayers, partnerships and S corporations. Then on July 15, 2002, the IRS issued Notice 2002-50, where it announced that it would challenge any transaction in which an investor uses a foreign currency straddle, a tiered partnership structure, transitory partners and a permanent non-economic loss. This mirrors the PICO transactions, with the exception of the use of an S corporation as opposed to a tiered partnership.

160.    On or about August 21, 2002, Daugerdas called Jan Vyas, a representative of the Leffs, and advised of the increased IRS scrutiny but reassured that there was nothing to worry about because the focus was on J&G only. He assured Mr. Vyas that the Leffs had nothing to be concerned about.

**I.    PICO as "Listed Transaction"**

161.    On September 25, 2002, the IRS announced that it would challenge tax shelters with PICO-like strategies. Less than a month later, on October 15, 2002, the IRS announced again that it would challenge foreign currency straddle transactions and found that such straddle transactions using S corporations were "listed transactions."

162.    As a result, the IRS made it perfectly clear and known that it would challenge any tax return based on a PICO tax strategy.

163.    Upon information and belief, Defendant still failed to register the PICO transactions or advise the Leffs of the IRS announcements.

**J.    The Amnesty Programs**

164.    On December 21, 2001, the IRS announced a "Tax Amnesty Program" in Announcement 2002-2, that would have allowed Plaintiffs to avoid accuracy-related penalties. The State of Pennsylvania, where the Leffs reside, announced a similar program.

165.    The Tax Amnesty Program allowed taxpayers who voluntarily disclosed their involvement in tax shelter strategies, such as COBRA and PICO, to avoid liability for penalties for underpayment of taxes without conceding liability for back-taxes or interest.

166.    If the taxpayer voluntarily disclosed the tax shelter before April 23, 2002, the IRS would agree to waive the accuracy-related penalties for underpayment under Internal Revenue Code § 6662.

167.    The Tax Amnesty Program was an initiative aimed at using taxpayers to aid the IRS in identifying tax shelter promoters, such as Defendants, who had failed to properly register the tax shelters with the IRS.

168.    Defendants and their coconspirators advised the Leffs not to participate in the Tax Amnesty Programs. This failure resulted in Plaintiffs being subject to penalties at the federal and state levels, which would have been waived had the Leffs participated in the Amnesty Programs.

169.    Upon information and belief, individuals at Jenkens and at Defendants who had personally engaged in a tax shelter filed amended returns, most likely in order to avoid a penalty from the IRS. However, neither Jenkens nor Defendants advised their clients to do so. Therefore, individual employees at Jenkens and Defendants may have participated in the Amnesty Program that they advised their clients to disregard.

### K.    Plaintiffs Uncover The Fraud

170.    The Leffs were notified that their income tax returns had been selected for audit by the tax shelter unit of the IRS. The Leffs retained new tax counsel at considerable expense.

171.    Following this retention of new tax and legal advisors, the Leffs first discovered that Defendants had, among other things:

- Induced them to participate in a series of unregistered, abusive tax shelters that could succeed only if the IRS failed to discover the transaction; and

- Abused their fiduciary relationship with the Leffs by providing advice that they knew or should have known was incorrect and contradicted by established authority; and

- Exposed the Leffs to substantial additional tax liability, including interest and penalties, as a result of their failure to advise Plaintiffs to amend their tax returns, and their recommendation not to enter the Amnesty Program; and

- Caused the Leffs to pay a substantial amount of money in fees to Defendants for their false and fraudulent advice and to incur substantial additional costs and expenses for engaging in unnecessary transactions, and for retaining new tax and legal advisors to investigate and rectify the situation; and

- Caused the Leffs to forego other legitimate tax saving opportunities.

