# EXHIBIT 1

DEC-08-1999  15:07      ACCUCORP ADMIN                    215 671 8296   P.17

JENKE & GILCHRIST                                          P.17/19

3 December, 1999

Foreign Exchange Digital Option Transaction
Our ref: 6x28371A

LJL CATHERINE INVESTMENTS LLC                    Deusche Bank AG New York Branch
Care of Kevin Lynch                               31 West 52nd Street
DB Alex Brown                                     New York NY 10919
222 W. Adams's Suite 1900
Chicago, IL 60606                                 Telephone: 212-474-8000
312-424-6020                                      Fax: 212-474-8580
                                                  Swift: DEUT US 33

Ladies and Gentleman:

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option Transaction entered into between us ("Party A") and you ("Party B") on the Trade Date referred to below (the "Transaction"). The parties acknowledge and agree that B.T. Alex Brown has acted as introducing broker to Party A with respect to this Transaction. The Transaction consists of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii) and Section 4. Certain definitions and provisions which are applicable to more than one element of the Transaction are detailed in Section 1. The terms of the Transaction to which this Confirmation relates are as follows:

1. Section 1 – General Terms

| | |
|---|---|
| Notional Amount: | USD 15,000,000 |
| Trade Date: | 03rd December 1999 |
| Termination Date: | 17th December 1999, subject to modification in accordance with the Following Business Day Convention. |
| Business Days: | In New York |
| Calculation Agent: | Party A |
| Currency Pair: | EUR/USD |

2. Section 1 – First Digital Option Transaction

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | Zero |
| Party B Initial Exchange Amount: | USD 7,500,000 |
| Initial Exchange Date: | 07th December 1999, subject to adjustment in accordance with the Following Business Day Convention. |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | USD 15,000,000 |
| Party B Final Exchange Amount: | Zero |
| First Range Level: | USD .9763 per EUR 1.0000 |
| First Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 21st December 1999, subject to adjustment in accordance with the Following Business Day Convention. |

(A) If the Spot Rate is, on the First Rate Determination Date at 10:00 a.m. local time in New York, less than or equal to the First Range Level (such event being a "First Digital Option Trigger Event"), then upon the occurrence of such First Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a First Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of the First Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the First Digital Option Trigger Event and provide details of the occurrence of such First Digital Option Trigger Event. A failure to give such notice shall not, however, prejudice the occurrence of the First Digital Option Trigger Event.

digconf

DEC 07 1999 12:15                              212 469 8888        PAGE.02

**(i) Initial Exchange Provisions:**

Party A Initial Exchange Amount        USD 7,425,000
Party B Initial Exchange Amount        Zero
Initial Exchange Date:                 07th December 1999, subject to adjustment in accordance with the
                                       Following Business Day Convention


**(ii) Final Exchange Provisions:**

Party A Final Exchange Amount:         Zero
Party B Final Exchange Amount:         USD 14,850,000
Second Range Level:                    USD .5761 per EUR 1.0000
Second Rate Determination Date:        Means the Termination Date
Final Exchange Date:                   21st December 1999, subject to adjustment in accordance with the
                                       Following Business Day Convention


(A) If the Spot Rate is, on the Second Rate Determination Date at 10:00 a.m. local time in New York, less than or equal to the Second Range Level (such event being a "Second Digital Option Trigger Event"), then upon the occurrence of such Second Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a Second Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of a Second Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Second Digital Option Trigger Event and provide details of the occurrence of such Second Digital Option Trigger Event. A failure to give such notice shall not however prejudice the occurrence of the Second Digital Option Trigger Event.


## Section 2 - Other Provisions

(i) For the purposes of this Transaction only, the following provision shall apply:

"Subparagraph (iii) of Section 2 (c) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.

(ii)        Offices:

        (a)    The Office of Party A for the Transaction is New York; and
        (b)    The Office of Party B for the Transaction is Delaware.


**3.    Representations:**

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)    Non-Reliance.  It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

DEC-08-1999  15:08        ACCUCORP ADMIN                215 671 0256     P.20

through independent professional advice), and understands ~~ ~~ ~~
Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)  **Status of Parties.**  The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

**4.    ISDA Agreement**

If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement") then this Confirmation supplements forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement referring to this Confirmation (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S. Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements" and (ii) incorporating any other modifications to the ISDA form specified below.

**5.    Definitions:**

The definitions and provisions contained in the 1991 ISDA Definitions (as amended by the 1997 Supplement) as published by the International Swaps and Derivatives Association, Inc (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions (the "FX Definitions") as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions", and together with the Swap Definitions, the "Definitions", are incorporated into this Confirmation. In the event of any inconsistency between either set of Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between the Swap Definitions and this Confirmation, this Confirmation will govern.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
Deutsche Bank AG, New York

By: _____
Name:  Jeanette Michaels
Title:  AVP

By: _____
Name:  Perry Parker
Title:  Director

Confirmed as of the date first above written.
LJL CATHERINE INVESTMENTS LLC

By: X _____
Name:    LESLIE J. WEFF
Authorised Signatory

By: _____
Name:
Authorised Signatory

For any query relating to this Confirmation please contact : 212-469-4033

digenf

212 469 8888          PAGE.04

DEC 27 1999 12:16

# Deutsche Bank AG New York Branch



3 December, 1999

**Foreign Exchange Digital Option Transaction**
Our ref: ex28371A

LJL CATHERINE INVESTMENTS LLC
Care of Kevin Lynch
DB Alex Brown
222 W. Adams's Suite 1900
Chicago, IL. 60606
312-424-6020

Deutsche Bank AG New York Branch
31 West 52nd Street
New York NY 10019

Telephone: 212-474-8000
Fax: 212-474-8560
Swift: DEUT US 33

Ladies and Gentlemen:

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option Transaction entered into between us ("Party A") and you ("Party B") on the Trade Date referred to below (the "Transaction"). The parties acknowledge and agree that B.T. Alex Brown has acted as introducing broker to Party A with respect to this Transaction.The Transaction consists of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii) and Section 4. Certain definitions and provisions which are applicable to more than one element of the Transaction are detailed in Section 1. The terms of the Transaction to which this Confirmation relates are as follows:

### 1. Section 1 – General Terms

Notional Amount:      USD 15,000,000
Trade Date:      03rd December 1999
Termination Date:      17th December 1999, subject to modification in accordance with the Following Business Day Convention.
Business Days:      In New York
Calculation Agent:      Party A
Currency Pair:      EUR/USD

### 2. Section 1 – First Digital Option Transaction

(i) Initial Exchange Provisions:

Party A Initial Exchange Amount:      Zero
Party B Initial Exchange Amount:      USD 7,500,000
Initial Exchange Date:      07th December 1999, subject to adjustment in accordance with the Following Business Day Convention.

(ii) Final Exchange Provisions:

Party A Final Exchange Amount:      USD 15,000,000
Party B Final Exchange Amount:      Zero
First Range Level:      USD .9763 per EUR 1.0000
First Rate Determination Date:      Means the Termination Date
Final Exchange Date:      21st December 1999, subject to adjustment in accordance with the Following Business Day Convention.

(A) If the Spot Rate is, on the First Rate Determination Date at 10:00 a.m. local time in New York, less than or equal to the First Range Level (such event being a "First Digital Option Trigger Event"), then upon the occurrence of such First Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a First Digital OptionTrigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of the First Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the First Digital Option Trigger Event and provide details of the occurrence of such First Digital Option Trigger Event. A failure to give such notice shall not, however, prejudice the occurrence of the First Digital OptionTrigger Event.

**3. Section 1 – Second Digital Option Transaction**

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | USD 7,425,000 |
| Party B Initial Exchange Amount: | Zero |
| Initial Exchange Date: | 07th December 1999, subject to adjustment in accordance with the Following Business Day Convention |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | Zero |
| Party B Final Exchange Amount: | USD 14,850,000 |
| Second Range Level: | USD .9761 per EUR 1.0000 |
| Second Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 21st December 1999, subject to adjustment in accordance with the Following Business Day Convention |

(A) If the Spot Rate is, on the Second Rate Determination Date at 10:00 a.m. local time in New York, less than or equal to the Second Range Level (such event being a "Second Digital Option Trigger Event"), then upon the occurrence of such Second Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a Second Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of a Second Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Second Digital Option Trigger Event and provide details of the occurrence of such Second Digital Option Trigger Event. A failure to give such notice shall not however prejudice the occurrence of the Second Digital Option Trigger Event.

**Section 2 - Other Provisions**

(i) For the purposes of this Transaction only, the following provision shall apply:

"Subparagraph (ii) of Section 2 (c) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.

(ii)         Offices:

      (a)   The Office of Party A for the Transaction is New York; and
      (b)   The Office of Party B for the Transaction is Delaware.

**3.     Representations:**

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)      **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii)    **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)    **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

**4.    ISDA Agreement:**

If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement") then this Confirmation supplements forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation. Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S., Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

**5.    Definitions:**

The definitions and provisions contained in the 1991 ISDA Definitions (as amended by the 1997 Supplement) as published by the International Swaps and Derivatives Association, Inc (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions (the "FX Definitions") as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
**Deutsche Bank AG, New York**

By:

Name:   Jeanette Michaels
Title:   AVP

By:

Name:   Perry Parker
Title:   Director

Confirmed as of the date first above written:
**LJL CATHERINE INVESTMENTS LLC**

By: _____
Name:
Authorised Signatory

By: _____
Name:
Authorised Signatory

For any query relating to this Confirmation please contact : 212-469-4033

# EXHIBIT 2

DEC-08-1999 15:04     ACCUCORP ADMIN                      215 871 8256    P.09



7 December, 1999

**Foreign Exchange Digital Option Transaction**
Our ref: cx28372A

RHL CHAPEL INVESTMENTS LLC
Care of Kevin Lynch
DB Alex Brown
222 W. Adams's Suite 1900
Chicago, IL 60606
312-424-6020

Deutsche Bank AG New York Branch
31 West 52nd Street
New York NY 10019

Telephone: 212-474-8000
Fax: 212-474-8580
Swift: DEUT US 33

Ladies and Gentlemen:

## AMENDED CONFIRMATION

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option Transaction entered into between us ("Party A") and you ("Party B") on the Trade Date referred to below (the "Transaction"). The parties acknowledge and agree that B.T. Alex Brown has acted as introducing broker to Party A with respect to this Transaction.The Transaction consists of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii) and Section 4. Certain definitions and provisions which are applicable to more than one element of the Transaction are detailed in Section 1. The terms of the Transaction to which this Confirmation relates are as follows:

### 1. Section 1 – General Terms

| | |
|---|---|
| Notional Amount: | USD 15,000,000 |
| Trade Date: | 03rd December 1999 |
| Termination Date: | 17th December 1999, subject to modification in accordance with the Following Business Day Convention. |
| Business Days: | In New York |
| Calculation Agent: | Party A |
| Currency Pair: | EUR/USD |

### 2. Section 1 – First Digital Option Transaction

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | Zero |
| Party B Initial Exchange Amount: | USD 7,500,000 |
| Initial Exchange Date: | 07th December 1999, subject to adjustment in accordance with the Following Business Day Convention. |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | USD 15,000,000 |
| Party B Final Exchange Amount: | Zero |
| First Range Level: | USD .9783 per EUR 1.0000 |
| First Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 21st December 1999, subject to adjustment in accordance with the Following Business Day Convention. |

(A) If the Spot Rate is, on the First Rate Determination Date at 10:00 a.m. local time in New York, less than or equal to the First Range Level (such event being a "First Digital Option Trigger Event"), then upon the occurrence of such First Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a First Digital OptionTrigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of the First Digital Option Trigger Event, the Calculation Agent shall notify the other party orally and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the First Digital Option Trigger Event and provide details of the occurrence of such First Digital Option Trigger Event. A failure to give such notice shall not, however, prejudice the occurrence of the First Digital OptionTrigger Event.

digconf

DEC 07 1999 14:25                              212 469 7633        PAGE.02

DEC-08-1999  15:05        ACCUCORP ADMIN                  215 811 8298       T.10
                                                                             P.09/19

(i) Initial Exchange Provisions:

Party A Initial Exchange Amount:        USD 7,425,000
Party B Initial Exchange Amount:        Zero
Initial Exchange Date:                  07th December 1999, subject to adjustment in accordance with the
                                        Following Business Day Convention

(ii) Final Exchange Provisions:

Party A Final Exchange Amount:          Zero
Party B Final Exchange Amount:          USD 14,850,000
Second Range Level:                     USD .9781 per EUR 1.0000
Second Rate Determination Date:         Means the Termination Date
Final Exchange Date:                    21st December 1999, subject to adjustment in accordance with the
                                        Following Business Day Convention

(A) If the Spot Rate is, on the Second Rate Determination Date at 10:00 a.m. local time in New York, less than or equal to the Second Range Level (such event being a "Second Digital Option Trigger Event"), then upon the occurrence of such Second Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a Second Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of a Second Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Second Digital Option Trigger Event and provide details of the occurrence of such Second Digital Option Trigger Event. A failure to give such notice shall not however prejudice the occurrence of the Second Digital Option Trigger Event.

## Section 2 - Other Provisions

(i) For the purposes of this Transaction only, the following provision shall apply:

"Subparagraph (ii) of Section 2 (c) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.

(ii)         Offices:

        (a)   The Office of Party A for the Transaction is New York; and
        (b)   The Office of Party B for the Transaction is Delaware.

## 3.      Representations:

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)          Non-Reliance. It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

digeesf

through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)   **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

**4.    ISDA Agreement:**

If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement") then this Confirmation supplements forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation. Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S. Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 46 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

**5.    Definitions:**

The definitions and provisions contained in the 1991 ISDA Definitions (as amended by the 1997 Supplement) as published by the International Swaps and Derivatives Association, Inc (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions (the "FX Definitions") as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
**Deutsche Bank AG, New York**

By: _____          By: _____
Name:  Jeanette Michaels                Name:  Perry Parker
Title:  AVP                             Title:  Director

Confirmed as of the date first above written:
**RHL CHAPEL INVESTMENTS LLC**

By: _____          By: _____
Name:  ROBERT H. LEFF                   Name:
Authorised Signatory                    Authorised Signatory

For any query relating to this Confirmation please contact : 212-469-4033

# Deutsche Bank AG New York Branch



7 December, 1999

**Foreign Exchange Digital Option Transaction**
Our ref: ex28372A

RHL CHAPEL INVESTMENTS LLC
Care of Kevin Lynch
DB Alex Brown
222 W. Adams's Suite 1900
Chicago, IL. 60606
312-424-6020

Deutsche Bank AG New York Branch
31 West 52nd Street
New York NY 10019

Telephone: 212-474-8000
Fax: 212-474-8560
Swift: DEUT US 33

Ladies and Gentlemen:

### AMENDED CONFIRMATION

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option Transaction entered into between us ("Party A") and you ("Party B") on the Trade Date referred to below (the "Transaction"). The parties acknowledge and agree that B.T. Alex Brown has acted as introducing broker to Party A with respect to this Transaction. The Transaction consists of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii) and Section 4. Certain definitions and provisions which are applicable to more than one element of the Transaction are detailed in Section 1. The terms of the Transaction to which this Confirmation relates are as follows:

**1. Section 1 – General Terms**

| | |
|---|---|
| Notional Amount: | USD 15,000,000 |
| Trade Date: | 03rd December 1999 |
| Termination Date: | 17th December 1999, subject to modification in accordance with the Following Business Day Convention. |
| Business Days: | In New York |
| Calculation Agent: | Party A |
| Currency Pair: | EUR/USD |

**2. Section 1 – First Digital Option Transaction**

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | Zero |
| Party B Initial Exchange Amount: | USD 7,500,000 |
| Initial Exchange Date: | 07th December 1999, subject to adjustment in accordance with the Following Business Day Convention. |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | USD 15,000,000 |
| Party B Final Exchange Amount: | Zero |
| First Range Level: | USD .9763 per EUR 1.0000 |
| First Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 21st December 1999, subject to adjustment in accordance with the Following Business Day Convention. |

(A) If the Spot Rate is, on the First Rate Determination Date at 10:00 a.m. local time in New York, less than or equal to the First Range Level (such event being a "First Digital Option Trigger Event"), then upon the occurrence of such First Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a First Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of the First Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the First Digital Option Trigger Event and provide details of the occurrence of such First Digital Option Trigger Event. A failure to give such notice shall not, however, prejudice the occurrence of the First Digital Option Trigger Event.

**3. Section 1 – Second Digital Option Transaction**

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | USD 7,425,000 |
| Party B Initial Exchange Amount: | Zero |
| Initial Exchange Date: | 07th December 1999, subject to adjustment in accordance with the Following Business Day Convention |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | Zero |
| Party B Final Exchange Amount: | USD 14,850,000 |
| Second Range Level: | USD .9761 per EUR 1.0000 |
| Second Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 21st December 1999, subject to adjustment in accordance with the Following Business Day Convention |

(A) If the Spot Rate is, on the Second Rate Determination Date at 10:00 a.m. local time in New York, less than or equal to the Second Range Level (such event being a "Second Digital Option Trigger Event"), then upon the occurrence of such Second Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a Second Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of a Second Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Second Digital Option Trigger Event and provide details of the occurrence of such Second Digital Option Trigger Event. A failure to give such notice shall not however prejudice the occurrence of the Second Digital Option Trigger Event.

**Section 2 - Other Provisions**

(i) For the purposes of this Transaction only, the following provision shall apply:

*Subparagraph (ii) of Section 2 (c) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.

(ii)          Offices:

(a)    The Office of Party A for the Transaction is New York; and

(b)    The Office of Party B for the Transaction is Delaware.

**3.      Representations:**

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)      **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii) **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii) **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

**4.    ISDA Agreement:**

If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement") then this Confirmation supplements forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation. Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S., Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

**5.    Definitions:**

The definitions and provisions contained in the 1991 ISDA Definitions (as amended by the 1997 Supplement) as published by the International Swaps and Derivatives Association, Inc (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions (the "FX Definitions") as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
**Deutsche Bank AG, New York**

By: _____          By: _____
Name:  Jeanette Michaels              Name:  Perry Parker
Title:   AVP                          Title:   Director

Confirmed as of the date first above written:
**RHL CHAPEL INVESTMENTS LLC**

By: _____          By: _____
Name:                                 Name:
Authorised Signatory                  Authorised Signatory


For any query relating to this Confirmation please contact : 212-469-4033

# EXHIBIT 3

**Deutsche Bank** /

Deutsche Bank AG New York
31 West 52nd Street
New York  NY 10019

Tel  212 469 8000

October __, 2000

Ms. Leslie Leff
1212 Fairview Road
Villanova, PA 19085

Dear Ms. Leff:

We understand that you may cause an entity that you control to pursue directly or indirectly through other entities investment strategies proposed, organized and arranged for you by Counterpoint Capital, LLC (the "Strategy" or "Strategies"), pursuant to which you or entities you control intend to execute with or through us, or our affiliates, transactions involving foreign exchange derivatives (collectively, the "Transaction" or "Transactions").

In consideration of our execution of the Transactions, you hereby represent, warrant and acknowledge to us, Deutsche Bank Securities, Inc. and to our affiliates for which we act as agent in connection with the Transactions (collectively, "Deutsche Bank") that:

1.  Deutsche Bank has had no involvement in, and accepts no responsibility for, the establishment or promotion of the Strategies;

2.  Deutsche Bank makes no guarantee or representation whatsoever as to the expected performance or results of the Strategies or any Transaction (including the financial, regulatory, accounting or tax consequences thereof), and you have not engaged in the Strategies or entered into the Transactions in reliance upon any such guarantee or representation;

3.  You have been independently advised by your own legal counsel and will comply with all applicable laws of the United States related to the Transactions;

4.  Neither you nor any member of your immediate family was approached by Deutsche Bank to enter into the Strategies or any Transaction.

In addition, you agree that, except as expressly provided in the documentation evidencing the Transactions, Deutsche Bank shall not be liable to you for any losses, liabilities, costs, expenses, or other amounts relating to the Strategies or the Transactions, including any losses, liabilities, costs, expenses, or other amounts arising out of the failure of the Strategies or any Transaction to achieve your legal, regulatory, business, investments, financial, accounting, tax or other objectives.

Please indicate your agreement to the above by countersigning and returning to us a copy of this letter, which shall be governed by, and construed in accordance with, the internal laws of the State of New York.

Very truly yours,

DEUTSCHE BANK SECURITIES, INC.

Agreed to and Accepted:

_____          _____
Name:                                      Name: Leslie Leff
Title:

# EXHIBIT 4

**Deutsche Bank**

Deutsche Bank AG New York
31 West 52nd Street
New York  NY 10019
Tel  212 469 8000

Mr. Ronnie Leff                                                                                    October ___, 2000
425 Chapel Road
Elkins Park, PA 19117

Dear Mr. Leff

We understand that you may cause an entity that you control to pursue directly or indirectly through other entities investment strategies proposed, organized and arranged for you by Counterpoint Capital, LLC (the "Strategy" or "Strategies"), pursuant to which you or entities you control intend to execute with or through us, or our affiliates, transactions involving foreign exchange derivatives (collectively, the "Transaction" or "Transactions").

In consideration of our execution of the Transactions, you hereby represent, warrant and acknowledge to us, Deutsche Bank Securities, Inc. and to our affiliates for which we act as agent in connection with the Transactions (collectively, "Deutsche Bank") that:

1.  Deutsche Bank has had no involvement in, and accepts no responsibility for, the establishment or promotion of the Strategies;

2.  Deutsche Bank makes no guarantee or representation whatsoever as to the expected performance or results of the Strategies or any Transaction (including the financial, regulatory, accounting or tax consequences thereof), and you have not engaged in the Strategies or entered into the Transactions in reliance upon any such guarantee or representation;

3.  You have been independently advised by your own legal counsel and will comply with all applicable laws of the United States related to the Transactions;

4.  Neither you nor any member of your immediate family was approached by Deutsche Bank to enter into the Strategies or any Transaction.

In addition, you agree that, except as expressly provided in the documentation evidencing the Transactions, Deutsche Bank shall not be liable to you for any losses, liabilities, costs, expenses, or other amounts relating to the Strategies or the Transactions, including any losses, liabilities, costs, expenses, or other amounts arising out of the failure of the Strategies or any Transaction to achieve your legal, regulatory, business, investments, financial, accounting, tax or other objectives.

Please indicate your agreement to the above by countersigning and returning to us a copy of this letter, which shall be governed by, and construed in accordance with, the internal laws of the State of New York.

