# EXHIBIT E

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ROCCO A. ABESSINIO, et al. on behalf of themselves and all others similarly situated, | : : : : : : | **Civil Action No. 1:06-cv-02777-LTS** |
| Plaintiffs, | : : | |
| vs. | : : | |
| ERNST & YOUNG LLP, ANDREW D. BEER, SAMYAK VEERA, COUNTERPOINT CAPITAL, LLC, DELTA CURRENCY TRADING, LLC, ASA TRADING, LLC, JJC TRADING, LLC, DEUTSCHE BANK AG, TAUNUS CORPORATION, DEUTSCHE BANK SECURITIES INC. d/b/a DEUTSCHE BANK ALEX. BROWN, DEUTSCHE BANK TRUST COMPANY AMERICAS, and PROSKAUER ROSE LLP, | : : : : : : : : : : : : : | **JURY TRIAL DEMANDED** |
| Defendants. | : : | |

## SECOND AMENDED
## CLASS ACTION COMPLAINT

### INTRODUCTION

1.      This class action ("Action") is brought by Rocco A. Abessinio, Mary Abessinio,

Plantation Incorporated and Paul Mejean (collectively, "Plaintiffs") on behalf of themselves and

all others similarly situated against Ernst & Young LLP ("E&Y"), Andrew D. Beer ("Beer"),

Samyak Veera ("Veera"), Counterpoint Capital, LLC ("Counterpoint"), Delta Currency Trading,

LLC ("Delta"), ASA Trading, LLC, JJC Trading, LLC, Deutsche Bank AG, Taunus Corporation, Deutsche Bank Securities Inc. d/b/a Deutsche Bank Alex. Brown, Deutsche Bank Trust Company Americas, and Proskauer Rose LLP ("Proskauer") (collectively,"Defendants").

2.    Beginning in at least 2000 and continuing into 2003, Defendants, together with Bricolage Capital, LLC ("Bricolage") and Arnold & Porter LLP ("Arnold & Porter"), and certain other subsidiaries of Defendants, entities and individuals engaged in a common course of conduct in developing, marketing, selling and implementing a generic tax product known as Personal Investment Company (PICO) in order to defraud Plaintiffs and others out of millions of dollars in unearned and exorbitant fees.  Plaintiffs seek damages from Defendants on their own behalf and on behalf of every taxpayer who purchased or implemented the PICO strategy (as more fully defined below, the "Class").

3.    The PICO strategy was intricate and involved an investment in an S corporation, execution of straddle transactions in foreign currency forward contracts and transitory shareholders in the S corporation.   Upon redemption of the transitory shareholders' interests, the taxpayer claimed an immediate ordinary loss while deferring, perhaps permanently, an offsetting capital gain on the taxpayer's investment in the S corporation.

4.    The PICO strategy was so complex and difficult to understand, except by tax experts, that even though the tax product was marketed to high net worth individuals, these Class members reasonably relied on trusted professionals such as Defendants, Bricolage and Arnold & Porter, to understand and implement the PICO strategy.  Each of the Defendants was involved in the promotion and implementation of this intricate strategy.

2

5.      Defendants ASA Trading, LLC, JJC Trading, LLC and other related parties to Bricolage: Delta, Counterpoint, Beer and Veera ("Bricolage-Related Entities"), implemented the foreign currency transactions. Defendants Deutsche Bank Securities Inc. and Deutsche Bank Trust Company Americas, formerly Bankers Trust Company (collectively, as defined below, "Deutsche Bank") acted as the account custodian and counter-party for the straddle transactions for each PICO strategy implemented.

6.      Defendants fraudulently and negligently misrepresented to the Class that PICO was a legal and legitimate strategy of minimizing tax liability. In making the misrepresentations, Defendants purposefully traded on their reputations as highly respected accountants, investment advisors and law firms. As set forth below, as part of the package sold by Defendants, the members of the Class would be provided a favorable tax opinion on PICO from a choice of two prestigious law firms, Arnold & Porter or Proskauer. The opinions supported the sales pitch that PICO was "more likely than not" to survive a challenge by the Internal Revenue Service ("IRS").

7.      In fact, Defendants, Bricolage and Arnold & Porter knew, recklessly ignored, or should have known that such course of conduct operated as a fraud or deceit on the Class because Defendants, Bricolage and Arnold & Porter knew, recklessly ignored, or should have known that this PICO strategy would be regarded by the IRS as an abusive tax shelter. Defendants, Bricolage and Arnold & Porter were aware or recklessly ignored that PICO was not a legitimate tax strategy, in part due to their familiarity with or participation in the marketing and/or implementation of other discredited tax shelters. For example, Defendants, Bricolage and

3

Arnold & Porter were aware that the marketing and sale of COBRA (Currency Options Bring Reward Alternatives), a similar product using foreign currency trades, was discontinued by E&Y and Deutsche Bank in 2000.

8.      As set forth below, each of the Defendants, Bricolage and Arnold & Porter also had knowledge, which they, intentionally, recklessly, or negligently disregarded, that PICO was an abusive tax shelter, created for tax avoidance purposes, that should have been, but was not, registered with the IRS. By not registering, Defendants, Bricolage and Arnold & Porter sought to keep the PICO strategy away from the attention of the IRS. Moreover, each of the Defendants, Bricolage and Arnold & Porter knew that PICO was precisely the type of tax shelter that the IRS would seek to challenge if discovered.

9.      The IRS in 2002, unbeknownst to Plaintiffs and the Class, had begun an investigation into the tax shelter activities of E&Y and Deutsche Bank. This investigation resulted in the public announcement on July 2, 2003 that E&Y had settled with the IRS for $15 million in penalties. The IRS said the matter related to E&Y's "compliance with registration and list maintenance requirements."

10.      Beginning in October 2002, the U.S. Senate Permanent Subcommittee on Investigations of the Committee on Governmental Affairs (the "Subcommittee") began an investigation into the development, marketing and implementation of abusive tax shelters by accountants, lawyers, financial advisors and bankers. The Subcommittee acquired internal documents from, among others, E&Y and Deutsche Bank. On the basis of these documents and testimony given by representatives from these firms, among others, the Subcommittee prepared

4

two reports. The first report was published in conjunction with the Subcommittee's hearings in November 2003 and focused on four tax shelters promoted by E&Y competitor, KPMG LLP ("KPMG"). A second report, "The Role of Professional Firms in U.S. Tax Shelter Industry" was published on April 13, 2005 detailing the conduct of several accounting firms, including E&Y, in developing mass-marketed generic tax products. The report also discussed the major banks, advisory firms and law firms who played critical roles in facilitating the development and implementation of those tax shelters.

11.    Plaintiffs first learned of the details of the knowledge and intentions of Defendants and Bricolage regarding the mass-marketing of generic tax products such as PICO through the public release of this report on April 13, 2005. As set forth below, that report made clear – for the first time – the extent of knowledge which Defendants had regarding the lack of legitimacy of the tax shelters being mass-marketed.

## PARTIES

12.    Plaintiff, Rocco A. Abessinio ("Abessinio"), is an individual and a citizen of the State of Florida.

13.    Plaintiff, Mary Abessinio (together with Abessinio, the "Abessinios"), is an individual, a citizen of the State of Florida, and the wife of Abessinio.

14.    Plaintiff, Plantation Incorporated ("Plantation" or the "Company"), is a corporation formed under the laws of the State of Delaware which filed an election to be treated as an S corporation ("S corporation") under federal tax laws.

15.    The Abessinios engaged in transactions to implement the PICO strategy during the years 2001, 2002, and into 2003. Plantation was the S corporation through which the PICO strategy was implemented.

16.    Plaintiff, Paul Jacques Mejean ("Mejean"), is an individual and a citizen of the State of Connecticut.

17.    Mr. Mejean, along with his wife, Inger S. Mejean engaged in transaction to implement the PICO Strategy, including forming a subchapter S company, Mejean Corp. In connection therewith, Mr. Mejean received a favorable tax opinion from Proskauer on the PICO Strategy.

18.    Defendant, Ernst & Young LLP ("E&Y"), is a limited liability partnership of certified public accountants with offices throughout the globe and the United States. The United States headquarters of E&Y is 5 Times Square, New York, New York 10036-6530.

