claiming amnesty with the IRS if that is the decision you ultimately make. Please call me with any questions you may have.

(emphasis added)

130.    Because disclosure opens the door to IRS scrutiny, E&Y was understandably reluctant for any of its clients to participate in the Amnesty Program.

131.    On information and belief, E&Y urged its PICO strategy clients not to participate in the Amnesty Program, yet was aware that if some members of the Class participated in the Amnesty Program, the IRS would be alerted as to the PICO strategy.

132.    The Abessinios, despite the urgings of E&Y not to participate, elected to participate in the Amnesty Program with respect to the PICO strategy, and on April 18, 2002, in a letter to the IRS disclosed their participation in the PICO strategy in accordance with Announcement 2002-2.

133.    Ultimately, this decision by the Abessinios to participate in the Amnesty Program mitigated the amount of damages they sustained as part of the PICO strategy.

134.    On information and belief, other members of the Class heeded E&Y's urgings not to participate in the Amnesty Program or simply were never advised of this IRS Amnesty Program, exposing them to greater damages from the PICO strategy.

135.    On information and belief, E&Y disregarded its affirmative obligation to properly advise its clients who are members of the Class of the Amnesty Program.

**G.    E&Y Is Investigated By IRS With Regard To Tax Shelters**

136.    As E&Y feared, the IRS used the information provided by taxpayers who participated in the Amnesty Program to discover tax shelter promoters who had not provided disclosures to the IRS and to identify tax shelter products previously unknown to the IRS.

137.    In March 2002, the IRS commenced an investigation of E&Y's tax shelter activities.  In the summer of 2002, as part of this investigation, E&Y turned over documents regarding tax shelters to the Government.

138.    Shortly thereafter, on July 15, 2002, the IRS issued Notice 2002-50 announcing that the IRS would challenge transactions in which an investor uses a foreign currency straddle, a tiered partnership structure, a transitory partner and a permanent non-economic loss, in essence a similar structure to the PICO strategy, but using a tiered partnership, rather than an S corporation.

139.    In June 2002, the IRS introduced a further disclosure rule requiring individual taxpayers, partnerships and S corporations to include a statement on their tax returns if they participated in a "listed transaction" or questionable tax shelter program.  Previously, only corporations were required to make such a disclosure statement as part of their tax returns.

**H.    Plaintiffs Receive Arnold & Porter Form Opinion Letter on the PICO Strategy**

140.    On or about February 28, 2002, Arnold & Porter sent Abessinio an initial bill for $200,000 for the, as yet, undated opinion letter.

46

141.    On August 16, 2002, the sum of $125,000 was wired from the account of Plantation to Arnold & Porter in payment for the Arnold & Porter opinion letter on the PICO strategy.  On August 20, 2002, Arnold & Porter issued the opinion letter to Abessinio.

142.    Upon information and belief, the opinion letter prepared for the Abessinios by the Arnold & Porter firm as to the tax benefits of the PICO strategy was prepared well in advance of its issue date.

143.    On information and belief, the opinion was also issued by Arnold & Porter with minor changes to certain other members of the Class.

144.    The opinion issued to Abessinio provided as follows:

**II.    Representations**

In addition to the other facts and representations referred to elsewhere in this letter, the Investor [Abessinio], JJC, ASA, Bricolage or the Company [Plantation], as the case may be, have represented to us, for purposes of our opinion, as follows:

(a)    The Investor believed that he had reasonable opportunities to earn a reasonable profit (taking into account all costs associated with this investment) and to realize long-term estate planning and asset management objectives from forming and operating the Company, and thus did not invest in the Company primarily to obtain income tax benefits.

(b)    The Investor believed that the Company had a reasonable opportunity to realize an aggregate gross return in excess of the sum of the Company's expenses, including consulting and investment advisory costs, during its first two years of operations.

(c)    An objective review of the anticipated activities of the Company would show that these anticipated activities support the Investor's beliefs as reflected in the two preceding representations.

47

(d)    When he invested in the Company, the Investor intended for the Company to continue trading in foreign currencies and U.S. Government and Agency securities for at least a year, although that intention was subject to change based on market conditions and trading results.

(e)    Neither the Investor nor JJC or ASA has entered into hedging transactions designed to neutralize the effect of the transactions entered into by the Company, thereby reducing their opportunity for gain or risk of loss from their ownership of Company stock.

(f)    The Company had a substantial non-tax business purpose for entering into the Forward Contracts.

(g)    Each Forward Contract is a legally binding and enforceable contract.

(h)    The Forward Contracts have terms and conditions substantially similar to those described in the attached Strategy Memorandum (except for the specific currencies, prices and maturity dates), and such terms and conditions generally are consistent with those contained in International Swap Dealer Association standard form contracts.

(i)    The parties to each Forward Contract will not have committed to terminate, nor to negotiate to terminate, the Forward Contract at the time that the Forward Contract is entered into.

(j)    The Company's decision as to the time at which it will terminate or offset a Forward Contract or Combined Transaction has not and will not be based primarily on tax benefits.

(k)    The functional currency of the Company is the U.S. dollar.

(l)    The costs of closing out a position through the termination of a Forward Contract and through entering into a new neutralizing contract are very similar, and it is generally not possible to predict in advance of entering into the Forward Contract which method will be more cost effective.

(m)    Neither the employees of Bricolage who held the shares of the Company through their respective wholly owned limited liability companies nor the Company acted as agents of Bricolage or any other party with respect to any transaction described herein.

48

(n)    The Rocco A. Abessinio Irrevocable Trust is classified as a trust under subpart E of part I of subchapter J of the Code and the Investor is treated as the owner of the Company shares held by that trust.

(o)    Notwithstanding any tax benefit the Investor might derive from his ownership of the Company, the ownership of the Company constitutes an appropriate investment strategy in light of his investment objectives.

(p)    Under no circumstances is the Company's opportunity for profit insignificant relative to the amount of the equity investment.

(q)    None of the Company, the Investor, JJC, ASA or Bricolage has entered into any additional agreements relating to the Company, including any agreement that would affect, limit or modify any of the agreements referred to herein.

145.    Arnold & Porter knew, or should have known that these representations, some of which were false, were pre-designed to assist Arnold & Porter in readily reaching the following pre-determined conclusions:

**III.**    <u>**Conclusion**</u>

Subject to, and as qualified and limited by the discussion that follows, in our opinion:

A.    It is more likely than not that the Company will be treated for federal income tax purposes as an S corporation.

B.    It is more likely than not that neither the formation of the Company nor the redemption of Company stock held by JJC and ASA, which left the Investor as sole owner of the Company, will be treated as an acquisition made to evade or avoid tax under Section 269.

C.    It is more likely than not that Section 382 will not apply to limit the Investor's deduction of built-in losses realized by the Company after he assumed full ownership of the Company.

D.    It is more likely than not that (1) gains and losses recognized by the Company will be allocated to JJC, ASA and the Investor in proportion to their stock ownership in the Company, (2) if the Company makes the election under Section 1377(a)(2), gains and losses recognized by the Company after JJC's and ASA's

49

Company stock is redeemed should be allocated solely to the Investor, and (3) no mark-to-market requirement will be triggered under Section 1256 by the redemption and election.

E.    It is more likely than not that (1) the Subchapter S loss limitation rules will not limit the Investor's ability to deduct his share of the Company's losses as long as he has sufficient basis in his Company stock and indebtedness owed to him by the Company, and (2) the Investor's basis in stock and debt will be reduced, but not below zero, by the amount of Company losses allocated to him.

F.    It is more likely than not that loan repayments by the Company to the Investor after he has recovered in full his basis in indebtedness owed to him by the Company will be taxable to him as capital gain.

G.    It is more likely than not that distributions made by the Company to the Investor after he has recovered in full his basis in his Company stock will be taxable to him as capital gain.

H.    It is more likely than not that the passive activity loss rules will not limit the Investor's ability to deduct his share of Company losses.