### L.    2003 Pronouncement by the IRS

172.    In June of 2003, the IRS restated the obvious with respect to Notice 99-59 and

2000-44 transactions by issuing temporary regulations retroactive to October 18, 1999. These

regulations, which dealt with the "Son of Boss" tax shelter that was very similar to Defendants'

COBRA shelter, confirmed the illegality of the tax shelters sold to Plaintiffs. In the companion

Office of Chief Counsel Notice ("OCC Notice"), the IRS stated that:

> (1) For written options assumed by partnerships after October
> 18, 1999, but before June 24, 2003, the Service will apply §
> 1.752-6T of the Income Tax Regulations to reduce the outside
> basis in the partnership of the taxpayer from whom the written
> call option was assumed.
>
> * * *
>
> (3) For an individual partner, the loss that a partner claims
> resulting from the artificial inflation of the partner's outside
> basis in a partnership used in a Son of Boss transaction may be
> disallowed under § 165(c)(2) because the partner lacked the
> requisite economic profit objective.
>
> (4) Under § 465(b)(4), taxpayers are not considered at risk for
> amounts invested in the economically offsetting option positions
> contributed to and assumed by a partnerships [sic] formed or
> availed of in connection with a Son of Boss transaction as such
> amounts are protected against loss.

173.    The Regulations provide that both option positions are taken into account in

determining the basis and thus little, if any, "extra" basis is created. 26 CFR § 1.752-6T.

174.    In the OCC Notice accompanying the regulations, the IRS also stated that it will

not be relying only upon the Regulations to invalidate the transactions, but also that the losses

generated by such transactions may be disallowed under §§ 165(c)(2) and 465(c)(4) of the Code.

175.    Jenkens opined in their opinion letters that § 165(c) was inapplicable to the

COBRA transaction. In the OCC Notice, the IRS stated:

> Losses claimed by individuals, other than casualty losses, are limited by §165(c) to (1) losses incurred in a trade or business and (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business.
>
> * * *
>
> The application of § 165(c) does not require a finding that the transaction lacks economic substance[.] If an individual invests in a Son of Boss transaction, any loss generated either through the disposition of the partnership interest or through the disposition of assets distributed to the individual in complete liquidation of the individual's partnership interest may be limited or denied under § 165(c)(2) because of the lack of an economic profit objective.

176.    As with Notice 2000-44, although the IRS named these transactions as "Son of Boss" in reference to a name given by another promoter, the description of the transaction makes it clear that the COBRA strategy is included.

177.    Finally, the IRS also stated (contrary to the opinion letters provided by Defendants) that the transaction may be set aside as violative of the partnership "anti-abuse" rules:

> Section 1.701-2(a), the partnership anti-abuse rule, provides in pertinent part that subchapter K is intended to permit taxpayers to conduct joint business (including investment) activities through a flexible economic arrangement without incurring an entity-level tax.
>
> * * *
>
> Accordingly, if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Service can recast the transaction for federal tax purposes, as appropriate to achieve tax results that are consistent with the intent of subchapter K in light of the applicable statutory and regulatory provisions and the pertinent facts and circumstances. Thus, even though the transaction may fall within the literal words of a particular statutory or regulatory

provision, the Service can determine, based on the particular facts and circumstances, that to achieve tax results that are consistent with the intent of subchapter K: (1) the purported partnership should be disregarded in whole or in part, and the partnership's assets and activities should be considered, in whole or in part, to be owned and conducted, respectively, by one or more of its purported partners; (2) one or more of the purported partners of the partnership should not be treated as a partner; (3) the methods of accounting used by the partnership or a partner should be adjusted to reflect clearly the partnership's or the partner's income; (4) the partnership's items of income, gain, loss, deduction or credit should be reallocated; or (5) the claimed tax treatment should otherwise be adjusted or modified . . . [if] the requirement that each partnership transaction or series of related transactions be entered into with a substantial business purposes is not met.

\* \* \*

Although establishment of substantial business purpose is a fact specific inquiry, the reasonably expected pre-tax profit from both the economically offsetting option positions and the investment transactions is minimal when compared to the purported reduction in tax liability achieved through the Son of Boss transaction.

## M.    Injury To Plaintiffs

178.    The Leffs incurred a significant amount of damages as a result of the COBRA and PICO transactions, including but not limited to the following.

179.    Ronnie Leff paid fees for the transactions and related tax returns of more than $500,000.

180.    Leslie Leff paid fees for the transactions and related tax returns of more than $500,000.

181.    The Leffs paid attorneys and accountants significant fees in connection with rectifying the wrongs that have been perpetrated against them and addressing the Federal and State audits.

44

182.    Plaintiffs have incurred costs for penalties and interest to the IRS and State tax offices. The total penalties and interest paid were $4,954,717.