Very truly yours,

DEUTSCHE BANK SECURITIES, INC.                                Agreed to and Accepted:


Name: _____              Name: Ronnie Leff
Title:

# EXHIBIT 5

*Bankers Trust Private Banking*
Deutsche Bank Group

**Worldwide Custody Account
Letter of Instructions
- Corporate -**

191144

**BANKERS TRUST PRIVATE BANKING**

*OPENING THE ACCOUNT*

NEW YORK _October_ _15 2008_

Bankers Trust Private Banking ("Bankers Trust," the "Bank," or "you") is hereby authorized to open and maintain a Custody Account comprised of one or more securities accounts and one or more cash accounts (collectively, the "Account") in the name(s) of:

_L. Leff, Inc._

("we," or the "undersigned"). You are also authorized to maintain or dispose of any securities, securities entitlements (as defined in the New York Uniform Commercial Code ("UCC")), other non-cash investment property, and cash from any source and in any currency deposited from time to time in the Account and all property in which the same is reinvested, all dividends, interest and distributions with respect thereto, and all disposition and other proceeds in respect of the foregoing (the "Property"), subject to the following instructions and upon the following agreements:

**EXECUTION:**

In accordance with written or oral instructions as we may give to you from time to time, you are authorized and directed to purchase or sell securities and/or other financial instruments as agent for, and for the account and sole risk of, the undersigned and to purchase and sell any foreign exchange in order to effect such transactions. When instructed to purchase securities or other assets, the cost thereof (together with any commissions or expenses) is to be charged to the Account unless you are instructed otherwise.

You may decline to execute any purchase order unless you are satisfied in your sole judgment that sufficient funds or credit will be freely available in the required currency to complete the transaction prior to the time at which payment is due. The undersigned also hereby agrees to indemnify and to hold you harmless with respect to any losses, costs and expenses incurred as a result of the failure of the undersigned to furnish funds as required.

Any such orders to purchase and sell securities or other instruments (and to enter related foreign exchange transactions) may be affected in any commercially reasonable manner you deem appropriate in your sole discretion, which may include the use of such brokers, counterparties or other intermediaries as you may select, including, without limitation, yourself, BT Alex. Brown Incorporated, BT Brokerage Corporation and/or other affiliates of yours. We understand that BT Alex. Brown Incorporated, BT Brokerage Corporation and other affiliates of Bankers Trust are separately incorporated companies and, in most cases, are not banks. BT Alex. Brown Incorporated, BT Brokerage Corporation and such other affiliates are solely responsible for their own obligations, and such obligations are not guaranteed by Bankers Trust Private Banking or any other bank.

You may purchase or sell any foreign exchange from yourself or one of your affiliates as a counterparty. In the case of any transactions effected with or through your affiliates (or yourselves), such affiliates (or you, as the case may be) may, without affecting any compensation payable hereunder, earn and be paid such fees and other compensation as they (or you) would customarily receive in respect of similar transactions with third parties.

**CUSTODIAN RESPONSIBILITIES:**

Except as expressly provided herein, your sole responsibility is to keep and protect the Property in the Account as custodian, and, to the extent such Property constitutes financial assets for purposes of the New York UCC, to maintain those financial assets in such Account as security entitlements in our favor.

We acknowledge that you are not being engaged to render any advice with respect to any securities or other investments. We agree that any purchase or sale of securities or other investments hereunder shall not be made in reliance upon any such advice by you. We agree that we will effect any such purchase or sale based on our own independent investigation of the investment merits thereof, and upon the advice of such legal, tax, accounting, investment and other expert advisors, other than you, as we deem appropriate. We acknowledge that we are engaging you to perform only the custody and execution services described herein. You shall not be responsible for making any determination regarding the appropriateness or suitability of any investment, regardless of any information you may have regarding our investment history, financial position, investment objectives, age and/or family situation or similar matters, or regarding the credit of any borrower or issuer of any security or other investment, legal or tax characteristics of any security or investment.

**CASH MANAGEMENT AUTHORIZATION:**

Unless otherwise directed, the undersigned hereby authorizes you to invest any uninvested balances in our U.S. dollar cash account in a Bankers Trust Private Banking Money Market Deposit Account. For any non-USD cash balances we maintain with you, you will attempt to place such balances in an interest bearing account. We understand the ability for you to place non-USD cash balances and pay interest on such balances may depend upon, but is not limited to, laws, rules or regulations in the foreign countries the non-USD cash balances are held. You may deduct from the interest earnings on the non-USD cash balances, commercially reasonable fees to cover the administration, placement, and posting of any interest earned of these non-USD cash balances. You will provide the details of any such fees upon our request.

**COLLECTIONS:**

You are authorized to collect all interest, dividends, proceeds of sales and other monies due and collectible which are paid and arise from the Property and to credit such collections as provided below, or as we shall otherwise direct pursuant to the terms hereof.

You may refrain from delivering to the undersigned any rights, securities or scrip, or any document, or assisting the undersigned in exercising any rights or taking any other action, if you in your sole discretion shall determine that such delivery or assistance, or any other action in respect thereof, shall be (1) unreasonably burdensome or costly, or (2) contrary to any applicable law, regulation, stock exchange rule or rule of any self-regulatory organization.

With respect to securities for which adequate financial information is not readily available and which are included as Property, your responsibility is limited to safekeeping and you assume no responsibility with respect to following such securities for coupon payments, redemptions, exchanges, or similar matters affecting such securities. Such information will generally not be available with respect to privately placed securities, securities that are not traded on organized exchanges in the U.S. or securities of foreign issuers that are not registrants under the United States Securities Exchange Act of 1934.

Corporate

2

**REINVESTMENT INSTRUCTIONS:**

Except as otherwise provided below, we agree that all instructions concerning the reinvestment of principal proceeds of maturing issues, interest payments, sales proceeds and other amounts received by you for the Account must be received by you at least five (5) business days prior to the date of maturity of the issue (or such other date on which such proceeds or other amounts are to be received in order to ensure prompt reinvestment). Instructions may be issued in writing or orally. Except as otherwise provided herein, if you do not receive reinvestment instructions from the undersigned, all such proceeds and other amounts are to be credited to one of the cash accounts comprising the Account. We hereby authorize you to invest any uninvested balances in our U.S. dollar cash account in a Bankers Trust Private Banking Money Market Deposit Account.

**REMITTANCE INSTRUCTIONS:**

Transfer on the _____ of each month to Checking Account No. _____

☐ Balances of both Income and Principal

☐ Balances of Income only

Remit on the _____ of each month

☐ Balances of both Income and Principal

☐ Balances of Income only

To: _____

_____

_____

**SUBCUSTODIANS:**

We authorize you to maintain Property (or any portion thereof) in the Account directly in one or more of your branches or indirectly through custody accounts established by you with the following: other financial intermediaries branches of other US banks; foreign banks, trust companies, securities brokers or dealers acting as custodian; and/or securities depositories or clearing agencies in which you or any of the foregoing participate (collectively, "subcustodians").

Upon prior notice, you may in your discretion bill to the undersigned or deduct from the Account the charges of any subcustodian relating to our property.

**PROXIES:**

You shall not exercise any voting or subscription rights (including those in respect of proxies received by you or in connection with any reorganization or restructuring or any rights offering) or make any elections in relation to any securities or other Property, except where we have given you specific instructions and authorizations (and in the case of subscriptions or elections requiring the payment of money or property, we shall have actually furnished you with sufficient money or property), and all relevant information necessary to make any certifications required to be made on behalf of the undersigned sufficiently in advance of the deadline for the taking of any such action to reasonably permit you to take such action. Upon your actual receipt of any correspondence or proxy (or similar) material relating to securities or other Property, your sole responsibility shall be to send such correspondence or other materials to us by regular first-class mail, at our risk and expense. You shall not be deemed to have received any such correspondence or other materials that are received by any subcustodian until such time as you shall have received the same from them. We hereby agree to indemnify you and hold you harmless with regard to any loss, liability or expense (including, without limitation, the fees and expenses of counsel) which arise out of your compliance with the foregoing.

☒ Notwithstanding the foregoing, we do not wish to receive any proxy (or similar) materials or annual or periodic reports or other materials distributed to shareholders by funds or other securities issuers and direct you not to send the same to us and to destroy such materials.

☐ Forward proxy materials to: _____

_____

_____

_____

**TELEPHONE INSTRUCTIONS:** From time to time we may give instructions on the telephone or facsimile regarding our Account. It is understood that the risk of instructions being given by a person or persons purporting to be an authorized representative of the undersigned is our own. Bankers Trust shall not be liable for any loss that may result from such misunderstandings or unauthorized instructions. Over certain dollar levels, Bankers Trust may, but shall not be required to, seek verifications of your verbal instructions by call back. In case of doubt, the Bank may in its discretion refuse to execute our instructions, or any part thereof, without incurring any liability.

**REGISTRATION:** You and any subcustodians may maintain any or all of the Property in our name or in the name of yours or any subcustodian's nominee. The undersigned hereby appoints you as Attorney-in-Fact with power to execute endorsements and assignments.

Securities maintained through a subcustodian or which are eligible for deposit in a securities depository or clearing system may be maintained with the subcustodian or securities depository or clearing system in an account for your or your subcustodian's customers, unless prohibited by law, rule, or regulation. Securities maintained with a securities depository or clearing system shall be maintained subject to the rules of such depositories or systems governing the rights, and obligations among the securities depositories or clearing systems and its participants.

**CERTAIN AUTHORIZATIONS:** You may execute in the name of the undersigned for the Account whenever you deem it appropriate, such ownership and other certificates as may be required to obtain the payment of income and/or principal in respect of the Property. Furthermore, you may (but shall not be obligated to) pay on our behalf, and out of Property in the Account or otherwise held by you, any and all taxes (and levies in the nature of taxes) imposed by any governmental authority. The undersigned agrees, when and if requested by you and required in connection with the payment of any such taxes, to cooperate with you in furnishing information, executing documents or otherwise.

**IDENTIFIED ADVISOR; BROKER CONFIRMATIONS:** You are authorized to act on advisors' instructions regarding purchases and sales and to rely upon any other instructions from:

Name of Advisor(s): Counterpoint Capital LLC
101 E. 52nd Street 29th floor
NYC NY 10022

Such advisor has been appointed as our attorney-in-fact with full power of authority to take any or all actions and to give any and all instructions hereunder as fully as if we were to take or give the same. You shall be fully protected and shall not be expected to inquire as to the authority given above. You are authorized to enter into any arrangements with such advisor whereby you will receive instructions through an electronic means (including, without limitation an "institutional delivery system"). If you elect to enter into any such arrangement, you are hereby authorized to accept and to act upon instructions received by you under such arrangements, and we shall hold you harmless for any action or inaction of yours in relying upon such instructions.

The terms and conditions of appointment and authority of any advisor shall be our sole responsibility. We shall promptly notify Bankers Trust in writing of the appointment and removal of such advisor and the portion of the assets subject to the investment control of such advisor.

Corporate

4

11/26/1999

We acknowledge that you will receive instructions or confirmations from brokers engaged by us or by any advisor referred to above. We shall not in many cases advise you of the identity of any such broker or furnish you with evidence of our having engaged such broker. Your receipt (by electronic or other means) from a broker (whether or not such broker has been previously identified by us) of any confirmation of a purchase or sale transaction that would require you to pay funds, deliver securities or take other action will be deemed to constitute an "instruction" for purposes of this provision if such confirmation properly identifies our account number and identification number, and you shall be deemed authorized to make such payment or delivery without any consultation with or further instruction from the undersigned.

In addition, you shall be under no duty or obligation to review any investment or reinvestment made or received upon the instructions of such broker or advisor. Without limiting the generality of the foregoing, in the case of any transaction, the person giving the instructions shall have the entire responsibility for assuring that the transaction does not violate the prohibitions of any applicable state or federal law or court order or judgment affecting the administration of the assets of the undersigned. You may from time to time consult with legal counsel and shall be fully protected in acting upon the advice of counsel.

As it relates to any advisor fees, we:

☐ authorize you to charge our custody account for advisor fees communicated to you by our advisors. It is our responsibility to review these charges for accuracy and appropriateness and to raise questions about the fee's validity with our advisor. You may continue to pay advisor fees until such time we notify you in writing.

☐ do not authorize you to charge our custody account for advisor fees. We will make arrangements to pay advisor fees separately with our advisor.

**STATEMENTS:**

You shall provide to us, and to whomever we authorize below, a written statement of all transactions in the Account effected by you during each preceding month. If we do not file any written objections with you within ninety (90) days from the date of mailing of any statement to us, it shall be understood that we have no objection to the statement in any respect.

In any periodic statement of securities held in custody, Bankers Trust may, but shall not be required to provide indications of the price or value of such securities. We acknowledge that securities issued in markets outside the United States (including the "Euromarkets") and other securities which are not listed on major U.S. securities exchanges may not be liquid or easily salable, even where they are listed on a foreign securities exchange or quoted on one or more computer screens or "inter-dealer quotation systems". Where a statement includes values for any such securities (or issue or series thereof), these values may be obtained from one or more publicly available sources, including "last trade" information made available by foreign securities exchanges. We acknowledge that such information may not, in fact, be current or represent or approximate the prices that could be obtained were we or Bankers Trust to endeavor to sell or offer for sale all or any portion of the securities of such issue on any securities exchange or in private transactions. We understand that Bankers Trust is under no obligation to solicit bids or offers, or indications of prices or values, from dealers (including persons employed by Bankers Trust or its affiliated companies who deal in such securities). We acknowledge that Bankers Trust assumes no responsibility whatsoever for the accuracy of such price or value information or for any use that may be made of such information by us or by persons with whom we deal, and we shall hold Bankers Trust harmless with respect to the foregoing.

Corporate

5

**ACCESS TO BANKERS TRUST INSIGHT:**

We hereby request that Bankers Trust make available to us the Bankers Trust InSight service, we confirm that we have read the *Standard Terms and Conditions* for Bankers Trust InSight; and agree to all of the terms and conditions specified therein (all of which are hereby incorporated by reference herein). We further agree to abide by any amendments thereto effected hereafter in accordance with Section 1 thereof.

Prior to authorizing any third-party to access our accounts or any of them via the Bankers Trust InSight service, we agree to execute a further authorization letter in a form furnished to us by Bankers Trust and to be bound by the terms thereof.

**REPRESENTATIONS AND WARRANTIES:**

We hereby represent, warrant and agree that:

(1) we are a corporation duly incorporated and validly existing under the laws of _Delaware_ and have all necessary power and authority (corporate and otherwise ) to execute, deliver and perform this agreement;

(2) our principal executive office and (if different) our registered office is/are located at:

_10101 Roosevelt Blvd_
_Philadelphia_
_PA._

(3) the execution, delivery and performance of this agreement have been duly authorized by all necessary corporate action on our part and this agreement constitutes a legal, valid and binding obligation, enforceable in accordance with its terms;

(4) the execution, delivery and performance of this agreement do not and will not conflict with or result in a breach of our corporate charter or by-laws or any agreement or instrument to which we are a party or by which any of our property is bound or any applicable statute, decree, order, rule or regulation and do not and will not result in the creation of any lien or encumbrance on any of our property or assets, except the lien provided for herein;

(5) we are the beneficial owner of the Property free and clear from any trust, mortgage, charge, pledge, lien, encumbrance or other security interest whatsoever, except the lien provided for herein and we shall likewise be the unencumbered beneficial owner of any additional Property from time to time subject to this agreement;

(6) the persons identified and whose specimen signatures appear in Annex A are duly authorized (each acting individually) to take any actions, and give any instructions hereunder; and

(7) the undersigned agrees to promptly notify you in writing if any of the foregoing matters cease to be true and accurate, and you are authorized to rely upon the foregoing until your receipt of any such written notice.

**TAX STATUS:**    Our U.S. Taxpayer Identification Number is _pending_

**IRS SUBSTITUTE**
**W-9 CERTIFICATION**    ☐ Domestic Clients    By checking this box, we hereby certify, under penalties of perjury, that we are not subject to backup withholding because: (a) we are exempt from backup withholding, or (b) we have not been notified that we are subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the Internal Revenue Service has notified us that we are no longer subject to backup withholding.

**IRS SUBSTITUTE**
**W-8 CERTIFICATION**    ☐ Foreign Clients    By checking this box, we hereby certify, under penalties of perjury, that we are the beneficial owner of all the income in this account, we are a foreign corporation, the income earned in this account is not effectively connected with the conduct of any trade or business in the United States, and we are neither engaged, nor plan to be engaged during the year, in a United States trade or business that has effectively connected gains from transactions with a broker or barter exchange.

In addition, if we are claiming a United States tax treaty benefit, we hereby certify, under penalties of perjury, that we are a resident of _____ within the meaning of the income tax treaty between the United States and that country. If required, a U.S. Taxpayer Identification Number is included above. We meet the requirements of the article in the applicable treaty dealing with limitations on benefits, (if any), and derives the income for which the treaty benefits are claimed.

Relevent W-8 and/or W-9 instructions are available upon request.

**MAIL:**    All communications should be addressed to: _____

10101 Roosevelt Blvd
Philadelphia
PA 19154

**FEE:**    We agree to pay you a monthly fee as compensation for your services hereunder, based on the sum of cash and the market value (or in the absence of a readily ascertainable market value, at such fair value as shall be determined by you in your discretion in accordance with methods customarily and consistently followed) of the securities and other Property in the Account, as well as applicable transaction fees, at the fee schedule that is then in effect. The fee shall be payable monthly in arrears. The Account will be valued at the close of each calendar month, each such valuation to determine the compensation for the preceding one-month period.

**PAYMENT OF FEE:**    You are authorized to charge all fees, and all expenses and costs incurred by you and any other amounts payable by us hereunder, to the cash account associated with the account or any other deposit account of the undersigned maintained in any department or branch of the Bank for all such items.

Corporate

7

⊕                                                                11/26/1999

**TERMINATION:** This arrangement may be terminated at any time either by us or by you upon thirty (30) days written notice to the other (except that either of us may terminate this agreement forthwith and without prior notice in the event of a breach of any representation, warranty or agreement set forth herein) and in such event all fees are to be prorated. All representations, warranties and agreements hereunder shall survive any termination hereof, except that our obligation to pay your fees shall be limited to such fees as are accrued through the effective date of termination (but such limitation shall only be effective to the extent that we shall have taken delivery of all Property held by you in the Account prior to the effective date of termination). In the event of termination, we both shall cooperate in all respects and shall take all actions necessary to permit you to make an orderly transfer of the Property to us or such successor custodian, as we shall nominate.

**DISCLOSURE OF INFORMATION:** The undersigned hereby authorizes you and your affiliates (including, without limitation, BT Alex. Brown Incorporated and BT Brokerage Corporation) to share information regarding the undersigned. The undersigned hereby directs you not to disclose the name or address of the undersigned to the issuer of any security held in the Account or the amount of securities to which the undersigned is the beneficial owner, unless you believe that you are required under applicable law to make such disclosure, in which event such disclosure may be made without notifying us or obtaining any further specific consent thereto; provided, however, that nothing in this agreement shall be deemed to prohibit disclosure, and you may disclose, upon request, to any governmental agency, stock exchange or self-regulatory organization having or claiming jurisdiction over you or your affiliates any information regarding the Account.

**GENERAL:** You and your nominees shall not be responsible for, and we shall hold you and your nominees harmless and indemnify you and your nominees against, against any Liabilities (as defined below) in relation to or stemming from any of the following:

(1) any decline in value of the Property resulting from (1) decisions to invest in, retain or dispose of any investments, or (2) any other cause that is not the result of your gross negligence, willful misconduct or breach of an undertaking of yours expressly stated herein;

(2) any action which we or our attorneys, agents, custodians, executors or advisors may take or omit to take in respect of the Property or the Account;

(3) any of the following acts, events or circumstances affecting the Property, the Account or your ability (or that or your subcustodians, nominees or agents) to carry out any duties: acts of governmental authorities (whether de jure or de facto), including, without limitation, nationalization, expropriation, and the imposition of currency restrictions; acts of war, terrorism, insurrection or revolution; strikes or work stoppages; the inability of a local clearing and settlement system to settle transactions for reasons beyond your control; or acts of God;

(4) the action or inaction of any subcustodian or any loss sustained in the event of the insolvency, bankruptcy or similar event affecting any subcustodian except in the event that such subcustodian was selected as a result of your gross negligence or willful misconduct;

(5) taxes, fines or governmental charges other than those incurred as a result of your gross negligence, willful misconduct or breach of an undertaking of yours expressly stated herein;

(6) lack of authority or incapacity of any broker or advisor identified under "Identified Broker/Advisor" above; or

(7) causes other than your gross negligence or willful misconduct or breach of an undertaking of yours expressly stated herein.

Corporate

8

11/26/1999

In no event shall you be liable for consequential, special or punitive damages.

For purposes of this provision, "Liabilities" means all taxes, charges, claims, fees and liabilities, including, without limitation, all fees and disbursements of counsel, court costs and any other costs or expenses incurred in connection with any dispute, controversy or proceeding whether or not the undersigned or the successors, heirs, executors, administrators or assignees of the undersigned are parties thereto.

You are authorized to charge the Account for all items for which we are responsible to indemnify you. Any Property, together with property in any other account which we may have with you (or your affiliates) shall be security for any obligations of ours in, under, or in respect of, this Agreement, and any loans, overdrafts or other extensions of credit which you may now or hereafter extend to the undersigned. We hereby pledge all such property to you and grant to you a continuing lien to secure the foregoing obligation. At no time will we, without your prior written consent, permit the Account or any Property to be subject to any other pledge, security interest or other claim. Such pledge and security interest shall remain in full force and effect until you receive full and final payment for all of our obligations referred to in this paragraph. We hereby consent and agree to promptly take such actions as you shall reasonably request from time to time in order to perfect and/or maintain the foregoing pledge, lien and security interest as a valid, perfected, first priority referred to above.

If the undersigned directs Bankers Trust to purchase securities or other investments that are mutual funds or other pooled investment vehicles which are organized, managed or advised by Bankers Trust or any of its affiliates, any purchase order shall constitute our acknowledgment that we have received a copy of the prospectus or offering materials for each such mutual fund or other vehicle. Without affecting the compensation to which Bankers Trust is otherwise entitled hereunder, each of Bankers Trust and its affiliates is authorized to charge and withhold any compensation in connection with advisory and/or other services performed for such mutual funds or other vehicles.

All amounts payable by the undersigned hereunder (including, without limitation, amounts payable in respect of purchases of securities or other property that we have instructed you to purchase for the Account) shall be paid by the undersigned in New York in freely available U.S. dollars (or in the case of purchases of securities or other property where such securities or other property are denominated or traded in another currency, if you so require or direct) without any deductions, withholdings, set-offs or counterclaims, and free and clear of all taxes (including, but not limited to, any withholding). If we shall be legally required to withhold any tax or other amount, we shall pay you such additional amounts as shall be required so that the net amounts received by you, after all such withholdings, shall be not less than what you would have received had no such withholdings been made or required.