19.    Defendant, Beer, an individual, is a resident of the State of New York and indirectly owns 100% of the stock of Bricolage, a limited liability company formed under the laws of the State of Delaware and currently operating in bankruptcy.

20.    Defendant, Veera, an individual, is a resident of the State of New York . Upon information and belief, Veera, along with Defendant Beer, has an ownership interest of and/or control position in Defendant Delta Currency Trading LLC, a company established by Veera and Defendant Beer exclusively to promote and implement the PICO tax strategy.

21.    Defendant, Counterpoint, is a limited liability company formed under the laws of the State of Delaware.  Counterpoint has offices at 10 East 50th Street, New York, New York 10022.

22.    Defendant, Delta, is a limited liability company formed under the laws of the State of Delaware.  Delta has offices at 10 East 50th Street, New York, New York 10022.

23.    Defendant, ASA Trading, LLC ("ASA"), is a limited liability company formed under the laws of the State of Delaware.  ASA has its principal place of business at 570 Lexington Avenue, New York, New York 10022.

24.    Defendant, JJC Trading, LLC ("JJC"), is a limited liability company formed under the laws of the State of Delaware.  ASA has its principal place of business at 570 Lexington Avenue, New York, New York 10022.

25.    Defendant, Deutsche Bank AG, is a German corporation that maintains its principal place of business in Frankfurt, Germany.  Deutsche Bank AG offers various investment, financial and related products and services to consumer and corporate clients worldwide.  Deutsche Bank AG has approximately 67,700 employees and more than 13 million customers in 76 countries worldwide.  As of December 31, 2005, Deutsche Bank AG had total assets of nearly a trillion euros.  Deutsche Bank AG has offices at 60 Wall Street, New York, New York 10005.

26.    Defendant, Taunus Corporation ("Taunus"), is a Delaware corporation which is the holding company for most of Deutsche AG's subsidiaries in the United States.  Taunus has offices at 60 Wall Street, New York, New York 10005.

7

27.    Defendant, Deutsche Bank Securities Inc. d/b/a Deutsche Bank Alex. Brown ("DB Alex. Brown"), is an indirect United States subsidiary of Deutsche Bank AG and direct subsidiary of Taunus. Deutsche Bank Securities Inc. is organized under the laws of the State of Delaware. DB Alex. Brown is a member of the New York Stock Exchange. Deutsche Bank Securities Inc. has offices at 60 Wall Street, New York, New York 10005.

28.    Defendant, Deutsche Bank Trust Company Americas, formerly Bankers Trust Company, is an indirect United States subsidiary of Deutsche Bank AG and a direct subsidiary of Taunus. Commencing in April 2002, Bankers Trust Company changed its name to reflect the name of its parent, Deutsche Bank AG. Deutsche Bank Trust Company Americas has offices at 60 Wall Street, New York, New York 10005.

29.    Defendant, Deutsche Bank AG describes itself as the pre-eminent provider of liquidity in the world's foreign exchange markets. Deutsche Bank AG, its United States holding company, Taunus, and its subsidiaries Deutsche Bank Securities Inc. and Deutsche Bank Trust Company Americas, formerly Bankers Trust Company, are referred to herein as "Deutsche Bank". Deutsche Bank acted as the custodian for accounts set up by Defendants for the personal investment companies used in the PICO strategy and acted as the sole counter-party to Bricolage in the foreign currency straddle transactions involved in the PICO strategy.

30.    Defendant, Proskauer, is a limited liability partnership organized under the laws of the State of New York. Proskauer has offices in New York, Los Angeles, Washington, D.C., Boston, Boca Raton, Newark, New Orleans and Paris. Its principal office is located at 1585 Broadway, New York, New York 10036.

8

31.     Defendant Proskauer issued opinion letters on the PICO strategy.

## THE NON-PARTIES

32.     Non-Party, Bricolage Capital, LLC ("Bricolage"), has principal offices at 570 Lexington Avenue, New York, New York 10022. Bricolage is an investment advisor registered with the Securities and Exchange Commission ("SEC") pursuant to Section 203 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-3. On information, Bricolage voluntarily filed a petition in bankruptcy in the Southern District of New York, Bankruptcy Petition #05-46914 on October 14, 2005.

33.     Non-Party, Arnold & Porter, is a limited liability partnership registered under the laws of the District of Columbia. Arnold & Porter has offices in Washington, D.C., New York, Los Angeles, Northern Virginia, Denver and San Francisco in the United States. Its principal office is located at 555 Twelfth Street, N.W., Washington, D.C. 20004.

## JURISDICTION AND VENUE

34.     This is an action for fraudulent misrepresentation, negligent misrepresentation, civil conspiracy, professional malpractice, breach of fiduciary duty, breach of contract, breach of implied contract, aiding and abetting, disgorgement, unjust enrichment and a declaratory judgment.

35.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the claims of all Plaintiffs, aggregated together, exceed $5 million and any member of the Class is diverse to at least one defendant.

36.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C.

§ 1391(b) because several defendants reside in this District and a substantial part of the events or

omissions giving rise to this Action occurred in this District.

## CLASS ALLEGATIONS

37.     Plaintiffs bring this action on their own behalf and as a class action pursuant to

Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all persons defined as follows:

All persons who, at any time during the period from January 1, 2000, through and including

December 31, 2003, either (a) consulted with, relied upon, or received an oral or written opinion

or advice from: (i) Ernst & Young LLP (or any current or former partner, principal or employee

of Ernst & Young LLP who at the time was a partner, principal or employee of Ernst & Young

LLP) and/or; (ii)  Andrew D. Beer, Samyak Veera, Counterpoint Capital, LLC, Delta Currency

Trading, LLC, and/or Bricolage Capital, LLC (or any current or former partner, principal or

employee of Counterpoint Capital, LLC, Delta Currency Trading, LLC, ASA Trading, LLC, JJC

Trading, LLC or Bricolage Capital, LLC) concerning the development and implementation of

the Personal Investment Company (PICO) strategy and who implemented, in whole or in part,

directly or indirectly, the PICO strategy; or (b) filed a tax return (joint or otherwise) relating to

the PICO strategy described in (a); and (c) the administrators, executors, personal

representatives, heirs, successors, beneficiaries and assigns of all person described in (a) and (b)

(the "Class").  Within the Class, there are two subclasses: one subclass consisting of those

persons who received an opinion from Arnold & Porter LLP, and a second subclass consisting of

those persons who received an opinion from Proskauer Rose LLP.

10

38.    The Abessinios represent the Arnold & Porter subclass, and Mejean represents the Proskauer subclass.

39.    Excluded from the Class are Defendants, Bricolage, the officers and directors of the Defendants and Bricolage, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants or Bricolage have or had a controlling interest.

40.    The members of the Class are so numerous that joinder of all members is impracticable.  At least 90 PICO strategy products were sold by Defendants during the time period in question to members of the Class.  Members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in class actions.

41.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of law that is complained of herein.

42.    If brought and prosecuted individually, each of the members of the Class would necessarily be required to prove their claims upon the same material and substantive facts, and upon the same remedial theories.

43.    The claims and remedial theories pursued by Plaintiffs are sufficiently aligned with the interests of the Class to ensure that the Class's claims will be prosecuted with diligence and care by the Plaintiffs as representatives of the Class.

44.     Plaintiffs will fairly and adequately protect the interests of the other members of the Class. Plaintiffs have retained counsel competent and experienced in class action litigation. Plaintiffs have no interests antagonistic to, or in conflict with, the Class they seek to represent.

45.     Plaintiffs' and the Class's claims have a common origin and share a common legal and factual basis. All Class members' claims originate from the same fraudulent transactions promoted by Defendants and Bricolage and implemented by the Defendants and Bricolage.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants made misrepresentations or misleading statements regarding the nature and risks of the PICO strategy;

(b)     whether Defendants acted knowingly and/or recklessly and/or negligently;

(c)     whether Defendants were aware or recklessly ignored that the PICO strategy was entered into primarily to generate tax losses and not profit and/or lacked economic substance and that therefore any losses attributable to the PICO strategy would be disallowed by the IRS;

(d)     whether Defendants and Bricolage conspired to create, approve and market the PICO strategy to Plaintiffs and members of the Class;

(e)     whether Defendants took advantage of relationships of trust and confidence and used knowledge of members of the Class's finances to solicit the PICO strategy;

(f)     whether Defendants failed to disclose that the opinion letters procured by E&Y in connection with PICO were not issued independently and were form opinions; and

12

(g)     whether members of the Class have sustained damages and, if so, the appropriate measure of damages.