I.    It is more likely than not that the Investor's amount at risk for purposes of Section 465 will include capital contributions and loans made by him to the Company for use in the Company's arbitrage trading and investing activity.

J.    It is more likely than not that any gain or loss realized on the Forward Contracts will be ordinary gain or loss under Section 988.

K.    It is more likely than not that (1) Forward Contracts in Major Currencies[9] will be required under Section 1256 to be marked-to-market at the end of the Company's taxable year, and (2) Forward Contracts in Minor Currencies will not be required under Section 1256 to be marked-to-market at the end of the Company's taxable year.

L.    It is more likely than not that Combined Transactions, whether in Major or Minor Currencies, will be straddles under Section 1092.

---

[9] For these purposes, if the Forward Contract involves payments in two currencies, neither of which is the U.S. dollar, the Forward Contract will be treated as a contract in Major Currencies only if both of those currencies are Major Currencies.

M.   It is more likely than not that Combined Transactions in Major Currencies that are not part of a larger straddle will not be subject to the straddle rules of Sections 1092 and 263(g).

N.   It is more likely than not that (1) if the Company terminates its exposure in respect of one Forward Contract in a Combined Transaction by terminating that contract, the Company will recognize gain or loss realized on the termination, and (2) the termination will have no impact on the tax treatment of the Forward Contract that makes up the other leg of the Combined Transaction.

O.   It is more likely than not that neutralizing further risk of loss or opportunity for gain with respect to a Forward Contract by entering into a new but opposite contract will not cause the recognition of gain or loss with respect to such Forward Contract.

P.   It is more likely than not that each Forward Contract will be accorded independent economic significance.

Q.   It is more likely than not that the Forward Contract transactions will not be disregarded under the "profit motive" tests applied to straddles.

R.   It is more likely than not that the anticipated tax consequences resulting from the Investor's investment in the Company and the Company's transactions in Forward Contracts will not be disregarded under the economic substance doctrine.

**Our ultimate conclusion is that it is more likely than not that, assuming sufficient basis in his Company stock and debt, the Investor will be entitled to deduct any losses realized on Forward Contracts closed after he became the sole shareholder of the Company.**

146.   In point of fact, the conclusion that Arnold & Porter reached in the opinion letter issued to Abessinio was a pre-ordained conclusion, based on ignoring or taking the position that various code sections, pronouncements and cases interpreting the code did not apply to the specific facts of Plaintiffs' employment of the PICO strategy.  For example, Arnold & Porter ignored the effect of IRC §165(a) and (b) and those provisions interpretation by <u>Fox v.</u>

<u>Commissioner,</u> 82 TC 1000 (1984) which requires that taxpayers must, in order for there to be a legitimate loss, enter into straddle transactions "primarily for profit."

## I.   Class Members Received Pre-Arranged More Likely Than Not Opinion Letters From Arnold & Porter or Proskauer

147.   On information and belief, the opinion letters issued by Arnold & Porter and Proskauer to other members of the Class were similarly written and reached a pre-ordained favorable conclusion based on ignoring and taking the position that various code sections, pronouncements and cases interpreting the code did not apply to the specific facts of the PICO strategy as implemented by members of the Class.

148.   Like the opinion letter issued by Arnold & Porter, the opinion letters issued by Proskauer contained generally the following conclusions:

<u>Conclusions</u>

Subject to, and as qualified and limited by the discussion that follows, in our opinion it is more likely than not that:

A.   [Personal investment company] would be treated for federal income tax purposes as an S corporation.

B.   Neither the formation of [personal investment company] nor the retirement of stock held by ASA and JJC, which would leave the Investor in control of [personal investment company], would be treated as an acquisition made to evade or avoid tax under Section 269.

C.   Section 382 would not apply to limit the Investor's use of built-in losses, if any, realized by [personal investment company] after the Investor assumes full control of [personal investment company].

D.   Gains and losses recognized by [personal investment company] would be allocated to ASA, JJC and the Investor in proportion to their stock ownership in [personal investment company].  If [personal investment company] makes the

election under Section 1377(a)(2), gains and losses recognized by [personal investment company] after ASA and JJC transfer all of their stock to [personal investment company] would be allocated solely to the Investor. Also, no mark-to-market obligation would be triggered under Section 1256 by the transfer and election.

E.  The subchapter S loss limitation rules would not limit the Investor's ability to take his share of [personal investment company] losses as long as the Investor has sufficient basis in [personal investment company] stock and basis in indebtedness owned by [personal investment company] to the Investor. The Investor's basis in stock and in indebtedness owned by [personal investment company] to the Investor would be reduced, but not below zero, by the amount of losses allocated to the Investor.

F.  Loan repayments made by [personal investment company] to the Investor after the Investor reduces basis in indebtedness from [personal investment company] would be treated as capital gain to the Investor.

G.  Distributions made by [personal investment company] to the Investor after he reduces his stock basis to zero would be taxable to the Investor as capital gain.

H.  The passive activity loss rules would not limit the Investor's ability to deduct his share of [personal investment company] losses.

I.  The investor's amount at risk for purposes of Section 465 would include contributions by the Investor to [personal investment company] as well as loans made by the Investor to [personal investment company] for use in [personal investment company]'s trading and investing activity.

J.  Gain or loss realized on the Forward Contracts would be ordinary gain or loss under Section 988.

K.  Forward Contracts in Major Currencies[10] would be marked-to-market at the end of [personal investment company]'s taxable year under Section 1256. Forward Contracts in Minor Currencies would not be required to be marked-to-market at the end of [personal investment company]'s taxable year.

---

[10]  For these purposes, if the Forward Contract involves payments in two currencies, neither of which is the U.S. dollar, the Forward Contract will be treated as a contract in major currency only if both of those currencies are Major Currencies.

53

L.    Combined Transactions in both Major and Minor Currencies would be straddles under Section 1092.

M.    Combined Transactions in Major Currencies which are not part of a larger straddle, however, would not be subject to the straddle rules of Section 1092 and 263(g).

N.    If [personal investment company] terminates its exposure in respect of one Forward Contract in a Combined Transaction by terminating that contract, [personal investment company] would recognize gain realized on the termination. The termination would have no effect on the tax treatment of the Forward Contract that makes up the other leg of the Combined Transaction.

O.    Neutralizing further risk of loss or opportunity for gain with respect to a Forward Contract by entering into a new but opposite contract would not cause the recognition of gain or loss with respect to such a Forward Contract.

P.    The Investor's investment in [personal investment company] and its transactions in Forward Contracts would be regarded as undertaken for profit and not lacking in economic reality.

Q.    Each Forward Contract would be accorded independent economic significance.

R.    The Forward Contract transactions would not be disregarded under the general "economic substance" doctrine.

S.    The Forward Contract transactions would not be disregarded under the "profit motive" tests applied to straddles.

**Our ultimate conclusion is that, it is more likely than not that, to the extent that there are losses from [personal investment company]'s investments, the Investor would be able to recognize and deduct such losses on Forward Contracts that are closed after the Investor has sole ownership of [personal investment company] .**

149.    In point of fact, the conclusion that Proskauer reached in its opinion letter was a pre-ordained conclusion, based on ignoring or taking the position that various code sections, pronouncements and cases interpreting the code did not apply to the specific facts of the PICO strategy. For example, Proskauer ignored the effect of IRC §165(a) and (b) and those provisions

54

interpretation by <u>Fox v. Commissioner</u>, 82 TC 1000 (1984) which requires that taxpayers must, in order for there to be a legitimate loss, enter into straddle transactions "primarily for profit."

150.    Defendants were aware that analysis used in the opinion letters issued by Arnold & Porter and Proskauer also relied on assumed facts rather than the real facts of which the issuers were aware regarding the contrived steps in the PICO strategy.