183.    Plaintiffs contracted with Defendants for services generating a legitimate net, after-tax benefit. Said tax benefit was never delivered by Defendants. The exact value of the tax benefit has not been calculated, but is believed to be at least $11 million.

## COUNT I

### Breach of Fiduciary Duty and
### Aiding and Abetting Breach of Fiduciary Duty

184.    Plaintiffs reallege and reassert the foregoing paragraphs 1-183 as if fully set forth herein in this Count I.

185.    Defendants, as the Leffs' financial advisors, were the Leffs' fiduciaries, and thus owed Plaintiffs the duties of honesty, loyalty and care. Jenkens, Daugerdas, and Bricolage and its principals were likewise fiduciaries of the Leffs.

186.    Defendants breached their fiduciary duties to the Leffs by advising them to engage in the COBRA and PICO transactions and to sign and file the tax returns prepared in reliance on Defendants' advice, representations, recommendations, instructions, and opinions, which Defendants knew or should have known to be improper and illegal, for the purpose of generating fees for Defendants.

187.    In breach of and blatant disregard for their fiduciary duties to the Leffs, Defendants took advantage of a relationship of trust and confidence and used their knowledge of the Leffs' finances to solicit the Leffs and recommend tax shelters that they knew or should have known were illegal and improper and that would be disallowed and held invalid by the IRS on the grounds that the transactions lacked economic substance, had no business purpose, were "sham transactions", and violated the step transaction, sham transaction, and economic substance

doctrines. Defendants further aided and abetted Jenkens', Daugerdas', and Bricolage's breaches of fiduciary duty in this regard, as described above.

188.    As detailed above, Defendants further breached their fiduciary duties to the Leffs by failing to inform them of relevant IRS Notices, publications and other rules, regulations and laws that directly called into question the viability and legality of the COBRA and PICO transactions. Defendants further failed to revise, alter, amend or modify their advice regarding the propriety of the transactions in light of IRS Notice 2000-44. In addition, Defendants failed to recommend and advise the Leffs to enroll in the Amnesty Programs to prevent the imposition of penalties and interest by the IRS. Defendants further aided and abetted Jenkens', Daugerdas', and Bricolage's breaches of fiduciary duty in this regard, as described above.

189.    The misrepresentations, omissions, suppressions, concealment and otherwise improper conduct of Defendants, as described herein, were willfully carried out with reckless indifference to the rights of Plaintiffs and solely to secure egregious business profits and gain, and with wanton and blatant disregard of the rights of Plaintiffs, thereby warranting substantial punitive damages to be assessed against Defendants.

190.    As a direct and proximate result of the foregoing misrepresentations, acts and omissions, Plaintiffs have suffered injury in that (1) they paid Defendants hundreds of thousands of dollars in unnecessary fees, (2) they purchased unnecessary investments to effectuate the transaction, (3) have incurred tax penalties and interest, (4) they have incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation, (5) they never received the tax benefits for which they contracted and made payment, and (6) they have foregone legitimate tax savings opportunities.

## COUNT II

### Negligent Misrepresentation

191.    Plaintiffs reallege and reassert the foregoing paragraphs 1-190 as if fully set forth herein in this Count II.

192.    As Plaintiffs' financial advisors, Defendants owed Plaintiffs duties of care, loyalty and honesty, and a duty to comply with the applicable standards of care. Defendants also had a duty to the Leffs to meet the applicable standard of care for financial advisors and brokers. Defendants failed to meet those applicable standards of care. Defendants' failure to meet the standard of care caused damages to the Leffs as set forth elsewhere in this Complaint.