We hereby represent, warrant and agree that:

(1)    this agreement and our obligations hereunder (including, without limitation, any obligation to make payments in U.S. dollars or other currencies), and

(2)    our purchase, ownership and sale (as the case may be) of all securities and other Property, constitute and will at all times constitute, our legal, valid and binding obligations, enforceable in accordance with their respective terms, and we agree that we shall perform all such obligations (including, without limitation, obtaining and making payments in U.S. dollars and/or such other currencies) in such a manner as to comply with all applicable laws, regulations, and administrative guidance of relevant authorities, including those pertaining to securities, exchange controls and related matters.

We further agree to notify you forthwith in writing if at any time we would be unable to make the foregoing representation and warranty at such time or if we should be unable to perform the foregoing agreement.

Corporate

9

Any action taken by you or your nominee or nominees hereunder or any subcustodian prior to termination of this arrangement and final distribution as hereinabove provided, or, in the case of instructions given by any broker or advisor identified under the heading "Identified Broker/Advisor" above, written notice by us of our termination of the appointment of such broker or advisor, shall as to you and your nominee or nominees be binding upon the undersigned and our successors.

**GOVERNING LAW:**    This agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to choice of law principles. The undersigned hereby submits to the jurisdiction of the courts of the State of New York and of the Federal district court sitting therein with respect to any action, claim or proceeding arising out of or pertaining to this agreement or the matters or transactions referred to herein or contemplated hereby.

Under penalties of perjury, we certify that the information provided in the Tax Status section of this document is correct. We further certify that we will notify you in writing immediately if any representation made herein ceases to be true and correct.

We acknowledge that the Account does not constitute a deposit with Bankers Trust and is therefore not an obligation of or guaranteed by Bankers Trust, the Federal Deposit Insurance Corporation ("FDIC") or any other governmental agency. Similarly, the specific investments made by Bankers Trust for the Account as our agent may not be deposits or other obligations of or guaranteed by Bankers Trust, the FDIC or any other governmental agency. In such cases, such investments will be subject to investment risk, including possible loss of the principal invested.

Very truly yours,

THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISION OF THIS DOCUMENT OTHER THAN THE CERTIFICATIONS REQUIRED TO AVOID BACKUP WITHHOLDING, ESTABLISH YOUR STATUS AS A FOREIGN PERSON, AND, IF APPLICABLE, OBTAIN A REDUCED RATE OF WITHHOLDING.

_____          _____
(signature)                                                                      (print)

and/or _____          _____
                          (signature)                                                    (print)

and/or _____          _____
                          (signature)                                                    (print)

ACCEPTED: BANKERS TRUST PRIVATE BANKING

By: _____    Date: _October 24, 2000_____

☐  Please provide us with information on the Portfolio Lending service provided by Bankers Trust Private Banking.

Corporate

10

11/26/1999

# EXHIBIT 6

*Bankers Trust Private Banking*
Deutsche Bank Group

> **Worldwide Custody Account**
> **Letter of Instructions**
> **- Corporate -**

191/143

## BANKERS TRUST PRIVATE BANKING

NEW YORK *October 18, 2000*

### OPENING THE ACCOUNT

Bankers Trust Private Banking ("Bankers Trust," the "Bank," or "you") is hereby authorized to open and maintain a Custody Account comprised of one or more securities accounts and one or more cash accounts (collectively, the "Account") in the name(s) of:

R. Leff, Inc.

("we," or the "undersigned"). You are also authorized to maintain or dispose of any securities, securities entitlements (as defined in the New York Uniform Commercial Code ("UCC")), other non-cash investment property, and cash from any source and in any currency deposited from time to time in the Account and all property in which the same is reinvested, all dividends, interest and distributions with respect thereto, and all disposition and other proceeds in respect of the foregoing (the "Property"), subject to the following instructions and upon the following agreements:

**EXECUTION:**

In accordance with written or oral instructions as we may give to you from time to time, you are authorized and directed to purchase or sell securities and/or other financial instruments as agent for, and for the account and sole risk of, the undersigned and to purchase and sell any foreign exchange in order to effect such transactions. When instructed to purchase securities or other assets, the cost thereof (together with any commissions or expenses) is to be charged to the Account unless you are instructed otherwise.

You may decline to execute any purchase order unless you are satisfied in your sole judgment that sufficient funds or credit will be freely available in the required currency to complete the transaction prior to the time at which payment is due. The undersigned also hereby agrees to indemnify and to hold you harmless with respect to any losses, costs and expenses incurred as a result of the failure of the undersigned to furnish funds as required.

Any such orders to purchase and sell securities or other instruments (and to enter related foreign exchange transactions) may be affected in any commercially reasonable manner you deem appropriate in your sole discretion, which may include the use of such brokers, counterparties or other intermediaries as you may select, including, without limitation, yourself, BT Alex. Brown Incorporated, BT Brokerage Corporation and/or other affiliates of yours. We understand that BT Alex. Brown Incorporated, BT Brokerage Corporation and other affiliates of Bankers Trust are separately incorporated companies and, in most cases, are not banks. BT Alex. Brown Incorporated, BT Brokerage Corporation and such other affiliates are solely responsible for their own obligations, and such obligations are not guaranteed by Bankers Trust Private Banking or any other bank.

⊕

You may purchase or sell any foreign exchange from yourself or one of your affiliates as a counterparty. In the case of any transactions effected with or through your affiliates (or yourselves), such affiliates (or you, as the case may be) may, without affecting any compensation payable hereunder, earn and be paid such fees and other compensation as they (or you) would customarily receive in respect of similar transactions with third parties.

**CUSTODIAN RESPONSIBILITIES:** Except as expressly provided herein, your sole responsibility is to keep and protect the Property in the Account as custodian, and, to the extent such Property constitutes financial assets for purposes of the New York UCC, to maintain those financial assets in such Account as security entitlements in our favor.

We acknowledge that you are not being engaged to render any advice with respect to any securities or other investments. We agree that any purchase or sale of securities or other investments hereunder shall not be made in reliance upon any such advice by you. We agree that we will effect any such purchase or sale based on our own independent investigation of the investment merits thereof, and upon the advice of such legal, tax, accounting, investment and other expert advisors, other than you, as we deem appropriate. We acknowledge that we are engaging you to perform only the custody and execution services described herein. You shall not be responsible for making any determination regarding the appropriateness or suitability of any investment, regardless of any information you may have regarding our investment history, financial position, investment objectives, age and/or family situation or similar matters, or regarding the credit of any borrower or issuer of any security or other investment, legal or tax characteristics of any security or investment.

**CASH MANAGEMENT AUTHORIZATION:** Unless otherwise directed, the undersigned hereby authorizes you to invest any uninvested balances in our U.S. dollar cash account in a Bankers Trust Private Banking Money Market Deposit Account. For any non-USD cash balances we maintain with you, you will attempt to place such balances in an interest bearing account. We understand the ability for you to place non-USD cash balances and pay interest on such balances may depend upon, but is not limited to, laws, rules or regulations in the foreign countries the non-USD cash balances are held. You may deduct from the interest earnings on the non-USD cash balances, commercially reasonable fees to cover the administration, placement, and posting of any interest earned of these non-USD cash balances. You will provide the details of any such fees upon our request.

**COLLECTIONS:** You are authorized to collect all interest, dividends, proceeds of sales and other monies due and collectible which are paid and arise from the Property and to credit such collections as provided below, or as we shall otherwise direct pursuant to the terms hereof.

You may refrain from delivering to the undersigned any rights, securities or scrip, or any document, or assisting the undersigned in exercising any rights or taking any other action, if you in your sole discretion shall determine that such delivery or assistance, or any other action in respect thereof, shall be (1) unreasonably burdensome or costly, or (2) contrary to any applicable law, regulation, stock exchange rule or rule of any self-regulatory organization.

With respect to securities for which adequate financial information is not readily available and which are included as Property, your responsibility is limited to safekeeping and you assume no responsibility with respect to following such securities for coupon payments, redemptions, exchanges, or similar matters affecting such securities. Such information will generally not be available with respect to privately placed securities, securities that are not traded on organized exchanges in the U.S. or securities of foreign issuers that are not registrants under the United States Securities Exchange Act of 1934.

**REINVESTMENT INSTRUCTIONS:**

Except as otherwise provided below, we agree that all instructions concerning the reinvestment of principal proceeds of maturing issues, interest payments, sales proceeds and other amounts received by you for the Account must be received by you at least five (5) business days prior to the date of maturity of the issue (or such other date on which such proceeds or other amounts are to be received in order to ensure prompt reinvestment). Instructions may be issued in writing or orally. Except as otherwise provided herein, if you do not receive reinvestment instructions from the undersigned, all such proceeds and other amounts are to be credited to one of the cash accounts comprising the Account. We hereby authorize you to invest any uninvested balances in our U.S. dollar cash account in a Bankers Trust Private Banking Money Market Deposit Account.

**REMITTANCE INSTRUCTIONS:**

Transfer on the _____ of each month to Checking Account No._____

☐ Balances of both Income and Principal

☐ Balances of Income only

Remit on the _____ of each month

☐ Balances of both Income and Principal

☐ Balances of Income only

To: _____

_____

_____

**SUBCUSTODIANS:**

We authorize you to maintain Property (or any portion thereof) in the Account directly in one or more of your branches or indirectly through custody accounts established by you with the following: other financial intermediaries branches of other US banks; foreign banks, trust companies, securities brokers or dealers acting as custodian; and/or securities depositories or clearing agencies in which you or any of the foregoing participate (collectively, "subcustodians").

Upon prior notice, you may in your discretion bill to the undersigned or deduct from the Account the charges of any subcustodian relating to our property.

**PROXIES:**

You shall not exercise any voting or subscription rights (including those in respect of proxies received by you or in connection with any reorganization or restructuring or any rights offering) or make any elections in relation to any securities or other Property, except where we have given you specific instructions and authorizations (and in the case of subscriptions or elections requiring the payment of money or property, we shall have actually furnished you with sufficient money or property), and all relevant information necessary to make any certifications required to be made on behalf of the undersigned sufficiently in advance of the deadline for the taking of any such action to reasonably permit you to take such action. Upon your actual receipt of any correspondence or proxy (or similar) material relating to securities or other Property, your sole responsibility shall be to send such correspondence or other materials to us by regular first-class mail, at our risk and expense. You shall not be deemed to have received any such correspondence or other materials that are received by any subcustodian until such time as you shall have received the same from them. We hereby agree to indemnify you and hold you harmless with regard to any loss, liability or expense (including, without limitation, the fees and expenses of counsel) which arise out of your compliance with the foregoing.

☒ Notwithstanding the foregoing, we do not wish to receive any proxy (or similar) materials or annual or periodic reports or other materials distributed to shareholders by funds or other securities issuers and direct you not to send the same to us and to destroy such materials.

☐ Forward proxy materials to: _____

_____

_____

_____

Corporate

3

11/26/1999

**TELEPHONE INSTRUCTIONS:** From time to time we may give instructions on the telephone or facsimile regarding our Account. It is understood that the risk of instructions being given by a person or persons purporting to be an authorized representative of the undersigned is our own. Bankers Trust shall not be liable for any loss that may result from such misunderstandings or unauthorized instructions. Over certain dollar levels, Bankers Trust may, but shall not be required to, seek verifications of your verbal instructions by call back. In case of doubt, the Bank may in its discretion refuse to execute our instructions, or any part thereof, without incurring any liability.

**REGISTRATION:** You and any subcustodians may maintain any or all of the Property in our name or in the name of yours or any subcustodian's nominee. The undersigned hereby appoints you as Attorney-in-Fact with power to execute endorsements and assignments.

Securities maintained through a subcustodian or which are eligible for deposit in a securities depository or clearing system may be maintained with the subcustodian or securities depository or clearing system in an account for your or your subcustodian's customers, unless prohibited by law, rule, or regulation. Securities maintained with a securities depository or clearing system shall be maintained subject to the rules of such depositories or systems governing the rights, and obligations among the securities depositories or clearing systems and its participants.

**CERTAIN AUTHORIZATIONS:** You may execute in the name of the undersigned for the Account whenever you deem it appropriate, such ownership and other certificates as may be required to obtain the payment of income and/or principal in respect of the Property. Furthermore, you may (but shall not be obligated to) pay on our behalf, and out of Property in the Account or otherwise held by you, any and all taxes (and levies in the nature of taxes) imposed by any governmental authority. The undersigned agrees, when and if requested by you and required in connection with the payment of any such taxes, to cooperate with you in furnishing information, executing documents or otherwise.

**IDENTIFIED ADVISOR; BROKER CONFIRMATIONS:** You are authorized to act on advisors' instructions regarding purchases and sales and to rely upon any other instructions from:

Name of Advisor(s): _Counterpoint Capital LLC_

_101 E. 52nd - 24th floor_

_NY NY 10022_

Such advisor has been appointed as our attorney-in-fact with full power of authority to take any or all actions and to give any and all instructions hereunder as fully as if we were to take or give the same. You shall be fully protected and shall not be expected to inquire as to the authority given above. You are authorized to enter into any arrangements with such advisor whereby you will receive instructions through an electronic means (including, without limitation an "institutional delivery system"). If you elect to enter into any such arrangement, you are hereby authorized to accept and to act upon instructions received by you under such arrangements, and we shall hold you harmless for any action or inaction of yours in relying upon such instructions.

The terms and conditions of appointment and authority of any advisor shall be our sole responsibility. We shall promptly notify Bankers Trust in writing of the appointment and removal of such advisor and the portion of the assets subject to the investment control of such advisor.

We acknowledge that you will receive instructions or confirmations from brokers engaged by us or by any advisor referred to above. We shall not in many cases advise you of the identity of any such broker or furnish you with evidence of our having engaged such broker.    Your receipt (by electronic or other means) from a broker (whether or not such broker has been previously identified by us) of any confirmation of a purchase or sale transaction that would require you to pay funds, deliver securities or take other action will be deemed to constitute an "instruction" for purposes of this provision if such confirmation properly identifies our account number and identification number, and you shall be deemed authorized to make such payment or delivery without any consultation with or further instruction from the undersigned.

In addition, you shall be under no duty or obligation to review any investment or reinvestment made or received upon the instructions of such broker or advisor.  Without limiting the generality of the foregoing, in the case of any transaction, the person giving the instructions shall have the entire responsibility for assuring that the transaction does not violate the prohibitions of any applicable state or federal law or court order or judgment affecting the administration of the assets of the undersigned.  You may from time to time consult with legal counsel and shall be fully protected in acting upon the advice of counsel.

As it relates to any advisor fees, we:

☐  authorize you to charge our custody account for advisor fees communicated to you by our advisors.  It is our responsibility to review these charges for accuracy and appropriateness and to raise questions about the fee's validity with our advisor. You may continue to pay advisor fees until such time we notify you in writing.

☐  do not authorize you to charge our custody account for advisor fees.  We will make arrangements to pay advisor fees separately with our advisor.

**STATEMENTS:**

You shall provide to us, and to whomever we authorize below, a written statement of all transactions in the Account effected by you during each preceding month.  If we do not file any written objections with you within ninety (90) days from the date of mailing of any statement to us, it shall be understood that we have no objection to the statement in any respect.

In any periodic statement of securities held in custody, Bankers Trust may, but shall not be required to provide indications of the price or value of such securities.    We acknowledge that securities issued in markets outside the United States (including the "Euromarkets") and other securities which are not listed on major U.S. securities exchanges may not be liquid or easily salable, even where they are listed on a foreign securities exchange or quoted on one or more computer screens or "inter-dealer quotation systems".  Where a statement includes values for any such securities (or issue or series thereof), these values may be obtained from one or more publicly available sources, including "last trade" information made available by foreign securities exchanges.  We acknowledge that such information may not, in fact, be current or represent or approximate the prices that could be obtained were we or Bankers Trust to endeavor to sell or offer for sale all or any portion of the securities of such issue on any securities exchange or in private transactions.  We understand that Bankers Trust is under no obligation to solicit bids or offers, or indications of prices or values, from dealers (including persons employed by Bankers Trust or its affiliated companies who deal in such securities).  We acknowledge that Bankers Trust assumes no responsibility whatsoever for the accuracy of such price or value information or for any use that may be made of such information by us or by persons with whom we deal, and we shall hold Bankers Trust harmless with respect to the foregoing.

**ACCESS TO BANKERS TRUST INSIGHT:**

We hereby request that Bankers Trust make available to us the Bankers Trust InSight service, we confirm that we have read the *Standard Terms and Conditions* for Bankers Trust InSight; and agree to all of the terms and conditions specified therein (all of which are hereby incorporated by reference herein). We further agree to abide by any amendments thereto effected hereafter in accordance with Section 1 thereof.

Prior to authorizing any third-party to access our accounts or any of them via the Bankers Trust InSight service, we agree to execute a further authorization letter in a form furnished to us by Bankers Trust and to be bound by the terms thereof.

**REPRESENTATIONS AND WARRANTIES:**

We hereby represent, warrant and agree that:

(1) we are a corporation duly incorporated and validly existing under the laws of _____ Delaware . and have all necessary power and authority (corporate and otherwise ) to execute, deliver and perform this agreement;

(2) our principal executive office and (if different) our registered office is/are located at:

R. Leff, Inc
10101 Roosevelt Blvd
Philadelphia
PA 19154 .

(3) the execution, delivery and performance of this agreement have been duly authorized by all necessary corporate action on our part and this agreement constitutes a legal, valid and binding obligation, enforceable in accordance with its terms;

(4) the execution, delivery and performance of this agreement do not and will not conflict with or result in a breach of our corporate charter or by-laws or any agreement or instrument to which we are a party or by which any of our property is bound or any applicable statute, decree, order, rule or regulation and do not and will not result in the creation of any lien or encumbrance on any of our property or assets, except the lien provided for herein;

(5) we are the beneficial owner of the Property free and clear from any trust, mortgage, charge, pledge, lien, encumbrance or other security interest whatsoever, except the lien provided for herein and we shall likewise be the unencumbered beneficial owner of any additional Property from time to time subject to this agreement;

(6) the persons identified and whose specimen signatures appear in Annex A are duly authorized (each acting individually) to take any actions, and give any instructions hereunder; and

(7) the undersigned agrees to promptly notify you in writing if any of the foregoing matters cease to be true and accurate, and you are authorized to rely upon the foregoing until your receipt of any such written notice.

Corporate

6

11/26/1999

**TAX STATUS:**          Our U.S. Taxpayer Identification Number is _____ *pending* _____

**IRS SUBSTITUTE**
**W-9 CERTIFICATION**    ☐ Domestic Clients    By checking this box, we hereby certify, under penalties of perjury, that we are not subject to backup withholding because: (a) we are exempt from backup withholding, or (b) we have not been notified that we are subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the Internal Revenue Service has notified us that we are no longer subject to backup withholding.

**IRS SUBSTITUTE**
**W-8 CERTIFICATION**    ☐ Foreign Clients    By checking this box, we hereby certify, under penalties of perjury, that we are the beneficial owner of all the income in this account, we are a foreign corporation, the income earned in this account is not effectively connected with the conduct of any trade or business in the United States, and we are neither engaged, nor plan to be engaged during the year, in a United States trade or business that has effectively connected gains from transactions with a broker or barter exchange.

In addition, if we are claiming a United States tax treaty benefit, we hereby certify, under penalties of perjury, that we are a resident of _____ within the meaning of the income tax treaty between the United States and that country.    If required, a U.S. Taxpayer Identification Number is included above.    We meet the requirements of the article in the applicable treaty dealing with limitations on benefits, (if any), and derives the income for which the treaty benefits are claimed.

Relevent W-8 and/or W-9 instructions are available upon request.

**MAIL:**          All communications should be addressed to: _____

_____

*R lift Inc*
*10107 Roosevelt Blvd*
*Philadelphia*
*PA 19154*

**FEE:**          We agree to pay you a monthly fee as compensation for your services hereunder, based on the sum of cash and the market value (or in the absence of a readily ascertainable market value, at such fair value as shall be determined by you in your discretion in accordance with methods customarily and consistently followed) of the securities and other Property in the Account, as well as applicable transaction fees, at the fee schedule that is then in effect. The fee shall be payable monthly in arrears. The Account will be valued at the close of each calendar month, each such valuation to determine the compensation for the preceding one-month period.

**PAYMENT OF FEE:**    You are authorized to charge all fees, and all expenses and costs incurred by you and any other amounts payable by us hereunder, to the cash account associated with the account or any other deposit account of the undersigned maintained in any department or branch of the Bank for all such items.

Corporate

7

**TERMINATION:**    This arrangement may be terminated at any time either by us or by you upon thirty (30) days written notice to the other (except that either of us may terminate this agreement forthwith and without prior notice in the event of a breach of any representation, warranty or agreement set forth herein) and in such event all fees are to be prorated. All representations, warranties and agreements hereunder shall survive any termination hereof, except that our obligation to pay your fees shall be limited to such fees as are accrued through the effective date of termination (but such limitation shall only be effective to the extent that we shall have taken delivery of all Property held by you in the Account prior to the effective date of termination). In the event of termination, we both shall cooperate in all respects and shall take all actions necessary to permit you to make an orderly transfer of the Property to us or such successor custodian, as we shall nominate.

**DISCLOSURE OF INFORMATION:**    The undersigned hereby authorizes you and your affiliates (including, without limitation, BT Alex. Brown Incorporated and BT Brokerage Corporation) to share information regarding the undersigned. The undersigned hereby directs you not to disclose the name or address of the undersigned to the issuer of any security held in the Account or the amount of securities to which the undersigned is the beneficial owner, unless you believe that you are required under applicable law to make such disclosure, in which event such disclosure may be made without notifying us or obtaining any further specific consent thereto; provided, however, that nothing in this agreement shall be deemed to prohibit disclosure, and you may disclose, upon request, to any governmental agency, stock exchange or self-regulatory organization having or claiming jurisdiction over you or your affiliates any information regarding the Account.