47.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy and there will be no difficulty in the management of this Action as a class action. Plaintiffs also allege that questions of law and fact applicable to the Class predominate over individual questions. Plaintiffs also allege that they are willing and prepared to serve the Court and the proposed Class in a representative capacity, that their interests are co-extensive with, and not antagonistic to those of the absent members of the Class, and that they will undertake to vigorously and truly protect the interests of the absent members of the Class. Plaintiffs have engaged the services of competent counsel, who are experienced in complex class action litigation, who will adequately prosecute this Action and who will assert, protect and otherwise represent the named Class representatives and absent members of the Class.

## BACKGROUND

48.     A tax shelter is a scheme or device used to reduce or eliminate tax liability. Some tax shelters advance a legitimate endeavor and are therefore lawful. On the other end of the spectrum, the IRS deems a shelter illegal if its only economic purpose is tax avoidance. Each of the Defendants knew and understood the distinction between legitimate and illegal tax shelters. E&Y is the fourth largest accounting firm in the United States. Defendants Beer and Veera controlled Bricolage and its affiliates, Counterpoint, Delta, ASA and JJC. Bricolage was a registered investment adviser under the Investment Advisers Act. Defendant Deutsche Bank is a global financial institution. Defendant Proskauer is a respected law firm. These Defendants knew, or should have known, that the IRS would act to disallow the PICO strategy which was

13

marketed by Defendants as a means to generate artificial deductible tax losses. Defendants even charged fees based upon a percentage of the targeted tax losses of members of the Class.

49.    In 1980, the IRS began providing rules and setting standards for providing opinions used in the promotion of tax shelter offerings.

50.    These rules became more elaborate in 1984 when Treasury Department Circular 230, set forth at 31 C.F.R. part 10, was adopted which governs the practice of attorneys and accountants, among others, before the IRS. A tax practitioner may not charge an unconscionable fee for representing a client in a matter before the IRS. (Section 10.27(a)). Further, a tax practitioner may not charge a contingent fee for preparing an original tax return or for any advice rendered in connection with a position taken or to be taken on an original tax return. (Section 10.27(b)(2)). Other provisions current at the time the Defendants marketed the PICO strategy addressed conflicts of interest and required that each party expressly consent to any conflict. (Section 10.28).

51.    Most importantly, any tax practitioners signing tax returns need to do so based upon a determination that there is a "reasonable possibility" that a particular position taken on the returns would be allowed by the IRS.

52.    The PICO strategy violated the well-publicized policies of the Internal Revenue Code (IRC"), regulations and case law. The PICO strategy involved a series of stepped transactions that lacked a business purpose and profit motive, and were done purely for tax avoidance reasons, which if examined for substance (rather than form) would be disallowed by the IRS.

53.    In addition, the PICO strategy was similar to several earlier, discredited shelters, with which Defendants were well acquainted.

54.    Beginning in 1999, the IRS and the Treasury Department began to publish notices identifying certain generic tax shelters as "listed transactions," i.e., transactions that the IRS has considered to be potentially abusive.  This guidance warned accountants, lawyers and financial professionals like Defendants that use of such "listed transactions" may lead to audits and penalties to the participants for using an illegal tax shelter, as well as penalties to the promoters.

55.    Defendants were also aware not only that the IRS was more aggressively pursuing abusive and illegal tax shelters and their promoters, but both the Senate and the House of Representatives proposed legislation to impose penalties on those who implement or promote tax shelters.

56.    In 2002, the Subcommittee, at the direction of Senator Carl Levin as its chairman, initiated an extensive investigation into the development, marketing and implementation of tax shelters by accounting firms, banks, investment advisors and law firms.

57.    During the course of the investigation, the Subcommittee issued numerous subpoenas and document requests.  As set forth in its initial report "U.S. Tax Shelter Industry: The Role of Accountants, Lawyers and Financial Professionals Four KPMG Case Studies: FLIP, OPIS, BLIPS and SC2", published in November 2003 by the minority staff of the Subcommittee, it was clear to the Subcommittee that "the development and sale of potentially abusive and illegal tax shelters have become a lucrative business in the United States."  As a result "respected professionals are spending substantial resources, forming alliances and developing the internal

15

and external infrastructure to design, market and implement hundreds of complex tax shelters, some of which are illegal and improperly deny the U.S. Treasury of billions of dollars in taxes."

58.　　The Subcommittee investigation focused on the abusive tax shelters sold as generic tax products to multiple clients.　Specifically, the Subcommittee in its report published on April 13, 2005 on "The Role of Professional Firms in the U.S. Tax Shelter Industry", Senate Report 109-54 ("2005 Senate Report"), found that during the period 1998 to 2002, E&Y sold generic tax products to multiple clients despite evidence that they were potentially abusive or illegal tax shelters.

59.　　As set forth in the 2005 Senate Report, E&Y marketed these tax products through a group of five to seven tax professionals initially called VIPER – Value Ideas Produce Extraordinary Results headed by E&Y partner, Robert B. Coplan.　The E&Y VIPER Group was later renamed the "more benign" and "less sinister sounding" Strategic Individual Solutions Group.[1]　E&Y told the Subcommittee that the tax products it sold were not created initially by them but were refined by them "to enhance the likelihood that [they] would be sustained on the merits."[2]

55.　　The 2005 Senate Report and litigation cited therein regarding E&Y and Deutsche Bank provides insight into E&Y's and Deutsche Bank's marketing of its generic tax shelter

---

[1]　　E&Y produced documents to the Subcommittee which were quoted as part of the 2005 Senate Report. See 2005 Senate Report, p. 78 fn. 314, citing 1/17/00 email from Robert Coplan, Bates 2003EY011613-14 (citations from 2005 Senate Report).

[2]　　See 2005 Senate Report, p. 78 fn. 315, citing E&Y letter dated 5/3/04 to the Subcommittee.

products, including the COBRA product, which itself was subsequently modified into the PICO

strategy to enhance the likelihood that it would pass muster. Prior to the publication of the 2005

Senate Report, this information was known by Defendants, but not by the Class.

     56.     On December 10, 1999, the IRS issued IRS Notice 1999-59, entitled "Tax

Avoidance Using Distribution of Encumbered Property." In that notice, the IRS stated that:

> [T]he Internal Revenue Service and Treasury Department have
> become aware of certain types of transactions, as described below,
> that are marketed to taxpayers, for the purposes of generating tax
> losses. This notice is being issued to alert taxpayers and their
> representatives that the purported losses arising from such
> transactions are not properly allowable for federal income tax
> purposes.

Notice 1999-59 described arrangements where through a series of contrived steps,

taxpayers claimed losses for capital outlays that they had in fact recovered and thus the artificial

losses were not allowed. The emphatic message from the IRS was that purported losses arising

from transactions wholly lacking in "economic substance" were not properly allowable for

federal income tax purposes.

     57.     Shortly after the release of Notice 1999-59, E&Y determined that it would no

longer market one of the tax shelter products it was currently co-promoting with Beer-controlled

Bricolage and Deutsche Bank called COBRA (Currency Options Bring Reward Alternatives)

which employed foreign currency options. In the COBRA strategy, a taxpayer would purchase

call options and simultaneously sell offsetting call options at a higher strike price but with the

same expiration date. These positions were then contributed to a partnership. The taxpayer

would then claim that the partnership basis was increased by the cost of the call options, but not

reduced by the assumption of the sold call options.  On the disposition of the partnership interest, the taxpayer would claim a loss, even though there had been no real corresponding economic loss.