**J.**    **E&Y Prepares And Signs 2001 Tax Returns**

151.    Meanwhile, E&Y prepared, purportedly in accordance with professional standards, and signed on August 6, 2002 the Abessinios 2001 tax returns. This occurred after the IRS pronouncement on July 15, 2005 listing transactions substantially similar to the PICO strategy. During the course of such preparation, E&Y advised the Abessinios that the PICO strategy was legal and that they could properly claim the capital and ordinary losses from the PICO strategy on their tax returns for 2001. E&Y, therefore, utilized the ordinary losses generated by the PICO strategy in the Abessinios 2001 returns. In reasonable reliance on the tax and legal advice rendered by E&Y, and the Arnold & Porter firm, the Abessinios signed and timely filed the income tax returns by the applicable due dates, including all extensions.

152.    On information and belief, E&Y prepared and signed tax returns for other members of the Class in 2001 and 2002 utilizing the losses generated by the PICO strategy. These members of the Class also reasonably relied on the tax and legal advice rendered by E&Y and the Arnold & Porter or Proskauer firm in signing and filing their 2000 and for 2001 tax returns.

**K.**    **The PICO Strategy Is Designated A Listed Transaction By The IRS**

153.    On September 25, 2002, the IRS announced that it would challenge the tax benefits of PICO-type strategies on a number of grounds.  This announcement was followed by the publication of Notice 2002-65 on October 15, 2002.  Notice 2002-65 made specific reference to its prior announcement of July 15, 2002 that: "The transaction described in this notice and that transaction described in Notice 2002-50, 2002-28 I.R.B. 98 (Partnership Straddle Tax Shelter) are substantially similar transactions."

154.    Clearly, it would be the IRS' position in its challenges to any tax returns predicated on the PICO strategy that Notice 2002-50 on July 15, 2002 although aimed at partnership straddle tax shelters incorporated the notion of an S corporation straddle tax shelter as a disallowed transaction.  The filing of Plaintiffs' tax returns signed by E&Y in August 2002 was subsequent to Notice 2002-50.

155.    On information and belief, E&Y signed 2001 tax returns for other Class members after the issuance of Notice 2002-50, and even after the issuance of Notice 2002-65.

156.    On March 4, 2003, the IRS published final regulations, Treas. Reg. § 1.6011-4(h), which required registration of any listed transaction.  Pursuant to Notice 2002-65, the PICO strategy was a "listed transaction."

157.    Defendants still did not register the PICO strategy.

158.    Because disclosure would open the door to further IRS scrutiny, Defendants continued to not comply with IRS regulations regarding registration of tax shelters.

159.    Despite these further IRS pronouncements, E&Y prepared, purportedly in accordance with professional standards, and signed in many instances 2002 tax returns for

members of the Class. For example, on April 12, 2003, signed the Abessinios 2002 tax returns. During the course of such preparation, E&Y advised Plaintiffs and other members of the Class that the PICO strategy was legal and that they could properly claim the carryforward and ordinary losses from the PICO strategy on their tax returns for 2002. E&Y, therefore, utilized the ordinary losses generated by the PICO strategy in preparing the 2002 returns. In reasonable reliance on the tax and legal advice rendered by E&Y and Arnold & Porter, the Abessinios filed the 2002 income tax returns prepared by E&Y.

160.    On information and belief, in 2003, E&Y prepared and signed 2002 returns for other members of the Class utilizing losses generated by the PICO strategy. In reliance on the tax and legal advice rendered by E&Y and the Arnold & Porter or Proskauer law firms, Class members signed and filed their 2002 income tax returns.

161.    In June 2003, the IRS commenced a separate investigation into E&Y's tax shelter activities occurring between January 1, 1995 and June 30, 2003.

162.    On July 2, 2003, the IRS issued a press release with the consent of E&Y announcing a closing agreement with E&Y "resolving issues relating to an examination of Ernst & Young's compliance with the registration and list maintenance requirements regarding the firm's marketing of tax shelters." Along with a $15 million settlement payment and compliance with the registration and list requirements, E&Y was required to make certain reforms of its tax strategies practice. As a first step, E&Y disbanded the VIPER/Strategic Individual Solutions Group that had taken the lead in devising and selling the PICO strategy to members of the Class.

163.     In May 2004, the U.S. Attorney for the Southern District of New York initiated a Federal grand jury investigation of E&Y regarding its sale of tax shelters to corporations and individuals to escape or reduce Federal taxes.  No indictments as a result of this grand jury investigation have been made to date.

## DAMAGES

**A.     Plaintiffs' Damages With Regard to PICO Strategy**

164.     On October 27, 2005, the IRS announced a "broad-based limited in time opportunity for taxpayers to come forward and settle an array of transactions that the IRS considers abusive" (the "Abusive Transaction Settlement Initiative Program").  The PICO strategy was one of tax schemes eligible for the Abusive Transaction Settlement Initiative Program which would require settlement agreements to be submitted on or before January 23, 2006.  The press release regarding this Announcement 2005-80 included the following statement by the IRS:

> "People entered into these deals often at the behest of lawyers and accountants peddling flaky tax products," said IRS Commissioner Mark W. Everson.  "Times have changed.  The IRS has acted to shut down these deals, as has the Congress, in passing stiffer disclosure requirements and promoter penalties last fall.  We're offering taxpayers a quick, quiet and cost effective way to put these deals behind them."  (emphasis added).

165.     Under the terms of the program, participants in the PICO strategy would be required to pay 100 percent of the taxes owed and interest.  Penalty relief would be given for

transactions disclosed to the IRS or where the taxpayer got a tax opinion from an independent

tax advisor.

166.   On January 23, 2006, the IRS approved a Closing Agreement with the Abessinios

under the program, pursuant to which all outstanding issues with the federal tax authorities were

resolved.  Pursuant to that agreement, the Abessinios agreed to an increased tax liability for 2001

and 2002 of over $40 million.

167.   As a result of having engaged in the PICO strategy, Plaintiffs have lost millions of

dollars, paid over $40 million in increased tax liabilities and interest and did not take advantage

of other legitimate investment and tax savings opportunities.  In conjunction with the PICO

strategy, Plantation paid fees as stated above to E&Y, Delta and Bricolage, including fees

amounting to $5,800,000, as well as other transactional fees.

168.   The Abessinios also paid Arnold & Porter $125,000 for its worthless opinion

letter.  The Abessinios have since 2003 additionally paid other accountants and lawyers to advise

them regarding the consequences to them of having engaged in the PICO strategy.

**B.**    **Class-Wide Allegations Regarding Damages**

169.   On information and belief, other members of the Class have also paid Defendants

millions of dollars in fees, purchased unnecessary investments to effectuate the PICO strategy,

filed tax returns in reliance on Defendants' representations regarding the PICO strategy and as a

result have or will now have to pay increased tax liabilities, interest and/or penalties, have and

may in the future incur substantial additional costs for additional legal and financial advice and

have foregone legitimate investment and/or tax saving opportunities.

59

## NOTICE TO CLASS MEMBERS

170.    The public announcement by the IRS on July 2, 2003 that it had entered into a

$15 million settlement with E&Y provided initial inquiry notice to the Class that E&Y's

activities in promoting the PICO strategy were not legitimate and the IRS was penalizing E&Y

for failing to properly register tax shelters and similar transactions such as PICO.  Until this time,

no enforcement action had been taken against any party involved with the promotion or

implementation of PICO.  While the public announcement on July 2, 2003 of E&Y's settlement

did not specifically address the propriety of any underlying tax shelter promoted by E&Y,

including PICO, Mark A. Weinberger, Vice Chairman of E&Y Tax Services disclosed to a

reporter for The Washington Post that E&Y had disbanded in 2003 the VIPER/Strategic

Individual Solutions Group which had promoted the PICO strategy to Class members.  This

disclosure, made on July 3, 2003, put Class members on further inquiry notice that a wrong was

committed by Defendants in the promotion and sale of the PICO strategy.