193.    Defendants made numerous knowingly or negligently false affirmative representations, and intentional or negligently misleading omissions of material fact, and gave directly and/or endorsed Jenkens' and Bricolage's numerous recommendations, advice, instructions, and opinions to the Leffs that, among other things:

(i)    the tax savings of the transactions to the Leffs would be significant and would far outweigh the amount of fees and costs incurred by the Leffs as well as any potential loss that might be incurred on the short sales;

(ii)    the disposition of the digital options or forward contracts (or any other stocks, bonds, or foreign currency utilized in the transactions) would result in capital loss and/or ordinary loss;

(iii)    the capital and/or ordinary losses created by the transactions were legitimate, proper, and in accordance with all applicable tax laws, rules and regulations;

(iv)    the design of the offsetting digital options and currency transactions made economic and investment sense and had business purpose and economic substance;

(v)    the Leffs had an opportunity to make a profit on the transactions when, in fact, it was virtually impossible to make a profit taking into account the fees, costs, and the fact that Defendants controlled the outcome of the results to ensure that the Leffs did not make money;

(vi)     various legal doctrines such as the step transaction, sham transaction and economic substance doctrines, as well as Treasury Regulation Section 1.701-2, would not apply to disallow the results of the transactions;

(vii)    the Jenkens and Proskauer opinions were independent opinions that would satisfy the IRS as to the propriety of the transactions if audited;

(viii)   despite the issuance of IRS Notices 99-59 and 2000-44, the COBRA and PICO transactions were valid and proper;

(ix)     Treasury Regulation Section 1.701-2 would not apply to the COBRA and PICO transactions and that the short foreign currency option positions would not be a liability within the meaning of Section 752 of the Internal Revenue Code of 1986;

(x)      the Leffs' tax returns, which utilized the capital and/or ordinary losses generated by the transactions, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities; and

(xi)     the Leffs did not need to enroll in the Amnesty Programs offered by the IRS in order to prevent the assessment of penalties and interest.

194.     The above representations are material because they specifically relate to the logistics, appropriateness, and most importantly, the legality of the COBRA and PICO transactions.

195.     Defendants omissions, including but not limited to failing to advise that the law firm opinion letters would not effectively confirm the propriety of the transaction, failing to disclose that Defendants were colluding with other entities and persons to market and sell illegal tax shelters for the purpose of collecting excessive fees from the Leffs, and failing to disclose IRS Notices and legal doctrines that showed that the transactions would not withstand scrutiny by the IRS or other legal bodies, constituted intentionally or negligently misleading omissions of material fact.

196.  Defendants either knew or should have known with the exercise of due care that their representations, recommendations, advice, instructions, opinions and/or endorsement of Jenkens' and Bricolage's representations, recommendations, advice, instructions and opinions were false. In addition, the rendering of such representations, recommendations, advice, instructions and opinions, as well as the failure to advise the Leffs of the omissions set forth above, was negligent and in breach of Defendants' duty of care to the Leffs. Accordingly, Defendants failed to exercise the standard of care required of them.

197.  Defendants' false representations, recommendations, advice, instructions, opinions, and omissions intended to induce the Leffs into executing the contract and carrying out their obligations.

198.  In reasonable reliance on Defendants' advice regarding the transactions, Plaintiffs paid excessive fees to Defendants and their coconspirators for advice and to execute the transactions, purchased unnecessary investments to effectuate the transactions, did not avail themselves of legitimate tax savings opportunities, filed federal and state tax returns that reflected deductions for capital and/or ordinary losses resulting from the transactions, did not file amended returns, did not enter the Amnesty Program, and did not take advantage of other legitimate tax savings opportunities.

199.  But for Defendants failure to meet the applicable standard of care and the intentional and/or negligent misrepresentations and material omissions described above, Plaintiffs would never have hired Defendants for advice on the strategy, engaged in the transactions, purchased unnecessary investments to effectuate the transactions, filed Federal and State tax returns that reflected deductions for capital and/or ordinary losses resulting from the

transactions, failed to file amended returns, failed to enroll in the Amnesty Programs, and/or
failed to avail themselves of other legitimate tax savings opportunities.

200.    As a result of Defendants misrepresentations and/or endorsements of Jenkens' and
Bricolage's misrepresentations, the Leffs incurred substantial additional costs in hiring new tax
and legal advisors to rectify the situation.

201.    Defendants' conduct set forth above proximately caused injury and damages to
Plaintiffs in that (1) they paid Defendants and their coconspirators excessive fees, (2) they
purchased unnecessary investments to effectuate the transactions, (3) they have incurred tax
penalties and interest, (4) they have incurred substantial additional costs in hiring new tax and
legal advisors to rectify the situation, (5) they never received the financial benefits for which
they contracted and paid, and (6) they have foregone legitimate tax savings opportunities.