**GENERAL:**    You and your nominees shall not be responsible for, and we shall hold you and your nominees harmless and indemnify you and your nominees against, against any Liabilities (as defined below) in relation to or stemming from any of the following:

(1)    any decline in value of the Property resulting from (1) decisions to invest in, retain or dispose of any investments, or (2) any other cause that is not the result of your gross negligence, willful misconduct or breach of an undertaking of yours expressly stated herein;

(2)    any action which we or our attorneys, agents, custodians, executors or advisors may take or omit to take in respect of the Property or the Account;

(3)    any of the following acts, events or circumstances affecting the Property, the Account or your ability (or that or your subcustodians, nominees or agents) to carry out any duties: acts of governmental authorities (whether de jure or de facto), including, without limitation, nationalization, expropriation, and the imposition of currency restrictions; acts of war, terrorism, insurrection or revolution; strikes or work stoppages; the inability of a local clearing and settlement system to settle transactions for reasons beyond your control; or acts of God;

(4)    the action or inaction of any subcustodian or any loss sustained in the event of the insolvency, bankruptcy or similar event affecting any subcustodian except in the event that such subcustodian was selected as a result of your gross negligence or willful misconduct;

(5)    taxes, fines or governmental charges other than those incurred as a result of your gross negligence, willful misconduct or breach of an undertaking of yours expressly stated herein;

(6)    lack of authority or incapacity of any broker or advisor identified under "Identified Broker/Advisor" above; or

(7)    causes other than your gross negligence or willful misconduct or breach of an undertaking of yours expressly stated herein.

Corporate

8

11/26/1999

In no event shall you be liable for consequential, special or punitive damages.

For purposes of this provision, "Liabilities" means all taxes, charges, claims, fees and liabilities, including, without limitation, all fees and disbursements of counsel, court costs and any other costs or expenses incurred in connection with any dispute, controversy or proceeding whether or not the undersigned or the successors, heirs, executors, administrators or assignees of the undersigned are parties thereto.

You are authorized to charge the Account for all items for which we are responsible to indemnify you. Any Property, together with property in any other account which we may have with you (or your affiliates) shall be security for any obligations of ours in, under, or in respect of, this Agreement, and any loans, overdrafts or other extensions of credit which you may now or hereafter extend to the undersigned. We hereby pledge all such property to you and grant to you a continuing lien to secure the foregoing obligation. At no time will we, without your prior written consent, permit the Account or any Property to be subject to any other pledge, security interest or other claim. Such pledge and security interest shall remain in full force and effect until you receive full and final payment for all of our obligations referred to in this paragraph. We hereby consent and agree to promptly take such actions as you shall reasonably request from time to time in order to perfect and/or maintain the foregoing pledge, lien and security interest as a valid, perfected, first priority referred to above.

If the undersigned directs Bankers Trust to purchase securities or other investments that are mutual funds or other pooled investment vehicles which are organized, managed or advised by Bankers Trust or any of its affiliates, any purchase order shall constitute our acknowledgment that we have received a copy of the prospectus or offering materials for each such mutual fund or other vehicle. Without affecting the compensation to which Bankers Trust is otherwise entitled hereunder, each of Bankers Trust and its affiliates is authorized to charge and withhold any compensation in connection with advisory and/or other services performed for such mutual funds or other vehicles.

All amounts payable by the undersigned hereunder (including, without limitation, amounts payable in respect of purchases of securities or other property that we have instructed you to purchase for the Account) shall be paid by the undersigned in New York in freely available U.S. dollars (or in the case of purchases of securities or other property where such securities or other property are denominated or traded in another currency, if you so require or direct) without any deductions, withholdings, set-offs or counterclaims, and free and clear of all taxes (including, but not limited to, any withholding). If we shall be legally required to withhold any tax or other amount, we shall pay you such additional amounts as shall be required so that the net amounts received by you, after all such withholdings, shall be not less than what you would have received had no such withholdings been made or required.

We hereby represent, warrant and agree that:

(1)     this agreement and our obligations hereunder (including, without limitation, any obligation to make payments in U.S. dollars or other currencies), and

(2)     our purchase, ownership and sale (as the case may be) of all securities and other Property, constitute and will at all times constitute, our legal, valid and binding obligations, enforceable in accordance with their respective terms, and we agree that we shall perform all such obligations (including, without limitation, obtaining and making payments in U.S. dollars and/or such other currencies) in such a manner as to comply with all applicable laws, regulations, and administrative guidance of relevant authorities, including those pertaining to securities, exchange controls and related matters.

We further agree to notify you forthwith in writing if at any time we would be unable to make the foregoing representation and warranty at such time or if we should be unable to perform the foregoing agreement.

Corporate

9

11/26/1999

Any action taken by you or your nominee or nominees hereunder or any subcustodian prior to termination of this arrangement and final distribution as hereinabove provided, or, in the case of instructions given by any broker or advisor identified under the heading "Identified Broker/Advisor" above, written notice by us of our termination of the appointment of such broker or advisor, shall as to you and your nominee or nominees be binding upon the undersigned and our successors.

**GOVERNING LAW:**  This agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to choice of law principles. The undersigned hereby submits to the jurisdiction of the courts of the State of New York and of the Federal district court sitting therein with respect to any action, claim or proceeding arising out of or pertaining to this agreement or the matters or transactions referred to herein or contemplated hereby.

Under penalties of perjury, we certify that the information provided in the Tax Status section of this document is correct. We further certify that we will notify you in writing immediately if any representation made herein ceases to be true and correct.

We acknowledge that the Account does not constitute a deposit with Bankers Trust and is therefore not an obligation of or guaranteed by Bankers Trust, the Federal Deposit Insurance Corporation ("FDIC") or any other governmental agency. Similarly, the specific investments made by Bankers Trust for the Account as our agent may not be deposits or other obligations of or guaranteed by Bankers Trust, the FDIC or any other governmental agency. In such cases, such investments will be subject to investment risk, including possible loss of the principal invested.

Very truly yours,

**THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISION OF THIS DOCUMENT OTHER THAN THE CERTIFICATIONS REQUIRED TO AVOID BACKUP WITHHOLDING, ESTABLISH YOUR STATUS AS A FOREIGN PERSON, AND, IF APPLICABLE, OBTAIN A REDUCED RATE OF WITHHOLDING.**

_____   _____
(signature)                                                                       (print)

and/or _____   _____
             (signature)                                                            (print)

and/or _____   _____
             (signature)                                                            (print)

ACCEPTED: BANKERS TRUST PRIVATE BANKING

By: _____   Date: _____

☐  Please provide us with information on the Portfolio Lending service provided by Bankers Trust Private Banking.

# EXHIBIT 7

# BT Alex. Brown Account Agreement

LJL CATHERINE PARTNERS
_____
Name(s)

322 Catharine Street
_____
Address

Philadelphia, PA   19147
_____
City

**▲BTAlex.Brown**

P.O. Box 515
Baltimore, MD 21203

*222-08844*
_____
Account Number

---

**IMPORTANT:  PLEASE SIGN AND RETURN THIS ACCOUNT AGREEMENT IN THE ENCLOSED ENVELOPE.**

---

In consideration of BT Alex. Brown Incorporated ("BT Alex. Brown") accepting the account(s) of the undersigned, and agreeing to act as my broker, I agree to the following with respect to any of my accounts with you, in which I currently or in the future have an interest, for the extension of credit or the purchase or sale of securities, options or other property. Throughout this Agreement, "I," "me," "my," "we" and "us" and "the undersigned" refer to the person(s) whose signature(s) appear(s) below and all others who are legally obligated on this account. "You" and "your" refer to BT Alex. Brown, its subsidiaries, affiliates, officers, directors, agents and employees. BT Alex. Brown is a subsidiary of Bankers Trust New York Corporation. As used herein, the term "affiliate of BT" means Bankers Trust New York Corporation and its subsidiaries and affiliates, including, without limitation, BT Alex. Brown and Bankers Trust Company. Each of BT and its affiliates is a separately incorporated legal entity, none of which is responsible for the obligations of the others. Where the context requires, the singular shall be plural and the plural shall be singular.

1. **Representations**

   Unless I have advised you otherwise in writing, I represent that I am of legal age, that I am not an employee or member of any securities exchange (or corporation of which any exchange owns a majority of the capital stock), the National Association of Securities Dealers, Inc., or of any broker-dealer, nor am I a senior officer of any bank, savings and loan institution, insurance company, registered investment company, registered investment advisory firm or institution that purchases securities, nor am I a member of the immediate family of such a person. I further represent that I am financially capable of satisfying any obligations undertaken through my account. I also represent that no one except the persons named on the account(s) has any interest in the account(s). I will promptly notify you in writing if any of the above circumstances change. I acknowledge that the purchase and sale of securities entails substantial economic risk and I represent to you that I knowingly and willingly assume such risk.

2. **Applicable Rules and Regulations**

   All transactions in my account shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed. Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations or by government restrictions, exchange or market rulings, suspension of trading, war, or other conditions beyond your control.

3. **Confirmations, Statements and Written Communications**

   I agree to notify you in writing, within ten (10) days of your sending me a confirmation, of any objection I have to any transaction in my account. In the absence of such written notification, I agree that all transactions for my account will be final and binding on me. Confirmations of transactions, as well as other communications, may be sent to the address I provided to you or to such other address I may hereafter give to you in writing, and all communications so sent, whether by mail, private carrier, facsimile, messenger or otherwise, shall be deemed given to me, whether actually received or not. Unless I advise you in writing to the contrary, you may disclose my name and address to the issuers of securities which you hold for me.

4. **Aggregation of Orders and Average Prices**

   I authorize you, at your discretion, to aggregate orders for my account(s) with other customer orders. I recognize that in so doing, I may receive an average price for my orders which may be different from the price(s) I might have received had my orders not been aggregated. I understand that this practice may also result in my orders being only partially completed.

5. **Short and Long Orders: Deliveries and Settlements**

   I agree that, in giving orders to sell, all "short" sales will be designated by me as "short" and all other sales will be designated by you as "long." "Short sale" means any sale of a security not owned by me or any sale that is consummated on settlement date by delivery of a borrowed security. I also agree that you may, at your discretion, immediately cover any short sales in my account, without prior notice. My failure to designate a sale order as "short" is a representation on my part that I own the security free of restriction, and if the security is not in your possession at the time of the sale, I agree to deliver the security to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to my account. I agree that if you fail to receive payment for securities I have purchased you may, without prior demand or notice, sell those securities or other property held by you in any of my accounts with you and any loss resulting therefrom will be charged to such account(s). I authorize you, at your discretion, to request and obtain extension(s) of my time to make payment for securities I purchase, as provided for by Federal Reserve Bank Regulation T.

6. **Authority to Borrow**

   In case of the sale of any security or other property by you at my direction and your inability to timely deliver the same to the purchaser by reason of my failure to supply you therewith, I authorize you to purchase or borrow any security or other property necessary to make the required delivery, and I agree to be responsible for any loss or cost, including interest, which you sustain as a result of my failure to make delivery to you.

*PAGE 1 OF 4 PAGES*

7. Interest Charges

I acknowledge that debit balances in my cash or margin account, including but not limited to those arising from my failure to make payment by settlement date for securities purchased, will be charged interest at the then current rate, in accordance with your usual custom. Interest will be computed on the net daily debit balance, which is computed by combining all debit balances and credit balances in each account with the exception of credit balances associated with short security positions. I acknowledge receipt of your statement regarding interest charges and that you may charge an account maintenance fee with respect to inactive accounts.

8. Credit Information and Investigation

I authorize you to obtain reports concerning my credit standing and business conduct at your discretion. I also authorize you and any affiliate of BT (including, without limitation, Bankers Trust Company) to share such information and any other confidential information you and such affiliate(s) may have about me and my account(s).

9. Satisfaction of Indebtedness

I agree to satisfy, upon demand, any indebtedness, including any interest and commission charges. I further agree to pay the reasonable costs and expenses of collection of any amount I owe you, including reasonable attorney's fees and court costs.

10. Liens

I hereby grant to you and all affiliates of BT a security interest in all securities and other property in your possession or in the possession of any affiliate of BT in which I have an interest in order to secure any and all indebtedness or any other of my obligations to you or any affiliate of BT. All such securities and other property shall be held as security for the payment of any such obligations or indebtedness in any account with you in which I have an interest, and you may, in your discretion, at any time and without prior notice, sell and/or transfer any or all securities and other property in order to satisfy such obligations. In enforcing this lien, you shall have the discretion to determine which securities and property are to be sold and/or which contracts are to be closed.

11. Margin Maintenance, Calls for Additional Collateral, Liquidations and Covering Short Positions

If I engage in margin transactions, I will maintain such securities and other property in my account for margin purposes as you shall require from time to time. You shall have the right in accordance with your general policies regarding margin maintenance requirements, as such may be modified or amended from time to time, to require additional collateral or the liquidation of any securities and other property whenever in your sole discretion you consider it necessary for your protection. You may do so under circumstances which include, but are not limited to, the failure to promptly meet any call for additional collateral, the filing of a petition in bankruptcy, the appointment of a receiver by or against me or the attachment or levy against any account with you in which I have an interest. In such event, you are authorized to sell any and all securities and other property in any of my accounts with you whether carried individually or jointly with others, to buy all securities or other property which may be short in such account, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase, or other notice or advertisement, each of which is expressly waived. Any such sales or purchases may be made at your discretion on any exchange or other market where such business is usually transacted or at public auction or private sale, and you may be the purchaser for your own account. I understand that any prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice as provided herein.

12. Loan or Pledge of Securities and Other Property

Within the limitations imposed by applicable law, all securities and other property now or hereafter held, carried or maintained by you in your possession that have not been fully paid for or are held in a margin account may be lent, either to yourself or to others, pledged and repledged by you, without notice to me, either separately or in common with other securities and other property of your other customers for any amount due in any account with you in which I have an interest, or for any greater amount, and you may do so without retaining in your possession or control for delivery a like amount of similar securities or other property. I understand that in the event securities held for my account are loaned out, I may lose certain voting rights attendant to such securities.

13. Correspondent Account: No Agency

If my account has been introduced to you by arrangement with another broker-dealer, you are authorized to accept from such other broker-dealer, without inquiry or investigation by you (i) orders for the purchase or sale of securities or other property for my account, on margin or otherwise, and (ii) any other instructions concerning my account. I understand and agree that such other broker-dealer is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such other broker-dealer, its officers, employees or agents.

14. Joint Accounts

If this is a Joint Account, we agree that each of us shall have authority with respect to this account to deal with you as if each of us alone were the account owner, all without notice to the other account owner(s). We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for this account. You may follow the instructions of any of us concerning this account and make deliveries to any of us, of any or all property and payment, even if such deliveries and/or payments shall be made to one of us personally, and not to all of the account owners. You shall be under no obligation to inquire into the purpose of any such demand for delivery of securities or payment, and you shall not be bound to see to the application or disposition of the securities and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by all of the account owners with respect to any matter concerning the account, including the giving or cancellation of orders and the withdrawal of monies, securities or other property. We agree that our account will be carried on your books in the form reflected by the above account name. In the event of the death of any of us, the survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such action, require such documents, retain such securities and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. Any cost resulting from the death of any of us, or through the exercise by any decedent's estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent.

15. Foreign Securities

With respect to debt or equity securities of foreign issuers or debt or deposit instruments of foreign banks ("Foreign Securities"), I acknowledge and understand that: (i) Foreign Securities are, in most cases, not registered with the Securities and Exchange Commission or listed on any U.S. securities exchange; (ii) Foreign Securities, particularly those of issuers in the so-called "emerging markets" are often illiquid, are sometimes subject to legal and/or contractual transfer restrictions, and it may be difficult or impossible to dispose of such Foreign Securities prior to the maturity thereof or to determine the market price thereof for valuation purposes; (iii) Foreign Securities, and the issuer, guarantors or other obligors with respect thereto ("Obligors") are subject to a variety of risks in addition to those typically faced in the case of U.S. securities and issuers, including, *inter alia*, currency risk, exchange controls, confiscatory taxation, withholding,

PAGE (2) OF 4 PAGES

limitations on the rights of security holders, civil unrest, hyperinflation, discriminatory treatment of foreign investors, etc.; (iv) there is often less information available regarding Obligors, and such information may be more difficult to interpret, than is the case with U.S. issuers whose securities are subject to the periodic reporting requirements under U.S. securities laws; (v) there may be no effective means to determine if an Obligor is in default of its obligations in respect of its debt securities or other financial obligations (and you specifically acknowledge that Foreign Securities purchased by you may be in default at the time of purchase); (vi) the Foreign Securities in question may be unrated; and (vii) such securities are not suitable for all investors.

I authorize BT Alex. Brown to purchase Foreign Securities (and, in the case of Foreign Securities denominated in foreign currencies, the relevant foreign currencies) from or sell Foreign Securities (and foreign exchange) to an affiliate of BT. In dealing with such affiliates, such affiliates may take their normal commissions, spreads or other fees without regard to BT Alex. Brown's relationship with me.

### 16. Acknowledgment of Possible Conflicts of Interest

I acknowledge that the advice provided to me by your employees may differ from the advice or the timing or nature of action recommended by or taken by other individuals or groups at BT Alex. Brown and/or affiliates of BT, whether acting as principal or agent. I understand that you provide investment advice, portfolio management and execution services for many clients and, in addition, act as principals in various markets. Given these different roles, individuals and groups at BT Alex. Brown and affiliates of BT are seldom of one view as to an investment strategy and will often pursue strategies which are not disclosed to other persons or groups within BT Alex. Brown and affiliates of BT. Your employees shall have no obligation to recommend to me the purchase or sale of any security which any individual or group at BT Alex. Brown or any affiliate of BT may purchase or sell for its own account or for the account of any other client or for the account of any affiliates of BT or for the accounts of any of their clients. I also acknowledge that:

BT Alex. Brown and affiliates of BT may perform services for or solicit business from issuers whose securities are recommended by your employees;

BT Alex. Brown and affiliates of BT may be paid fees by Registered Investment Companies or other investment vehicles, including without limitation those for acting as investment advisor, administrator, custodian and transfer agent; and

BT Alex. Brown and affiliates of BT act as brokers, principals, and/or market makers in certain markets and may do so in transactions with me.

### 17. No FDIC Insurance, Not Obligations of Bankers Trust Company

I understand that the assets in my account are subject to the risk of partial or total loss due to market fluctuations or the insolvency of the issuer(s).

The assets in my account (including all related cash balances and shares of any mutual fund) are not deposits or other obligations of Bankers Trust Company, are not guaranteed by Bankers Trust Company and are not insured by the Federal Deposit Insurance Corporation ("FDIC").

I may from time to time be offered investment products as to which Bankers Trust Company is an obligor. These products may be complex, may not provide for the return of the full amount of principal invested or for the payment of a fixed rate of interest (or any interest) and will not usually be subject to FDIC insurance. I will assume there are not subject to FDIC insurance and that such products may not be protected as to principal or interest unless Bankers Trust Company states in writing that a particular product is subject to FDIC insurance.

### 18. Miscellaneous

This Agreement shall be binding upon my heirs, executors, administrators, personal representatives and permitted assigns. It shall inure to the benefit of your successors and assigns to whom you may transfer my account. This Agreement contains the entire understanding between us concerning the subject matter of this Agreement. I agree that BT Alex. Brown has the right to amend this Agreement at any time by sending written notice of such amendment to me. Any such amendment shall be effective as of the date established by BT Alex. Brown. If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not affect the validity of the remaining provisions of this Agreement. This Agreement shall be deemed to have been made in the State of New York and shall be construed, and the rights of the parties determined, in accordance with the laws of the State of New York and the United States, as amended, without giving effect to the choice of law or conflict-of-laws provisions thereof.

### 19. Paragraph Headings

Paragraph headings are for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

### 20. Certification - Taxpayer Identification Number

Certification Instructions: I will cross out item (2) below if I have been notified by the IRS that I am currently subject to backup withholding because I have failed to report all interest and dividends on my tax return. If I am exempt from backup withholding, I will write the word "Exempt" here: _____ (For further information, see "Payees and Payments Exempt from Backup Withholding" on IRS Form W-9, a copy of which can be obtained from a BT Alex. Brown Investment Representative.)

Under penalties of perjury, I certify that: (1) The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because (a) I am exempt from backup withholding or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.

By signing below I acknowledge that I have received, read and agree to the terms of this Agreement.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. *If this is a Joint Account, all account owners must sign.*

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OE OR GUARANTEED BY ANY BANK AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

Signature _____     Date_____

Social Security or Employer ID No. 23-2985348

Signature _____     Date_____

Social Security or Employer ID No. _____

Signature _____     Date_____

Social Security or Employer ID No. _____

PAGE (3) OF 4 PAGES

**Certification of Foreign Status**

*A non-resident alien individual or an exempt foreign person must check the applicable box(es) and sign this section.*

Under penalties of perjury, I certify that:

- ☐ For interest payments, I am not a U.S. citizen or resident (or I am filing for a foreign corporation, partnership, estate, or trust).
- ☐ For dividends, I am not a U.S. citizen or resident (or I am filing for a foreign corporation, partnership, estate, or trust).
- ☐ For Broker transactions or Barter exchange, I am an exempt foreign person as defined on IRS Form W-8.
  *(A copy of IRS Form W-8 can be obtained from a BT Alex. Brown Investment Representative.)*

Signature _____    Date _____

Permanent Address _____

_____    Country _____

Note:   *Beneficial owners of certain types of income (or owners' trustees or agents) may use IRS Form 1001 to report to a withholding agent both the own-ership of the income and the reduced rate of tax or exemption from tax on the income under tax conventions or treaties. Such form can also be used to claim a release of tax withheld at source. For a copy of IRS Form 1001, please call a BT Alex. Brown Investment Representative.*

## PLEASE READ AND SIGN BELOW TO OPEN A MARGIN ACCOUNT

I agree to open a margin account with you and acknowledge to you that, in addition to the preceding information, I understand each of the following:

- When I purchase securities on margin, I borrow money from you to finance that purchase; I may also borrow against collateral in my margin account for other purposes.
- I will be obligated to pay interest on all sums I borrow from you.
- I may be required to deliver additional collateral consisting of cash or securities to you to maintain my loan balance, as you require.
- By using a margin account to leverage my investments, I increase my risk of loss.
- BT Alex. Brown will deduct all interest charges from my account.

BT Alex. Brown represents to me that:

- My current margin debit balance will appear on each account statement BT Alex. Brown sends to me.
- BT Alex. Brown will charge me interest on a monthly basis and will disclose on my account statement the interest rate and total interest charge.

By signing below, I authorize you to open and carry a margin account for my benefit, and acknowledge that securities in my account may be loaned to BT Alex. Brown as principal or loaned to others. I also acknowledge that I have received, read and agree to the terms of this Margin Agreement.

**I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF OR GUARANTEED BY ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.**

Signature _____    Date _____

Signature _____    Date _____

Signature _____    Date _____

Paragraph 20 of this Agreement includes a certification of the Taxpayer Identification Number designated for this account and a representation regarding the applicability of backup withholding. If BT Alex. Brown does not receive this certification, it will be required to withhold a portion of all payments to this account.