58.     Although IRS Notice 1999-59 did not specifically outline the foreign currency option strategy employed in COBRA, according to the disclosures in the 2005 Senate Report and documents filed by certain purchasers of the COBRA product in their litigation, on January 5, 2000, Jerrod Blanchard, an E&Y partner, had prepared an internal memorandum regarding the "VIPER/COBRA tax opinion" which was circulated internally at E&Y at least to the head of VIPER, Robert B. Coplan.[3]  Blanchard wrote this memorandum "to summarize my concern regarding the VIPER/COBRA transaction and the law firm tax opinion that is being used to market the transaction."  In this memorandum, Blanchard expressed grave concerns about the validity of COBRA and the opinions expressed by the law firm in the opinion letter. Specifically, Blanchard expressed concern with the E&Y marketing materials that indicated there was a thirty-eight percent (38%) probability that the taxpayer would make a profit.  The pre-tax economics of COBRA were a concern to Blanchard, who emphasized that the value of the downside risk (62% of the money invested) greatly exceeded the value of the upside opportunity.  Blanchard concluded:

---

[3]     E&Y internal memorandum is cited, for example, by the Camferdam plaintiffs ("Camferdam") in Camferdam v. Ernst & Young, Case No. 02 Civ. 10100 (S.D.N.Y.) (alleging causes of action against E&Y for selling COBRA), Camferdam v. Deutsche Bank AG, Case No. 017-212033-05 (Tarrant Co., 17th Dist., TX) (alleging causes of action against other defendants for selling COBRA).

> While there does appear to be some opportunity to earning a pre-tax profit, the transaction does not seem to be one that a reasonable investor would entertain in the absence of the anticipated generation of a ... federal income tax benefit. Looking solely at the pre-tax economics of the proposed transaction and ignoring any potential return on the additional ... cash to be invested by taxpayer in the Fund (which likely will be ignored for this purpose under *ACM* [*Partnership v. Commissioner*, 157 F.3d 231 (3d Cir. 1998)] it would appear that the value of the downside risk ... exceeds the value of the upside opportunity... . In other words, it is more likely than not that the Taxpayer will incur a pre-tax loss as a result of entering into the proposed transaction. Query whether a court would therefore hold, based on the clear evidence set forth in the marketing materials, that Taxpayer, acting as a reasonable investor desiring a reasonable opportunity to earn a pre-tax profit on his investment would not have entered into the proposed transaction for any reason other than the generation of ... tax benefits. Furthermore, it is my judgment that Taxpayer would likely lose the argument that his investment in the proposed transaction is motivated, in whole or in part, by desire to earn a pre-tax profit and, hence, the Taxpayer's anticipated loss would be disallowed under Section 165(a).

Blanchard also was highly critical of the alleged "business" purpose and the short time frame of the investment:

> It appears Taxpayer's investment in Fund [*i.e.*, the partnership] will be relatively short-lived (about 30 to 60 days). The avowed business purpose for the Fund investment is to diversify Taxpayer's foreign currency exposure and expand the pool of capital from which Taxpayer may derive its pre-tax return. Query whether the brevity of Taxpayer's investment in Fund belies this avowed business purpose.

Blanchard also expressed concerns regarding the opinion being issued by a law firm in conjunction with COBRA: "My main concern is that two or three rather key opinions are missing, without which the federal income tax benefits Taxpayer expects to derive from the proposed transaction clearly will not be realized." Blanchard was highly critical of the failure of law firm's opinion to offer legal authority to support a position that the loss from the disposition of the foreign currency was allowable. Blanchard stated, "First and foremost, there is no opinion that any loss recognized ... in connection with a subsequent sale of the Euros will be allowed

19

pursuant to section 165(a). I would think the government would argue tooth and nail that any loss recognized ... in connection with the disposition of the Euros is not allowable."

59.    By approximately January 6, 2000, following circulation of this internal memorandum, the head of VIPER, Robert B. Coplan was advising others that E&Y "was out of the COBRA business."

60.    E&Y's decision to halt its promotion of COBRA was prescient. On August 11, 2000, the IRS published Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis" which specifically described COBRA and another shelter, Son of BOSS, being promoted by PriceWaterhouse, as abusive tax shelters. Notice 2000-44 concerned "similar transactions [to those described in IRS Notice 1999-59] that purport to generate tax losses for taxpayers." The IRS stated that "[t]he purported losses from these transactions (and from any similar arrangements designed to produce non-economic tax losses by artificially overstating basis in partnership interests) are not allowable as deductions for federal income tax purposes."

61.    After the issuance of Notice 2000-44 in August 2000, on information and belief, Deutsche Bank sent a copy of the notice and an internal memorandum to its employees. The internal memorandum dated September 15, 2000 instructed Deutsche Bank employees to not promote the tax shelters identified in Notice 2000-44, i.e., COBRA.

62.    E&Y, Deutsche Bank and Bricolage were identified as promoters of the ill-conceived COBRA product.

63.    The Defendants formulated the PICO Strategy to circumvent Notice 2000-44. PICO was a strategy derived from COBRA that, rather than eliminating the long-term the

taxability of a gain, instead deferred it.  Delta and Bricolage worked with Deutsche Bank and

Ernst & Young to formulate the PICO Strategy, which they collectively reduced to writing in

May 2000 in a report entitled "Personal Investment Corporation – Descriptive Materials" that

explained how the PICO Strategy worked.

64.    While the PICO Strategy was being jointly developed, Beer became concerned

about Bricolage's direct involvement with the PICO Strategy promotional efforts.  On May 26,

2000, Beer e-mailed Richard Shapiro, an Ernst & Young National Tax partner (and a member of

the VIPER/Strategic Individual Solutions Group, and copied Veera, stating:

> As I mentioned to you, in light of the sensitive marketing issues involved in
> marketing such products, I think it makes more sense for the PICO to be marketed
> by Counterpoint Capital, LLC, an affiliated entity that we created early this year.
> This should help to insulate the product from our other activities.

This email shows that Beer was sufficiently concerned about the marketing of PICO to

advocate confining the marketing of PICO to a separate legal entity to insulate Beer and Veera's

other business activities from liabilities that could arise from the marketing of PICO.  Although

Beer suggests the Bricolage-related entity Counterpoint as the separate entity for marketing

PICO, upon information and belief, Beer and Veera also formed Delta for the same sole purpose

- to promote and implement the PICO Strategy while protecting other Bricolage-related entities

from liabilities that could arise from the marketing of PICO.

### DEFENDANTS' PICO STRATEGY

A.    **Defendants Marketed The PICO Strategy To Class Members**

65.    Recognizing the huge monetary gains that they were foregoing with this tabling

of COBRA, E&Y in conjunction with currency traders, Beer, the Bricolage Related Entities, and

21

Deutsche Bank, made adjustments to the paired foreign currency option concept which formed the basis of COBRA to create the PICO strategy by substituting an S corporation for the partnership. The use of the S corporation created another layer of advantageous tax rules related to the mechanics of the closing of the books of an S corporation upon transfer of shareholder interests. This refinement of the COBRA product into the PICO strategy was in keeping with E&Y's policy of continually refining a tax product "to enhance the likelihood that it would be sustained on the merits."[4]

66.     Documents submitted to the Government show that E&Y engaged in an aggressive effort to develop and market generic tax shelter products to high net worth individuals who were trusting clients. For example, an internal E&Y e-mail from October 1999, recites seven tax products then under development and closes with the statement "as you can see, we have a great inventory of ideas. Let's keep up the R&D to stay ahead of legislation and IRS movements."[5] Still another E&Y internal e-mail from May 2000 sets a nationwide sales goal for one of the firm's tax products asking its tax professionals to work to generate "one billion of loss."[6] E&Y determined that it would market the tax shelter to clients "that would only look to Ernst & Young for decision making and would not go to a lawyer for advice."[7]

---

[4]     See 2005 Senate Report, p. 78 fn. 315, citing E&Y letter dated 5/3/04 to the Subcommittee.

[5]     Id., p. 78 fn. 317, citing E&Y internal email dated 10/26/99.

[6]     Id., p. 78 fn. 319, citing E&Y internal email dated 5/10/00.

[7]     Member of E&Y's VIPER Group statement to Jenkens & Gilchrist attorney cited, for example, in Camferdam litigation regarding COBRA.

67.    Targeting high net worth individuals "who would only look to Ernst & Young for decision making" and would not go to outside advisors, commencing in 2000, E&Y marketed the PICO strategy aggressively to its clients and a few non-clients who E&Y knew were selling businesses.