171.    The designation of the PICO strategy as a listed transaction pursuant to Notice

2002-65 was insufficient to place the Class on notice that Defendants committed any wrong or

were subject to penalty.  Merely listing a transaction as potentially abusive does not indicate it is

illegal or that the IRS would take actual enforcement action for violating the law.  E&Y prepared

Class members' tax returns through 2003 thus confirming their advice that the PICO strategy

was legitimate.  Accordingly, until the IRS enforcement action against E&Y on July 2, 2003, the

Class was not on notice that Defendants' activity was wrongful.

172.    The publication of the 2005 Senate Report has since provided invaluable insight into Defendants' wrongful activities in the promotion and implementation of the PICO strategy.

## CAUSES OF ACTION

### COUNT I – FRAUDULENT MISREPRESENTATION
### (Against All Defendants, Except Deutsche Bank)

173.    Plaintiffs reassert and incorporate by reference all of the foregoing paragraphs of the Complaint in their entirety as if fully set forth herein and further allege:

174.    In order to induce Plaintiffs and other members of the Class to enter into the PICO strategy and pay Defendants millions of dollars in fees, Defendants knowingly or recklessly made numerous affirmative misrepresentations to, and intentionally withheld material facts from Plaintiffs and other members of the Class including, but not limited to:

(a)    representing that each of the transactions in which Plaintiffs and other members of the Class engaged as part of the PICO strategy was meaningful and was imbued with non-tax considerations;

(b)    representing that the PICO strategy was an "Individual Tax Planning Solution" rather than a mass-marketed generic tax shelter product;

(c)    representing that the PICO strategy was properly allowable for federal income tax purposes;

(d)    representing that the PICO strategy would more likely than not be approved by the IRS;

(e)    failing to disclose that the Defendants and Bricolage formed an alliance where the sole purpose was to develop, market and implement the PICO tax product in order to collect large fees when each of the Defendants and Bricolage knew or recklessly ignored it was an abusive tax shelter;

(f)    representing the Defendants' fees were based on services rendered;

(g)    representing that it was appropriate to create a purported business purpose for the S corporation;

(h)    representing that the PICO strategy did not need to be registered as a tax shelter with E&Y and Bricolage as its promoters;

(i)    representing that the "independent" opinion letter arranged for by E&Y and received by Plaintiffs and members of the Class was an opinion drafted based on the unique circumstances of a particular client when it was a form opinion used with minor changes by Arnold & Porter or Proskauer in connection with the PICO strategy; and

(j)    failing to disclose that the opinion letters arranged for by E&Y and provided by Arnold & Porter or Proskauer were not issued independently or that Bricolage had an ongoing relationship with the Arnold & Porter firm.

175.    Such affirmative misrepresentations and intentional omissions of material facts were made knowingly or recklessly by Defendants with the intent to induce Plaintiffs and other members of the Class to enter into the PICO strategy and pay them millions of dollars in fees.

176.    In reasonable reliance on Defendants' affirmative misrepresentations and intentional omissions of material facts, Plaintiffs and other members of the Class paid Defendants millions of dollars in fees, created S corporations, made unnecessary loans, purchased unnecessary foreign currency contracts to effectuate the PICO strategy, paid fees to execute the foreign currency transactions, did not avail themselves of other legitimate tax savings opportunities, and filed federal and state tax returns that reflected improper deductions for capital and ordinary losses.

177.    But for Defendants' affirmative misrepresentations and intentional omissions of material facts, Plaintiffs and other members of the Class would not have hired Defendants and Bricolage for advice, or currency trading services, engaged in the currency transactions, claimed

the purported resulting losses on their income tax returns, signed and filed their tax returns in reliance on Defendants' advice and/or failed to avail themselves of legitimate tax saving opportunities.

178.    As a result of Defendants' conduct herein, Plaintiffs and other members of the Class have suffered injury in that (1) they paid Defendants' millions of dollars in fees; (2) they purchased unnecessary investments to implement the PICO strategy; (3) they have or may in the future incur increased tax liabilities, interest and/or penalties; (4) they have and may in the future incur substantial additional costs for additional legal and financial advice; and (5) they have foregone legitimate investment and/or other tax saving opportunities.

179.    By reason of such acts and conduct, Plaintiffs and other members of the Class are entitled to recover all actual damages sustained as a result of Defendants' acts as alleged, to be proven at trial, plus punitive damages in accordance with the evidence, interest, costs and reasonable attorneys' fees.

## COUNT II – NEGLIGENT MISREPRESENTATION
### (Against All Defendants, Except Deutsche Bank)

180.    Plaintiffs reassert and incorporate by reference all of the foregoing paragraphs of the Complaint in their entirety as if fully set forth herein, except as to fraudulent and intentional conduct, which is not required for this Count, and further allege:

181.    In order to induce Plaintiffs and members of the Class to enter into the PICO strategy and pay Defendants millions of dollars in fees, Defendants negligently made numerous affirmative misrepresentations to, and negligently withheld material facts from Plaintiffs and other members of the Class including, but not limited to:

63

(a)    representing that each of the transactions in which Plaintiffs and other members of the Class engaged as part of the PICO strategy was meaningful and was imbued with non-tax considerations;

(b)    representing that the PICO strategy was an "Individual Tax Planning Solution" rather than a mass-marketed generic tax shelter product;

(c)    representing that the PICO strategy was properly allowable for federal income tax purposes;

(d)    representing that the PICO strategy would more likely than not be approved by the IRS;

(e)    failing to disclose that the Defendants and Bricolage formed an alliance where the sole purpose was to develop, market and implement the PICO tax product in order to collect large fees when each of the Defendants and Bricolage knew or negligently ignored it was an abusive tax shelter;

(f)    representing the Defendants' fees were based on services rendered;

(g)    representing that it was appropriate to create a purported business purpose for the S corporation;

(h)    representing that the PICO strategy did not need to be registered as a tax shelter with E&Y and Bricolage as its promoters;

(i)    representing that the "independent" opinion letter arranged for by E&Y and received by Plaintiffs and other members of the Class was an opinion drafted based on their unique circumstances of a particular client when it was a form opinion used with minor changes by Arnold & Porter or Proskauer in connection with the PICO strategy; and

(j)    failing to disclose that the opinion letters arranged for by E&Y and, provided to plaintiffs and other members of the Class by Arnold & Porter or Proskauer were not issued independently and specifically, that Bricolage had an ongoing relationship with the Arnold & Porter firm.

182.    Such affirmative misrepresentations and omissions of material facts were made negligently by Defendants with the purpose to induce Plaintiffs and other members of the Class to enter into the PICO strategy and pay them millions of dollars in fees.

64

183.    In reasonable reliance on Defendants' negligent affirmative misrepresentations and negligent omissions of material facts, Plaintiffs and other members of the Class paid Defendants millions of dollars in fees, created S corporations, purchased unnecessary foreign currency contracts to effectuate the PICO strategy, paid fees to execute the foreign currency transactions, did not avail themselves of other legitimate tax savings opportunities, and filed federal and state tax returns that reflected improper deductions for capital and ordinary losses.

184.    But for negligent affirmative misrepresentations and negligent omissions of material facts of Defendants, Plaintiffs and other members of the Class would not have hired Defendants and Bricolage for advice, currency trading services, engaged in the currency transactions, claimed the purported resulting losses on their income tax returns, signed and filed their tax returns as prepared by E&Y in reliance on Defendants' advice and/or failed to avail themselves of legitimate investment and/or tax saving opportunities.

185.    As a result of Defendants' conduct herein, Plaintiffs and other members of the Class have suffered injury in that (1) they paid Defendants' millions of dollars in fees; (2) they purchased unnecessary investments to implement the PICO strategy; (3) they have or may in the future incur increased tax liabilities, interest and/or penalties; (4) they have and may in the future incur substantial additional costs for additional legal and financial advice; and (5) they have foregone legitimate investment and/or other tax saving opportunities.