## COUNT III

### Violations of the Illinois Consumer Fraud and
### Deceptive Business Practices Act, 815 ILCS § 505 *et seq.*

202.    Plaintiffs reallege and reassert the foregoing paragraphs 1-201 as if fully set forth
herein in this Count III.

203.    Defendants, Jenkens and Bricolage held themselves out as businesses where
consumers can seek tax services, financial planning, financial portfolio management and other
services related thereto and their misrepresentations, omissions, suppressions, concealments and
deceptions in marketing their services to the public occurred in the course of trade or commerce
and involve consumer protection concerns.

204.    The misrepresentations, omissions, suppressions, concealments and deceptions
made by Defendants constitute consumer fraud and unfair and deceptive trade practices within
the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815

ILCS §505, *et seq.* Moreover, Defendants' actions described above aided and abetted Jenkens'

and Bricolage's violations thereof.

205.    Defendants intended for the Leffs to rely on their misrepresentations, and made

them to induce the Leffs to enter into the transactions.

206.    The omissions, suppressions and concealments included, among other actions

detailed herein:

- The secret payment and receipt of referral fees;

- The representation that the law firm opinion letters were independent opinions that
  would confirm the propriety of the transactions;

- The failure to disclose that Defendants were colluding with other entities and persons,
  including Jenkens, Daugerdas and Bricolage to market and sell illegal tax shelters for
  the purpose of collecting excessive fees from the Leffs;

- The failure to disclose IRS Notices and legal doctrines that showed that the
  transactions would not withstand scrutiny by the IRS or other legal bodies.

207.    The foregoing omissions, suppressions, concealments and deceptions constitute

material unfair and deceptive practices occurring in the course of conduct involving trade or

commerce and were made to induce the Leffs to engage in the transactions. In reliance on these

material misrepresentations and omissions, the Leffs entered into the transactions. Had the Leffs

known the truth about these misrepresentations, they would not have entered into the

transactions. Therefore, Defendants and their coconspirators caused the Leffs to be deceived

through the various misrepresentations, omissions, suppressions and concealments.

208.    The relief requested herein is in the best interest of all consumers to deter

Defendants, and/or those persons or entities acting in concert with them from engaging in

conduct similar to that alleged fraudulent in this Complaint.

209.    As a result of Defendants' conduct set forth herein, the Leffs have suffered actual damages in that (1) they paid Defendants hundreds of thousands of dollars in fees, (2) they purchased unnecessary investments to effectuate the transactions, (3) they incurred tax penalties and interest, (4) they have and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation, (5) they never received the tax benefits for which they contracted and made payment, and (6) they have foregone legitimate tax savings opportunities.

## COUNT IV

## Fraud, Aiding and Abetting Fraud, and Conspiracy to Defraud

210.    Plaintiffs reallege and reassert the foregoing paragraphs 1-209 as if fully set forth herein in this Count IV.

211.    Defendants took advantage of a relationship of trust and confidence and used their knowledge of the Leffs' finances to solicit, recommend and ultimately implement for the Leffs what were promoted to be legal tax advantaged transactions.

212.    As set forth in detail above, to induce the Leffs to pay Defendants excessive fees, Defendants, Jenkens and Bricolage made numerous knowingly false affirmative representations and intentional omissions of material facts to the Leffs.

213.    Despite Defendants' and their coconspirators' knowledge of, among other things, IRS Notices and Regulations along with well-established legal precedent, Defendants, Jenkens and Bricolage misrepresented that the tax shelters that they were marketing to the Leffs would withstand scrutiny by the IRS should they be audited.

214.    In perpetuating this misrepresentation, Defendants and their coconspirators knowingly made and/or endorsed the affirmative and false representations to the Leffs that, among other things:

- the tax savings of the transactions to the Leffs would be significant and would far outweigh the amount of fees and costs incurred by the Leffs as well as any potential loss that might be incurred on the short sales;

- the foreign currency transactions would result in capital loss and/or ordinary loss;

- the capital and/or ordinary losses created by the transactions were legitimate, proper, and in accordance with all applicable tax laws, rules and regulations;

- the design of the currency transactions made economic and investment sense and had business purpose and economic substance;

- the Leffs had an opportunity to make a profit on the transactions when, in fact, it was virtually impossible to make a profit taking into account the fees, costs, and the fact that Defendants controlled the outcome of the results to ensure that the Leffs did not make money;

- various legal doctrines such as the step transaction, sham transaction and economic substance doctrines, as well as Treasury Regulation Section 1.701-2, would not apply to disallow the results of the transactions;

- the law firm opinion letters were independent opinions that would satisfy the IRS as to the propriety of the transactions if audited;

- despite the issuance of IRS Notices 99-59 and 2000-44, the transactions were valid and proper;

- the Leffs should not enroll in the Amnesty Programs offered by the IRS.