Branch Manager approval for margin accounts

Signature _____    FOR OFFICE USE ONLY    Date _____

PAGE (4) OF 4 PAGES

# EXHIBIT 8

# BT Alex. Brown Account Agreement

RHL CHAPEL PARTNERS

**ＡBTAlex.Brown**
P.O. Box 515
Baltimore, MD 21203

Name(s)

425 Chapel Road

Address

Elkins Park, PA   19027

City

*222-08845*

Account Number

---

**IMPORTANT:  PLEASE SIGN AND RETURN THIS ACCOUNT AGREEMENT IN THE ENCLOSED ENVELOPE.**

In consideration of BT Alex. Brown Incorporated ("BT Alex. Brown") accepting the account(s) of the undersigned, and agreeing to act as my broker. I agree to the following with respect to any of my accounts with you, in which I currendy or in the future have an interest, for the extension of credit or the purchase or sale of securities, options or other property. Throughout this Agreement, "I," "me," "my," "we" and "us" and "the undersigned" refer to the person(s) whose signature(s) appear(s) below and all others who are legally obligated on this account.  "You" and "your" refer to BT Alex. Brown, its subsidiaries, affiliates, officers, directors, agents and employees. BT Alex. Brown is a subsidiary of Bankers Trust New York Corporation. As used herein, the term "affiliate of BT" means Bankers Trust New York Corporation and its subsidiaries and affiliates, including, without limitation. BT Alex. Brown and Bankers Trust Company. Each of BT and its affiliates is a separately incorporated legal entity, none of which is responsible for the obligations of the others.  Where the context requires, the singular shall be plural and the plural shall be singular.

1.  Representations

Unless I have advised you otherwise in writing, I represent that I am of legal age, that I am not an employee or member of any securities exchange (or corporation of which any exchange owns a majority of the capital stock), the National Association of Securities Dealers, Inc., or of any broker-dealer. nor am I a senior officer of any bank, savings and loan institution, insurance company, registered investment company, registered investment advisory firm or institution that purchases securities, nor am I a member of the immediate family of such a person. I further represent that I am financially capable of satisfying any obligations undertaken through my account. I also represent that no one except the persons named on the account(s) has any interest in the account(s). I will promptly notify you in writing if any of the above circumstances change. I acknowledge that the purchase and sale of securities entails substantial economic risk and I represent to you that I knowingly and willingly assume such risk.

2.  Applicable Rules and Regulations

All transactions in my account shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed. Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations or by government restrictions, exchange or market rulings, suspension of trading, war, or other conditions beyond your control.

3.  Confirmations, Statements and Written Communications

I agree to notify you in writing, within ten (10) days of your sending me a confirmation. of any objection I have to any transaction in my account.  In the absence of such written notification. I agree that all transactions for my account will be final and binding on me. Confirmations of transactions, as well as other communications, may be sent to the address I provided to you or to such other address I may hereafter give to you in writing, and all communications so sent, whether by mail, private carrier, facsimile, messenger or otherwise, shall be deemed given to me, whether actually received or not. Unless I advise you in writing to the contrary, you may disclose my name and address to the issuers of securities which you hold for me.

4.  Aggregation of Orders and Average Prices

I authorize you, at your discretion, to aggregate orders for my account(s) with other customer orders. I recognize that in so doing, I may receive an average price for my orders which may be different from the price(s) I might have received had my orders not been aggregated. I understand that this practice may also result in my orders being only partially completed.

5.  Short and Long Orders: Deliveries and Settlements

I agree that, in giving orders to sell, all "short" sales will be designated by me as "short" and all other sales will be designated by you as "long." "Short sale" means any sale of a security not owned by me or any sale that is consummated on settlement date by delivery of a borrowed security.  I also agree that you may, at your discretion, immediately cover any short sales in my account, without prior notice.  My failure to designate a sale order as "short" is a representation on my part that I own the security free of restriction, and if the security is not in your possession at the time of the sale. I agree to deliver the security to you by settlement date.  In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to my account. I agree that if you fail to receive payment for securities I have purchased you may, without prior demand or notice. sell those securities or other property held by you in any of my accounts with you and any loss resulting therefrom will be charged to such account(s).
I authorize you, at your discretion, to request and obtain extension(s) of my time to make payment for securities I purchase, as provided for by Federal Reserve Bank Regulation T.

6.  Authority to Borrow

In case of the sale of any security or other property by you at my direction and your inability to timely deliver the same to the purchaser by reason of my failure to supply you therewith. I authorize you to purchase or borrow any security or other property necessary to make the required delivery, and I agree to be responsible for any loss or cost, including interest, which you sustain as a result of my failure to make delivery to you.

*PAGE (1. OF 4 PAGES*

7. **Interest Charges**

I acknowledge that debit balances in my cash or margin account, including but not limited to those arising from my failure to make payment by settlement date for securities purchased, will be charged interest at the then current rate, in accordance with your usual custom. Interest will be computed on the net daily debit balance, which is computed by combining all debit balances and credit balances in each account with the exception of credit balances associated with short securities positions. I acknowledge receipt of your statement regarding interest charges and that you may charge an account maintenance fee with respect to inactive accounts.

8. **Credit Information and Investigation**

I authorize you to obtain reports concerning my credit standing and business conduct at your discretion. I also authorize you and any affiliate of BT (including, without limitation, Bankers Trust Company) to share such information and any other confidential information you and such affiliate(s) may have about me and my account(s).

9. **Satisfaction of Indebtedness**

I agree to satisfy, upon demand, any indebtedness, including any interest and commission charges. I further agree to pay the reasonable costs and expenses of collection of any amount I owe you, including reasonable attorney's fees and court costs.

10. **Liens**

I hereby grant to you and all affiliates of BT a security interest in all securities and other property in your possession or in the possession of any affiliate of BT in which I have an interest in order to secure any and all indebtedness or any other of my obligations to you or any affiliate of BT. All such securities and other property shall be held as security for the payment of any such obligations or indebtedness in any account with you in which I have an interest, and you may, in your discretion, at any time and without prior notice, sell and/or transfer any or all securities and other property in order to satisfy such obligations. In enforcing this lien, you shall have the discretion to determine which securities and property are to be sold and/or which contracts are to be closed.

11. **Margin Maintenance, Calls for Additional Collateral, Liquidations and Covering Short Positions**

If I engage in margin transactions, I will maintain such securities and other property in my account for margin purposes as you shall require from time to time. You shall have the right in accordance with your general policies regarding margin maintenance requirements, as such may be modified or amended from time to time, to require additional collateral or the liquidation of any securities and other property whenever in your sole discretion you consider it necessary for your protection. You may do so under circumstances which include, but are not limited to, the failure to promptly meet any call for additional collateral, the filing of a petition in bankruptcy, the appointment of a receiver by or against me or the attachment or levy against any account with you in which I have an interest. In such event, you are authorized to sell any and all securities and other property in any of my accounts with you whether carried individually or jointly with others, to buy all securities or other property which may be short in such account, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase, or other notice or advertisement, each of which is expressly waived. Any such sales or purchases may be made at your discretion on any exchange or other market where such business is usually transacted or at public auction or private sale, and you may be the purchaser for your own account. I understand that any prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice as provided herein.

12. **Loan or Pledge of Securities and Other Property**

Within the limitations imposed by applicable law, all securities and other property now or hereafter held, carried or maintained by you in your possession that have not been fully paid for or are held in a margin account may be lent, either to yourself or to others, pledged and repledged by you, without notice to me, either separately or in common with other securities and other property of your other customers for any amount due in any account with you in which I have an interest, or for any greater amount, and you may do so without retaining in your possession or control for delivery a like amount of similar securities or other property. I understand that in the event securities held for my account are loaned out, I may lose certain voting rights attendant to such securities.

13. **Correspondent Account: No Agency**

If my account has been introduced to you by arrangement with another broker-dealer, you are authorized to accept from such other broker-dealer, without inquiry or investigation by you (i) orders for the purchase or sale of securities or other property for my account, on margin or otherwise, and (ii) any other instructions concerning my account. I understand and agree that such other broker-dealer is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such other broker-dealer, its officers, employees or agents.

14. **Joint Accounts**

If this is a Joint Account, we agree that each of us shall have authority with respect to this account to deal with you as if each of us alone were the account owner, all without notice to the other account owner(s). We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for this account. You may follow the instructions of any of us concerning this account and make deliveries to any of us, of any or all property and payment, even if such deliveries and/or payments shall be made to one of us personally, and not to all of the account owners. You shall be under no obligation to inquire into the purpose of any such demand for delivery of securities or payment, and you shall not be bound to see to the application or disposition of the securities and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by all of the account owners with respect to any matter concerning the account, including the giving or cancellation of orders and the withdrawal of monies, securities or other property. We agree that our account will be carried on your books in the form reflected by the above account name. In the event of the death of any of us, the survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such action, require such documents, retain such securities and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. Any cost resulting from the death of any of us, or through the exercise by any decedent's estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent.

15. **Foreign Securities**

With respect to debt or equity securities of foreign issuers or debt or deposit instruments of foreign banks ("Foreign Securities"), I acknowledge and understand that: (i) Foreign Securities are, in most cases, not registered with the Securities and Exchange Commission or listed on any U.S. securities exchange; (ii) Foreign Securities, particularly those of issuers in the so-called "emerging markets" are often illiquid, are sometimes subject to legal and/or contractual transfer restrictions, and it may be difficult or impossible to dispose of such Foreign Securities prior to the maturity thereof or to determine the market price thereof for valuation purposes; (iii) Foreign Securities, and the issuer, guarantors or other obligors with respect thereto ("Obligors") are subject to a variety of risks in addition to those typically faced in the case of U.S. securities and issuers, including, *inter alia*, currency risk, exchange controls, confiscatory taxation, withholding,

limitations on the rights of security holders, civil unrest, hyperinflation, discriminatory treatment of foreign investors, etc.; (iv) there is often less information available regarding Obligors, and such information may be more difficult to interpret, than is the case with U.S. issuers whose securities are subject to the periodic reporting requirements under U.S. securities laws; (v) there may be no effective means to determine if an Obligor is in default of its obligations in respect of its debt securities or other financial obligations (and you specifically acknowledge that Foreign Securities purchased by you may be in default at the time of purchase); (vi) the Foreign Securities in question may be unrated; and (vii) such securities are not suitable for all investors.

I authorize BT Alex. Brown to purchase Foreign Securities (and, in the case of Foreign Securities denominated in foreign currencies, the relevant foreign currencies) from or sell Foreign Securities (and foreign exchange) to an affiliate of BT. In dealing with such affiliates, such affiliates may take their normal commissions, spreads or other fees without regard to BT Alex. Brown's relationship with me.

### 16. Acknowledgment of Possible Conflicts of Interest

I acknowledge that the advice provided to me by your employees may differ from the advice or the timing or nature of action recommended by or taken by other individuals or groups at BT Alex. Brown and/or affiliates of BT, whether acting as principal or agent. I understand that you provide investment advice, portfolio management and execution services for many clients and, in addition, act as principals in various markets. Given these different roles, individuals and groups at BT Alex. Brown and affiliates of BT are seldom of one view as to an investment strategy and will often pursue strategies which are not disclosed to other persons or groups within BT Alex. Brown or affiliates of BT. Your employees shall have no obligation to recommend to me the purchase or sale of any security which any individual or group at BT Alex. Brown or any affiliate of BT may purchase or sell for its own account or for the account of any other client or for the account of any affiliates of BT or for the accounts of any of their clients. I also acknowledge that:

BT Alex. Brown and affiliates of BT may perform services for or solicit business from issuers whose securities are recommended by your employees;

BT Alex. Brown and affiliates of BT may be paid fees by Registered Investment Companies or other investment vehicles, including without limitation those for acting as investment advisor, administrator, custodian and transfer agent; and

BT Alex. Brown and affiliates of BT act as brokers, principals, and/or market makers in certain markets and may do so in transactions with me.

### 17. No FDIC Insurance, Not Obligations of Bankers Trust Company

I understand that the assets in my account are subject to the risk of partial or total loss due to market fluctuations or the insolvency of the issuer(s).

The assets in my account (including all related cash balances and shares of any mutual fund) are not deposits or other obligations of Bankers Trust Company, are not guaranteed by Bankers Trust Company and are not insured by the Federal Deposit Insurance Corporation ("FDIC").

I may from time to time be offered investment products as to which Bankers Trust Company is an obligor. These products may be complex, may not provide for the return of the full amount of principal invested or for the payment of a fixed rate of interest (or any interest) and will not usually be subject to FDIC insurance. I will assume they are not subject to FDIC insurance and that such products may not be protected as to principal or interest unless Bankers Trust Company states in writing that a particular product is subject to FDIC insurance.

### 18. Miscellaneous

This Agreement shall be binding upon my heirs, executors, administrators, personal representatives and permitted assigns. It shall inure to the benefit of your successors and assigns to whom you may transfer my account. This Agreement contains the entire understanding between us concerning the subject matter of this Agreement. I agree that BT Alex. Brown has the right to amend this Agreement at any time by sending written notice of such amendment to me. Any such amendment shall be effective as of the date established by BT Alex. Brown. If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not affect the validity of the remaining provisions of this Agreement. This Agreement shall be deemed to have been made in the State of New York and shall be construed, and the rights of the parties determined, in accordance with the laws of the State of New York and the United States, as amended, without giving effect to the choice of law or conflict-of-laws provisions thereof.

### 19. Paragraph Headings

Paragraph headings are for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

### 20. Certification - Taxpayer Identification Number

Certification Instructions: I will cross out item (2) below if I have been notified by the IRS that I am currently subject to backup withholding because I have failed to report all interest and dividends on my tax return. If I am exempt from backup withholding, I will write the word "Exempt" here: _____ (For further information, see "Payees and Payments Exempt from Backup Withholding" on IRS Form W-9, a copy of which can be obtained from a BT Alex. Brown Investment Representative.)

Under penalties of perjury, I certify that: (1) The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because (a) I am exempt from backup withholding or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.

By signing below I acknowledge that I have received, read and agree to the terms of this Agreement.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. *If this is a Joint Account, all account owners must sign.*

**I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.**

Signature _Ronnie W Jill_ _____ Date _____

Social Security or Employer ID No. _23-3185345_ _____

Signature _____ Date _____

Social Security or Employer ID No. _____

Signature _____ Date _____

Social Security or Employer ID No. _____

PAGE (3) OF 4 PAGES

## Certification of Foreign Status

*A non-resident alien individual or an exempt foreign person must check the applicable box(es) and sign this section.*

Under penalties of perjury, I certify that:

☐ For interest payments, I am not a U.S. citizen or resident (or I am filing for a foreign corporation, partnership, estate, or trust).

☐ For dividends, I am not a U.S. citizen or resident (or I am filing for a foreign corporation, partnership, estate, or trust).

☐ For Broker transactions or Barter exchange, I am an exempt foreign person as defined on IRS Form W-8.
(A copy of IRS Form W-8 can be obtained from a BT Alex. Brown Investment Representative.)

Signature _____  Date _____

Permanent Address _____

_____  Country _____

*Note: Beneficial owners of certain types of income (or owners' trustees or agents) may use IRS Form 1001 to report to a withholding agent both the ownership of the income and the reduced rate of tax or exemption from tax on the income under tax conventions or treaties. Such form can also be used to claim a release of tax withheld at source. For a copy of IRS Form 1001, please call a BT Alex. Brown Investment Representative.*

## PLEASE READ AND SIGN BELOW TO OPEN A MARGIN ACCOUNT.

I agree to open a margin account with you and acknowledge to you that, in addition to the preceding information, I understand each of the following:

- When I purchase securities on margin, I borrow money from you to finance that purchase; I may also borrow against collateral in my margin account for other purposes.
- I will be obligated to pay interest on all sums I borrow from you.
- I may be required to deliver additional collateral consisting of cash or securities to you to maintain my loan balance, as you require.
- By using a margin account to leverage my investments, I increase my risk of loss.
- BT Alex. Brown will deduct all interest charges from my account.

BT Alex. Brown represents to me that:

- My current margin debit balance will appear on each account statement BT Alex. Brown sends to me.
- BT Alex. Brown will charge me interest on a monthly basis and will disclose on my account statement the interest rate and total interest charge.

By signing below, I authorize you to open and carry a margin account for my benefit, and acknowledge that securities in my account may be loaned to BT Alex. Brown as principal or loaned to others. I also acknowledge that I have received, read and agree to the terms of this Margin Agreement.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

Signature _Ronnie H Jeff_____  Date _____

Signature _____  Date _____

Signature _____  Date _____

Paragraph 20 of this Agreement includes a certification of the Taxpayer Identification Number designated for this account and a representation regarding the applicability of backup withholding. If BT Alex. Brown does not receive this certification, it will be required to withhold a portion of all payments to this account.

Branch Manager approval for margin account
Signature _____  FOR OFFICE USE ONLY  Date _____

AA2 (10/97)

PAGE 4 OF 4 PAGES

# EXHIBIT 9

STATE OF MINNESOTA     FILED     **DISTRICT COURT**

**COUNTY OF HENNEPIN**    06 AUG 16    **FOURTH JUDICIAL DISTRICT**

       DEPUTY

      HENN CO. DISTRIC **Court File No.** 27CV05-11478

     COURT ADMINISTRATOR

BFS MORGAN INVESTORS, LLC; RDH
LOCH INVESTMETNS LLC; WFW GRAYS
LANDING INVESTMENTS LLC; WRB
PARTNERS; WRB LAKE INVESTORS, INC.,
WILLIAM F. WANNER, JR; KATHLEEN A.
WANNER; BRIAN F. SULLIVAN; MARIA T.
SULLIVAN; RICHARD D. HEMBREE; and
MARY-ANNE MACKINNON-HEMBREE

         Plaintiffs,

vs.                           **ORDER DISMISSING**
                              **COMPLAINT**

DEUTSCHE BANK AG, DEUTSCHE BANK
SECURITES, INC., D/B/A DEUTSCHE BANK
ALEX BROWN, a DIVISION OF DEUTSCHE
BANKE SECURTIES, INC.; DAVID PARSE;
SIDLEY AUSTIN BROWN & WOOD LLP;
R.J. RUBLE; GRADY DICKENS; SCHEEF &
STONE, LLP

         Defendants.

The above-entitled matter came before the Honorable Harry Seymour Crump on
August 2, 2006, pursuant to Defendants Deutsche Bank and David Parse's ("Defendants
Deutsche Bank") Motion to Dismiss Plaintiff's Original Complaint.  The record closed
on August 16, 2006.

Plaintiffs BFS Morgan Investors, et al. ("Plaintiff BFS") was represented by
Jeven Sloan of Deary Montgomery DeFeo & Canada, L.L.P., Chateau Plaza, Suite 1565,
2515 McKinney Avenue, Dallas, TX 75201; and K. Jon Breyer of Fruth Jamison &
Elsass P.A., 3902 IDS Center, 80 South Eighth Street, Minneapolis MN 55402.
Defendants Deutsche Bank were represented by Adam Keiser of Dewey Ballantine
L.L.P., 1301 Avenue of the Americas, New York, NY 10019-6092; Daniel Walworth (for
David Parse) of Brune & Richard L.L.P., 2019 Webster Street, San Francisco, CA 94115;

and Michael J. Bleck (for Deutsche Bank and David Parse) of Oppenheimer Wolff & Donnelly L.L.P., Plaza VII, Suite 3300, 45 South Seventh Street, Minneapolis, MN 55402-1609.

Based on the record, the parties' oral consent, and pursuant to Minn. R. Civ. Proc. 12.02(b) the Court makes the following order with respect to the Deutsche Bank Defendants:

**IT IS HEREBY ORDERED:**

1.  Plaintiff BFS's Count One: for Declaratory Judgment and Unjust Enrichment, is **DISMISSED**;

2.  Plaintiff BFS's Count Two: Breach of Contract or Breach of the Duty of Good Faith and Fair Dealing, is **DISMISSED**;

3.  Plaintiff BFS's Count Three: Breach of Fiduciary Duty is **DISMISSED**;

4.  Plaintiff BFS's Count Four: Fraud claim is **DISMISSED**;

5.  Plaintiff BFS's Count Five: Negligence claim is **DISMISSED**;

6.  Plaintiff BFS's Count Six: Negligent Misrepresentation claim is **DISMISSED**:

7.  Plaintiff BFS's Count Seven: Breach of Contract claim is **DISMISSED**;

8.  Plaintiff BFS's Count Eight: Declaratory Judgment claim is **DISMISSED**;

9.  Plaintiff BFS's Count Nine: Unethical, Excessive and Illegal Fees is **DISMISSED**;

10.  Plaintiff BFS's Count Ten: Civil Conspiracy is **DISMISSED**;

11.  The attached Memorandum of Law is incorporated herein.

*There Being No Just Reason for Delay, Let Judgment Be Entered Accordingly,*

BY THE COURT:

Dated: August 16, 2006

Harry Seymour Crump
Judge of District Court

2

## MEMORANDUM OF LAW

### I.    INTRODUCTION

Defendants Deutsche Bank brings this motion to dismiss pursuant to Minn. R. Civ. Proc. 12.02(e) for failure to state a claim upon which relief can be granted on all of Plaintiff BFS's ten counts for claims of declaratory judgment and unjust enrichment; breach of the duty of good faith and fair dealing; breach of fiduciary duty; fraud; negligence; negligent misrepresentation; breach of contract; declaratory judgment; unethical, excessive and illegal fees; and civil conspiracy.  Plaintiffs' claims arise out of foreign exchange contracts ("FX contracts") signed by Plaintiff and executed by investment bank Defendants Deutsche Bank as part of a tax savings strategy initiated by accounting firm Ernst & Young LLP.  (Ernst & Young is not a defendant in this action since they are in separate arbitration proceedings with Plaintiff BFS).

As a preliminary matter the court addresses the governing law in this dispute. Minnesota courts traditionally uphold contractual choice-of-law provisions as enforceable.  *See* Hagstrom v. Am. Circuit Breaker Corp., 518 N.W.2d 46, 48 (Minn.App. 1994).  The FX contracts between Plaintiff BFS and Defendants Deutsche Bank designate New York law as the applicable law.  Plaintiff has made no objection to the application of New York law and in its defensive motion papers rely heavily on New York law.  Therefore, New York law will apply to the substantive claims and defenses of the parties (Plaintiff BFS and Defendants Deutsche) to this action.  However, Minnesota law governs all procedural aspects of these claims, particularly in adjudging the sufficiency of the claims and pleadings under Minn. R. Civ. Proc. 9.01 and Minn. R. Civ. Proc. 12.02(e).  On a motion to dismiss a court will liberally construe the pleadings and take all facts alleged as true.  *See* Northern States Power Co. v. Franklin, 122 N.W.2d 26, 29 (Minn. 1963).