68.    E&Y enlisted the aid of the other Defendants, Bricolage and Arnold & Porter to help carry out the transactions involved in the PICO strategy.  Pursuant to the PICO strategy, Beer and Veera would arrange for Bricolage, or various of its affiliates, such as Counterpoint and Delta, to act as the investment manager for each personal investment company S corporation.  Beer and Veera would also arrange for ASA and JJC to act as interim principals in each personal investment company S corporation.  Deutsche Bank would participate as the custodian for each personal investment company S corporation and as counter-parties to the Bricolage Related Entities for the intricate foreign currency straddles which were the basis of the PICO strategy.

69.    E&Y went to "great lengths" to line up law firms in advance as part of the promoted package to issue an opinion on their tax products according to an E&Y internal e-mail from Robert B. Coplan, the head of E&Y's VIPER/Strategic Individual Solutions Group, produced by E&Y to the Government and cited in the 2005 Senate Report by the Subcommittee.[8] In general, the purpose of a tax opinion from an independent source is to provide written advice

---

[8]    See 2005 Senate Report, p. 80 fn. 330, citing an email from Robert B. Coplan of E&Y, Bates 2003EY01139, which states: "As you know, we go to great lengths to line up a law firm to issue an opinion pursuant to a separate engagement letter from the client that is meant to make the law firm independent from us."

explaining whether a particular tax product is permissible under the law and, if challenged by the IRS, the likelihood that the tax product would survive court scrutiny. In addition, tax shelter promoters, at this time, would use the tax opinion to convince the prospective buyer of a tax shelter that they would be "protected" against the imposition of penalties by the IRS. In general, a tax opinion provided by a law firm with ties to the tax product or promoters has traditionally been accorded less deference than an opinion from a completely unaffiliated and detached source. In order to have the opinion on the tax product appear to be independent of E&Y, E&Y would arrange for the taxpayer to enter into a separate engagement letter and pay the law firm's fee separately. For the PICO tax product, E&Y lined up the law firms of Arnold & Porter and Proskauer in advance to issue pre-arranged favorable opinions to the prospective PICO purchasers.

70.    In promoting the PICO strategy, Defendants used promotional materials, which on information and belief, were developed by the Strategic Individual Solutions Group, headed by Robert B. Coplan, with input from the other Defendants. E&Y and Bricolage used these promotional materials to present the PICO strategy to E&Y clients who met the target criteria.

71.    The PICO strategy was marketed as an "Individual Tax Planning Solution". The E&Y presentation materials touted PICO as follows:

(a)    Provides investor with maximum investment control and **minimum investment risk.**

(b)    Creates long-term personal investment vehicle integrating investment management services with estate planning and asset protection opportunities.

24

72.     The E&Y presentation materials outlined the steps involved in the PICO strategy.

Step One required the "Creation of S Corporation" as follows:

> Investor creates S Corporation with principals of Counterpoint Capital, LLC ("Counterpoint") and designates Counterpoint as investment manager.
>
> Investor retains full control over S Corporation and retains right to replace Counterpoint as investment manager at any time. Counterpoint has right to have stock redeemed by S Corporation at FMV [fair market value] after 90 days.

73.     Step Two involved the investor taxpayer making a loan to the S corporation. The purpose of the loan was to create basis in the corporation; however, the loan was at risk only to the extent that any investment losses exceeded the aggregate equity investment of Counterpoint principals and the proposed investor. Step Three called for the allocation of the investment gains to the Counterpoint principals and the proposed investor in accordance with their respective percentage interests in the S corporation. Step Four involved the redemption of the Counterpoint principals' stock after a 90 day period by the proposed investor. Step Five left the proposed investor as the sole shareholder of the S corporation with an allocation of 100% of gross losses realized by the S corporation at year-end. Step Six allowed the proposed investor to contribute funds to the S corporation sufficient to provide a tax basis "so that investment losses realized by the S corporation can be utilized by the Investor." Step Seven described the fact that the S corporation (with its deferred capital gain in basis) would continue "for an indefinite period of time," i.e. until the death of the investor when the proposed investor's heirs would be eligible to receive a stepped-up basis in the S corporation, wiping out the deferred capital gain, assuming tax laws provisions providing for such stepped-up tax basis continue in effect.

74.    Each of the steps were fully planned by the Defendants, acting in concert, in order to reduce the taxpayer's tax liability and earn large fees for Defendants.

75.    The E&Y presentation set forth the following overview of services that would be provided by Defendants and Bricolage:

> E&Y – General transaction consulting, structuring and coordination of implementation, tax advice
>
> Arnold & Porter [or Proskauer] – Preparation of tax opinion and formation of S corporation
>
> Counterpoint – Structuring advice, investment of portfolio, including investment management and advice, and direct bank/custodian to make trades
>
> Deutsche Bank – Execute trades and maintain accounts

76.    The E&Y presentation set forth the following fee schedule:

> 3% – Counterpoint Capital – Investment management and derivative (straddle) structuring
>
> 2% – Ernst & Young – Tax consulting and preparation for S corp., financial statement compilation, and audit defense through appellate level of IRS
>
> 1% – Deutsche Bank – counter party in straddle

This fee schedule was in keeping with industry practice whereby tax shelter promoters charged a fee equal to 6% of the tax losses. It represented tax product billing contingent on desired outcome rather than more traditional charging by the hour or individual currency transaction.

77.    The list of services to be provided by Defendants and the fee structure indicates the PICO strategy was a pre-packaged team effort by Defendants and the scheme was premised on splitting of the fees generated.

78.     The law firms procured by E&Y would not only provide the tax opinion on the PICO strategy, but would form the S corporation through which the PICO strategy would be implemented.

79.     The availability of the tax opinion from respected law firms, such as Arnold & Porter and Proskauer, was a material part of the marketing of PICO.  The members of the Class were promised at the outset that one of these two respected law firm would issue a favorable tax opinion on the PICO strategy.

80.     The PICO Strategy sold to E&Y clients was structured in substantially the same way for all participants, including Plaintiffs.

81.     The Strategic Individual Solutions Group of E&Y fraudulently characterized the PICO strategy as an "Individual Tax Planning Solution", rather than as a tax shelter, legal or illegal.  Such characterization of the PICO strategy as an "Individual Tax Planning Solution" was a misrepresentation because the strategy was structured identically or virtually identically in terms of substance for all E&Y clients who purchased the PICO strategy.

82.     The loans to the S corporations and foreign currency stradle transactions that formed the basis of the PICO strategy had no purpose other than to generate artificial tax losses, which E&Y clients were persuaded to then claim against legitimate income.

83.     In truth, Defendants knew or recklessly ignored that the sole purpose of the PICO strategy was to produce artificial tax losses that would be disallowed while generating millions of dollars in fees for themselves.  Defendants knew, or recklessly ignored, or should have known

that the PICO strategy was an unsustainable artificial loss transaction that would not be allowed

by the IRS and would result in damages to those who elected to participate in the PICO strategy.

**B.    The Promotion of the PICO Strategy to the Abessinios is Typical of the Promotion of the PICO Strategy to Class Members**

84.    In approximately May 2001, E&Y, through its Strategic Individual Solutions

Group, approached Abessinio regarding what they termed potential individual tax planning

solutions.  Two ideas were proposed, one was to create a family trust, the other to engage in the

PICO strategy.

85.    E&Y was aware of Abessinios' substantial income level since E&Y's

Philadelphia office was responsible for preparing the Abessinios' individual tax returns and

E&Y had assumed a role of trusted advisor to the Abessinios.  Accordingly, the Abessinios did

not approach E&Y or seek out the PICO strategy.  Rather, they were targeted by E&Y due to

their high income level and the level of trust they had placed in E&Y.  E&Y pitched the PICO

strategy to the Abessinios as a "safe investment" that would produce legitimate tax benefits.  The

Abessinios depended on E&Y to determine if the PICO strategy was appropriate for them and

was a legitimate tax saving device.

86.    Two partners from E&Y, David E. Lees and W. Scott Balestrier, made the

presentation to Abessinio regarding the advantages of the PICO strategy.  Abessinio was given a

PowerPoint presentation prepared by the Strategic Individual Solutions Group, similar to the

promotional materials presentation discussed above, which were used to sell the PICO strategy

to all prospective purchasers.