186.    By reason of such acts and conduct, Plaintiffs and other members of the Class are entitled to recover all actual damages sustained as a result of Defendants' acts as alleged, to be proven at trial, interest, costs and reasonable attorneys' fees.

## COUNT III – CIVIL CONSPIRACY
### (Against All Defendants)

187.    Plaintiffs reassert and incorporate by reference all of the foregoing paragraphs of the Complaint in their entirety as if fully set forth herein and further allege:

188.    Defendants engaged in a civil conspiracy with each other which consisted of: (1) an agreement between and among the Defendants, (2) to misrepresent to Plaintiffs and other members of the Class the true nature of the PICO strategy, and/or to defraud the Plaintiffs and other members of the Class into paying large fees for a fraudulent product, (3) which agreement resulted in injury to Plaintiffs and other members of the Class.

189.    As more fully described above, Defendants knowingly acted in concert to market and implement the fraudulent and abusive PICO strategy.  In doing so, Defendants acted with full knowledge and awareness that the transaction was designed to give the false impression that a complex series of financial transactions were legitimate business transactions which had economic substance from an investment standpoint, when in fact they lacked those and other features necessary for a successful tax strategy.

190.    Prior to the marketing and sale of PICO strategy to Plaintiffs and other members of the Class, Defendants entered into an agreement to form an association and union, in fact devised and designed to facilitate, promote and sell the PICO strategy to Plaintiffs and other members of the Class for the express purpose of generating and sharing in millions of dollars in fees.

66

191.　Each of the Defendants knew the details of the other Defendant's agreements and understandings, and acted negligently and outside of any acceptable professional standard because they knew or were reckless in not knowing that:

(a)　the PICO strategy was being sold as an investment strategy with a future tax opinion as part of the promotional material;

(b)　the PICO strategy involved improper disqualifying step transactions;

(c)　the PICO strategy involved E&Y and Bricolage functioning as unregistered tax shelter promoters;

(d)　the PICO strategy was being sold as a valid and valuable investment with minimum risk;

(e)　the PICO strategy was being sold as an "Individual Tax Planning Solution" when it was a generic tax shelter product, not customized or individualized tax planning;

(f)　the PICO strategy presented almost no likelihood of Plaintiffs and other members of the Class making an economic profit on the cash they had invested;

(g)　the PICO strategy involved improper and unethical fee splitting;

(h)　the PICO strategy involved the preparation of tax returns for Plaintiffs and other members of the Class by E&Y without the exercise of due care;

(i)　the PICO strategy involved improper and unethical conflicts of interest;

(j)　the PICO strategy involved procuring legal opinions for Plaintiffs and other members of the Class which were predicted on transactions that lacked economic substance and were done solely to generate artificial losses; and

(k)　the PICO strategy involved a tax strategy that had no material valid business purpose and would likely be deemed an abusive tax shelter by the IRS.

67

192.    Not only did the Defendants know that the PICO strategy was an abusive tax shelter, but on information and belief, they have continued to represent that the PICO strategy was not a tax shelter and explicitly represented that PICO strategy was a legitimate tax strategy. This was manifestly untrue, as Defendants either knew or were reckless in not knowing.

193.    Defendants knew or were reckless in not knowing that the amount of fees charged by them was not representative of or reflective of the amount of time and effort they expended in providing tax, accounting, and investment advisory services, but rather was based upon the amount of losses the Plaintiffs and other members of the Class would be able to claim on their tax returns and the amounts of tax Plaintiffs and other members of the Class would supposedly avoid.

194.    The acts of the Defendants violated laws as well as rules governing professional standards.

195.    Defendants acted in their respective roles as described above according to a pre-determined and commonly understood and accepted plan of action all for the sole purposes of obtaining fees from Plaintiffs and other members of the Class.

196.    As co-conspirators, each of the Defendants aided the other in the implementation and execution of the Defendants' joint deceptive scheme by causing Plaintiffs and other members of the Class to invest in the PICO strategy.

197.    There was a meeting of the minds between and among the Defendants and Bricolage to commit the unlawful acts alleged herein.

198.    The conspiracy to commit these unlawful overt acts proximately caused or continues to cause Plaintiffs' and the Class' damages as previously set forth herein.

199.    As a result of Defendants' conduct herein, Plaintiffs and other members of the Class have suffered injury in that (1) they paid Defendants' millions of dollars in fees; (2) they purchased unnecessary investments to implement the PICO strategy; (3) they have or may in the future incur increased tax liabilities, interest and/or penalties; (4) they have and will continue to incur substantial additional costs for additional legal and financial advice; and (5) they have foregone legitimate investment and/or other tax saving opportunities.

200.    By reason of such acts and conduct, Plaintiffs and other members of the Class are entitled to recover all actual damages sustained as a result of Defendants' acts as alleged, to be proven at trial, plus punitive damages in accordance with the evidence, interest, costs and reasonable attorneys' fees.

## COUNT IV – PROFESSIONAL MALPRACTICE
### (Against E&Y and Proskauer)

201.    Plaintiffs reassert and incorporate by reference the foregoing paragraphs of the Complaint in their entirety as if fully set forth herein and further allege:

202.    As tax advisers, accountants and attorneys, Defendants E&Y and Proskauer owed Plaintiffs and other members of the Class undivided duties of care, loyalty and honesty, duty to comply with the applicable standards of care, and a duty to comply with the applicable provisions of their respective codes of professional responsibility.

203.    Defendants E&Y and Proskauer also had a duty to Plaintiffs and other members of the Class to meet the applicable standard of care for accountants and attorneys, respectively.

69

Defendants E&Y and Proskauer failed to meet those applicable standards of care, which proximately caused damage to Plaintiffs and members of the Class as set forth elsewhere in this Complaint.

204.    During the course of their representation of the Plaintiffs and other members of the Class, E&Y and Proskauer made numerous knowingly or negligent false affirmative representations, and intentional or negligently misleading omissions of material fact, and gave numerous recommendations, advice, instructions and opinions to Plaintiffs and other members of the Class, and acted outside the applicable standards of care for accountants and attorneys by doing the following:

(a)    taking advantage of relationships of trust and confidence with E&Y clients and using its knowledge of confidential information regarding E&Y clients to solicit them to purchase the PICO strategy;

(b)    falsely advising Plaintiffs and other members of the Class that the entities formed to carry out the PICO strategy had a legitimate business purpose and economic substance;

(c)    falsely advising Plaintiffs and other members of the Class that opinion letters procured by E&Y for the PICO strategy could be relied upon to protect Plaintiffs and other members of the Class from incurring penalties with regard to the PICO strategy;

(d)    falsely advising Plaintiffs and other members of the Class that the ordinary losses created by the PICO strategy were legitimate, proper, and in accordance with all applicable tax laws, rules and regulations;

(e)    falsely endorsing the representations and statements in the opinion letters issued to Class members;

(f)    falsely endorsing the representations and statements contained in Defendants' oral advice, instructions, recommendations and tax returns prepared by E&Y;

70

(g)    failing to disclose that the opinion letters procured by E&Y for Class members were not issued independently and specifically that Arnold & Porter had an ongoing business relationship with Bricolage;

(h)    failing to fully explain the details of the PICO strategy to ensure that Plaintiffs and other members of the Class understood those details before inducing them to enter into the PICO strategy;

(i)    failing to advise Plaintiffs and other members of the Class that E&Y was promoting and selling unregistered tax shelters;

(j)    failing to advise Plaintiffs and other members of the Class that if they had tax returns claiming ordinary losses based on the PICO strategy, they would be liable for the full amount of any disallowed losses, unadjusted for any other gains or any other applicable tax rate, and interest;

(k)    failing to disclose to Plaintiffs and other members of the Class that if they filed tax returns claiming ordinary losses based on the PICO strategy, they could be liable for penalties;

(l)    failing to advise Plaintiffs and members of the Class on the roles of Deutsche Bank and Bricolage and their various affiliates in assisting and carrying out the foreign currency transactions as part of the PICO strategy;

(m)    recommending, advising, instructing and assisting Plaintiffs and other members of the Class in carrying out each of the steps of the PICO strategy;

(n)    advising, instructing, and assisting in the preparation of or actually preparing and signing the tax returns of Plaintiffs and other members of the Class utilizing the losses generated by the PICO strategy;

(o)    charging and collecting unreasonable, excessive and unethical fees, such as improper contingent fees based on the losses generated by the PICO strategy;

(p)    advising Plaintiffs and other members of the Class that their tax returns which utilized the losses generated by the PICO strategy were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

(q)    failing to ensure that the transactions into which Defendants advised Plaintiffs and other members of the Class to enter complied with applicable state and federal rules and regulations;

(r)    failing to comply with ethical obligations to Plaintiffs and other members of the Class and violating professional rules of conduct, including engaging in professional relationships that violated these obligations and rules; and

(s)    providing erroneous, legal and tax opinions and advice to Class members.