215.    The above representations and omissions are material because they specifically relate to the logistics, appropriateness, and most importantly, the legality of the transaction.

216.    The affirmative representations made and/or endorsed by Defendants were false when made and Defendants knew or should have known these representations to be false when made, or acted in reckless disregard of the truth or falsity of the representations.

217.     These false representations, recommendations, advice, instructions, opinions, and omissions were intended to induce the Leffs into engaging in the COBRA and PICO transactions.

218.     The Leffs relied upon and were induced by the foregoing misrepresentations, as well as Defendants' and their coconspirators' omissions, suppressions and concealments described herein, to enter into the COBRA and PICO transactions and pay hundreds of thousands of dollars in fees for what they perceived to be competent and sound tax and financial advice.

219.     The Leffs exercised all due diligence and reasonably relied on the foregoing false affirmative representations and intentional omissions, suppressions and concealment of material facts regarding the tax shelter transactions. In consequence of their reasonable reliance, the Leffs paid excessive fees to Defendants for tax and financial advice, to execute the transaction, and to purchase unnecessary investments to effectuate the transaction. Moreover, they refrained from entering the Amnesty Program, did not avail themselves of legitimate tax savings opportunities, and did not amend their tax returns.

220.     But for Defendants intentional misrepresentations and material omissions described herein, the Leffs would never have, among other things, hired Defendants for advice on the strategy, engaged in the COBRA and PICO transactions, claimed the purportedly resulting capital and/or ordinary losses on their income tax returns, filed and signed their tax returns as prepared, failed to amend their tax returns, failed to enter the Amnesty Program, and/or failed to avail themselves of legitimate tax savings opportunities.

221.     As more fully set forth above, Defendants knowingly conspired with Jenkens, Daugerdas and Bricolage to: (1) obtain money by means of false pretenses, representations or promises; (2) defraud Plaintiffs and implement fraudulent and illegal tax shelter transactions; and

(3) violate the Illinois Consumer Fraud and Deceptive Trade Practices Act in promoting the transaction. In doing so, Defendants acted in concert with each other and in furtherance of the conspiracy when they promoted the transactions that were deceptively designed to give the false impression that a complex series of financial transactions were legitimate business transactions which had economic substance, when they in fact lacked the features which were necessary for a successful and legally recognized tax strategy.

222.    Jenkens, Bricolage, and Defendants acted in the respective roles as described above according to a predetermined and commonly understood and accepted plan of action, all for the purposes of obtaining excessive fees from consumers, including Plaintiffs.

223.    As a result of Jenkens', Bricolage's, and Defendants' conduct set forth herein, the Leffs have suffered actual damages in that (1) they paid Defendants hundreds of thousands of dollars in fees, (2) they purchased unnecessary investments to effectuate the transactions, (3) they incurred tax penalties and interest, (4) they have and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation, (5) they never received the tax benefits for which they contracted and made payment, and (6) they have foregone legitimate tax savings opportunities.

224.    The misrepresentations, omissions, non-disclosure and otherwise improper conduct of Defendants, as described herein, were willfully carried out with reckless indifference to and wanton and blatant disregard for the rights of the Leffs, thereby warranting substantial punitive damages to be assessed against Defendants.

## COUNT V

### **Breach of Contract**

225.    Plaintiffs reallege and reassert the foregoing paragraphs 1-224 as if fully set forth herein in this Count V.

226.    Plaintiffs' agreements with Defendants and their coconspirators, taken together, constitute valid and enforceable contracts whereby Defendants agreed to deliver legitimate financial services, including tax benefits, to the Leffs.