3

<u>Brief Factual Summary</u>

Plaintiff BFS are a series of businesses set up to effectuate a tax-shelter strategy called COBRA marketed by accounting firm, Ernst & Young. The overall strategy was designed to limit Plaintiff BFS's tax liability by increasing their tax basis and off-setting their capital gains liability resulting from their multi-million dollar sale of their business, REI, Inc.. The strategy was implemented through the use of foreign exchange digital option contracts ("FX contracts"). Defendant Deutsche Bank, investment bank, was the brokerage house who executed the FX contracts. Defendant David Parse at all relevant times of Plaintiff's complaint was an employee of Deutsche Bank. Plaintiffs bought into the COBRA strategy sometime in November of 1999. The strategy was ultimately declared illegal by the Internal Revenue Service (IRS), retroactive to October of 1999. Plaintiff BFS suffered several million dollars in tax penalties as a result. Plaintiff BFS seeks to recover from all defendants who were in any way related to the COBRA strategy.

## II.    PLAINTIFF BFS's TEN COUNTS

After reading all two-hundred-and-sixty-three paragraphs of Plaintiff BFS's original complaint, the court makes the following conclusions of law with respect to each claim asserted against Defendants Deutsche Bank.

### A. Count One: Declaratory Judgment and Unjust Enrichment

Plaintiff BFS asks the court to declare the FX contracts signed with Defendants Deutsche Bank unenforceable and as a consequence the fees paid under the contracts, a sum of $4,227,500, unjust enrichment. Plaintiff's grounds for asserting the unenforceability of the contracts are alternative theories of lack of consideration or failure of consideration. Specifically, Plaintiffs allege that because Defendants Deutsche had

4

discretion to select the "spot-rates" at which the FX contracts paid out, this discretion made the FX contracts illusory.

Declaratory relief is appropriate where there are no alternative theories of recovery, such as breach of contract. *See* Arthur Young & Co. v. Fleischman, 445 N.Y.S.2d 720, 720-721 (App. Div. 1981); *see also* Apple Records v. Capitol Records, 529 N.Y.S.2d 279, 281 (App. Div. 1988). "A 'failure of consideration' means a failure to render the performance the parties agreed on (citation omitted)." In re Estate of Wirth, 842 N.E.2d 480, 481 (N.Y. 2005); *see also* Fugeslang v. Fugeslang, 517 N.Y.S.2d 176, 177 (App. Div. 1987).

In their ten counts of claims for relief against Defendants Deutsche Bank, Plaintiff BFS alleges breach of contract twice. The signed FX contracts at issue contain provisions which read in part, "[i]n determining whether a First Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent [Deutsche Bank], acting in good faith considers that it would not be commercially reasonable to take account of it." (Def. Ex. 2-4; Compl. ¶ 43). While Plaintiffs BFS opine that the contracts were designed to never pay out and as a result were not profitable investments, they tacitly acknowledge having been informed that such a limited profit potential was consistent with Ernst and Young's COBRA strategy—to increase Plaintiffs' tax basis and offset their capital gains liability, resulting in substantial tax savings to Plaintiffs. (Compl. ¶¶ 30-32, 139-141).

Declaring the FX contracts unenforceable is inappropriate given the alternative theories of recovery available to, and already alleged by, Plaintiffs BFS. Further, the discretionary nature of Defendants Deutsche Bank with regard to the spot rates of the FX contracts is plainly evident from the language of the contracts themselves. Plaintiff knew of Defendant Deutsche Bank's discretionary power at the time they signed the contracts and therefore Plaintiff's claim that the contracts were illusory must fail.

Similarly, Plaintiff BFS must allege facts demonstrating Deutsche Bank did not perform in accordance with the written terms of the FX agreements, or in a manner inconsistent with the tax strategy adopted by Plaintiff, to support their claims of failure of consideration or lack of consideration. They did not. To the contrary, taking all of Plaintiff's allegations as true and all reasonable inferences therefrom, the court finds

Defendants Deutsche Bank performed under the contracts' terms as agreed by both parties.

The FX contracts were not illusory. The contracts are enforceable. Plaintiff BFS may not recover for unjust enrichment. Therefore, count one is dismissed.

### B. Count Two: Breach of Contract/Breach of the duty of good faith and fair dealing

Next, Plaintiff BFS alleges breach of contract, or breach of the duty of good faith and fair dealing. Where a plaintiff alleges breach of contract, the complaint must set forth specific provisions of the contract upon which liability is predicated, either by citing to the contract's express language or attaching a copy of the contract to the complaint. *See* Chrysler Capital Corp. v. Hilltop Egg Farms, Inc., 514 N.Y.S.2d 1002, 1003 (App. Div. 1987). New York law maintains that valid contracts carry the implied covenants of good faith and fair dealing. *See* Rowe v. Great Atlantic and Pacific Tea Co., 46 N.Y.2d 62,69 (N.Y. 1978); *see also* Wood v. Duff-Gordon, 222 N.Y. 88, 91 (N.Y. 1917). A party alleging breach of the duty of good faith and fair dealing must demonstrate that the defendant acted to prevent performance of the contract or impaired rights under the contract, causing injury to the plaintiff. *See* Maxon Int'l Inc. v. International Harvester, 442 N.Y.S.2d 588, 589 (App. Div. 1981).

Conspicuously absent from Plaintiff BFS's lengthy complaint are any cites to actual provisions of the FX contracts allegedly breached by Defendants Deutsche Bank. Further, copies of the actual FX contracts purportedly breached were not even appended to Plaintiff's original complaint. The court was only made aware of the contracts at issue and the terms therein by way of Defendants Deutsche Bank's Answer, which included copies of the FX contracts in the appendix.

Plaintiff BFS's claims for breach of implied covenants of good faith and fair dealing are deficient. Because Plaintiffs have not alleged facts showing that Defendants Deutsche Bank impaired performance of the contract—that is, they did not execute the options transactions as provided under the agreements, or that any of Plaintiff's enumerated rights under the FX contracts were impaired by defendants, their claims for breach of the implied covenants of good faith and fair dealing must fail.

6

In sum, Plaintiff BFS has not adequately plead facts supporting their claims of breach of contract and or breach of the duty of good faith and fair dealing. Accordingly, their claims under count two are dismissed.

## C. Count Three: Breach of Fiduciary Duty

Plaintiff BFS alleges a breach of a fiduciary duty by Defendants Deutsche Bank. "A fiduciary relationship may exist where one party reposes confidence in another and reasonably relies on the other's superior expertise or knowledge [citation omitted], but an arms-length business relationship does not give rise to a fiduciary relationship." <u>Wit Holding Corp. v. Klein</u>, 724 N.Y.S.2d 66, 68 (App. Div. 2001). Section three of the signed FX contracts between Plaintiff BFS and Defendant Deutsche Bank expressly provides,

> "Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between parties that expressly imposes affirmative obligations to the contrary for this Transaction) ... *It is acting for its own account,* and *it has made its own independent decisions* to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. *It is not relying on any communication (written or oral) of the other party* [Defendant Deutsche Bank] including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter it into this transaction."

In Plaintiff BFS's complaint there are numerous assertions that Defendants Deutsche Bank acted as Plaintiff's investment advisor. However, these assertions are conclusory, unsupported by any underlying facts, and directly contradict the signed representations made by Plaintiff BFS. The transactions between Plaintiff BFS and Defendants Deutsche Bank were sophisticated, intricate, lucrative business dealings. Unless fraud in the inducement of the contract is plead with specific facts, this court

concludes these FX contracts exemplify the arms-length business negotiations that do not give rise to a fiduciary relationship.

No fiduciary relationship existed between Plaintiff BFS and Defendants Deutsche Bank. Consequently, there was no breach of a fiduciary duty by Defendants Deutsche Bank. Count three of Plaintiff's complaint is dismissed.

### D. Count Four: Fraud

Plaintiff next alleges Fraud against Defendants Deutsche Bank. Elements for common law fraud are a representation of a material fact, falsity, scienter, reliance and injury. *See* Channel Master Corp. v. Aluminum Limited Sales, 176 N.Y.S.2d 259, 262 (App. Div. 1958). Fraud must be plead with particularity. Minn. R. Civ. Proc. 9.02.

With respect to Defendants Deutsche Bank, Plaintiff has not alleged the falsity of any material fact represented by Defendant Deutsche Bank. Instead, it is the falsity of the COBRA tax strategy which Plaintiff attacks. Throughout the complaint Plaintiff asserts that it was Ernst & Young who introduced Plaintiff BFS to the COBRA tax saving strategy, represented along with law firm Jenkens and Gilchrist that such strategy was immune from attack by the IRS, knew that the strategy was likely to be attacked by the IRS during marketing of COBRA to Plaintiff, and that as a result of the falsity of these representations, Plaintiff suffered tax penalties when the strategy was retroactively declared illegal. (Compl. 33, ¶¶ 50-51, 75-77, 84-85, 97, 164-173). Nowhere in the complaint does Plaintiff BFS allege any particular facts—such as time, place, specific persons, or statements made, showing Defendants Deutsche had anything to do with designing the COBRA strategy or introducing the strategy to Plaintiff BFS. By Plaintiff's own admission, Defendant Deutsche only implemented the strategy brought to them by Plaintiff BFS and Ernst & Young. (Compl. ¶ 97).

To find that Plaintiff BFS has adequately pled fraud against Defendants Deutsche would require the court to take all factual assertions fairly made against Ernst and Young, and attribute them to Defendants Deutsche Bank. Such leaps in logic are untenable and are not contemplated when liberally construing the pleadings on a motion to dismiss. As

Plaintiff BFS has not made out with particularity their claims of fraud against Defendants Deutsche Bank, their count four fraud claim is dismissed with leave to replead.

### E.  Count Five: Negligence

Plaintiff BFS asserts a claim of negligence against Defendants Deutsche Bank premised on allegations of duties owed as Plaintiff's investment advisors.  The tort of negligence is established where there is a duty of care owed, breach of that duty, and breach was the proximate cause of injury.  *See* Wolfe v. Samaritan Hosp. 484 N.Y.S.2d 168, 171 (App.Div. 1984).

The court has already addressed the issue of the existence of an investment advisor relationship between Plaintiff BFS and Defendant Deutsche Bank. (*infra* Section II.C).  There was no such relationship.  Defendant Deutsche Bank owed no duty of care to Plaintiff BFS.  Therefore, Plaintiff BFS cannot, and did not, set forth facts sufficient to make out a claim for negligence.  Count Five of Plaintiff BFS's complaint is dismissed.

### F.  Count Six: Negligent Misrepresentation

Plaintiff BFS asserts a claim of negligent misrepresentation premised on the nearly identical set of allegations made for its negligence claim.  A claim for negligent misrepresentation will not lie absent some special relationship between the parties. *See* Wit Holding Corp., 724 N.Y.S.2d at 68.  Again, as the court finds no special relationship existed between Plaintiff BFS and Defendant Deutsche there is no basis for Plaintiff's negligent misrepresentation claim. Count six for negligent misrepresentation is therefore dismissed.

### G.  Count Seven: Breach of Contract

For reasons discussed in Section II.B of this memorandum, count seven for breach of contract is also dismissed.

9

### H. Count Eight: Declaratory Judgment

Plaintiff BFS's count eight claim for declaratory relief asks the court to declare all defendants in this action, including Defendants Deutsche Bank, liable for the tax penalties suffered by Plaintiff. As Plaintiff BFS has not adequately pled any theory of liability against Defendant Deutsche Bank, this count eight claim for declaratory judgment is dismissed.

### I. Count Nine: Unethical, excessive and illegal fees

Plaintiff BFS's claim for unethical, excessive, and illegal fees against Defendants Deutsche Bank flounders. Plaintiff BFS cites no law broken, no code of conduct—at least one applicable to Deutsche Bank, abrogated, and no customary fee arrangement violated, to support these claims. As a result, these claims must also fail and count nine is dismissed.

### J. Count Ten: Civil Conspiracy

Plaintiff BFS's last claim for civil conspiracy against all defendants, including Defendant Deutsche Bank, fails as a matter of law. New York does not recognize civil conspiracy as a substantive tort. However, conspiracy may be pled for an actionable underlying tort in New York. *See* Empire State Building Assocs. v. Trump, 669 N.Y.S.2d 205 (App. Div. 1998); *see also* American Preferred Prescription, Inc. v. Health Management, Inc., 678 N.Y.S.2d 1, 3 (App. Div. 1998). Plaintiff BFS has not sufficiently pled an independent tort in any of the two-hundred-and-sixty-three paragraphs of its complaint. Therefore, no relief may be granted on Plaintiff BFS's civil conspiracy claim. Count ten for civil conspiracy is dismissed.

### III.    CONCLUSION

For all of the reasons stated herein, Plaintiff BFS's original complaint alleging ten counts of declaratory judgment and unjust enrichment; breach of contract/ breach of the

duty of good faith and fair dealing; breach of fiduciary duty; fraud; negligence; negligent misrepresentation; breach of contract; declaratory judgment; unethical, excessive and illegal fees; and civil conspiracy are all dismissed.

**HSC**

# EXHIBIT 10

1

2

3

4

5

6

7                      IN THE UNITED STATES DISTRICT COURT

8                          FOR THE DISTRICT OF OREGON

9

10   MICHAEL L. E. KING, et al.,    )
                                    )      No. 04-1029-HU
11                  Plaintiff,      )
                                    )
12        v.                        )
                                    )    FINDINGS AND RECOMMENDATION
13                                  )
     DEUTSCHE BANK AG, et al.,      )
14                                  )
                    Defendants.     )
15   _____)

16   John S. Stone
     Preston Bunnell & Stone
17   1100 S.W. Sixth Avenue, Suite 1405
     Portland, Oregon 97204
18
     David R. Deary
19   W. Ralph Canada
     Stewart Clancy
20   Jeven R. Sloan
     Deary Montgomery Defeo & Canada
21   2515 McKinney Avenue, Suite 1565
     Dallas, Texas 95201
22        Attorneys for plaintiffs

23   Keith Dubanevich
     Garvey Schubert Barer
24   121 S.W. Morrison Street, 11th floor
     Portland, Oregon 97204
25
     Seth C. Farber
26   Dewey Ballantine
     1301 Avenue of the Americas
27

28   FINDINGS AND RECOMMENDATION Page 1

New York, New York 10010
       Attorneys for defendants Deutsche Bank AG; Deutsche Bank
       Securities, Inc., d/b/a Deutsche Bank Alex Brown, a division
       of Deutsche Bank Securities, Inc.; Craig Brubaker; David
       Parse

Kerry J. Shepherd
Markowitz, Herbold, Glade & Mehlhaf
1211 S.W. Fifth Avenue, Suite 3000
Portland, Oregon 97204
       Attorneys for defendants BDO Seidman LLP, Michael Kerekes,
       and Robert Greisman

Peter C. Richter
Sarah Lowinger
Miller Nash
111 S.W. Fifth Avenue, Suite 3400
Portland, Oregon 97204
       Attorneys for defendants
       Lincoln National Corporation, d/b/a Lincoln Financial Group;
       Lincoln Financial Advisors Corporation; Michael Nelson;
       James Siegfried

HUBEL, Magistrate Judge:

    This is an action by three groups of plaintiffs (the "King plaintiffs," the "Mulholland plaintiffs," and the "Allen plaintiffs") against four groups of defendants, investment advisors and accountants (the "Deutsche Bank defendants," the "Lincoln defendants," the "BDO defendants," and the "Brown defendants"). Plaintiffs assert claims under the Racketeering Influenced and Corrupt Organization Act (RICO), 18 U.S.C. § 1965, breach of fiduciary duty, fraud, breach of contract or breach of the duty of good faith and fair dealing, negligent misrepresentation, professional malpractice, declaratory judgment, unjust enrichment, and civil conspiracy.

    The court has previously ruled on the Deutsche defendants' motion to arbitrate or stay claims (doc. # 37), the BDO defendants'

FINDINGS AND RECOMMENDATION Page 2

1  motion to arbitrate or stay claims (doc. # 43), the Lincoln
2  defendants' motion to dismiss (doc. # 53), and the BDO defendants'
3  motion to strike and to seal certain portions of plaintiffs' briefs
4  and supporting evidence (doc. # 63). The matter now before the
5  court is the Deutsche defendants' motion under Rule 12(b)(6) of the
6  Federal Rules of Civil Procedure to dismiss all or parts of the
7  claims asserted against them in plaintiffs' Amended Complaint (doc.
8  # 124).

9      The facts alleged and the claims asserted in the Amended
10  Complaint are discussed in the Findings and Recommendation filed on
11  March 9, 2005 (doc. # 107) and adopted by Judge Mosman on May 9,
12  2005. The Deutsche defendants move to dismiss the claims asserted
13  against them on the grounds that 1) the RICO claims are barred by
14  the Private Securities Litigation Reform Act (PSLRA) 2) the RICO
15  claim asserted under § 1962(c)(Claim One) fails to allege
16  adequately the standing and pattern requirements; 2) the RICO
17  conspiracy claim asserted under § 1962(d) (Claim Two) fails to
18  allege a substantive RICO claim under § 1962(c); 3) the RICO aiding
19  and abetting claim (Claim Three) cannot stand as a matter of law;
20  4) plaintiffs have failed to state cognizable state law claims; 5)
21  plaintiffs have failed to plead their fraud-based claims with the
22  degree of particularity required by Rule 9(b) of the Federal Rules
23  of Civil Procedure; and 6) to the extent that any of plaintiffs'
24  claims against the Deutsche defendants survive the motion, certain
25  of plaintiffs' damages claims fail as a matter of law.
26  ///
27
28  FINDINGS AND RECOMMENDATION Page 3

**Standard**

A motion under Rule 12(b)(6) should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Edwards v. Marin Park, Inc., 356 F.3d 1058, 1061 (9th Cir. 2004). When ruling on a Rule 12(b)(6) motion, the complaint must be construed in the light most favorable to the plaintiff. Broam v. Bogan, 320 F.3d 1023, 1028 (9th Cir. 2003). The court accepts as true all material allegations in the complaint, as well as any reasonable inferences to be drawn from them. Id.

**Discussion**

**A.   RICO Claims**

Claim One is for violation of 18 U.S.C. § 1962(c), which provides that it

> shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt.

Claim Two is for violation of 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). Section 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a) or (c) of this section."

Claim Three is a claim for violation of 18 U.S.C. § 2 by "seeking to and aiding and abetting a scheme to violate 18 U.S.C. § 1962(c).

FINDINGS AND RECOMMENDATION Page 4

1    **1. Preemption by the PSLRA**

2    In 1995, RICO was amended by the PSLRA, to provide, "Any

3    person injured in his business or property by reason of a violation

4    of [RICO] may sue * * * except that no person may rely upon any

5    conduct that would have been actionable as fraud in the purchase or

6    sale of securities to establish a violation of [RICO]." 18 U.S.C.

7    § 1964(c).

8    The Deutsche defendants argue that the PSLRA precludes the

9    plaintiffs' RICO claims because 1) it was integral to the COBRA tax

10   shelter scheme to generate the desired tax losses through the

11   purchase and sale of securities; 2) plaintiffs have alleged that

12   they were deceived into believing the FX contracts involved the

13   purchase of securities in the form of exchange-traded foreign

14   currency option contracts; and 3) the COBRA tax shelter scheme

15   involved the issuance of securities in the form of S Corporation

16   shares. The court has previously ruled that the RICO claims of the

17   Allen plaintiffs against the Lincoln defendants are precluded by

18   the PSLRA.

19   The King plaintiffs allege that as part of the COBRA strategy,

20   M & M King Investment Partners purchased shares of Cisco Systems,

21   Inc. and Canadian Dollars and subsequently contributed these assets

22   to Michael L.E. King and Associates, Inc., an Oregon corporation in

23   which Michael King was the 100% shareholder, as a contribution to

24   capital. Amended Complaint, ¶¶ 94, 96. M & M King Investment

25   Partners was subsequently liquidated, and Michael L.E. King and

26   Associates sold all of the Cisco shares and the Canadian Dollars it

27

28   FINDINGS AND RECOMMENDATION Page 5

1  had received from M & M King Investment Partners. Id. at ¶ 97.

2  The Mulholland plaintiffs allege that the transaction into
3  which they entered was "identical in form to the one entered into
4  by the King Plaintiffs and differed only in the size of the various
5  "trades" and the type of currency involved." Amended Complaint, ¶
6  100.

7  Plaintiffs argue, as they have previously, that the purchase
8  and sale of stock were not necessary to implementation of the COBRA
9  strategy. As discussed in the March 9, 2005 Findings and
10 Recommendation, even if the COBRA strategy could have been
11 accomplished with the use of assets other than stock,[1] in this
12 particular case, the purchase and sale of stock was an intrinsic
13 part of the COBRA strategy. I conclude that the PSLRA bar applies
14 to the RICO claims of the King and Mulholland plaintiffs, and

15

---

16  [1] The Deutsche defendants' argument that the COBRA scheme
17 involved securities because plaintiffs have alleged that they
18 were deceived into believing the FX contracts were traded on a
19 national securities exchange is unpersuasive. Plaintiffs alleged
20 that the FX Contracts were "not something traded on any
21 recognized exchange but were simply a matter of private contract
22 between the participants. ... Plaintiffs were unaware of these
23 aspects of the FX Contracts." Amended Complaint, ¶¶ 38, 92. I
24 disagree with the defendants that this amounts to an affirmative
25 statement that plaintiffs intended to purchase securities that
26 
27 did not in fact exist.

28 FINDINGS AND RECOMMENDATION Page 6

1   recommend that the motion to dismiss the RICO claims on this ground

2   be granted.

3        **2.   RICO Standing**

4        The Deutsche defendants assert that the plaintiffs' RICO

5   claims fail because plaintiffs cannot establish RICO standing.

6   Standing to assert a RICO claim requires an allegation that

7   defendants' conduct proximately caused plaintiffs' injuries and

8   that they suffered a concrete financial loss as a result. See

9   Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 268 (1992)(18 U.S.C.

10  § 1964(c)'s provision that "[a]ny person injured ... by reason of

11  a violation of [§ 1962] may sue therefor" means that in order to

12  prevail on a civil RICO claim, plaintiff must show that the

13  defendant's violation was the "proximate cause" of the plaintiff's

14  injury); see also Chaset v. Fleer/Skybox Int'l, LP, 300 F.3d 1083,

15  1086 (9th Cir. 2002).