28

87.    With regard to the implementation of the PICO strategy, a representative from Bricolage, operating at the direction of Beer and Veera, also made a PowerPoint presentation. The Bricolage representative explained how the foreign currency transactions would work. Bricolage traders, ASA and JJC, would become shareholders in the S corporation formed by the taxpayer. Bricolage Related Entities would acquire on behalf of the S corporation a long and a short position, called a straddle, in foreign currency forward contracts. A straddle involves the use of substantially offsetting positions in forward contracts whereby the value of one position ordinarily varies inversely with the value of the other position. Any profits on the currency contracts would be allocated to ASA, JJC and the investor taxpayer in proportion to their ownership interests in the S corporation. The gain would increase each shareholder's basis in the S corporation. After 90 days, the investor taxpayer would redeem the interests of ASA and JJC in the S corporation. By this time, the profitability of the S corporation would be established. When the shares of ASA and JJC would be redeemed, the S corporation would elect to treat its taxable year as if there were two separate taxable periods with the first period ending on the date of redemption, and the second period ending at the end of the calendar year. The unrealized losses on the currency straddles would not be realized, i.e. recognized, until the second deemed taxable period when the investor taxpayer would be the sole shareholder of the S corporation. These losses could then be claimed as ordinary loss by the investor taxpayer to the extent of his basis in the S corporation.

88.    The E&Y and Bricolage representatives downplayed the risk of the investment strategy to the Abessinios. The presentations used by E&Y and Bricolage emphasized the

29

legitimacy of the transactions. The E&Y representatives indicated that E&Y would defend the PICO strategy if it was audited.

89.     As part of the marketing materials given to the Abessinios, Defendants and Bricolage represented that Arnold & Porter would prepare a tax opinion on the legitimacy of the PICO strategy and form the S corporation.

90.     Defendants further advised that if the IRS audited the Abessinios' tax returns as a result of the PICO strategy, the "independent" opinion letter would confirm the propriety of the PICO strategy and of claiming the resulting losses on their tax returns. According to Defendants, this "independent" opinion letter would enable the Abessinios to satisfy the IRS auditors as to the propriety of the tax returns and provide penalty protection in the event that the tax returns were ever audited.

91.     Despite being a knowledgeable businessman, Abessinio did not understand the complexities of the PICO strategy and believed based on representations by Defendants that the entire PICO strategy was a legitimate strategy to save taxes.

C.     **What Was Not Disclosed In the Sale of PICO by Defendants**

92.     Defendants knew, or recklessly ignored, or should have known, that the sole purpose of the PICO strategy was to produce artificial tax losses that would be disallowed while generating hundreds of millions of dollars in fees for Defendants. Defendants knew, or recklessly ignored or should have known, that the PICO strategy was an unsustainable artificial loss transaction that would not be allowed by the IRS.

93.    Beer-controlled Bricolage failed to disclose that, at this time, one of the law firms

that would be issuing the favorable tax opinions to members of the Class, Arnold & Porter, was

also providing Bricolage and its affiliates with legal services, and therefore, was not

independent.

94.    Most importantly, Defendants failed to disclose that, in reality, each step of the

PICO strategy was contrived by Defendants and would be open to challenge by the IRS. The S

corporation had no legitimate purpose other than as a vehicle for tax avoidance. The loans were

unnecessary other then to establish an artificial basis in the corporation. The Bricolage traders,

ASA and JJC, participated as shareholders in the S corporation only in order to establish a

pattern of trading in foreign currency straddles to create the fiction that there was economic

substance to the activity of the S corporation. The profitability of the trading activity was

artificially created. As a currency fluctuates, one side of the straddle will ordinarily be in a

profitable position, i.e., gain leg, and one side of the straddle will be in a loss position, i.e., loss

leg. To record a gain, one merely closes the gain side of the straddle. The value of the

unrealized loss position may be locked in by neutralizing any further risk of loss by either

negotiating a termination payment with the counter-party or entering into a new hedged position.

The effect is to eliminate the risk of future loss but leave the initial contract still open and

unrealized until such time as it is closed. By repeatedly entering into these straddles, gains can

be recorded and losses left unrealized, at will. The entire strategy was, therefore, controllable.

To protect against the foreseeable contention by the IRS that the straddles were merely mirror

positions, and thus without economic substance, the Bricolage Related Entities would buy the

31

forward contracts slightly varied in duration and strike price. However, a long term pursuit of the strategy could never be truly profitable because of the transaction fees, and the time period for the activity, therefore, only occurred for a limited duration.

95.    In promoting the PICO strategy, Defendants followed a script. This scripted presentation was used in promoting the PICO strategy to Abessinios and the other Class members. These facts were not disclosed in the scripted presentations.

96.    Further, these facts were not included in the assumptions on which the pre-arranged tax opinions provided to the Class in support of the PICO strategy were based. Defendants knew it was questionable whether tax opinions issued under these circumstances would indeed provide PICO purchasers protection from penalties.

97.    The IRS stated the following in Notice 1999-59:

> Through a contrived series of steps, taxpayers claim tax losses for capital outlays that they have in fact recovered. Such artificial losses are not allowable for federal income tax purposes.

Thus, tax-advantaged transactions must have real economic substance (*i.e.*, there must be a real risk of losing money). This is the long-standing "economic substance" doctrine that was firmly established well before the PICO Strategy was designed, promoted, or implemented. *See ACM Partnership v. Comm. of Internal Revenue*, 157 F.3d 231 (3d Cir. 1998). Although Notice 1999-59 did not specifically mention the PICO strategy because it did not exist at the time the Notice was published, its substance nevertheless applies directly to PICO. Thus, Defendants were or should have been fully aware that the IRS would disallow the purported tax treatment of PICO, a strategy completely devoid of economic substance. However, the Defendants, all the

32

while withholding this critical information from the Plaintiffs, knowingly defrauded the

Plaintiffs by giving Plaintiffs faulty legal, tax, accounting and investment advice in order to

profit from Plaintiffs' participation in the PICO strategy.

      98.     Internal E&Y communications show that E&Y knew of the risks and dangers of

the PICO strategy, and tried to limit any entanglements that could possibly increase its exposure

to liability.

      99.     For example, on May 29, 2001, Mark Harbour of E&Y e-mailed several Ernst &

Young individuals, including Robert (Bob) Coplan and Richard Shapiro, and expressed concern

regarding the oversight (or lack thereof) of Bricolage's investment activities in PICO.

Specifically, he stated:

> Since E&Y through the efforts of Richard Shapiro, Bob Coplan,
> and other SISG [Strategic Information Systems Group ] players
> have (sic) essentially forged an alliance with Bricolage as part of
> the PICO Strategy, I think from the EYIA standpoint, we should at
> least be aware of if not involved in the continuing due diligence of
> their investment activities beyond the SIS transaction.
>
> In most cases, I suspect that E&Y is investment advisor to our
> clients undertaking the SIS [Strategic Information Systems]
> transactions. Thus, any follow up investments arising from those
> sources would probably fall under your oversight umbrella.

      100.    Harbour received a response from Bertram J. Schaeffer stating "I believe that you

have an opinion from our [General Counsel] office that we are not rendering investment advice

on SISG transaction...I'm concerned that by performing due diligence, our exposure to liability

may actually increase." Although Ernst &Young had an internal legal opinion that it was not

properly categorized as an investment advisor regarding the PICO Strategy, defendants

Bricolage and Deutsche Bank through their various entities (including Delta and Counterpoint)

did, in fact, serve as the investment advisors on the PICO Strategy.

101.    A later email, dated  June 23, 2001, from Robert Coplan to several prominent

E&Y tax partners, shows other ways E&Y attempted to conceal the risks of the PICO strategy to

the potential PICO clients and limit its own potential liability for PICO:

> For one thing, I wanted to avoid putting too much in an E&Y
> declaration about the financial risk to their position since we are
> trying to maintain our posture as the tax advisor and on these
> transactions (PICO and CDS [another tax shelter]) there is an
> investment firm who is doing the investment advice....Based on my
> discussion with Ron, I have put together the sample language
> below, and attached a sample PICO engagement letter to show
> how it might look if the declaration *were simply folded into the*
> *standard engagement letter right above the client's signature*. I
> am interested in your reaction to this approach, and what the
> heading should be (e.g. – "Declaration" or "Risks", etc.).  We have
> a fair number of sales heading for completion (hopefully) so
> resolving this quickly would be great.  I supposed for those deals
> recently closed, we might be able to get the client to sign this
> language as a stand-alone document, but that might be awkward –
> looks like a cover-our-ass afterthought.