205.    Defendants E&Y and Proskauer either knew or recklessly ignored or reasonably should have known that its representations, recommendations, advice, instructions and opinions were false.  In addition, the rendering of such representations, recommendations, advice, instructions and opinions as well as the failure to advise Plaintiffs and other members of the Class of the omissions set forth above, was negligent, grossly negligent and reckless. Accordingly, Defendants E&Y and Proskauer failed to exercise the standards of care required of them as accountants and attorneys.

206.    Plaintiffs and other members of the Class fully performed their obligations to Defendants E&Y and Proskauer under their contracts, and thus, did not contribute to the negligent, grossly negligent, reckless and/or intentional acts in any way.

207.    In reasonable reliance on Defendants' advice regarding the PICO strategy, Plaintiffs and other members of the Class paid millions of dollars for tax and legal advice and to execute the PICO strategy, made unnecessary loans, purchased unnecessary investments to effectuate the PICO strategy, did not avail themselves of legitimate tax saving opportunities, filed federal and state tax returns that reflected deductions for capital and/or ordinary losses

72

resulting from the PICO transactions and did not take advantage of other legitimate investment and/or tax savings opportunities.

208.     But for Defendants E&Y and Proskauer's failure to meet the applicable standard of care in the manner described above, Plaintiffs and other members of the Class would never have engaged in the PICO strategy; made unnecessary loans, purchased unnecessary investments to effectuate that strategy, filed federal and state tax returns that reflected deductions for capital and/or ordinary losses resulting from the PICO strategy and/or failed to avail themselves of other legitimate investment and/or tax saving opportunities.

209.     As a result of Defendants' conduct set forth herein, Plaintiffs and other members of the Class have suffered injury in that (1) they paid Defendants millions of dollars in fees; (2) they purchased unnecessary investments to effectuate the PICO strategy; (3) they have or may in the future incur increased tax liabilities, interest and/or penalties; (4) they have incurred and will continue to incur substantial additional costs for additional legal and financial services; and (5) they have foregone legitimate investment and/or tax saving opportunities.

210.     By reason of such acts and conduct, Plaintiffs and other members of the Class are entitled to recover all actual damages sustained as a result of Defendants E&Y and Proskauer's acts as alleged, to be proven at trial, plus punitive damages in accordance with the evidence, interest, costs and reasonable attorneys' fees.

## COUNT V – BREACH OF FIDUCIARY DUTY
### (Against E&Y and Proskauer)

211.     Plaintiffs reassert and incorporate by reference all of the foregoing paragraphs of the Complaint in their entirety as if fully set forth herein and further allege:

212.   E&Y and Proskauer held themselves out to the public to Plaintiffs and other members of the Class as experts with particular competence in tax matters.

213.   E&Y procured tax opinion letters for the respective members of the Class from Arnold & Porter and Proskauer in which the law firms opined that the tax losses generated in the PICO strategy were legitimate and would more likely than not survive scrutiny by the IRS, when the transactions lacked economic substance and were done solely to generate artificial losses.

214.   E&Y was engaged as the tax preparer for Plaintiffs and other members of the Class.

215.   In connection with the PICO strategy, E&Y and Proskauer acted as respective fiduciaries to Plaintiffs and other members of the Class, and thus owed Plaintiffs and other members of the Class the undivided duties of honesty, loyalty, care and compliance with the applicable codes of professional responsibility.  Plaintiffs and other members of the Class relied on E&Y and Proskauer to act as a fiduciaries and to advise them as to the legitimacy of the PICO strategy and the propriety of the tax deductions claimed on their tax returns.

216.   In truth, the PICO strategy lacked economic substance, was designed to generate false tax losses and was contrary to the IRC, Treasury Regulations and public announcements and policies of the IRS and the Treasury, all of which were known to E&Y and Proskauer ,or which should have been known to E&Y and Proskauer upon the exercise of reasonable professional research and judgment.

217.   E&Y and Proskauer breached their respective fiduciary duties to Plaintiffs and the members of the Class by, among others, the following acts and/or omissions:

74

(a)     taking advantage of relationships of trust and confidence with E&Y clients and using its knowledge of confidential information regarding E&Y clients to solicit them to purchase the PICO strategy;

(b)     falsely advising Plaintiffs and other members of the Class that the entities formed to carry out the PICO strategy had a legitimate business purpose and economic substance;

(c)     falsely advising Plaintiffs and other members of the Class that opinion letters procured by E&Y for the PICO strategy could be relied upon to protect Plaintiffs and other members of the Class from incurring penalties with regard to the PICO strategy;

(d)     falsely advising Plaintiffs and other members of the Class that the ordinary losses created by the PICO strategy were legitimate, proper, and in accordance with all applicable tax laws, rules and regulations;

(e)     falsely endorsing the representations and statements in the opinion letters issued to Class members;

(f)     falsely endorsing the representations and statements contained in Defendants' oral advice, instructions, recommendations and tax returns prepared by E&Y;

(g)     failing to disclose that the opinion letters procured by E&Y for Class members were not issued independently and specifically that Arnold & Porter had an ongoing business relationship with Bricolage;

(h)     failing to fully explain the details of the PICO strategy to ensure that Plaintiffs and other members of the Class understood those details before inducing them to enter into the PICO strategy;

(i)     failing to advise Plaintiffs and other members of the Class that E&Y was promoting and selling unregistered tax shelters;

(j)     failing to advise Plaintiffs and other members of the Class that if they had tax returns claiming ordinary losses based on the PICO strategy, they would be liable for the full amount of any disallowed losses, unadjusted for any other gains or any other applicable tax rate, and interest;

(k)     failing to disclose to Plaintiffs and other members of the Class that if they filed tax returns claiming ordinary losses based on the PICO strategy, they could be liable for penalties;

(l)     failing to advise Plaintiffs and members of the Class on the roles of Deutsche Bank and Bricolage and their various affiliates in assisting and carrying out the foreign currency transactions as part of the PICO strategy;

(m)     recommending, advising, instructing and assisting Plaintiffs and other members of the Class in carrying out each of the steps of the PICO strategy;

(n)     advising, instructing, and assisting in the preparation of or actually preparing and signing the tax returns of Plaintiffs and other members of the Class utilizing the losses generated by the PICO strategy;

(o)     charging and collecting unreasonable excessive and unethical fees, such as improper contingent fees based on the losses generated by the PICO strategy;

(p)     advising Plaintiffs and other members of the Class that their tax returns which utilized the losses generated by the PICO strategy were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

(q)     failing to ensure that the transactions into which Defendants advised Plaintiffs and other members of the Class to enter complied with applicable state and federal rules and regulations;

(r)     failing to comply with ethical obligations to Plaintiffs and other members of the Class and violating their respective professional rules of conduct, including engaging in professional relationships that violated these obligations and rules; and

(s)     providing erroneous opinions and advice to Class members.