227.    Plaintiffs paid all fees and fully performed all requirements of this agreement.

228.    Defendants promised to deliver certain benefits to Plaintiffs, but failed to deliver thebenefits promised and for which they were paid.

229.    Defendants owed Plaintiffs a duty of good faith and fair dealing.  Defendants breached their agreements with the Leffs, and their duty of good faith and fair dealing, by, among other things: failing to disclose the true likelihood that the COBRA and PICO transactions would not result in a gain; failing to disclose that Defendants retained virtually unlimited discretion to determine whether the COBRA and PICO transactions would result in a gain, and therefore could ensure that the foreign currency options contract would not result in a gain; failing to disclose that the COBRA and PICO transactions were not an open-market transaction; failing to disclose that Defendants knew through their own research that the schemes they were promoting had no legal merit, and/or failing to apprise the Leffs that the COBRA and PICO transactions they were purchasing and selling had no reasonable possibility of a profit, net of all fees and costs.

230.    The aforesaid misrepresentations, omissions, suppressions and concealments by Defendants were willfully carried out with reckless indifference to the rights of the Leffs and

solely to secure egregious business profits and gain, thereby warranting substantial punitive damages to be assessed against Defendants.

231.    By reason of the foregoing acts and conduct, Plaintiffs are entitled to recover from these Defendants all actual damages sustained by them as a result of the acts alleged above, plus consequential damages, punitive damages in accordance with the evidence, interest, costs, and reasonable attorneys' fees.

## COUNT VI

### Negligence

232.    Plaintiffs reallege and reassert the foregoing paragraphs 1-231 as if fully set forth herein in this Count VI.

233.    Defendants, as the Leffs' financial advisors owed the Leffs the duties of due care.

234.    Defendants breached their duties to the Leffs by negligently advising them to engage in the COBRA and PICO transactions and to sign and file the tax returns prepared in reliance on Defendants' advice, representations, recommendations, instructions, and opinions, which Defendants knew or should have known to be improper and illegal, for the purposes of generating fees for Defendants.

235.    Defendants recommended tax shelters to the Leffs that they knew or should have known, and unknown to the Leffs, were illegal and improper and that would be disallowed and held invalid by the IRS on the grounds that the transactions lacked economic substance, had no business purpose, were "sham transactions", and violated the step transaction, sham transaction and economic substance doctrines.

236.    As detailed herein, Defendants further breached their duties to the Leffs by negligently failing to inform them of relevant IRS Notices, publications and other rules,

regulations and laws that directly called into question the viability and legality of the COBRA and PICO transactions. Defendants further negligently failed to revise, alter, amend or modify their advice regarding the propriety of the transactions in light of the various IRS Notices listed above. In addition, Defendants negligently failed to recommend and advise the Leffs to enroll in the Amnesty Program to prevent the imposition of penalties and interest by the IRS.

237.    As a direct and proximate result of the foregoing misrepresentations, acts and omissions, the Leffs have suffered injury in that (1) they paid Defendants and their coconspirators hundreds of thousands of dollars in unnecessary fees, (2) they purchased unnecessary investments to effectuate the transaction, (3) they have incurred tax penalties and interest, (4) they have incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation, (5) they never received the financial benefits for which they contracted and paid, and (6) they have foregone legitimate tax savings opportunities.

## PRAYERS FOR RELIEF

238.    WHEREFORE, Plaintiffs respectfully pray for judgment against Defendants, as

follows: (a) awarding Plaintiffs compensatory and punitive damages to the extent permitted by

law, including interest; (b) awarding Plaintiffs their costs and expenses incurred in this action,

including reasonable attorney's and expert's fees and other costs and disbursements; and (c) such

other and further relief as the Court may deem just and proper.


## JURY TRIAL DEMANDED

239.    Plaintiffs hereby demand a trial by jury on all claims triable by jury

Dated:  February 1, 2008



Respectfully submitted,


Patrick J. O'Brien
O'Brien & O'Brien, P.C.
55 W. Wacker Drive, Suite 900
Chicago, Illinois 60601
Attorneys for the Plaintiffs
ARDC # 2081946

David S. Pegno
Dewey Pegno & Kramarsky LLP
220 East 42nd Street
New York, NY 10017
Attorneys for Plaintiffs