16       The Deutsche defendants argue that because the predicate

17  offense alleged by the plaintiffs is mail fraud, the proximate

18  cause element requires a showing of reasonable reliance, citing

19  Bank of China v. NBM LLC, 359 F.3d 171, 176 (2d Cir. 2004), and

20  that the Mulholland and Allen plaintiffs cannot show such reliance

21  because the FX Contracts they executed included a letter agreement

22  confirming the terms of the investments entered into with Deutsche

23  Bank (the Confirmation), which expressly disclaims such reliance.

24       The Confirmation states:

25       Each party represents to the other party as of the date
         that it enters into this Transaction that ...
26       It is acting for its own account, and it has made its own
         independent decisions to enter into this Transaction and

27

28  FINDINGS AND RECOMMENDATION Page 7

1    as to whether the Transaction is appropriate or proper
     for it based upon its own judgment and upon advice from
2    such advisers as it has deemed necessary. It is not
     relying on any communication (written or oral) of the
3    other party ... as investment advice or as a
     recommendation to enter into this Transaction, it being
4    understood that information and explanations related to
     the terms and conditions of this Transaction shall not be
5    considered to be investment advice or a recommendation to
     enter into the Transaction. No communication (written or
6    oral) received from the other party shall be deemed to be
     an assurance or guarantee as to the expected results of
7    this Transaction.

8    Dubanevich Declaration, Exhibit 4, ¶ 3(iii); Dubanevich Reply

9    Declaration, Exhibit 1, ¶ 3(iii). Defendants argue that given this

10   representation, the Mulholland plaintiffs cannot, as a matter of

11   law, have reasonably relied upon any representations or omissions

12   by the Deutsche defendants and, thus, cannot demonstrate the

13   causation necessary for RICO standing.

14       Plaintiffs counter that when mail or wire fraud is the

15   predicate act for a RICO violation, the mailing or use of the wires

16   need only be incident to the underlying scheme, not essential to

17   it, and that the mailing or use of the wires need not contain any

18   misrepresentations, citing United States v. Shipsey, 363 F.3d 962,

19   971 (9th Cir. 2004).

20       In Bank of China, the court stated the established rule in the

21   Second Circuit that where mail fraud was the predicate act for a

22   civil RICO claim, the proximate cause element articulated in Holmes

23   required the plaintiff to show "reasonable reliance." 359 F.3d at

24   176. The court noted that the same rule applied in other

25   jurisdictions, including the Fifth, Eighth, and Fourth Circuits.

26   Id.

27

28   FINDINGS AND RECOMMENDATION Page 8

1       The Deutsche defendants have not cited a Court of Appeals case

2   from the Ninth Circuit which so holds. They do cite a district

3   court ruling from Washington, <u>Swartz v. KPMG</u>, 2004 U.S. Dist. LEXIS

4   22757 (W.D. Wash. 2004), a case involving a similar tax avoidance

5   strategy, in which the court held that an essential element of a

6   predicate wire fraud claim is proof of reasonable reliance on

7   allegedly fraudulent statements. The <u>Swartz</u> court relied on cases

8   from the Second, Fifth and Eleventh Circuits and on <u>Martin v.</u>

9   <u>Dahlberg, Inc.</u>, 156 F.R.D. 207, 215 (N.D. Cal. 1994).

10      This court has previously ruled that the Allen plaintiffs'

11  RICO claims are precluded by the PSLRA. The RICO claims of the King

12  and Mulholland plaintiffs are based on the same allegations. I find

13  it unnecessary, therefore, to consider whether plaintiffs' RICO

14  claims should also be dismissed for failure to allege RICO

15  standing, in the absence of authority from the Court of Appeals. I

16  recommend that the motion to dismiss on this ground be denied as

17  moot. If, upon review, the court rejects my recommendation that the

18  RICO claims of the King and Mulholland plaintiffs be dismissed as

19  precluded by the PSLRA, I recommend that the question of whether

20  the plaintiffs have alleged RICO standing be considered by the

21  reviewing court or remanded to me for consideration.

22      **3.   Pattern of Racketeering Activity**

23      The Deutsche defendants contend that the Amended Complaint

24  fails to allege a pattern of racketeering activity under 18 U.S.C.

25  § 1962, because the plaintiffs have failed to allege that the

26  "racketeering predicates are related, and that they amount to or

27

28  FINDINGS AND RECOMMENDATION Page 9

1  pose a threat of continued criminal activity." <u>H.J. Inc. v.</u>
2  <u>Northwestern Bell Tel. Co.</u>, 492 U.S. 229, 239 (1989). In <u>H.J.</u>, the
3  Supreme Court held that continuity can be demonstrated by proving
4  either "a series of related predicates extending over a substantial
5  period of time" or "past conduct that by its nature projects into
6  the future with a threat of repetition." <u>Id.</u> at 241-42; see also
7  <u>Religious Technology Center v. Wollersheim</u>, 971 F.2d 364, 366 (9th
8  Cir. 1992).

9      The Deutsche defendants contend that the plaintiffs have
10  failed to establish the continuity requirement because they have
11  pleaded neither open-ended continuity, by pleading predicate acts
12  that "specifically threaten repetition or that become a regular way
13  of doing business," <u>Howard v. AOL, Inc.</u>, 208 F.3d 741, 750 (9th Cir.
14  2000)nor closed-ended continuity, by alleging a series of related
15  predicates extending over a substantial period of time.

16      They allege that the Amended Complaint fails to allege open-
17  ended continuity because none of the alleged predicate acts
18  threatens to recur. See <u>H.J., Inc.</u>, 492 U.S. at 241-42 and <u>Howard</u>,
19  208 F.3d at 750. Defendants point to allegations in the Amended
20  Complaint that the IRS invalidated the COBRA strategy retroactively
21  to before the date of Plaintiffs' transactions, so that there was
22  no realistic possibility that the alleged conduct would recur. See,
23  e.g., Amended Complaint ¶¶ 104 (IRS issues IRS Notice 1999-59 on
24  December 27, 1999), 106 (IRS issues Notice 2000-44 in August 2000);
25  136 (in June 2003, IRS formalizes its position regarding the COBRA
26  strategy and other 2000-44 transactions by issuing new regulations
27
28  FINDINGS AND RECOMMENDATION Page 10

1  retroactive to October 18, 1999).

2     Plaintiffs have not addressed the Deutsche defendants'
3  arguments with respect to open-ended continuity. I agree with the
4  Deutsche defendants' contention that plaintiffs have failed to
5  allege open-ended continuity because they have alleged that the IRS
6  had already invalidated the COBRA strategy before the date of
7  Plaintiffs' transactions, so that there was no realistic
8  possibility that the alleged conduct would recur.

9     The Deutsche defendants contend that according to the Amended
10 Complaint, Deutsche Bank's alleged activities occurred between the
11 summer of 1999 and December 2000, and apparently lasted no more
12 than one year for each group of plaintiffs. See, e.g., Amended
13 Complaint, ¶¶ 101 (in approximately October 1999, the Allen
14 plaintiffs agreed to engage in the COBRA strategy); 170F (facsimile
15 dated October 20, 1999, from Mr. Allen to Deutsche defendant Parse,
16 attaching letters authorizing the wire transfer of funds); 64-65
17 (in the summer of 2000, or "shortly thereafter," King met with
18 Brubaker of Deutsche); 85-86 ("In approximately August September
19 2000, the King Plaintiffs agreed to engage in the COBRA strategy";
20 in October 2000, King plaintiffs formed the entities for the
21 purpose of carrying out the COBRA strategy; 170B (letter dated
22 October 11, 2000 sent from Deutsche to Michael King enclosing new
23 account forms); 89 (on or about November 10, 2000, King plaintiffs
24 entered into FX contract with Deutsche Bank); 93-97 (between
25 November 13, 2000 and December 26, 2000, King plaintiffs went
26 through remaining steps of COBRA strategy); 69 (at unspecified

27
28 FINDINGS AND RECOMMENDATION Page 11

1    time, Mulholland plaintiffs were referred to Deutsche defendant

2    Judd, who sold the strategy to them over the phone); 98 (in

3    approximately November 2000, the Mulholland plaintiffs agreed to

4    engage in the COBRA strategy); 170D (email dated April 10, 2001

5    from Deutsche employee on behalf of Judd, to Mulholland regarding

6    fees relating to the COBRA strategy).

7        The Deutsche defendants assert that these allegations fail to

8    establish a period long enough to constitute closed-ended

9    continuity, citing <u>Religious Technology Center</u>, 971 F.2d at 966-67

10   (predicate acts extending over six months at most did not satisfy

11   continuity requirement, citing Supreme Court's holding in <u>H.J.,</u>

12   <u>Inc.</u> that predicate acts extending over a few weeks or months and

13   threatening no future criminal conduct do not satisfy the

14   continuity requirement; court noting that it had found "no case in

15   which a court has held the requirement to be satisfied by a pattern

16   of activity lasting less than a year."); <u>Symantec Corp. v. DC</u>

17   <u>Micro, Inc.</u>, 2002 WL 31112178 at *2 (D. Or. 2002)(same).

18       Plaintiffs argue that they have alleged closed-ended

19   continuity because the Amended Complaint alleges a time period

20   from January 1999 to December 2003. See Amended Complaint, ¶ 165

21   ("The predicate acts of mail and wire fraud began at least as early

22   as January 1999 and continued until at least December 2003.")

23   However, the court is not required to accept as true legal

24   conclusions that are cast in the form of factual allegations,

25   <u>Warren v. Fox Family Worldwide, Inc.</u>, 328 F.3d 1136, 1139 (9th Cir.

26   2003) and conclusory allegations of law and unwarranted inferences

27

28   FINDINGS AND RECOMMENDATION Page 12

1  are insufficient to defeat a motion to dismiss. <u>Associated Gen.</u>

2  <u>Contractors v. Metropolitan Water Dist. of S. California</u>, 159 F.3d

3  1178, 1181 (9th Cir. 1998).

4      The acts specifically alleged against the Deutsche defendants

5  comprise the period between October 1999 and November 2000, a

6  period of, at most, 14 months. This is sufficient to allege closed-

7  ended continuity, under <u>Allwaste, Inc. v. Hecht</u>, 65 F.3d 1523 (9th

8  Cir. 1995). In <u>Allwaste</u>, the court acknowledged that it had decided

9  no case in which the continuity requirement was satisfied by a

10 pattern of activity lasting less than a year, but cautioned against

11 a "hard and fast, bright line, one-year rule." 65 F.3d at 1528. The

12 court noted that although Allwaste's original complaint failed to

13 specify the dates of the first and last alleged predicate acts, it

14 had maintained at oral argument that it could show acts occurring

15 over a period of as much as 13 months. <u>Id.</u> The court held that such

16 a showing would demonstrate that the criminal activity spanned a

17 "substantial period of time," and would therefore satisfy the

18 continuity requirement. I conclude, therefore, that under <u>Allwaste</u>,

19 plaintiffs have sufficiently alleged closed-ended continuity.

20     Because of my recommendation that the court apply to the King

21 and Mulholland plaintiffs its previous ruling that the Allen

22 plaintiffs' RICO claims are foreclosed by the PSLRA, it may be

23 unnecessary for the reviewing court to consider whether plaintiffs

24 have pleaded the continuity requirement, so that the motion to

25 dismiss on this ground should be denied as moot. If, upon review,

26 the court rejects my recommendation that the RICO claims of the

27

28 FINDINGS AND RECOMMENDATION Page 13

1  King and Mulholland plaintiffs be dismissed on the grounds of

2  PSLRA, I recommend that the motion to dismiss on the basis of a

3  failure to plead the continuity requirement be denied.

4              **4.  RICO Conspiracy Claim**

5      The Deutsche defendants assert that Claim Two must be

6  dismissed because plaintiffs' failure to allege the requisite

7  substantive elements of a RICO claim under § 1962 (c) necessarily

8  requires dismissal of a claim under § 1962(d). They rely on <u>Turner</u>

9  <u>v. Cook</u>, 362 F.3d 1219, 1231 n. 17 (9th Cir. 2004):

10         Because appellants failed to allege the requisite
           substantive elements of a RICO claim under 18 U.S.C. §
11         1962(c), appellants' claim under 18 U.S.C. § 1962(d),
           which makes it "unlawful for any person to conspire to
12         violate any of the provisions of subsections (a), (b), or
           (c) of this section," also fails.
13
   They also rely on <u>Religious Technology Center</u>, 971 F.2d at 367 n.
14
   8 (where plaintiff has failed to allege requisite substantive
15
   elements of RICO, conspiracy cause of action cannot stand).
16
17      The plaintiffs argue that a RICO conspiracy defendant need not

   himself commit or agree to commit predicate acts, citing <u>Salinas v.</u>
18
   <u>United States</u>, 522 U.S. 52, 65 (1997). In <u>Salinas</u>, 522 U.S. at 65,
19
   the Supreme Court held that a violation of § 1962(c) was not a
20
   prerequisite to a violation of § 1962(d).
21
22      However, the Deutsche defendants point out that in <u>Beck v.</u>

   <u>Prupis</u>, 529 U.S. 494, 506 n. 10 (2000), the Supreme Court declined
23
   to resolve whether its holding in <u>Salinas</u>, a criminal RICO case,
24
   extended to a civil RICO case:
25
26         Respondents argue that a § 1962(d) claim must be
           predicated on an *actionable* violation of §§ 1962(a)-(c).
27         However, the merit of this view is a different (albeit

28  FINDINGS AND RECOMMENDATION Page 14

related) issue from the one on which we granted
certiorari, namely, whether a plaintiff can bring a §
1962 claim for injury flowing from an overt act that is
not an act of racketeering. Therefore, contrary to
Justice STEVENS' suggestion, see *post*, at 1619-20, we do
not resolve whether a plaintiff suing under § 1964(c) for
a RICO conspiracy must allege an actionable violation
under §§ 1962 (a)-(c), or whether it is sufficient for
the plaintiff to allege an agreement to complete a
substantive violation and the commission of at least one
act of racketeering that caused him injury.

The Deutsche defendants argue that the issue has been resolved in
the Ninth Circuit by Turner and Religious Technology Center. I
agree that the court is bound by this authority. Accordingly, I
recommend that Claim Two be dismissed with leave to replead, if my
recommendation that Claim Two be dismissed as barred under PSLRA is
not adopted, and if plaintiffs are given leave to replead Claim
One.

### 5.    Aiding and Abetting

The Deutsche defendants assert that Claim Three must be
dismissed because there is no private cause of action for aiding
and abetting a RICO violation. In the March 9, 2005 Findings and
Recommendation adopted by Judge Mosman, the court so held, on the
basis of Central Bank of Denver v. First Interstate Bank of Denver,
511 U.S. 164,182 (1994), in which the Supreme Court held that
liability for aiding and abetting would not be read into a statute.
Although Central Bank was a § 10(b) securities fraud case, the
court applied its holding to RICO claims.

If my recommendation that Claim Three be dismissed as
foreclosed by the PSLRA is not adopted, I recommend that Claim
Three be dismissed with prejudice on this ground.

FINDINGS AND RECOMMENDATION Page 15

**B.    Common Law Claims**

**1.    Unjust Enrichment**

The Deutsche defendants assert that the Amended Complaint fails to state a claim for the equitable remedy of unjust enrichment because a valid contract existed between the plaintiffs and Deutsche Bank. Unjust enrichment is an equitable rather than a legal claim; consequently, no action for unjust enrichment lies where a contract governs the parties' relationship. McKesson HBOC v. New York State Common Retirement Fund, Inc., 339 F.3d 1087, 1091 (9th Cir. 2003).

Plaintiffs respond by asking the court to declare that the FX Contracts were invalid for lack of consideration, because Deutsche Bank had unlimited discretion to determine whether the FX Contracts would pay out, and therefore had the sole ability to determine whether it was required to perform under the contract.

In reply, the Deutsche defendants contend that under New York law,[2] even "unbridled discretion" is not fatal to enforcement of an

---

[2] The Deutsche defendants assert that New York law applies to this claim because the Account Agreements contain New York choice of law clauses. The plaintiffs do not concede that New York law governs, arguing that contractual choice of law provisions do not govern tort claims. See, e.g., Sutter Home Winery, Inc. v. Vintage Selections, Ltd., 971 F.2d 401, 407-08 (9th Cir. 1992). However, the parties' contractual agreement to application of New York law would govern the question of whether

FINDINGS AND RECOMMENDATION Page 16

1   agreement. Lee v. Joseph E. Seagram & Sons, Inc., 552 F.2d 447, 454

2   (2d Cir. 1977). Rather than invalidate the contract, the court

3   analyzes such discretion under the duty of good faith. Id.; see

4   also Paper Corp. of U.S. v. Schoeller Technical Papers, Inc., 807

5   F. Supp. 337, 346 (S.D.N.Y. 1992). The Deutsche defendants argue

6   that, in addition, the amounts received by the Deutsche defendants,

7   the premiums, were provided for in the FX Contracts, and therefore

8   cannot be recovered on an unjust enrichment theory.

9       The Deutsche defendants contend that if the discretion

10  provided for in the contract is analyzed under a contractual good

11  faith theory, the claim must fail because plaintiffs can point to

12  no contractual right of which plaintiffs were deprived as a result

13  of the Deutsche defendants' conduct. Agency Dev., Inc. v.

14  Medamerica Ins. Co. of New York, 327 F. Supp.2d 199, 203 (W.D.N.Y.

15  2004)(covenant of good faith and fair dealing prohibits a party

16  from engaging in conduct that "will have the effect of destroying

17  or injuring the rights of the other party to receive the benefit of

18  the contract."); Jaffe v. Paramount Communications, Inc., 644

19  N.Y.S.2d 43, 47-48 (N.Y. App. Div. 1996)(failure to allege facts

20  demonstrating that defendants deprived plaintiff of any rights he

21  possessed under agreement was fatal to claim for breach of covenant

22  of good faith and fair dealing); Sutton Associates v. Lexis-Nexis,

23  761 N.Y.S.2d 800, 804 (N.Y. Sup. Ct. 2003)(complaint failed to

24  identify any specific contractual provision actually breached).

25      And finally, the Deutsche defendants assert that plaintiffs

26  _____

27  the agreement was a valid contract.

28  FINDINGS AND RECOMMENDATION Page 17

1   cannot ground a claim for breach of the implied covenant of good
2   faith and fair dealing on allegations that Deutsche Bank had
3   discretion with respect to the spot rates, because that discretion
4   was explicitly disclosed in the contract itself and plaintiffs have
5   not alleged that Deutsche Bank acted arbitrarily or irrationally in
6   exercising that discretion. See State St. Bank & Trust Co. v.
7   Inversiones Errazuriz Limitada, 374 F.3d 158, 169 (2d Cir.
8   2004)(where contract contemplates exercise of discretion, covenant
9   of good faith and fair dealing includes promise not to act
10  arbitrarily or irrationally in exercising that discretion).

11      Plaintiffs counter that they have alleged, in ¶ 44 of the
12  Amended Complaint, that the Deutsche defendants breached the
13  covenant of good faith and fair dealing in their contracts with the
14  plaintiffs by 1) failing to disclose the true likelihood that the
15  FX contracts would pay out; 2) failing to disclose that the
16  Deutsche defendants retained unlimited discretion to determine
17  whether the FX contracts would pay out; 3) failing to apprise
18  plaintiffs that the FX contracts had no reasonable possibility of
19  a profit, or at least not in excess of the fees paid; and 4)
20  failing to disclose that the COBRA strategy had been devised by
21  Jenkens and, in some instances, affirmatively stating that COBRA
22  was Deutsche Bank's own proprietary strategy.

23      In reply, the Deutsche defendants argue that ¶ 44 of the
24  Amended Complaint contains no factual allegations supporting the
25  conclusion that the transactions would almost certainly be
26  unprofitable for plaintiffs. Moreover, they argue, even assuming
27
28  FINDINGS AND RECOMMENDATION Page 18

1  for purposes of the present motion that there had been failures to
2  disclose of the type plaintiffs assert, plaintiffs point to no
3  contractual obligations in the FX contracts that such purported
4  failures to disclose allegedly breached.

5      I agree that plaintiffs have failed to state a claim for
6  unjust enrichment because their relationship with the Deutsche
7  defendants was contractual. I further conclude that, because the
8  agreements between the plaintiffs and Deutsche Bank explicitly
9  granted Deutsche Bank unfettered discretion in selecting the spot
10 rates, the agreements between them cannot be invalidated on the
11 basis of that discretion. Absent any allegation that Deutsche Bank
12 exercised its discretion in an arbitrary or irrational manner,
13 plaintiffs have not stated a claim for breach of the implied
14 covenant of good faith and fair dealing. I recommend that
15 plaintiffs' claim for unjust enrichment be dismissed with leave to
16 replead.

17         **2.    Breach of Fiduciary Duty**

18     Plaintiffs and the Deutsche defendants have cited both New
19 York and Oregon law in support of their arguments on the various
20 tort claims.  However, as discussed above, contractual choice of
21 law provisions do not ordinarily control claims arising in tort;
22 rather, the tort claims are decided according to the law of the
23 forum state. <u>Sutter Home</u>, 971 F.2d at 407; see also <u>Consolidated</u>
24 <u>Data Terminals v. Applied Digital Data Systems</u>, 708 F.2d 385, 390
25 n. 3 (9th Cir. 1983). Accordingly, the court will apply Oregon law
26 to the remaining common-law tort claims.

27

28 FINDINGS AND RECOMMENDATION Page 19

1    The Deutsche defendants move against plaintiffs' claim for
2  breach of fiduciary duty on the ground that there was no fiduciary
3  relationship between them. They argue that although the Amended
4  Complaint alleges, "Defendants, as the Plaintiffs' attorneys,
5  accountants, and advisors, were Plaintiffs' fiduciaries ..." ¶ 222,
6  the Amended Complaint does not allege that Deutsche Bank itself
7  acted as attorney, accountant or advisor to plaintiffs.

8    With respect to the Mulholland and Allen plaintiffs, the
9  Deutsche defendants argue that the Confirmation explicitly states
10 that the Deutsche defendants were not "acting as a fiduciary for or
11 advisor to [Plaintiffs] in respect of this Transaction." Dubanevich
12 Declaration, Exhibit 4.

13   Plaintiffs counter that the relationship between plaintiffs
14 and the Deutsche defendants was not merely an arms-length
15 commercial transaction because they have alleged that Parse and
16 other employees of Deutsche Bank were instrumental in developing
17 and designing the COBRA transaction for use as a tax strategy,
18 Amended Complaint, ¶ ¶ 35, 38, 39, 65, 69, and advising plaintiffs
19 on the consequences of the COBRA transaction. Id. at ¶¶ 65, 66, 68,
20 69, 224.