(Emphasis added).  This email shows that Ernst & Young was focused on completing the

pending sales and limiting  its own exposure and not in fully-informing its clients of the risks

involved.

102.    In developing the PICO Strategy, Bricolage retained Arnold & Porter to advise

Bricolage and its related parties regarding the federal tax implications of PICO.  In reviewing

and analyzing the PICO Strategy, Arnold & Porter opined, among other things, that Bricolage

did not need to register under 26 U.S.C. §101, *et. seq*. as a tax shelter promoter with the IRS.

34

103.    Arnold & Porter did not disclose its separate representation of Bricolage when it undertook to issue opinion letters to PICO participants.  Similarly none of the Bricolage Related Parties revealed the lack of Arnold & Porter's independence to the PICO participants.

104.    James Joseph, an attorney at Arnold & Porter, knew that Arnold & Porter had provided advice to Bricolage and its related entities.  Mr. Joseph was also involved in drafting the opinion letters issued by Arnold & Porter to PICO participants.

**D.    Defendants, Bricolage and Arnold & Porter Implement the PICO Strategy for the Abessinios and Other Class Members**

105.    The implementation of the PICO strategy involved a complex series of financial transactions designed by Defendants.  The Abessinios and other Class members followed the directions of Defendants and relied on their representations that these transactions were legitimate and that the tax treatment applied to such transactions would "more likely than not" survive a challenge from the IRS.

106.    To implement the PICO strategy, the following steps were uniformly taken on behalf of Plaintiffs and the Class members at the direction of Defendants:

(a)    A certificate of incorporation drafted by Arnold & Porter or Proskauer would be filed for the personal investment company;

(b)    An application for employee identification number and an election by small business corporation for the personal investment company to be an S corporation would be prepared by Arnold & Porter or Proskauer and executed at the direction of Defendants by taxpayer;

(c)    Organizational documents for the personal investment company would be drafted by Arnold & Porter or Proskauer ;

35

(d)    Equity investments in the personal investment company S corporation would be made by ASA and JJC and David J. Diamond ("Diamond") on behalf of Bricolage, as managing agent for the trading companies, ASA and JJC, would execute subscription agreements and stockholder agreements;

(e)    An equity investment would be made by the taxpayer in the S corporation;

(f)    The newly formed S corporation would execute an agreement with Diamond, on behalf of Bricolage or one of its affiliates, such as Delta, to manage and trade the foreign currency forward contracts involved in the PICO strategy;

(g)    The newly formed personal investment company S corporation would engage Deutsche Bank or one of its affiliates, such as Bankers Trust Company, to hold the custodial account of the S corporation;

(h)    The newly formed S corporation would pay an initial fee to Bricolage or a Beer-controlled Bricolage affiliate;

(i)    The taxpayer would redeem the interest of ASA and JJC after approximately three months;

(j)    Fees would be paid by Class members to Delta or other Beer controlled Bricolage affiliate based on the amount of loss generated by any unrealized transactions, which would then be realized, after the withdrawal of the Bricolage traders, ASA and JJC;

(k)    Tax returns would be prepared by E&Y claiming the loss generated by the PICO strategy; and

(l)    A favorable tax opinion would be issued by Arnold & Porter or Proskauer.

107.    On July 2, 2001, Abessinio executed an engagement letter written by E&Y dated June 29, 2001 confirming E&Y's engagement to provide "advice to you concerning the development and implementation of the Personal Investment Company (PICO) Strategy." The fee for such tax advisory services was $50,000.

36

108.    The engagement letter also revealed that E&Y would also be compensated by Counterpoint.

109.    A copy of the engagement letter was provided to Robert B. Coplan, the E&Y partner in Washington, D.C. who headed the Strategic Individual Solutions Group, the re-named VIPER Group.

110.    The following steps were taken on behalf of Plaintiffs at the direction of Defendants to implement the PICO strategy:

(a)    A certificate of incorporation drafted by Arnold & Porter, the law firm procured by E&Y for Plantation was filed with Office of the Secretary of State of the State of Delaware on July 16, 2001;

(b)    On or about August 22, 2001, Abessinio executed an Application for Employee Identification Number for Plantation and an Election by Small Business Corporation for Plantation to be an S corporation faxed to him by Arnold & Porter, the law firm procured by E&Y for Abessinio;

(c)    On or about August 27, 2001, Abessinio executed a Waiver of Notice and Written Consent of the Sole Director in Lieu of Organization Meeting for Plantation and a set of Bylaws for Plantation drafted by Arnold & Porter;

(d)    On or about August 28, 2001, Abessinio and Diamond as general counsel for Bricolage, the managing agent for ASA and JJC, the single member limited liability companies formed for Bricolage traders, Andrew S. Ahn and Jason J. Chai, executed the Subscription Agreements for their equity investments in Plantation;

(e)    On or about August 28, 2001, Abessinio and Diamond as general counsel for Bricolage, the managing agent for ASA and JJC, the single member limited liability companies formed for Bricolage traders, Andrew S. Ahn and Jason J. Chai, executed a Stockholders Agreement;

(f)    On or about August 28, 2001, Abessinio on behalf of Plantation and Diamond as general counsel for Bricolage, executed an Investment Management Agreement with Bricolage to manage and trade the foreign currency forward contracts involved in the PICO strategy.  The agreement

was with Bricolage itself, rather than with the Bricolage affiliate, Counterpoint, mentioned in the promotional material and E&Y's engagement letter;

(g)   On August 28, 2001, Abessinio, on behalf of Plantation, executed a Worldwide Custody Account Agreement with Deutsche Bank, through Bankers Trust, its private banking division. The foreign currency transactions engaged in by Bricolage would be cleared and maintained by the Bankers Trust division of Deutsche Bank and Deutsche Bank would also be the counterparty in the foreign currency straddle positions;

(h)   On September 10, 2001, Abessinio executed a promissory note in the amount of $6 million made payable to Plantation and funded his $300,000 equity investment in Plantation;

(i)   Plantation agreed to pay Bricolage a $50,000 fee in 2001;

(j)   In or about December 2001, approximately three months after the PICO strategy was initiated, Plantation, through its taxpayer shareholder, Abessinio, redeemed the interests of ASA and JJC in Plantation;

(k)   At the same time, Abessinio executed a Currency Consulting and U.S. Government Agency Securities Trading Agreement with Delta who would allegedly continue the foreign currency transactions on behalf of Plantation. This agreement provided for a strategic consulting and advisory fee of $5,700,000.00 payable in advance for a period of eight quarters in early 2002;

(l)   On January 9, 2002, Diamond requested payment to Delta from Abessinio under terms of the agreement. On January 17, 2002, the sum of $5,700,000.00 was transferred by wire from the account of Plantation to Delta, the Bricolage affiliate;

(m)   As set forth below, E&Y prepared and signed tax returns for the Abessinios for tax years 2001 and 2002; and

(n)   On February 28, 2002, Arnold & Porter billed Abessionio for the favorable tax opinion.

38

111.     On information and belief, despite the huge fee paid to Delta by Plantation, no further straddles were purchased after December 31, 2001 for the Plantation account and Delta performed no work for Plaintiffs in return for this enormous fee.

112.     On information and belief, in reliance on representations from Defendants, other members of the Class entered into transactions almost identical in form and substance to the ones entered into by Plaintiffs as part of the implementation of the PICO strategy.  The transactions themselves differed only in the names of the S corporation, the size of the various trades, the type of currency straddled, the duration and strike price of the currency trade, the size of the loss claimed and the percentage of fees paid.

113.     On information and belief, either Arnold & Porter or Proskauer assisted members of the Class in the legal details to implement the PICO strategy such as the formation of the S corporation and the election of S corporation status, and issued the pre-arranged favorable opinion letters.