218.     But for Defendants E&Y and Proskauer's failure to fulfill their fiduciary duties in the manner described above, Plaintiffs and other members of the Class would never have engaged in the PICO strategy; made unnecessary loans, purchased unnecessary investments to

76

effectuate that strategy, filed federal and state tax returns that reflected deductions for capital and/or ordinary losses resulting from the PICO strategy and/or failed to avail themselves of other legitimate investment and/or tax saving opportunities.

219.     As a result of Defendants' conduct set forth herein, Plaintiffs and other members of the Class have suffered injury in that (1) they paid Defendants millions of dollars in fees; (2) they purchased unnecessary investments to effectuate the PICO strategy; (3) they have or may in the future incur increased tax liabilities, interest and/or penalties; (4) they have incurred and will continue to incur substantial additional costs for additional legal and financial advice; and (5) they have foregone legitimate investment and/or tax saving opportunities.

220.     By reason of such acts and conduct, Plaintiffs and other members of the Class are entitled to recover all actual damages sustained as a result of Defendant E&Y and Proskauer's acts as alleged, to be proven at trial, plus punitive damages in accordance with the evidence, interest, costs and reasonable attorneys' fees.

## COUNT VI – BREACH OF CONTRACT
### (Against E&Y)

221.     Plaintiffs reassert and incorporate by reference all of the foregoing paragraphs of the Complaint in their entirety as if fully set forth therein and further allege:

222.     Plaintiffs and other members of the Class and E&Y entered into agreements under which E&Y agreed to provide advice concerning the development and implementation of the PICO strategy.  Plaintiffs and other members of the Class bargained for E&Y's contractual undertakings and paid E&Y for such tax advisory services.  In addition, on information and

belief, E&Y was directly compensated by Bricolage or the Bricolage affiliates pursuant to a Tax Consulting Agreement in connection with the development of the PICO strategy.

223.    Plaintiffs and other members of the Class were either contracting parties or intended third party beneficiaries of E&Y's contractual undertakings.

224.    Under the terms of the engagement agreements that E&Y entered into with Plaintiffs and other members of the Class, E&Y obligated itself to provide assistance in the tax planning aspects of the PICO strategy.

225.    E&Y materially breached its obligations under its agreements by failing to provide legitimate tax planning.

226.    Further, under the terms of contractual dealings of Plaintiffs and other members of the Class with E&Y, E&Y had an obligation not to engage in fraudulent and/or reckless and/or negligent behavior, not to engage in improper conflicts of interest, not to engage in unethical behavior with lawyers to opine on the validity of abusive tax shelters, and not to sell fraudulent investments, but rather to act in good faith, to deal fairly and honestly, and to act reasonably and with due care towards Plaintiffs and other members of the Class.

227.    E&Y materially breached its obligations under the agreements by devising, orchestrating and executing a worthless and abusive tax shelter, misrepresenting the legitimacy of the PICO strategy, and by not informing Plaintiffs and other members of the Class of the very substantial risk associated with the PICO strategy and that Plaintiffs and other members of the Class could not rely on the advice provided to them.

228.    Further, E&Y failed to or neglected to perform under the agreements by failing to exercise due care, by failing to act in good faith, by failing to honor its fiduciary duties, by acting fraudulently and by entering into a conspiracy to deprive Plaintiffs and other members of the Class of the fees charged through deception.  Accordingly, E&Y has breached the agreements between it on the one hand and Plaintiffs and other members of the Class on the other hand.

229.    Plaintiffs and other members of the Class fully performed their obligations to E&Y under the agreements and did not contribute to E&Y's breaches in any way.

230.    As a result of E&Y's conduct set forth herein, Plaintiffs and other members of the Class have suffered injury in that (1) they paid Defendants millions of dollars in fees; (2) they purchased unnecessary investments to effectuate the PICO strategy; (3) they have or may in the future incur increased tax liabilities, interest and/or penalties; (4) they have incurred and will continue to incur substantial additional costs for additional legal and financial services; and (5) they have foregone legitimate investment and/or tax saving opportunities.

231.    By reason of such acts and conduct, Plaintiffs and other members of the Class are entitled to recover all actual damages sustained as a result of E&Y's acts as alleged, to be proven at trial, plus punitive damages in accordance with the evidence, interest, costs and reasonable attorneys' fees.

### COUNT VII – BREACH OF IMPLIED CONTRACT
### (Against All Defendants)

232.    Plaintiffs reassert and incorporate by reference all of the foregoing paragraphs of the Complaint in their entirety as if fully set forth therein and further allege:

233.    Plaintiffs and other members of the Class entered into implied, oral and written contracts with the Defendants to provide Plaintiffs and other members of the Class with professionally competent tax advice, accounting services, investment, advisory and execution services and tax return preparation services in connection therewith, Defendants were required and expected to meet all applicable standards of care, to meet the fiduciary duties of loyalty and honesty, and to comply with all applicable Rules of Professional Conduct.

234.    Defendants ignored their obligations and instead materially breached their contracts by, among other things, providing Plaintiffs and other members of the Class with advice, opinions, recommendations, representations, instructions and services that the Defendants either knew or reasonably should have known to be wrong and in furtherance of the conduct described above.  In addition, by rendering of such advice, opinions, recommendations, representations, instructions and services, was negligent, grossly negligent and reckless. Accordingly, the Defendants failed to exercise the standard of care required of them and materially breached their contracts with Plaintiffs and other members of the Class.  In the alternative, as to E&Y, to the extent no express contract existed for the services described herein, Plaintiffs and other members of the Class have been damaged under theories of implied contract and/or unjust enrichment.

235.    Plaintiffs and other members of the Class fully performed their obligation to the Defendants under these contracts and did not contribute to Defendants' material breaches in any way.

236.    As a result of Defendants' conduct set forth herein, Plaintiffs and other members of the Class have suffered injury in that (1) they paid Defendants millions of dollars in fees; (2) they purchased unnecessary investments to effectuate the PICO strategy; (3) they have or may in the future incur increased tax liabilities, interest and/or penalties; (4) they have incurred and will continue to incur substantial additional costs for additional legal and financial services; and (5) they have foregone legitimate investment and/or tax saving opportunities.

237.    By reason of such acts and conduct, Plaintiffs and members of the Class are entitled to recover all actual damages sustained as a result of Defendants' acts as alleged, to be proven at trial, plus punitive damages in accordance with the evidence, interest, costs and reasonable attorneys' fees.

## COUNT VIII – AIDING AND ABETTING
### (Against Deutsche Bank)

238.    Plaintiffs reassert and incorporate by reference the foregoing paragraphs of the Complaint in their entirety as if fully set forth herein and further allege:

239.    Deutsche Bank has directly benefitted and has knowingly and substantially participated in the scheme committed by the Defendants and aided and abetted the misrepresentations and breaches of fiduciary duties and contract described herein by the other Defendants by acting as the counter-party for the foreign currency transactions.

240.    Deutsche Bank benefitted directly from Defendants' scheme at the expense of Plaintiffs and members of the Class.

81

241.    As a result of Deutsche Bank and Deutsche Bank affiliates' conduct set forth herein, Plaintiffs and other members of the Class have suffered injury in that (1) they paid Defendants millions of dollars in fees; (2) they purchased unnecessary investments to effectuate the PICO strategy; (3) they have or may in the future incur increased tax liabilities, interest and/or penalties; (4) they have incurred and will continue to incur substantial additional costs for additional legal and financial services; and (5) they have foregone legitimate investment and/or tax saving opportunities.

242.    By reason of such acts and conduct, Plaintiffs and other members of the Class are entitled to recover all actual damages sustained as a result of Deutsche Bank and Deutsche Bank affiliates' acts as alleged, to be proven at trial, plus punitive damages in accordance with the evidence, interest, costs and reasonable attorneys' fees.