21   Under Oregon law, no fiduciary duties are implied unless the
22 parties are in a "special relationship." Bennett v. Farmers Ins.
23 Co. of Oregon, 332 Or. 138 (2001). A special relationship arises
24 when

25        the party who is owed the duty effectively has authorized
          the party who owes the duty to exercise independent
26        judgment in the former party's behalf and in the former
          party's interests. In doing so, the party who is owed the
27

28 FINDINGS AND RECOMMENDATION Page 20

duty is placed in a position of reliance upon the party
who owes the duty; that is, because the former has given
responsibility and control over the situation at issue to
the latter, the former has a right to rely on the latter
to achieve a desired outcome or resolution.

Conway v. Pacific University, 324 Or. 231, 240 (1996); see also
Bird v. Lewis & Clark College, 303 F.3d 1015, 1023 (9th Cir.
2002)(citing Conway). A special relationship is defined, not by its
name, but by the roles assumed by the parties. Bird, 303 F.3d at
1023, citing Strader v. Grange Mut. Ins. Co., 179 Or. App. 329
(2002).

The disclaimer in the Confirmation signed by the Allen and
Mulholland plaintiffs requires dismissal of the breach of fiduciary
duty claim asserted by them. See Steckman v. Hart Brewing, Inc.,
143 F.3d 1293, 1295-96 (9th Cir. 1998)(on a motion to dismiss, court
is not required to accept as true conclusory allegations which are
contradicted by documents referred to in the complaint).

Aside from the disclaimer, although paragraph 222 of the
Amended Complaint alleges that "defendants" were plaintiffs'
"attorneys, accountants, and advisors," the factual allegations of
the Amended Complaint do not bear out this conclusion. See Holden
v. Hagopian, 978 F.2d 1115, 1121 (9th Cir. 1992)(on a motion to
dismiss, court examines whether conclusory allegations follow from
the description of facts as alleged by the plaintiff). It is not
alleged that the Deutsche defendants were plaintiffs' attorneys or
accountants. This leaves only a possible role as "advisors." But
there are no allegations from which it could reasonably be inferred
that the Deutsche defendants exercised independent judgment on the

FINDINGS AND RECOMMENDATION Page 21

1  plaintiffs' behalf or took care of the plaintiffs' affairs in any
2  way. Paragraph 65 of the Amended Complaint merely alleges that Mr.
3  King was placed in contact with Brubaker of Deutsche Bank.
4  Paragraph 66 alleges that "[b]ased on the representations and
5  assurances of Brown [the King plaintiffs' "long-time accountant,"
6  according to ¶ 62 of the Amended Complaint], Brubaker [a Deutsche
7  defendant] and Mayer [a lawyer at Jenkens & Gilchrest, according to
8  ¶ 63 of the Amended Complaint], the King Plaintiffs agreed to
9  engage in the COBRA strategy." The King plaintiffs' decision to
10 engage in the COBRA strategy based on the alleged "representations
11 and assurances" of their long-time accountant, a lawyer, and a
12 Deutsche defendant does not establish that the Deutsche defendant
13 had a special relationship with the King plaintiffs.
14     The allegations pertaining to the Mulholland and Allen
15 plaintiffs are even less substantive. Plaintiffs allege that
16 Deutsche defendant Judd "sold" the strategy to the Mulholland
17 plaintiffs over the phone. Amended Complaint ¶ 69, and that
18 "[b]ased on the representations and assurances of Mount [the
19 Mulholland plaintiffs' long-time accountant, according to ¶ 67 of
20 the Amended Complaint] and Judd, the Mulholland plaintiffs agreed
21 to engage in the COBRA strategy." Amended Complaint, ¶ 70. The
22 Mulholland plaintiffs allege that their decision to engage in the
23 COBRA strategy was "based in large measure upon the Defendants'
24 advice ... and the representations and recommendations of the
25 Defendants during the initial COBRA Strategy presentation and
26 thereafter." Amended Complaint ¶ 98. They allege further that the
27
28 FINDINGS AND RECOMMENDATION Page 22

1    "Defendants instructed, advised, and orchestrate the formation of
2    [the COBRA strategy entities]." Amended Complaint ¶ 99.

3         The Allen plaintiffs allege that the COBRA strategy was
4    presented to them by Nelson, Siegfried and Kerekes, none of whom is
5    a Deutsche defendant, and that they agreed to engage in the COBRA
6    strategy based on the "representations and assurances" of those
7    three individuals. Amended Complaint, ¶¶ 72-74.

8         Paragraph 224 of the Amended Complaint enumerates separate
9    breaches of fiduciary duty, but none is specific to the Deutsche
10   defendants.

11        I conclude that the plaintiffs have not pleaded the existence
12   of a special relationship with the Deutsche defendants and, insofar
13   as the Mulholland and Allen plaintiffs are concerned, such a
14   relationship is contradicted by the terms of the Confirmation. I
15   recommend that all the plaintiffs' claims for breach of fiduciary
16   duty against the Deutsche defendants be dismissed, with leave to
17   replead.

18        **3.    Fraud**

19        The Deutsche defendants assert that the Mulholland and Allen
20   plaintiffs cannot assert a claim for fraud because of their
21   representations in the Confirmation that they were "not relying on
22   any communication (written or oral) of [Deutsche Bank] including
23   any affiliate or subsidiary thereof as investment advice or as a
24   recommendation to enter into [the] Transaction." They assert
25   further that none of the plaintiffs has alleged, with the
26   particularity required by Rule 9(b) of the Federal Rules of Civil

27

28   FINDINGS AND RECOMMENDATION Page 23

1  Procedure, any material misrepresentation or omission by the
2  Deutsche defendants.

3      The elements of a cause of action for fraud under Oregon law
4  are 1) that the defendants falsely represented a material fact; 2)
5  that the misrepresentation was knowingly made, or made with an
6  insufficient basis for asserting its truth (scienter); 3) that the
7  misrepresentation was made with the intent to induce plaintiff to
8  act or refrain from acting; 4) that plaintiff justifiably relied on
9  defendants' misrepresentation; and 5) that plaintiff suffered
10  resultant damage. In re Harris Pine Mills, 44 F.3d 1431 (9th Cir.
11  1995); see also Riley Hill General Contractor v. Tandy Corp., 303
12  Or. 390, 405 (1987). The Confirmations directly contradict the
13  Mulholland and Allen plaintiffs' allegations of reliance on
14  statements or advice made by the Deutsche defendants. The court is
15  not required to accept as true conclusory allegations which are
16  contradicted by documents referred to in the complaint. Steckman,
17  143 F.3d at 1295-96).

18      Rule 9(b) requires that fraud be alleged with particularity.
19  Mere conclusory allegations of fraud are insufficient; although the
20  complaint need not allege, in detail, all facts supporting each and
21  every allegation, it must be specific. See United States ex rel.
22  Lee v. Smithkline Beecham, Inc., 245 F.3d 1048, 1051-52 (9th Cir.
23  2001). Rule 9(b) requires the identification of the circumstances
24  constituting fraud, Walling v. Beverly Enterprises, 476 F.2d 393,
25  397 (9th Cir. 1973); this means the plaintiff must state the time
26  and specific content or nature of the fraudulent misrepresentations
27
28  FINDINGS AND RECOMMENDATION Page 24

1  or omissions, <u>Misc. Service Workers, Etc. v. Philco-Ford Corp.</u>, 661
2  F.2d 776, 782 (9th Cir. 1981), and the identities of the parties to
3  it. <u>Riley v. Brazeau</u>, 612 F. Supp. 674, 677 (D. Or. 1985). In a
4  case involving multiple defendants, plaintiff must specify the role
5  of each defendant in the fraud. <u>Id.</u>

6      Plaintiffs contend that they have alleged the Deutsche
7  defendants falsely represented that 1) the COBRA strategy was a
8  legitimate tax saving strategy, Amended Complaint ¶¶ 84, 129; 2)
9  the opinion letter was from an "independent" law firm, Amended
10  Complaint, ¶ 56, 61, 64, 69, and 73; 3) through the partnership
11  formed to engage in the COBRA strategy, it was possible to create
12  capital losses to offset expected capital gain and income, Amended
13  Complaint ¶ 77; and 4) the losses created by the COBRA strategy
14  were legitimate and legal, Amended Complaint ¶ 84, 129.

15      They contend that the Deutsche defendants also made the
16  following omissions of fact: 1) the significance of the IRS
17  notices, Amended Complaint ¶¶ 104, 109, 110, 112; 2) the existence
18  of the IRS Amnesty program, Amended Complaint ¶ 164; 3) the true
19  likelihood that the FX Contracts would pay out; 4) that Defendants
20  retained unlimited discretion to determine whether the FX Contracts
21  would pay out; 5) that the FX Contracts had no reasonable
22  possibility of a profit; and 6) that COBRA was a Jenkins strategy,
23  Amended Complaint ¶ 44.

24      However, none of these cited allegations contains the
25  requisite specificity of dates or identity of parties, as required
26  by Rule 9(b). Paragraphs 84, 129, 56, 61, 77, 84, 129, 104, 109,
27
28  FINDINGS AND RECOMMENDATION Page 25

1  110, 112, 164, and 44 refer to "the defendants," without specifying
2  which defendant or defendants made the misrepresentations or
3  omitted the material facts, see <u>Newman v. Comprehensive Care Corp.</u>,
4  794 F. Supp. 1513, 1527 (D. Or. 1992)[generic references to
5  "defendants" fail to reach the level of particularity required by
6  Rule 9(b)], and contain no indication as to the date or time the
7  misrepresentation or omission occurred. Paragraph 64 does not
8  identify the party making some of the misrepresentations; other
9  misrepresentations are attributed to Brown and Mayer, who are not
10 Deutsche defendants. Paragraph 69 refers to statements allegedly
11 made by Judd, a Deutsche defendant, but does not identify the time
12 the statement was made; other statements alleged in that paragraph
13 are not attributed to anyone ("The Mulholland plaintiffs were also
14 told ..."). Paragraph 73 refers to statements made by Kerekes,
15 Nelson and Siegfried, who are not Deutsche defendants.

16     Plaintiffs have not pleaded their fraud claims with the
17 specificity required by Rule 9(b), and the disclaimer of reliance
18 in the Confirmations signed by the Mulholland and Allen plaintiffs
19 specifically contradict one of the elements of fraud. I recommend
20 that the fraud claims be dismissed with leave to replead.

21         **4.  Negligent Misrepresentation and Professional**
22             **Malpractice**

23     To state a claim for professional negligence, or malpractice,
24 the plaintiff must allege and prove 1) a duty that runs from the
25 defendant to the plaintiff; 2) breach of that duty; 3) resulting
26 harm measurable in damages; and 4) causation. <u>Varner v. Eves</u>, 164
27 Or. App. 66, 73 (1999).

28 FINDINGS AND RECOMMENDATION Page 26

1    The tort of negligent misrepresentation requires that one
2 party in a relationship owe a duty "beyond the common law duty to
3 exercise reasonable care to prevent foreseeable harm to the other
4 party." Conway, 324 Or. at 236. However, the law does not imply a
5 tort duty "simply because one party to a business relationship
6 begins to dominate and to control the other party's financial
7 future;" rather, a duty is imposed "only when that relationship is
8 of the type that, by its nature, allows one party to exercise
9 judgment on the other party's behalf." Bennett, 332 Or. at 161-62.

10    As discussed above and in the Findings and Recommendation of
11 March 9, 2005, plaintiffs have not pleaded the existence of a
12 special relationship between the plaintiffs and the Deutsche
13 defendants.    They have not alleged that the Deutsche defendants
14 exercised independent judgment with respect to the COBRA strategy,
15 or that the plaintiffs relinquished control over the COBRA strategy
16 to the Deutsche defendants.

17    I therefore recommend that the claims for professional
18 malpractice and negligent misrepresentation be dismissed with leave
19 to replead.

20    **5.  Civil Conspiracy**

21    The Deutsche defendants move to dismiss the civil conspiracy
22 claim on the ground that such a claim is not permitted under New
23 York law. However, New York law is not applicable to this claim.

24    Under Oregon law, a civil conspiracy is a "combination of two
25 or more persons by concerted action to accomplish an unlawful
26 purpose, or to accomplish some purpose not in itself unlawful by

27

28 FINDINGS AND RECOMMENDATION Page 27

1  unlawful means," so that to plead a claim for civil conspiracy, the

2  plaintiff must allege facts showing 1) two or more persons; 2) an

3  object to be accomplished; 3) a meeting of minds on the object or

4  course of action; 4) one or more unlawful overt acts; and 5)

5  damages as the proximate result thereof. <u>Bonds v. Landers</u>, 279 Or.

6  169, 174 (1977).[3]

7      Plaintiffs argue that they have properly pleaded a civil

8  conspiracy to commit fraud. They rely on their allegations at ¶¶

9  256-257 and 260 of the Amended Complaint:

10     [T]he Defendants acted with full knowledge and awareness
       that the transaction was designed to give the false
11     impression that a complex series of financial
       transactions were legitimate business transactions which
12     had economic substance from an investment standpoint,
       when they in fact lacked these features ... [and they did
13     so] all for the purposes of obtaining professional fees
       from consumers, including the Plaintiffs.
14
       Plaintiffs also rely on their allegation that the defendants
15
   "conspired to devise and promote the ... Strategy" and "[t]he
16
   receipt of fees ... was the primary ... motive in the development
17
   and execution of the transaction." Amended Complaint ¶ 127.
18
       I conclude that these allegations are insufficient. As the
19
   court held previously in the March 9, 2005 Findings and
20

21
       [3] Oregon law does not conflict with federal common law on
22
   civil conspiracy. See, e.g., <u>Gilbrook v. City of Westminster</u>, 177
23
   F.3d 839, 856 (9th Cir. 1999)(civil conspiracy is a combination
24
25 of two or more persons who, by some concerted action, intend to

26 accomplish some unlawful objective for the purpose of harming

27 another, and which results in damage).

28 FINDINGS AND RECOMMENDATION Page 28

1  Recommendation, plaintiffs' general allegations against
2  "defendants," as discussed above, do not suffice to plead the
3  necessary element of intent, or a "meeting of minds on the object
4  or course of action." See Lawver v. Lawvor, 86 Or. App. 721, 726
5  (1987)(plaintiffs who "merely plead in a vague and conclusory
6  manner that the named persons 'have conspired with and among each
7  other' to achieve the allegedly fraudulent objectives" fail to
8  plead a claim for civil conspiracy) and Yanney v. Koehler, 147 Or.
9  App. 269 (1997)(plaintiffs failed to plead the meeting of the minds
10 element because the allegations were vague and conclusory). I
11 recommend, therefore, that the civil conspiracy claim be dismissed
12 with leave to replead.
13 ///
14        **6.   Declaratory Judgment Claim**
15      The Deutsche defendants move for dismissal of the declaratory
16 judgment claim because plaintiffs have pleaded insufficient facts
17 in support of their underlying claims. This is the ground upon
18 which the court dismissed the declaratory judgment claim asserted
19 against the Lincoln defendants in the March 9, 2005 Findings and
20 Recommendation. I agree with the Deutsche defendants that dismissal
21 of this claim is warranted, for the reasons discussed in the March
22 9, 2005 Findings and Recommendation.
23    **C.   Damages**
24       **1.   Interest**
25      Defendants assert that plaintiffs are not entitled to recover
26 any interest allegedly paid to the IRS or other taxing authorities.
27
28 FINDINGS AND RECOMMENDATION Page 29

In the March 5, 2005 Findings and Recommendation, the court held that plaintiffs' interest recovery should be limited to the difference between the interest earned on the tax savings and the interest paid to the IRS for possessing the money unlawfully. Defendants assert that New York law applies to plaintiffs' claims against the Deutsche defendants, and that under New York law, no interest at all is recoverable as compensatory damages, because plaintiffs had the use of the government's money from the time they filed their tax returns until they paid any tax deficiencies to the IRS. See Alpert v. Shea Gould Climenko & Casey, 559 N.Y.S.2d 312, 315 (N.Y. App. Div. 1990).

I decline to apply the contractual choice of law provision to the tort claims asserted in this case, and conclude that the court's earlier ruling, allowing the plaintiffs to assert a claim for the "interest differential" should stand.

### 2. Penalties

Defendants assert that plaintiffs are not entitled to recover from the Deutsche defendants any penalties paid to the IRS because they have not alleged any statements or acts by the Deutsche defendants that prevented plaintiffs from taking advantage of the IRS amnesty program, or any facts giving rise to an inference that the Deutsche defendants had any duty to advise plaintiffs to take advantage of the amnesty program. I agree.

I recommend that plaintiffs' claim for recovery of penalties paid to the IRS be dismissed with leave to plead facts showing that the Deutsche defendants prevented the plaintiffs from taking

FINDINGS AND RECOMMENDATION Page 30

1  advantage of the IRS amnesty program, or that they had a duty to
2  advise plaintiffs to take advantage of the IRS amnesty program.

3                            **Conclusion**

4      I recommend that the Deutsche defendants' motion to dismiss
5  (doc. # 124) be GRANTED in part and DENIED in part. I recommend
6  that the motion to dismiss Claims One, Two and Three as barred
7  under the PSLRA be granted. If this recommendation is rejected, I
8  recommend that 1) the issue of whether plaintiffs have pleaded RICO
9  standing be reconsidered; 2) the motion to dismiss Claim One for
10 failure to allege the continuity requirement be denied; 3) Claim
11 Two be dismissed with leave to replead; and 4) Claim Three be
12 dismissed with prejudice. I recommend further that the claim for
13 unjust enrichment be dismissed, with leave to replead; that the
14 claim for breach of fiduciary duty be dismissed with leave to
15 replead; that the fraud claim be dismissed, with leave to replead;
16 that the negligent misrepresentation and professional malpractice
17 claims be dismissed, with leave to replead; that the civil
18 conspiracy claim be dismissed with leave to replead; that the
19 declaratory judgment claim be dismissed, with leave to replead;
20 that the motion to dismiss the claim for interest be denied; and
21 that the motion to dismiss the claim for penalties be granted with
22 leave to replead.

23                         **Scheduling Order**

24     The above Findings and Recommendation will be referred to a
25 United States District Judge for review. Objections, if any, are
26 due September 27, 2005. If no objections are filed, review of the

27

28 FINDINGS AND RECOMMENDATION Page 31

1   Findings and Recommendation will go under advisement on that date.
2   If objections are filed, a response to the objections is due
3   October 11, 2005, and the review of the Findings and Recommendation
4   will go under advisement on that date.
5
6
7   Dated this 12th day of September, 2005.
8
9   /s/  Dennis James Hubel
10  Dennis James Hubel
    United States Magistrate Judge
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28  FINDINGS AND RECOMMENDATION Page 32

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

KING, et. al.,

                Plaintiffs,

       v.

DEUTSCHE BANK AG,

                Defendants.

No. CV04-1029

OPINION AND ORDER

**MOSMAN, J.,**

      On September 12, 2005, Magistrate Judge Hubel issued a Findings and Recommendation ("F&R") (#143) granting in part and denying in part Deutsche Bank defendants' Motion to Dismiss. Specifically, Judge Hubel recommended that plaintiffs' RICO claims be dismissed with prejudice, all state law claims as well as penalty damages be dismissed with leave to replead, and Deutsche Bank defendants' motion to dismiss plaintiffs' claim for interest be denied.

      Plaintiffs did not make any substantive objections to the F&R. Instead, plaintiffs conceded the dismissal of the federal question RICO claims and requested this court to dismiss the remaining state law claims for lack of supplemental jurisdiction thereby permitting plaintiffs to re-file in state court. The Deutsche Bank defendants' only substantive objection to the F&R is the denial of its motion to dismiss with regard to plaintiffs' claim for interest recovery. The Deutsche Bank defendants responded to the jurisdiction issue, arguing that this court should retain jurisdiction even without the RICO claims either through federal question or supplemental jurisdiction.

This court has conducted a *de novo* review pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b), and ADOPTS the F&R. In addition, I find the court has supplemental jurisdiction over the state law claims.

Pursuant to plaintiffs' argument that the court should not retain jurisdiction, this court held a telephonic hearing on January 23, 2006. This court agrees with the numerous recent opinions that there is no federal question jurisdiction in this case. *Acker v. AIG Intern'l, Inc.*, 398 F. Supp. 2d 1239 (S.D. Fla. Nov. 8, 2005) (remand granted); *Sheridan v. New Vista, LLC*, 2005 WL 2090898 (W.D. Mich. Aug. 30, 2005) (remand granted); *Maletis v. Perkins & Co.*, No. CV-05-820-ST (D. Or. Sept. 13, 2005) (remand granted); *Cantwell v. Deutsche Bank Sec., Inc.*, No. 3:05-CV-1378-D (N.D. Tex. Sept. 21, 2005) (remand granted); *Ling v. Deutsche Bank AG*, 2005 WL 3158040 (E.D. Tex. Nov. 28, 2005) (remand granted). However, this court does find there to be supplemental jurisdiction under 28 U.S.C. § 1367.

Supplemental jurisdiction is proper where the relationship between the federal and state claim is such that they "form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The exercise of supplemental jurisdiction is discretionary and the court may decline to exercise supplemental jurisdiction where, as here, the "district court has dismissed all claims over which it has original jurisdiction . . . ." 28 U.S.C. § 1367(c)(3); *Schneider v. TRW, Inc.*, 938 F.2d 986, 993-94 (9th Cir. 1991). When the federal claim is dismissed early in the case, the federal court will be strongly inclined to dismiss the state law claims without prejudice rather than retaining supplemental jurisdiction. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350, n.7 (1988). In determining whether the court will find supplemental jurisdiction, the court should consider whether the exercise of jurisdiction advances the values of economy, convenience, fairness, and comity. *Acri v. Varian Associates,*

*Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997).

This court finds that judicial economy and fairness cut in favor of finding supplemental jurisdiction. This case was filed in July 2004, and there have been extensive motions and rulings, as well as a considerable amount of time and energy invested by the attorneys and two federal judges in making the rulings which have, to some degree, involved the state court claims. Furthermore, fairness dictates that this court provide the same ruling to the Deutsche Bank defendants as was made to the same or similar claims against the Lincoln defendants on May 9, 2005. As such, this court finds supplemental jurisdiction proper and will retain jurisdiction over this case.

This court has conducted a *de novo* review pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b), and ADOPTS the F&R (#143) and also finds supplemental jurisdiction.

IT IS SO ORDERED.

DATED this ___1st___ day of _____February_____, 2006.

                         /s/ Michael W. Mosman
                         MICHAEL W. MOSMAN
                         United States District Court