114.     On information and belief, other members of the Class entered into transactions in which they paid enormous fees to Delta and other Bricolage affiliates formed by Beer and Veera. Those fees were paid in consideration of the complex PICO tax shelter strategy consisting of the fraudulently artificial transactions described above.

115.     Like Abessinio, the other Class members trusted their accountants and the professionals with whom they associated to provide them with the highest quality of services and assistance.  Like Abessinio, these Class members were targeted because of their wealth and relationships with E&Y.

116.    On information and belief, Bricolage and Bricolage affiliates formed by Beer and Veera, such as Delta and Counterpoint, assisted Class members in providing Bricolage affiliated traders, ASA and JJC, as initial shareholders in the personal investment company S corporation. These traders would enable the fiction that by engaging in foreign currency straddles, the S corporation had a legitimate business purpose and profit motive.  These traders would, however, quickly withdraw in line with the pre-determined steps in the PICO strategy and Delta or some other Bricolage affiliates formed by Beer and Veera would collect the enormous fees that would be shared by Defendants.

117.    On information and belief, Deutsche Bank and its affiliates acted as counter-parties for the Bricolage affiliates in the foreign currency straddles.  These straddles were continued to create the appearance of profits and losses.  Deutsche Bank collected part of the enormous fees shared by Defendants.  Deutsche Bank was aware of the improper purpose behind the currency straddle transactions.

118.    E&Y violated well-known and long-established ethical standards, including those related to fees, auditor independence and conflicts of interest in their representation of members of the Class.

119.    For example, although traditionally accounting firms such as E&Y charge flat fees or hourly fees for tax services, E&Y, through the fee-splitting arrangement with Counterpoint or Delta, charged PICO strategy clients a "contingency fee" equal to a percentage of the "tax losses" that E&Y expected the members of the Class's use of the PICO strategy to generate.  As set forth in the promotional materials prepared by E&Y's Strategic Individual

Solution Group for the PICO strategy, the client fee was paid to Counterpoint or Delta, or some other Bricolage affiliate formed by Beer and Veera, which apportioned the fee amount among E&Y and Deutsche Bank in accordance with a pre-determined sharing agreement. This fee-splitting arrangement violated restrictions on contingency fees to accountants.

120.    E&Y through Delta or Counterpoint, or other Bricolage affiliates formed by Beer and Veera, charged clients these "contingency fees" despite the fact that more than 20 states prohibit the payment of contingency fees to accountants, and rules promulgated by the SEC, the American Institute of Certified Public Accountants and other regulatory or watchdog bodies constrain their use in various ways, see, e.g., AICPA Rule 302.355 and Circular 230.

121.    On information and belief, Arnold & Porter or Proskauer were procured to issue legal opinions on the PICO strategy to members of the Class and charged separately for each legal opinion provided in connection with the PICO strategy, even though these legal opinions were predetermined as to the conclusion that would be reached, i.e., that the PICO strategy would more likely than not survive an IRS challenge.

122.    American Bar Association (ABA) Model Rule 1.5 states that "[a] lawyer shall not make an agreement for, charge, or collect an unreasonable fee," and cites as the factors to consider when setting a fee amount "the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly."

123.    Despite the clear directive of Rule 1.5, these two law firms charged substantially similar fees for the legal opinions they issued to members of the Class, even when opinions drafted after the initial prototype opinion contained no new facts or legal analysis, were virtually

41

identical to the prototype except for client names, and in many cases required no client consultations.

124.    On information and belief, Beer and Veera received the portion of any fees paid to Counterpoint or Delta.  On information and belief, ASA and JJC received the proceeds of the profitable side of the currency straddles on each PICO strategy implemented, as well as the proceeds from their buy-out in each personal investment company.  These proceeds were in essence fees to ASA and JJC for their services rendered as interim shareholders in each personal investment company set up to implement the PICO strategy.

**E.    IRS Increases its Scrutiny of Tax Shelters and Defendants Determine Not To Register The PICO Strategy**

125.    Beginning in 2001, tax shelter promoters were required to obtain a registration number for each tax shelter and register it with the IRS.  Further, tax shelter promoters were required to keep user lists and copies of all promotional materials.  Taxpayers who engaged in tax shelters were also subject to disclosure requirements.  Initially, only corporations were required to disclose their use of a tax shelter.  Defendants, structured the PICO strategy to avoid IRS detection by targeting only individuals.  In time, however, such taxpayer disclosure requirements were expanded to individuals, S corporations and their shareholders and trusts. Despite these registration requirements, Defendants and Bricolage never registered the PICO strategy.

126.    The IRS continued to identify transactions it would act to disallow.  On July 27, 2001, the IRS issued Notice 2001-45 which identified a basis shifting tax shelter, being marketed

by KPMG LLP to corporations under various names, BLIS, FLIP and OPIC, as a "listed transaction," i.e., transactions that the IRS would disallow.

127.    On December 21, 2001, the IRS announced an initiative to encourage taxpayers to disclose tax shelters on their tax returns ("Amnesty Program"). This initiative was aimed at using taxpayers to readily identify tax shelter promoters such as Defendants who had not registered their tax shelters and assist the IRS enforcement efforts regarding tax shelters. Pursuant to this initiative, Announcement 2002-2, if the taxpayers disclosed the tax shelter and other related items before April 23, 2002, the IRS would waive the accuracy-related penalty for any underpayment under IRC § 6662(b)(1), (2), (3) and (4) attributable to the disclosures.

**F.    Plaintiffs Are Advised Regarding Participation In Amnesty Program And Increased Likelihood of Drawing Scrutiny to PICO Strategy**

128.    In February 2002, Abessinio was contacted by a member of E&Y's Philadelphia office to advise him of the existence of the IRS Amnesty Program. The E&Y representative outlined for Abessinio the details of the IRS Amnesty Program as it applied to the PICO strategy. In addition, the E&Y representative outlined for Abessinio the disadvantages of disclosure as memorialized in a letter from John Stine to Abessinio dated March 6, 2002:

> In making your decision, you should be aware that you would be required to agree to provide the IRS with privileged information if requested - particularly, your legal opinion. However, as a practical matter you might ultimately be forced to surrender this in the course of an audit in order to demonstrate to the IRS the basis for your reasonable belief that the tax treatment of the items on your return was at least more likely than not appropriate. Any other items in your possession would probably be obtainable by the IRS in normal audit Information Document Requests. In weighing your decision, you should consider the following factors:

43

1)    We previously advised you that audit of the transaction is
likely but not certain,

2)    <u>Making the special disclosure would greatly increase the
likelihood of a tax examination,</u>

3)    <u>It is possible that the IRS could issue a list maintenance
request to either E&Y or Bricolage that would require the
recipient to submit a list of clients that implemented the
PICO transaction.</u>  (emphasis added).

129.    Although E&Y through Stine, clearly understood that there was a clear incentive

to Abessinio to enter into the IRS Amnesty Program, E&Y was very concerned that the PICO

strategy and the activities of Defendants as promoters of PICO would be drawn to the attention

of the IRS as a result of any participation by the Abessinios in the Amnesty Program.  Stine goes

on to state in his March 6, 2002 communication:

> Note that the amnesty offer does not apply to taxes or interest you
> may owe in the event the IRS successfully challenges the item or
> transaction.  Conversely, the IRS clearly states in the Announcement
> that a taxpayer's disclosure of an item creates no inference that the
> taxpayer's tax treatment of the item was improper or that a penalty
> would apply if there were an underpayment of tax.  Furthermore, the
> Service notes that taxpayers who do not disclose under this initiative
> are not prevented from demonstrating that they satisfy the reasonable
> cause exception under §6664(c) and the regulations thereunder, e.g.,
> by reliance on an independent opinion from counsel.
>
> Rocco, based upon our discussions last week, you informed us that
> you will most likely avail yourself of this amnesty program.
> However, we agreed that we will not act as of yet, but will wait until
> March to make our final decision, <u>at which point we should have
> more facts as to whether the amnesty program has made it more
> likely that the PICO transaction may come to the attention of the IRS.</u>
>
> We will contact you before the end of this month to review and
> finalize your decision with respect to amnesty and to assist you in