## COUNT IX – DISGORGEMENT OF UNETHICAL EXCESSIVE AND ILLEGAL FEES (Against All Defendants)

243.    Plaintiffs reassert and incorporate by reference all of the foregoing paragraphs of the Complaint in their entirety as if fully set forth therein and further allege:

244.    Defendants charged Plaintiffs and other members of the Class for worthless work and expended little, if any, additional time or effort in providing advice, products, opinions and/or services to Plaintiffs and other members of the Class.

245.    Regardless of the merits of the investments, advice, and services that Defendants provided to Plaintiffs and other members of the Class, the fees charged by Defendants for which Plaintiffs and other members of the Class paid, are unethically excessive and in violation of the

Rules of Professional Conduct of the American Institute of Certified Public Accountants, and

Circular 230, which govern accountants.

246.    Bricolage essentially completed its currency trading when its representative

withdrew from the S corporation and the fees charged afterward by Counterpoint or Delta after

the withdrawal were for little or no investment advice.

247.    Further, because Defendants did not disclose information that they were required

to disclose, that the PICO strategy was designed and implemented in a manner to evade taxes on

legitimate income by using transactions that lacked economic substance and were done solely to

generate artificial losses, and that the opinion letters were not independent, that Bricolage and

Arnold & Porter had ongoing business relationships, that Defendants had significant pecuniary

interests in the PICO strategy transactions, that their representation of Plaintiffs and other

members of the Class and their arrangements with each other violated the Rules of Professional

Conduct, the fee agreements with Plaintiffs and other members of the Class are not enforceable.

Accordingly, all fees that Defendants received directly from Plaintiffs and other members of the

Class or from each other in connection with implementation of the PICO strategy for Plaintiffs

and other members of the Class must be disgorged.

### COUNT X – UNJUST ENRICHMENT
### (Against All Defendants)

248.    Plaintiffs reassert and incorporate by reference all of the foregoing paragraphs of

the Complaint in their entirety as if fully set forth therein and further allege:

249.    In connection with the PICO strategy, Defendants charged Plaintiffs and other

members of the Class, purportedly for, among other things, provision of professional and

investment services.  In truth, Defendants knew that rather than receiving valuable professional services, Plaintiffs and other members of the Class were being sold illegitimate tax products that the IRS likely would not approve and the fees that Plaintiffs and other members of the Class paid to Counterpoint or Delta or other Bricolage affiliates were subject to a fee splitting arrangement among themselves and third parties.

250.    The amount of fees received by Defendants were not tied to or reflective of the amount of time and effort they expended in providing tax, accounting, legal, investment or consulting services, but rather was tied to the amount of ordinary losses Plaintiffs were able to claim.

251.    Accordingly, Defendants were unjustly enriched at the expense of Plaintiffs and other members of the Class by virtue of the fees charged to Plaintiffs and members of the Class. Defendants are not entitled to retain any of the fees received from Plaintiffs and other members of the Class in connection with the PICO strategy.  Moreover, equity and good conscience mandate that the Defendants return the fees to Plaintiffs and other members of the Class.

## COUNT XI – DECLARATORY JUDGMENT
### (Against All Defendants)

252.    Plaintiffs reassert and incorporate by reference all of the foregoing paragraphs of the Complaint in their entirety as if fully set forth therein and further allege:

253.    The IRS has determined to audit the tax returns involving the PICO strategy.  As a result, Plaintiffs and other members of the Class may in the future incur additional professional fees and expenses and potentially other costs to rectify the Defendants' wrongdoing, in addition to the fees, expenses and other damages they have already incurred.

84

254. Defendants are legally responsible for: (1) interest and/or penalties assessed by the IRS and/or state tax authorities, as well as the disallowance of certain other deductions; (2) professional fees and costs incurred by Plaintiffs and other members of the Class in connection with the state and/or federal investigations and audits; and (3) professional fees and expenses incurred by Plaintiffs and members of the Class on account of Defendants' violations of law and other actionable conduct.

255. Pursuant to 28 U.S.C. § 2201, Plaintiffs and other members of the Class and members of the Class are entitled to a declaration that Defendants are liable to Plaintiffs and other members of the Class for such penalties, interest, loss of deductions, costs, professional fees, expenses and damages. There exists an actual, justiciable controversy between the parties as Defendants have denied such liability.

256. Pursuant to 28 U.S.C. § 2201, Plaintiffs and other members of the Class are entitled to a declaration that the agreements entered into with Defendants are void and unenforceable and are in any event inapplicable in all respects to the claims asserted herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and behalf of other members of the Class and members of the Class demand judgment against Defendants as follows:

(1) Determining that this Action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedures;

(2) Certifying Plaintiffs as the Class Representatives and the undersigned counsel as Class Counsel;

85

(3)     Awarding Plaintiffs and other members of the Class actual and punitive damages in the amount that can be proven at trial together with interest thereon;

(4)     Awarding Plaintiffs and other members of the Class pre-judgment and post-judgment interests, as well as reasonable attorneys' fees, expert witnesses and other costs;

(5)     Awarding extraordinary equitable or injunctive relief as permitted by law, equity and pursuant to Rule 64 and 65 of the Federal Rules of Civil Procedure and any appropriate state remedies;

(6)     Declaring the Defendants are liable to Plaintiffs and other members of the Class for penalties, interest, loss of deductions, costs, professional fees, expenses and damages they have incurred and will incur; and;

(7)     Declaring that the agreements that Plaintiffs and other members of the Class entered into with Defendants are void and unenforceable and are in any event inapplicable in all respects to the claims asserted herein and awarding such other further and different relief as the Court deems just and proper under the circumstances.

Dated: _May 22, 2007_          Respectfully submitted,

                                **BERGER & MONTAGUE, P.C.**

                                By: _Sherrie Savett_
                                Sherrie R. Savett, Esq.
                                Robin Switzenbaum, Esq.
                                1622 Locust Street
                                Philadelphia, PA 19103
                                (215) 875-3000

                                Counsel for Plaintiffs

86

LABATON SUCHAROW & RUDOFF, LLP

By: _____

Lawrence A. Sucharow, Esq.
Ethan Wohl, Esq.
100 Park Avenue
New York, New York 10017-5563
(212) 907-0860

Local Counsel for Plaintiffs

87

## CERTIFICATE OF SERVICE

I, Gregory R. Lewis, am over the age of 18 years and not a party to this action. My business address is 100 Park Avenue, New York, New York 10017. I hereby certify that on May 22, 2007, I served a true and correct copy of the SECOND AMENDED CLASS ACTION COMPLAINT via United States Postal Service first class mail on the following:

Robert John Malionek, Esq.
Jessica Bengels, Esq.
Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, NY 10022
*Attorneys for Defendant Ernst & Young LLP*

David L. Katsky, Esq.
Robert Abrams, Esq.
Katsky Korris LLP
605 Third Avenue
New York, NY 10022
*Attorneys for Defendants Andrew D. Beer,*
*Counterpoint Capital LLC and*
*Delta Currency Trading LLC*

Lawrence M. Hill, Esq.
Adam Kaiser, Esq.
Dewey Ballantine LLP
1301 Avenue of the Americas
New York, NY 10019
*Attorneys for Defendants Deutsche Bank AG,*
*Deutsche Bank Securities, Inc., Deutsche*
*Bank Trust Company Americas and Taunus Corp.*

Bruce E. Fader, Esq.
David Mark Lederkramer, Esq.
Elise A. Yablonski, Esq.
Proskauer Rose LLP
1585 Broadway
New York, NY 10036
*Attorneys for Defendant Proskauer Rose LLP*

ASA Trading, LLC
c/o CT
1209 Orange Street
Wilmington, DE 19801

JJC Trading, LLC
c/o CT
1209 Orange Street
Wilmington, DE 19801

Dated: May 22, 2007
    New York, New York

Gregory R. Lewis