# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
OF THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| **JACK EDWARD BROOKS, ET AL.** | § | |
| **Plaintiffs** | § | |
| | § | |
| **V.** | § | No. 5:05CV160 |
| | § | |
| **LEHMAN BROTHERS, INC., ET AL.** | § | |
| **Defendants** | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3) and the Amended Order for the

Adoption of Local Rules for Assignment of Duties to United States Magistrate Judges, The Lehman

Defendants' Motion to Dismiss (Docket Entry # 7) and DGI Defendants' Motion to Dismiss for Lack

of Jurisdiction, Stay Proceedings and Compel Arbitration, or, in the Alternative, Dismiss the

Complaint for Failure to State a Claim Upon Which Relief May be Granted (Docket Entry # 12)

were referred to the Honorable Caroline M. Craven for the purpose of preparing a report and

recommendation. The Court, after reviewing the relevant briefing and hearing arguments of

counsel,[1] makes the following recommendations.

## I.

## BACKGROUND

Jack Edwards Brooks, Kimberly Grace Brooks, Gerald Carroll, Katherine Brooks Carroll,

Glenn Collins as Trustee on Behalf of JKK Trust Number 1, JKK Trust Number 2, and Brooks'

Children Trust, Pinewood Trading Fund, LP ("Brooks Plaintiffs"), Glen W. Morgan, Teri Morgan,

and GWM Management, Inc. ("Morgan Plaintiffs")(collectively, "Plaintiffs") bring this lawsuit

---

[1] The Court conducted a hearing on the motions on August 2, 2006.

against, among others, Defendants Lehman Brothers, Inc. and Lehman Brothers Commercial Corp. ("Lehman"), Bruce Brier, Kevin Connor, Kevin Kemp, and Mark Stevenson (collectively the "Lehman Defendants") and the Diversified Group Incorporated and its president James Haber ("DGI Defendants") seeking damages for claims arising out of a tax strategy described in their 102-page Original Complaint.[2]

Plaintiffs allege, in 1999 and 2000, respectively, the Brooks and Morgan Plaintiffs entered into a highly complex tax strategy involving the purchase and sale of foreign currency options (the "Option Transactions"). (Compl. ¶¶ 78, 89). According to Plaintiffs, the Option Transactions involved the purchase and sale of opposing foreign currency options by Plaintiffs, (*Id.* ¶¶ 25, 30, 44, 66(a) & (b)), and the Options were governed by the FX Terms and Conditions Contract that Plaintiffs entered into with Lehman (the "Option Contracts"). (*Id.* ¶¶ 78, 89).

Plaintiffs allege Defendants and others defrauded the Plaintiffs through the design, marketing, sale, and implementation of financial and tax advice (*i.e.*, a strategy involving digital options referred to herein as the "the Digital Options Strategy" or "the Strategy") that they knew or should have known the Internal Revenue Service (the "IRS") would claim (i) to be flawed in its conception, and (ii) involved bets on the movements of foreign currency with no likelihood of

---

[2] Plaintiffs' original complaint also included as defendants in this action Alpha Consultants, Inc., Alpha Consultants, LLC, Ron Buesinger and Ivan Ross (the "Alpha Defendants") and Refco Capital Markets, Ltd. and Refco Capital LLC (the "Refco Defendants"). The Refco Defendants have filed for bankruptcy protection since the filing of this action, and all claims against them are stayed. On August 1, 2006, Plaintiffs filed a Notice of Dismissal Without Prejudice of the Alpha Defendants. Plaintiffs assert Sidley Austin Brown & Wood, LLP and R.J. Ruble (collectively "Brown & Wood") were involved in the actions giving rise to this lawsuit, but they are not pursuing their claims against Brown & Wood at this time.

positive returns in excess of all fees and thus lacking the economic substance necessary for a tax transaction to work. Plaintiffs also allege that the DGI Defendants, the other defendants, and Brown & Wood charged excessive and unconscionable fees for these transactions and advice, improperly agreed to split fees between lawyers and non-lawyers, and failed to disclose that the IRS would likely claim that the opinion letters received from Brown & Wood provided no penalty protection because the firm was not independent but was actually part of the group promoting the transactions. Plaintiffs claim that the DGI Defendants, the other defendants, and Brown & Wood failed to apprise Plaintiffs of critical developments that would have allowed Plaintiffs to seek amnesty from the IRS, thus avoiding exposure to substantial penalties and interest and otherwise reducing their damages.

Based on the above factual allegations, Plaintiffs allege the following pertinent claims against Defendants: (1) declaratory judgment and unjust enrichment against all Defendants; (2) breach of contract and breach of duty of good faith and fair dealing against Lehman Defendants; (3) breach of fiduciary duty against all Defendants; (4) fraud against all Defendants; (5) negligence against all Defendants; (6) negligent misrepresentation against all Defendants; (7) breach of contract against the Lehman and DGI Defendants; (8) declaratory judgment against all Defendants; and (9) civil conspiracy against all Defendants.

## II.

## PLAINTIFFS' ALLEGATIONS

### A.    General Allegations

The complaint alleges as follows. The Digital Options Strategy resulted:

in a tax strategy where a taxpayer (or an LLC) purchases and sells options and transfers these options positions to a limited liability company that is managed by DGI and Alpha Consultants. As a result, the taxpayer claims that the basis of the

3

> taxpayer's interest in the limited liability company is increased by the cost of the purchased options, but is *not reduced* by the taxpayer's obligation with regard to the sold options.

(Compl. ¶ 29). Defendants structured the Digital Options Contracts so that each "client entered into two opposing transactions - one where the client would be PAID if the Spot Rate or Final Two Year Swap Yield on a particular foreign currency or interest rate was at or above a certain Strike Price, and one where the client would have to PAY OUT if the Spot Rate or Final Two Year Swap Yield on a particular currency or interest rate was at or above a certain Strike Price."

The opposing options were designed to be in "almost identical amounts," with strike prices differing by only "fractions of a penny." (*Id.* ¶¶ 30, 66(a)). If the triggering event occurred, Plaintiffs received the payout on the option purchased, but would likely have to make the payout on the option sold. (*Id.* ¶ 30). Lehman, as the "Calculation Agent," had the ability to determine when and if the payout event was triggered and could "in good faith and in a commercially reasonable manner" choose to accept or disregard any spot rate during the specified time period that the triggering event was to occur. (*Id.* ¶¶ 31 & n. 6, 79, 80).

The DGI Defendants (along with the other Defendants and Brown & Wood) conspired to design, promote, sell, and implement the Strategy for the purpose of receiving and splitting millions of dollars in fees (the "Defendants' Arrangement"). (*Id.* ¶ 123). Plaintiffs' Option Transactions were designed, marketed and managed by the DGI and Alpha Defendants (*Id.* ¶¶ 29, 55, 66(b)). DGI recruited Lehman and others as "Marketing Participants" to assist DGI in marketing, selling, and implementing the Option Transactions to their wealthy clients. (*Id.* ¶ 47). An agreement existed where "the Lehman Defendants and Refco Defendants assisted the DGI Defendants in designing the Digital Options Contracts for each client." (*Id.* ¶ 56).

4

The Defendants structured the Strategy so that the total of fees to them and others was between five and one-half percent (5.5%) and nine and one-half percent (9.5%) of the tax savings the client desired to achieve. (*Id.* ¶ 32). Of this amount, a certain percentage went to the Lehman Defendants as the "spread" between the two options positions in the Digital Options Contracts (*i.e.*, the difference between what was paid for buying one position and what was received for selling the other); a certain percentage went to DGI for having "developed" the Strategy and acting as "Advisor" for the Strategy; a certain percentage went to the law firms for writing an opinion letter on the transaction; and a certain percentage went to others such as the Lehman Defendants (the "marketing Participants"), who introduced and recommended the Strategy to long-time clients who trusted them. (*Id.*). The amount of fees earned by the Defendants "was not tied to or reflective of the amount of time and effort they expended in providing tax or accounting services, but rather was tied to the amount of capital and/or ordinary losses each client would claim on its tax returns. Indeed, Defendants devised the Strategy and agreed to provide a veneer of legitimacy to each other's opinion as to the lawfulness and tax consequences of the Strategy by agreeing to the representations that would be made and to issue the allegedly 'independent' opinions before potential clients were solicited." (*Id.* ¶ 123).

As part of the Defendants' Arrangement, the DGI Defendants, the other Defendants, and Brown & Wood made numerous misrepresentations. (*Id.* ¶¶ 58-62, 65, 69, 71-73, 94, 99, 100, 104-105, 107-108, 156 (fraud), and 174 (negligent misrepresentation)). Examples of these misrepresentations include (among others):

1. The Strategy was completely legal (*Id.* ¶¶ 99, 156(20), 174(20));

2. The Brown & Wood opinion letter would provide absolute penalty protection (*Id.* ¶¶ 156 (14), 174 (14);

3. The Brown & Wood opinion letter could be relied upon to satisfy the IRS as to the propriety of the Strategy if audited (*Id.* ¶¶ 156(15), 174(15);

4. The Strategy had economic substance and business purpose (*Id.* ¶¶ 156(32), 174(32));

5. IRS Notice 1999-59 did not apply to the Strategy (*Id.* ¶¶ 156(37), 174(37)); and

6. IRS Notice 2000-44 did not apply to the Strategy. (*Id.* ¶¶ 156(44), 174(44).

The DGI Defendants also repeatedly failed to inform the Plaintiffs of material facts of which they were aware and on which the Plaintiffs would rely in making their decision on whether to engage in the Strategy and on how to subsequently deal with the ramifications of their participation in the Strategy. (*Id.* ¶¶ 36, 64, 94-95, 97-98, 101-102, 111, 113, 115, 117-119, 156 (fraud), and 174 (negligent misrepresentation)). Following the Plaintiffs' participation in the Strategy, the DGI Defendants failed to give the Plaintiffs full disclosure regarding the IRS's position with regard to the Strategy. (*Id.* ¶¶ 111-122).

On August 11, 2000, the IRS published Notice 2000-44 (*Id.* ¶ 96). This Notice "described the precise transaction marketed by the Defendants to Plaintiffs," and in the Notice, "[t]he clear message from the IRS to Defendants was that the purported losses arising from the Digital Options Strategy are not properly allowable for Federal income tax purposes." (*Id.* ¶ 97). In June of 2003, the IRS promulgated formal regulations which applied retroactively to invalidate the Option Transactions. (*Id.* ¶¶ 129, 131).

On or about May 5, 2004, in Notice 2004-46, the IRS, in furtherance of its previous pronouncements regarding the Strategy which the Defendants failed to disclose to the Plaintiffs, offered to "settle" with the Plaintiffs. Facing harsh ramifications if they did not "settle,"the Plaintiffs

6

accepted the settlement offer from the IRS.  (*Id.* ¶ 136).  As a result of their participation in the Strategy, the Plaintiffs paid significant fees and premiums to the Defendants and others. In addition, the IRS assessed the Plaintiffs substantial penalties and interest.  (*Id.* ¶ 137).

**B.      Allegations specific to Morgan Plaintiffs**

Lehman's contact with the Morgan Plaintiffs as alleged in the complaint is generally limited to Lehman's role as the counter-party and Calculation Agent on the Morgan Plaintiff's November 3, 2000 Option Contracts, which the Morgan Plaintiffs entered into through GWM Trading LLC ("GWM Trading"), their affiliated entity formed for the purpose of carrying out their Option Transaction.  (Compl. ¶¶ 88-89).

The Morgan Plaintiffs were repeatedly assured by the DGI Defendants that the Strategy was completely legal. (Compl. ¶ 61).  The DGI Defendants told the Morgan Plaintiffs that the Brown & Wood opinion letter would provide absolute IRS penalty protection.  (*Id.*).  The DGI Defendants also referred the Morgan Plaintiffs to the Lehman Defendants, explaining that the Lehman Defendants had substantial experience with the Strategy and would assist them in implementing the Strategy. (*Id.*).

The Morgan Plaintiffs decided to proceed with the Strategy based on the representations and recommendations of the DGI Defendants, the repeated confirmation of these representations by the other defendants, and the promised participation of such respected firms and entities as the other defendants.  (*Id.* ¶ 62).

**C.    Allegations specific to the Brooks Plaintiffs**

In late November of 1999, individual Lehman Defendants Brier, Connor, Kemp, and Stevenson, flew to Beaumont, Texas to meet with Plaintiff Jack Edward Brooks and his father, Jack B. Brooks, acting on behalf of Plaintiff Pinewood to "present them with the Digital Options Strategy." (*Id.* ¶ 58). Brier described the Digital Options Strategy to the Brooks Plaintiffs in detail. He explained that the Strategy, to be conducted in connection with the DGI Defendants, involved digital options on foreign currency. (*Id.*). Brier and the other Lehman Defendants explained that the investments in the Strategy offered the possibility of high investment return with limited downside risk. (*Id.*). The Lehman Defendants also explained that DGI and Haber would carry out the transactions involved in the Strategy. (*Id.*).

Brier and the other Lehman Defendants assured Plaintiff Jack Edward Brooks and Plaintiff Pinewood through Jack Brooks that a major respected law firm would provide the Brooks Plaintiff with an opinion of legality of the Strategy under the Tax Code. (*Id.* ¶ 59). The Lehman Defendants repeatedly assured the Brooks Plaintiffs that the Strategy was completely legal. (*Id.*). The Lehman Defendants explained to the Brooks Plaintiffs that the IRS had previously "argued in favor" of the Strategy's application of the Tax Code. The Lehman Defendants also assured the Brooks Plaintiffs that this investment was not a tax shelter for a number of reasons. (*Id.*). Specifically, the Lehman Defendants told the Brooks Plaintiffs that (1) there was a clear business purpose; (2) there was substantial money at risk; (3) the potential returns were much higher than the fees required; and (4) the tax opinion letter from the Brown & Wood Defendants would provide the requisite legal support for the Strategy. (*Id.*).

The Brooks Plaintiffs decided to proceed with the Strategy based on the representations and recommendations of the Lehman Defendants, the repeated confirmation of these representations by the other defendants, and the promised participation of such respected firms and entities as the other defendants. (*Id.* ¶ 60). On or about November 29, 1999, the Brooks Plaintiffs individually entered into Options Contracts with the Lehman Defendants. (*Id.* ¶ 78).

## III.

### DEFENDANTS' MOTIONS

The Lehman Defendants and the DGI Defendants filed motions to dismiss Plaintiffs' above-referenced case for varied reasons. The Lehman Defendants move to dismiss, asserting (1) the Court lacks personal jurisdiction over the individual Lehman Defendants with respect to the Morgan Plaintiffs' claims; (2) Plaintiffs waived any claim they may have had against them; (3) the Brooks Plaintiffs lack standing; (4) most claims are time-barred; and (5) the allegations are inadequate.

The DGI Defendants' motion asks this Court to: (1) dismiss this action for lack of personal jurisdiction; (2) order this dispute to arbitration; or (3) dismiss the claims against the DGI Defendants because the Brooks Plaintiffs allegedly released the DGI Defendants, certain claims of Plaintiffs are time-barred, and Plaintiffs have failed to state a claim upon which relief may be granted. The Court will first consider whether it has personal jurisdiction over the DGI Defendants and the individual Lehman defendants.

IV.

## DOES THE COURT HAVE PERSONAL JURISDICTION

## OVER PLAINTIFFS' CLAIMS AGAINST THE DGI DEFENDANTS?

**A.      Personal Jurisdiction**

The assumption of personal jurisdiction in a case "arising under" federal law involves a two-step inquiry.  First, absent a controlling federal statute, the defendant must be amenable to service of process.  Second, the exercise of jurisdiction must comport with due process.  *Id.* at 1349; *Ham v. La Cienega Music Co.*, 4 F.3d 413, 415 (5th Cir. 1993).  "Rule 4 of the Federal Rules of Civil Procedure allow a plaintiff to rely on the state long arm statute of the state in which the federal district court sits to obtain statutory authorization for the exercise of personal jurisdiction." *Deprenyl*, 297 F.3d at 1350.

"Under the Texas long-arm statute, a court has personal jurisdiction over a foreign defendant to the fullest extent allowed by the federal constitution." *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 213 (5th Cir. 2000).  Accordingly, the Court need only address the due process element of the inquiry.  *See Mink v. AAAA Dev. LLC.*, 190 F.3d 333, 335 (5th Cir. 1999).

Determining whether the exercise of personal jurisdiction is consistent with the Due Process Clause of the United States Constitution involves a two-pronged test.  First, the Court must conclude that the defendant has "minimum contacts" with the forum.  *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  Second, the Court must conclude that requiring a defendant to litigate in the forum does not offend "traditional notions of fair play and substantial justice." *Id.*

10

A defendant's contacts with the forum may support either specific or general jurisdiction over the defendant. *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336 (5th Cir. 1999). "Specific jurisdiction exists when the nonresident defendant has 'purposefully directed' his activities at the residents of the forum, and the litigation results from alleged injuries that 'arise from or relate to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). With respect to specific jurisdiction, the Court must examine three factors in analyzing due process: (1) did the defendant purposefully direct its activities at residents of Texas; (2) do Plaintiff's claims arise out of, or relate to those activities; and (3) is the exercise of personal jurisdiction reasonable and fair. *Deprenyl Animal Health, Inc. v. The Univ. of Toronto Innovations Found.*, 297 F.3d 1343, 1351 (Fed. Cir. 2002).

General jurisdiction exists when defendant's contacts are unrelated to the cause of action but are "continuous and systematic" and "substantial." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 9 (1984). "Both categories of minimum contacts require some act by which the defendant purposefully avails himself or herself of the privilege of conducting activities within the forum state, and thus invoke the benefits and protections of its laws." *Dakcoll, Inc. v. Grand Central Graphics, Inc.*, 352 F.Supp.2d 990, 995 (D. N. Dak. 2005).

"When a nonresident presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident. The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985). It is well established that when the court rules on a motion to

11

dismiss for lack of personal jurisdiction without conducting an evidentiary hearing, the plaintiff satisfies his burden by presenting a *prima facie* case of jurisdiction. *Felch v. Transportes Lar-Mex SA De CV*, 92 F.3d 320, 326 (5th Cir. 1996). Further, the court "must accept as true the uncontroverted allegations in the complaint and resolve in favor of the plaintiff any factual conflicts posed by the affidavits." *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999).

## B.    The DGI Defendants' Evidence

According to the Declaration of James Haber, the president of the Diversified Group Incorporation ("DGI"), DGI is a Delaware corporation with its principal place of business at 950 Third Avenue, New York, New York 10022. (Haber Decl. ¶¶ 1, 2). Between 1999 and the present, DGI has not maintained an office in Texas and has not regularly engaged in business in Texas (*Id.* ¶ 2). DGI does not employ anyone in Texas and does not own or lease any real property in Texas. It does not have any back accounts or a mailing address in Texas. (*Id.*).

Mr. Haber is a resident of New York, New York. (*Id.* ¶ 3). He does not own or lease any real property in Texas or employ anyone in Texas on his behalf. (*Id.*). Mr. Haber does not conduct business in Texas. He had not has business conducted on his personal behalf in Texas between 1999 and the present. (*Id.*). He does not have any bank accounts in Texas. (*Id.*).

Between 1999 and 2000, Plaintiffs invested in the Strategy. (*Id.* ¶ 4). "In connection with the Strategy, including discussions preliminary to the plaintiffs' investment therein, [Mr. Haber] never traveled to Texas, and [he] never met with any of the plaintiffs in this action. Similarly no one from DGI ever traveled to Texas, or ever met with any of the plaintiffs in this action." (*Id.*). In

1999, in his capacity as president of DGI, Mr. Haber returned two or three phone calls to Plaintiff

Jack Brooks in order to respond to his questions concerning the Strategy. Mr. Haber made those

phone calls from his office in New York, and Mr. Haber never initiated a phone call to Mr. Brooks.

(*Id.*). Mr. Haber never spoke to any of the other plaintiffs in connection with the Strategy or in

connection with any other matter. (*Id.* ¶ 5).

Certain limited liability companies were set up to effectuate the Strategy with Plaintiffs. (*Id.*

¶ 6). Specifically, AD Global FX Fund LLC helped facilitate the Brooks Plaintiffs' transaction and

AD Balanced Fund LLC helped facilitate the Morgans Plaintiffs' transaction. (*Id.*). The LLCs were

incorporated in Delaware and had a principal place of business in New York, New York. Mr. Haber

signed the operating agreements for the entities in his offices in New York on behalf of DGI. (*Id.*).

## C.    Plaintiffs' Evidence

According to Jack ("Jeb") Edward Brooks, in conjunction with the promotion and

implementation of the Strategy, he received numerous facsimiles from James Haber of DGI,

enclosing promotional and transactional materials for the Strategy. (Jeb Brooks' Aff. ¶ 5). The

documents were faxed to Brooks' fax number in Beaumont, Texas. (*Id.*). Copies of the facsimiles

are attached to Jeb Brooks' affidavit.

On or around August 19, 2003, Brooks received document requests from the IRS regarding

his participation in the Strategy. (*Id.* ¶ 6). Shortly thereafter, Brooks had a telephone conversation

with Mr. Haber regarding the document requests. Brooks participated in the conversation from

Beaumont, Texas. (*Id.*).

According to Jack B. Brooks, the father of Jack Edwards Brooks, he had several phone conversations with Mr. Haber of DGI concerning the Strategy. (Brooks' Aff. ¶¶ 3, 5). He participated in the phone calls from Beaumont, Texas. During the phone calls, Mr. Haber "talked extensively about the investment and tax aspects of the Strategy and reiterated to [Brooks] what the Lehman Brothers representatives had already told [him], *i.e.*, that the Strategy was a legal and legitimate way to either make a sizeable profit on the investment component of the Strategy or reduce taxable income and that an independent legal opinion would ensure that, under no circumstances, could I be liable to the IRS for penalties for participating in the Strategy. (*Id.* ¶ 5). During the discussions, Brooks was acting on behalf of Pinewood as well as the individual plaintiffs in this case. (*Id.*). Brooks attached to his affidavit copies of documents either faxed or mailed to Brooks in Texas Mr. Haber or other individuals at DGI in connection with the promotion and implementation of the Strategy. (*Id.* ¶ 7). Brooks relied on the discussions with Mr. Haber in choosing to participate in the Strategy. (*Id.* ¶ 8).

**D.    Discussion**

**1.    General Jurisdiction**

The exercise of personal jurisdiction on out of state defendants is permissible only if the plaintiff can meet either the test for general jurisdiction or the test for specific jurisdiction. General jurisdiction exists when defendant's contacts are unrelated to the cause of action but are "continuous and systematic" and "substantial." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 9 (1984). The minimum contacts test for general jurisdiction is more demanding and requires proof of more contacts than for specific jurisdiction. More contact is required because the

14

forum state has no direct interest in the cause of action. *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir. 1987). "[G]eneral jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed." *Access Telecom, Inc. v. MCI Telecomm. Corp.*, 197 F.3d 694, 717 (5th Cir. 1999).

After considering the evidence submitted, the Court finds The contacts asserted by Plaintiffs here are neither continuous nor systematic. Accordingly, this Court lacks general jurisdiction over the DGI Defendants. Specific jurisdiction though is another matter, and the Court will now consider whether the DGI Defendant's contacts rise to the level of those creating specific jurisdiction.

**2.      Specific Jurisdiction**

For specific jurisdiction, the minimum contacts test focuses on the nature and quality of the contacts with the forum state, not on the quantity of those contacts. *International Shoe*, 326 U.S. at 320. "It is well-established that specific jurisdiction can arise from a single contact with the forum state." *Dakcoll, Inc. v. Grand Central Graphics, Inc.*, 352 F.Supp.2d 990, 999 (D. N. Dak. 2005). However, as mentioned above, "minimum contacts require some act by which the defendant purposefully avails himself or herself of the privilege of conducting activities within the forum state, and thus invokes the benefits and protections of its laws." *Id.* at 995.

The allegations contained in the complaint demonstrate that, notwithstanding the fact that the DGI Defendants were not physically present in the State of Texas, they directed the activities alleged. Specifically, the complaint includes the following examples of conduct on the part of the DGI Defendants: (1) Developing the plan to market FX Contracts as part of a tax strategy; (2)

15

Receiving and splitting fees for services rendered in conjunction with the tax strategy; (3) Recruiting Lehman Brothers as a Marketing Participant for the Strategy; (4) Assisting and directing Lehman Brothers in the promotion and implementation of the Strategy; (5) Directing Lehman Brothers to "front" for the DGI Defendants in promoting and implementing the Strategy; (6) Along with the Alpha Defendants, forming the Fund LLCs for the sole purpose of implementing the Strategy; (7) Entering into secret arrangements with the other Defendants with respect to those Defendants' roles in the promotion and implementation of the Strategy and agreeing to pay these Defendants secret fees for these roles; and (8) Directly promoting the Strategy to the Morgan Plaintiffs.

Plaintiffs also submitted the affidavits of Jack Edward Brooks and Jack B. Brooks. The affidavits demonstrate the DGI Defendants directed numerous telephone calls, letters, and faxes to the Plaintiffs in Texas for the specific purpose of selling, promoting, and implementing the Strategy at issue.

In *Schexnayder v. Daniels*, 187 S.W.3d 238 (Tex. App. – Texarkana 2006), Schexnayder, a doctor residing in Arkansas, was sued by the mother of a deceased child. The child had been hospitalized in Texarkana, Texas with a serious medical condition. The Texarkana hospital contacted Arkansas Children's Hospital, where the defendant doctor was the intensive care unit's attending physician, for a transfer. *Id.* at 242. The defendant doctor approved the transfer and dispatched a transport team. The defendant doctor did not accompany the transplant team to Texas, but stayed behind in Arkansas. *Id.* As the team attempted to stabilize the child before transporting her, the defendant doctor telephonically "directed the care to be given." *Id.* The team encountered complications during the process, and the defendant doctor made the ultimate decision that further

16

resuscitation efforts would be futile. *Id.*

The defendant doctor argued that jurisdiction over him was improper because he never entered into the State of Texas. The court disagreed and held as follows:

> Based on the record in the instant case, we necessarily conclude that Schexnayder was not merely providing advice to the team, but that he fully participated in the care given by the team to this child and did, in fact, ***make the most important decisions concerning her care***. He was not a mere bystander, but was effectively there with the team in all but body. . . . He acknowledges that the other team members who were physically present do not contest jurisdiction of the Texas court over them. ***There is no logical reason why the team leader, although not physically present in Texas, but who headed up the medical treatment by telephone from Arkansas, should not likewise be subject to jurisdiction in Texas.***

*Id.* at 245 (emphasis added).

As described above, here the complaint alleges the DGI Defendants, along with the Alpha Defendants, drove the scheme to defraud the Plaintiffs through the promotion, sale, and implementation of the Strategy. As in *Schexnayder*, the DGI Defendants were not merely providing advice to the Lehman Defendants and Brown & Wood; rather, the DGI Defendants fully participated in the marketing, sale, and implementation of the Plaintiffs' Strategy. The DGI Defendants were not mere bystanders, but were effectively in Texas. Thus, there is no reason why the DGI Defendants, who allegedly headed up the promotion, sale, and implementation of the Strategy from New York, should not be subject to jurisdiction in Texas.

These direct contacts are sufficient to satisfy the minimum contacts necessary for the exercise of specific jurisdiction. Although the DGI Defendants performed acts in New York, the contacts with Texas, viewed as a whole, support a *prima facie* case of personal jurisdiction over the DGI

17

Defendants. The exercise of jurisdiction over the DGI Defendants would not offend traditional notions of fair play and substantial justice. "Texas has a significant interest in this dispute and the plaintiff[s] [have] an interest in obtaining convenient and effective relief. Although the [DGI Defendants are] burdened somewhat by having to litigate in Texas, the court cannot say this burden is unreasonable such that the court should decline to exercise jurisdiction." *Dunham v. Total Molding Concepts, Inc.*, Cause No. 2:05cv515 (E.D. Tex. 2006)(unreported).

## V.

## DOES THE COURT HAVE PERSONAL JURISDICTION OVER THE MORGAN PLAINTIFFS' CLAIMS AGAINST THE INDIVIDUAL LEHMAN DEFENDANTS?

### A.    Arguments

Defendants Brier, Kemp, Connor, and Stevenson (the "Individual Lehman Defendants") assert they have insufficient contacts with the State of Texas to enable to court to exercise personal jurisdiction over them with respect to the Morgan Plaintiffs' claims. According to the Individual Lehman Defendants, the only allegations in the complaint that connect them with the State of Texas occurred one year prior to the Morgan Plaintiffs' transactions with Lehman, when in November of 1999, the Individual Lehman Defendants flew to Texas to meet with certain of the Brooks Plaintiffs to "present them with the Digital Options Strategy." (Compl. ¶ 58). Neither the Individual Lehman Defendants nor Plaintiffs presented evidence regarding these defendants' contacts or lack thereof with the State of Texas.

**B.     Discussion**

**1.     General Jurisdiction**

Plaintiffs are "obligated to secure jurisdiction over each Defendant with respect to each claim brought." *Stelax Indus., Ltd. v. Donahue*, 2004 WL 733844, *2 (N.D. Tex. 2004). Regarding the Morgan Plaintiffs' claims, Plaintiffs bear the burden of demonstrating a *prima facie* case of personal jurisdiction over the nonresident Individual Lehman Defendants. In their briefing, Plaintiffs do not even address the Individual Lehman Defendants contacts with the State of Texas. They do not present evidence of any contacts, much less continuous or systematic contacts, with the State of Texas. Consequently, Plaintiffs have not made a *prima facie* showing of general jurisdiction over the Individual Lehman Defendants. The Court will now consider whether the Plaintiffs have made a *prima facie* showing of specific jurisdiction over the Individual Lehman Defendants

**2.     Specific Jurisdiction**

The complaint does not allege the Individual Defendants had any contact with the Morgan Plaintiffs, either during the November 1999 trip to Texas or anytime thereafter. The complaint does not allege a theory connecting the Morgan Plaintiffs to the Brooks Plaintiffs such that joinder of the two groups of Plaintiffs would be appropriate. In their briefing, Plaintiffs do not address the Individual Lehman Defendants specific contacts with the State of Texas or present evidence of any such contacts. Moreover, Plaintiffs have not shown, regarding the Morgan Plaintiffs' claims, that the Individual Lehman Defendants purposefully availed themselves of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. Because the

Court finds the Individual Lehman Defendants did not purposefully direct activities at residents of Texas, the Court need not examine the third prong of the three-part test for determining whether personal jurisdiction exists, namely whether subjecting Defendant to personal jurisdiction in Texas is fair and reasonable. However, even if the Court were to conclude sufficient contacts exist, the Court would find the exercise of jurisdiction over the Morgan Plaintiffs' claims against the Individual Lehman Defendants under the facts of this case would offend traditional notions of fair play and substantial justice.[3]

In sum, Plaintiff has failed to make a *prima facie* showing of either general or specific jurisdiction. The Court finds it lacks personal jurisdiction over the Morgan Plaintiffs' claims against the Individual Lehman Defendants.  The Court recommends the Morgan Plaintiffs' claims against Bruce Brier, Kevin Connor, Kevin Kemp, and Mark Stevenson be **DISMISSED WITHOUT PREJUDICE.**[4]

---

[3]  "Whether the exercise of jurisdiction is consistent with notions of fair play and substantial justice requires an evaluation of the burden on the defendant, the forum state's interest in resolving the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Funding Authority, Ltd. v. Somerset Marine, Inc.*, 923 F.Supp. 982, 986 (S.D. Tex. 1996).

[4] The Court's ruling on personal jurisdiction does not address the merits of the Morgan Plaintiffs' allegations as to the Individual Lehman Defendants, and, as a result, the claim against them should be dismissed without prejudice.  Rule 41(b) of the Federal Rules of Civil Procedure "specifically exempts dismissals for lack of jurisdiction . . . from the presumption that the dismissal is with prejudice."  8 Moore's Federal Practice § 41.50[7][c] (Matthew Bender 3d ed.) (*citing Costello v. United States*, 365 U.S. 265, 285 (1961)(discussing "lack of jurisdiction over the person or subject matter" as examples of dismissals that should be without prejudice pursuant to Rule 41)); FED. R. CIV. P. 41.

**VI.**

**SHOULD THE COURT ORDER PLAINTIFFS' DISPUTE**

**WITH THE DGI DEFENDANTS TO ARBITRATION?**

**A.**     **Arguments**

The AD Global Operating Agreement signed by Jack Brooks and the GWM and AD Balanced Operating Agreements signed by Glen Morgan each contained arbitration provisions providing that "[a]ny dispute, controversy or claim arising out of or relating to this Agreement shall be settled promptly by arbitration . . . ." The Contribution Agreements incorporate by reference the terms of the AD Global and AD Balanced Operating Agreements. The DGI Defendants assert the language contained in the arbitration provision has been construed broadly, and thus, Plaintiffs must settle their claims against the DGI Defendants through arbitration. The DGI Defendants rely on courts around the country that have held similar disputes fall within the ambit of arbitration provisions.

Plaintiffs contend none of Plaintiffs' claims are arbitrable under the Agreements because the arbitration provisions contained in the Agreements do not encompass the claims that Plaintiffs have brought in this action. Plaintiffs state the Agreements are formation documents for limited liability companies; none of these limited liability companies are parties to this lawsuit; Plaintiffs bring no claims concerning their formation or performance under the Agreements; and Plaintiffs specifically plead in the Complaint that "[n]o claims herein are asserted under or arise from any written agreement with AD Global FX Fund, LLC, AD Balanced Fund, LLC and/or GWM Trading, LLC." (Compl. n. 13). According to Plaintiffs, the language of each of the Agreements calling for

21

arbitration of disputes "arising out of or relating to this Agreement" does not encompass disputes like the provision of the tax advice and services by the DGI Defendants, services that began before the formation of some of these entities and continued on even after Plaintiffs had withdrawn from them.

In addition, Plaintiffs maintain the Agreements, along with the alleged transfers to the funds they purportedly evidence, were invalidated by the IRS along with the rest of the Strategy. Therefore, Plaintiffs urge the arbitration provisions contained in the Agreements relied on by the DGI Defendants are inapplicable. In June of 2003, the IRS formalized its position regarding the Strategy and other 2000-44 transactions by issuing new regulations (the "Regulations") retroactive to October 18, 1999 (before the Brooks and Morgan Plaintiffs entered into the Strategy), and through the Office of Chief Counsel Notice CC-2003-020 (the "OCC Notice"). According to Plaintiffs, the OCC Notice provided that "the purported partnership should be disregarded in whole or in part, and the partnership's assets and activities should be considered, in whole or in part, to be owned and conducted, respectively, by one or more of its purported partners. . . ." For these reasons, Plaintiffs assert their dispute against the DGI Defendants should not be ordered to arbitration.

## B.    Applicable Law

In adopting the Federal Arbitration Act ("FAA"), "Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984). Section 2 of the FAA states that a written arbitration agreement in any contract involving interstate commerce is valid, irrevocable, and enforceable except on

22

grounds that would permit the revocation of a contract in law or equity.  9 U.S.C. § 2.  Section 4 of

the FAA allows a party to seek an order compelling arbitration if the other party fails to arbitrate

under an arbitration agreement.  9 U.S.C. § 4.

In adjudicating a motion to compel arbitration under the FAA, courts begin by determining

whether the parties agreed to arbitrate the dispute.  *Fleetwood Enterprises, Inc. v. Gaskamp*, 280

F.3d 1069 (5th Cir. 2002).  This determination depends on the following two considerations: (1)

whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute falls

within the scope of the arbitration agreement.  *Id.* at 1073.  "Second, once the court determines that

the parties agreed to arbitrate, it must determine whether any federal statute or policy renders the

claims nonarbitrable."  *Bloxom v. Landmark Publishing Corp.*, 2002 WL 185551, *2 (E.D. Tex. Feb.

5, 2002).

"The Supreme Court has held that a presumption of arbitrability exists where a contract

contains an arbitration clause, and that an order to arbitrate should not be denied 'unless it may be

said with positive assurance that the arbitration clause is not susceptible to an interpretation that

covers the asserted dispute.'" *Miron v. BDO Seidman, LLP*, 342 F.Supp2d 324, 328 (E.D. Penn.

2004), *quoting AT&T Tech., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650 (1986).

"The presumption of arbitrability is particularly strong when the arbitration clause in question is

broad."  *Miron*, 342 F.Supp2d at 328, *quoting AT&T*, 475 U.S. at 657.  To overcome this

presumption, a party must either establish the existence of an express provision excluding the dispute

from arbitration or provide "the most forceful evidence of a purpose to exclude the claim from

arbitration."  *AT&T*, 475 U.S. at 650.

**C.    Discussion**

In support of their motion to compel arbitration, the DGI Defendants rely on cases wherein courts have ordered arbitration based on similar arbitration provisions.  For example, in *Stechler v. Sidley, Austin, Brown & Wood, LLP*, 382 F.Supp.2d 580 (S.D. N.Y. 2005), investors brought a RICO action against Brown & Wood, DGI, Haber, and others, alleging "a conspiracy among defendants to market, sell and implement a tax shelter – known as the Digital Options Strategy – which defendants knew or should have known would be considered unlawful by the IRS."  *Id.* at 582.  All defendants moved to dismiss the complaint.  In addition, Brown & Wood moved to compel arbitration and stay the proceedings.  *Id.* at 582-83.  The court granted DGI's motion to compel arbitration and granted with leave to amend the motions to dismiss.  *Id.* at 583.

In *Stechler*, DGI moved to compel arbitration on the basis of the arbitration clauses in the JXK Operating Agreement and the Fund Operating Agreement.  The arbitration clause provided that "any dispute, controversy or claim arising out of or relating to this Agreement shall be settled promptly by arbitration. . . ."  *Id.* at 588.  The court noted that the plaintiffs brought no claims concerning the performance of the agreements; rather, the plaintiffs' claims were "based on defendants' provision of allegedly fraudulent or negligent tax advice."  *Id.* at 589.  Therefore, according to the court, the plaintiffs' claims were merely collateral to the agreements.  *Id.*

The court further noted the arbitration clauses were clearly broad, and the Second Circuit had recognized that "a broad arbitration clause may extend to a collateral issue even where the collateral issue involved no 'issue of contract interpretation [or] construction, or application of any provision of the charter,' if the collateral issue 'touches matters' covered by the parties' contracts."  *Id.*,

*quoting JLM Industries v. Stolt-Nielsen SA*, 387 F.3d 163, 174 (2d Cir. 2004). Relying on *JLM Industries*, the Southern District of New York in *Stechler* noted the plaintiffs' claims similarly "touch" the subject matter of the agreements at issue and the court could not say "with positive assurance that the arbitration clause is not susceptible of an interpretation" which covers the Strategy as a whole." *Stechler*, 382 F.Supp2d at 590-91. Therefore, the court granted DGI's motion to compel arbitration. *Id.* at 591.

Here, Plaintiffs assert the Southern District of New York erred and urge the Court to conduct its own review of *JLM Industries*, the Second Circuit opinion discussed in *Stechler*. In *JLM Industries*, the arbitration clause at issue was characterized as "broad," and its coverage extended to "collateral matters." *JLM Industries*, 387 F.3d at 172. The Second Circuit explained that "[i]f the allegations underlying the claims touch matters covered by the parties' contracts, then those claims must be arbitrated, whatever the legal labels attached to them." *Id.*

Not only did the Court conduct its own review of *JLM Industries*, but it also reviewed many other cases involving issues similar to the one presented here. In addition to the cases submitted by the DGI Defendants, the Court has reviewed the following. In *Miron v. BDO Seidman LLP*, 342 F.Supp.2d 324 (E.D. Penn. 2004), investors who allegedly suffered losses in a tax shelter investment brought an action against the tax consultant and securities brokers. The BDO Defendants and the Deutsche Bank Defendants moved to compel arbitration and dismiss or stay the action. The court first granted the BDO Defendants' motion, noting the plaintiff, Amihai Miron ("Miron"), had entered into a consulting agreement with one of the BDO Defendants (the "BDO Agreement"). *Id.* at 327. The BDO Agreement contained the following mandatory arbitration clause:

25

> If any dispute, controversy or claims arises in connection with the performance or
> breach of this Agreement and cannot be resolved . . . then such dispute, controversy
> or claim shall be settled by arbitration with the laws of the Commonwealth of
> Pennsylvania.

*Id.* at 327.

The sale transaction referred to in the BDO Agreement "had in fact been completed in May 2000, two months before the BDO Agreement was signed, and the BDO Defendants admit they played no part instructing this transaction." *Id.* The services actually provided by the BDO Defendants related to "foreign exchange digital option contracts (FX Contracts), marketed as a tax shelter. . . ." *Id.* The BDO Defendants recommended the strategy to the plaintiffs "once they became aware that Plaintiffs expected substantial gains from the May 2000 sale transaction." *Id.*

The plaintiffs agreed to engage in the tax strategy. In order to implement the strategy and in connection with the formation of several entities through which the plaintiffs planned to engage in FX Contracts, Miron opened three brokerage accounts with the defendant, Deutsche Bank Securities, Inc. *Id.* Miron executed three account agreement ("DB Agreements"), binding on the plaintiffs and Deutsche Bank Defendants and containing arbitration clauses. *Id.* at 327-28.

Regarding the BDO Defendants' motion, the court first held that the BDO Agreement contained a valid arbitration agreement; the agreement, and the arbitration clause within the agreement, were not void due to mutual fraud as in *Denney v. Jenkins v. Gilchrist*, 340 F.Supp.2d 338 (S.D. N.Y. 2004). The *Miron* court noted that, "unlike the agreement in *Denney*, which identified expanding business operations as the client's only goal, the BDO Agreement identified one of Plaintiffs' goals as 'limiting [their] financial exposure' in connection with the May 2000 sale

transaction." *Miron*, 342 F.Supp2d at 329. The court held that even though the May 2000 transaction was complete when the BDO Agreement was signed, the plaintiffs alleged in their complaint they entered into the agreement for the purpose of implementing a tax strategy specifically with respect to the "substantial gains" from the May 2000 transaction cited in the BDO Agreement. *Id.* at 329-30. Noting the BDO Defendants may not have performed all of the consulting work described in the BDO Agreement, the court stated the BDO Defendants appeared to have provided tax consulting services in connection with the transaction as specified in the agreement. *Id.* at 330.

The court then held the plaintiffs' claims regarding the BDO Defendants' tax planning and marketing activities fell within the scope of the BDO Agreement's broad arbitration clause. *Id.* The court rejected the plaintiffs' efforts in rebutting the presumption of arbitrability. *Id.* at 330. The court noted that the heart of the plaintiffs' complaint with respect to the BDO Defendants is that they defrauded the plaintiffs by marketing the tax strategy without informing the plaintiffs that the strategy might be subject to IRS challenges. *Id.* The court concluded as follows:

> Plaintiffs' allegations against the BDO Defendants all relate to the COBRA tax savings strategy, which was tailored to meet Plaintiffs' financial needs resulting from the Transaction by providing a favorable tax treatment for its proceeds. Given that Plaintiffs' claims regarding the faulty tax strategy arguably arose 'in connection with the performance or breach' of an agreement to assist Plaintiff 'in determining a tax treatment for the Transaction' (language of the BDO Agreement), this Court cannot say 'with positive assurance' that no interpretation of the arbitration clause would cover the current dispute.

*Id.* at 331.

Turning to the Deutsche Bank Defendants' motion, the court held neither the BDO Agreement nor the DB Agreements required that Plaintiffs' claims against the Deutsche Bank Defendants be sent to arbitration at that time. *Id.* Because the plaintiffs were members of a putative

class in a class action lawsuit, the court held the Deutsche Bank Defendants could not seek to compel arbitration on the basis of the DB Agreement. *Id.* at 331-32. The court further held under the BDO Agreement that the plaintiffs' claims against the Deutsche Bank Defendants, as non-signatories to the BDO Agreement, did not fall within the scope of the agreement.

Similarly, in *King v. Deursche Bank AG*, 2005 WL 611954 (D. OR. 2005)(unpublished), three groups of plaintiffs filed suit against four groups of defendants, investment advisors and accountants. The plaintiffs alleged they were "induced by the defendants to enter into a tax shelter scheme involving foreign exchange digital options contracts." *Id.* at *1. The BDO Defendants moved to compel arbitration of the Allen plaintiffs' claims, pursuant to a Consulting Agreement entered into by Brian Allen. *Id.* at *13. The arbitration provision of the Consulting Agreement stated:

> If any dispute, controversy or claim arises in connection with the performance or breach of this agreement, and cannot be resolved by facilitated negotiations (or the parties agree to waive that process) then such dispute, controversy or claim shall be settled by arbitration in accordance with the laws of the State of New York and the then current Commercial Arbitration Rules of the American Arbitration Association, except that no prehearing discovery shall be permitted unless specifically authorized by the arbitration panel, and shall take place in the city in which the BDO Seidman, LLP office providing the relevant services exists, unless the parties agree to a different location. Such arbitration shall be conducted before a panel of three persons. . . . The arbitration panel shall have no authority to award nonmonetary or equitable relief, and any monetary award shall not include punitive damages.

*Id.* at *15.

The plaintiffs first urged the court to adopt the reasoning of the *Denney* court, which found the Consulting Agreement void on the basis of mutual fraud because the language of the Consulting Agreement did not describe the services the BDO Defendants actually provided. *Id.* Based on the

28

evidence involved in *King*, the court was not persuaded that the Consulting Agreement described work that was never done for the Allen plaintiffs. *Id.* Finding no evidence of either fraud in the inducement or mutual fraud, the court declined to invalidate the agreement. *Id.*

The plaintiffs next argued the broad arbitration provision was narrowed by the limitation to "performance or breach of this **agreement**," asserting the Allen plaintiffs were explicitly not claiming the BDO Defendants failed to perform under or breached the Consulting Agreement. *Id.* at *16 (emphasis in original). The plaintiffs argued the dispute between them and the BDO Defendants related to the tax strategy marketed by the defendants, not the services enumerated in the Consulting Agreement. *Id.*

First noting the Allen plaintiffs had asserted a breach of contract claim against the BDO Defendants, *Id.* at n. 8, the court was not persuaded that the services enumerated in the Consulting Agreement excluded the BDO Defendants' activities in presenting the tax strategy to the plaintiffs and assisting them in its implementation. *Id.* at *16. According to the court, the Consulting Agreement was the only agreement between the parties and "the only instrument which could conceivably provide the basis for the services rendered by BDO Seidman and the fees paid for those services by the Allen plaintiffs, and the only agreement upon which a breach of contract claim could be based." *Id.*

In conclusion, the court granted the BDO Defendants' motion to compel arbitration, stating (1) there is no express provision excluding claims arising from the COBRA strategy from arbitration; (2) there is no evidence of a purpose on the part of the Allen plaintiffs and BDO Seidman to exclude claims arising from the COBRA strategy from arbitration; (3) the arbitration clause is broad; and (4)

any doubts are to be resolved in favor of arbitrability. *Id.* The court stayed the action only to the claims asserted against BDO by the Allen plaintiffs; BDO had made no showing that would justify staying the action as to any other parties. *Id.*

Turning back to the case before the Court, the DGI Defendants filed a supplement to their reply brief to alert the Court to the following case, decided approximately 25 days after the DGI Defendants filed their reply. In *The Diversified Group, Incorporated, et al. v. Michael W. Keller, et al.*, Case No. 05 Civ 9455 (SAS), Judge Scheindlin issued an oral decision ordering arbitration in a case involving the same tax strategy claims against the DGI Defendants and the same arbitration provisions as in this case. In *Keller*, Judge Scheindlin ruled as follows:

> The facts of this case are essentially identical to those in *Stechler*, another case involving an investment strategy allegedly promoted by DGI and challenged by the IRS, implemented by agreements containing the same arbitration clause at issue in this case. . . . I quote from *Stechler*: 'Ultimately, the question is one of the parties' intent – whether, in entering into the arbitration clauses in the Agreements, the Stechlers intended to refer all disputes relating to the Strategy to arbitration, or only those disputes arising narrowly from a breach of the Agreements. The LLCS had no purpose and no independent existence outside the context of the Strategy. The natural interpretation of the broad language in the arbitration clauses is that they apply to disputes relating to the Strategy as a whole; any other interpretation would rob them of any practical meaning.' The same reasoning applies here. Respondents' claims in the California actions would not have accrued if Respondents' had not entered into the agreements with DGI containing the arbitration clause. Conversely, had the Respondents not decided to pursue the Strategy, they would not have entered into the agreements. . . . [R]espondents' attempts to escape the application of *Stechler* and *Buckeye* are in vain.

(Transcript of Judge Scheindlin's Order and Judgment, provided by the DGI Defendants, at 9-10 & 12).

Finally, the Court reviewed a recent case decided on June 13, 2006. *Amato v. KPMG, LLP,*

433 F.Supp2d 460 (M.D. Penn. 2006). In *Amato*, the "crux of the allegations in the complaint is that

the Deutsche Bank Defendants engaged in a scheme to induce wealthy and sophisticated persons,

like Plaintiffs, to pursue the [tax-advantaged investment] OPIS strategy when they knew or should

have known that OPIS was an abusive tax shelter that would be disallowed by the IRS. *Id.* at 464.

The Deutsche Bank Defendants moved to compel arbitration based on an arbitration clause with a

Customer Agreement. *Id.* at 481. When he opened his brokerage account with Deutsche Bank,

plaintiff Chebalo executed a Customer Agreement as part of his participation in the OPIS

transaction. *Id.* at 482.

The court found the Customer Agreement was an "integral part of the challenged investment

transaction as Mr. Chebalo could not have engaged in the challenged transaction through Deutsche

Bank without entering into the Agreement." *Id.* The Customer Agreement contained an arbitration

clause providing, in pertinent part, that "all controversies which may arise between us concerning

any transaction of construction, performance, or breach of this or any other agreement between us.

. . shall be determined by arbitration." *Id.* Applying FAA law, the court found there was a valid

agreement to arbitrate between the parties and that Mr. Chebalo's claims against the Deutsche Bank

Defendants fell within the scope of the broad arbitration provision. *Id.* at 484.

With the above cases in mind, the Court will consider the DGI Defendants' motion to compel

arbitration and ascertain whether a valid agreement to arbitrate exists between Plaintiffs and the DGI

Defendants and whether the claims in this case fall within the scope of the arbitration agreement.

*Fleetwood Enterprises, Inc. v. Gaskamp*, 280 F.3d at 1069, 1073 (5th Cir. 2002). As mentioned

above, Jack Brooks, as managing partner of Pinewood, executed an arbitration agreement as a part

of the AD Global Operating Agreement.  The arbitration provision provides that "[a]ny dispute, controversy or claim arising out of or relating to this Agreement shall be settled promptly by arbitration." All the Brooks Plaintiffs are bound by the arbitration clauses in the Operating and Contribution Agreements that effectuated the Strategy.  They all benefitted from the LLCs and the operating agreement.

Similarly, Glen Morgan signed the GWM and AD Balanced Operating Agreements which contained arbitration provisions providing that "[a]ny dispute, controversy or claim arising out of or relating to this Agreement shall be settled promptly by arbitration." Teri Morgan is bound by the arbitration provision because her claims derived from a contract signed by her husband.  *See Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 267 (5th Cir. 2004)(non-signatory wife forced to arbitrate where all her claims derived from a contract signed only by the signatory husband).

All of the operating agreements between the Brooks and Morgan Plaintiffs were signed by James Haber on behalf of DGI.  (DGI Ex. I, tabs 4 & 5)(DGI Ex. J, tabs 3, 5 & 6).  Certainly, DGI may take advantage of the arbitration agreements.  And although Mr. Haber did not sign the agreements in his personal capacity, he may still take advantage of the arbitration provisions.  Not only was Haber an agent of DGI, *see Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1360 (2d Cir. 1993)(noting that "employees or disclosed agents of an entity that is a party to an arbitration agreement are protected by that agreement"), but non-signatories to an arbitration agreement may also compel arbitration where principles of equitable estoppel apply. *See Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 528 (5th Cir. 2000)("although arbitration is a matter of contract and cannot, in general, be required for a matter involving an arbitration agreement non-signatory, a

32

signatory to that agreement cannot . . . on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory).

In addition to the operating agreements discussed above, the Contribution Agreements signed by Plaintiffs and by Mr. Haber on behalf of DGI incorporate by reference the terms of the AD Global and AD Balanced Operating Agreements, including the arbitration provision. "Under general principles of contract law, a contract may incorporate another document by making clear reference to it and describing it in such terms that its identity may be ascertained beyond doubt." *New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG,* 121 F.3d 24, 30 (2d Cir. 1997). The Contribution Agreements reference the incorporation of all of the terms of the LLC Operating Agreements.

Plaintiffs assert the arbitration provisions are invalid because the IRS invalidated the Agreements. The Court disagrees with this assertion for the following reasons. First, the Court has not located a case where an arbitration provision contained in similar agreements has been invalidated. Second, the Court has reason to assume the IRS never invalidated the Agreements. According to the DGI Defendants, the IRS Chief Counsel Notice CC-2003-020 relied upon by Plaintiffs, is a recommendation for assessing tax consequences, not a legal determination. Third, the Court agreed with the DGI Defendants that as a matter of substantive federal arbitration law, an arbitration provision contained in a contract is "severable from the remainder of the contract." *Buckeye Check Cashing v. Cardegna*, 126 S.Ct. 1204, 1209 (Feb. 21, 2006). Therefore, "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Id.*

The Court finds there is a valid agreement to arbitrate between the parties. The Court further finds the arbitration provision should be interpreted broadly, "particularly given the fact that the provision must be interpreted in the context of a strong judicial presumption favoring arbitration so that 'any doubt concerning the scope of arbitrable issues should be resolved in favor of arbitration. . . .'" *Amato*, 433 F.Supp2d 460, 487, *quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). In similar circumstances, including both the *Stechler* and *Keller* cases, courts have found that similar broad arbitration provisions encompass all the claims asserted by the plaintiffs. The Court is of the opinion Plaintiffs' claims against the DGI Defendants do "touch matters" covered by the parties' Agreements or "arise out of the creation of the" entities operated by the Agreements. *Stechler*, 382 F.Supp2d at 580.

Finding a valid agreement to arbitrate between the parties exists and that all of Plaintiffs' claims asserted against the DGI Defendants fall within the scope of the arbitration agreement, the Court recommends the DGI Defendants' motion to compel arbitration be **GRANTED**. The Court further recommends Plaintiffs' action against the DGI Defendants be stayed. The Court now turns to the issues remaining in the Lehman Defendants' motion.

## VII.

## WAIVER

### A.    Pertinent Facts

The Brooks and Morgan Plaintiffs entered into the Option Transactions in 1999 and 2000, respectively. (Compl. ¶¶ 78, 89). The Option Transactions were governed by the FX Terms and

Conditions Contract that Plaintiffs entered into with Lehman (the "Option Contracts"). (*Id.* ¶¶ 78, 89). On the same day that Plaintiffs entered into their Option Contracts (*Id.*), Plaintiffs signed letters. Specifically, the letters provide that:

> [T]he undersigned hereby represents and warrants to [Lehman Brothers] that the transactions were presented to [Lehman Brothers] on an unsolicited basis. . . .
>
> * * *
>
> The undersigned further acknowledges that (a) it has consulted with its own financial, tax and legal advisors with respect to the Transactions, (b) it has not relied on Lehman Brothers for any financial, tax or legal advice, with respect to the Transactions, and (c) it shall not have any claim against Lehman Brothers in the event of any tax liability, problem or issue should arise in connection with the Transactions, provided that this letter does not constitute a release with respect to the acts or omissions of Lehman Brothers in connection with the execution of Transactions.

(Lehman Ex. 3).

When the Morgan Plaintiffs entered into their Option Contracts, after the publication of IRS Notice 2000-44 which publicly scrutinized similar options strategies, they were placed on notice of the IRS's scrutiny of the Option Transactions through the express language in the letter. Their letter contained the following additional language: "[the undersigned has] consulted with [their] own financial, tax and legal advisors, with respect to the Transactions and IRS Notice 2000-44." (*Id.*).

**B.    Arguments**

Lehman asserts Plaintiffs are self proclaimed "successful business people" (Compl. ¶ 63) who knowingly signed the letters and entered into the Option Transactions after consulting first with their own financial, tax, and legal advisors. According to Lehman, the letters preclude Plaintiffs from bringing "any claim" against Lehman related to the Option Transactions and from relying on

Lehman for any "financial, tax or legal advice." Even if the Court were to disregard Plaintiffs' letters, Lehman asserts the fact that Plaintiffs also disclaimed "reli[ance] on Lehman Brothers for any financial, tax or legal advice" warrants, at the very least, dismissal of Plaintiffs' misrepresentation based claims for which reliance is an element as well as Plaintiffs' claims for breach of fiduciary duty, negligence, breach of contract, and declaratory judgment.

In response, Plaintiffs assert the Lehman Defendants' "waiver" argument fails for the following reasons: (1) the letters are limited solely to the "purchase and sale of the puts and calls on currencies" and do not apply to the broad-based conduct alleged in the complaint; (2) the letters were an instrumentality of the very fraud alleged in the complaint and should not provide the means for the Lehman Defendants to escape liability; (3) the letters are void and unenforceable; and (4) the Lehman Defendants should not be permitted to rely on the letters to escape liability because the Lehman Defendants intentionally failed to disclose highly relevant and material facts to the Plaintiffs before inducing them to sign the letters. In addition, Plaintiffs contend the letters do not and cannot rebut the allegations in the Complaint that the Plaintiffs reasonably relied on the Lehman Defendants' representations and omissions to their detriment.

## C.    Discussion

Plaintiffs assert the document containing the alleged release in this case, if valid at all, applies only to the Contribution Agreement. The Plaintiffs state they are not bringing any claims related to the DGI Defendants' performance under the Contribution Agreement, but rather assert claims relating to the DGI Defendants' actions in conspiring to defraud the Plaintiffs to enter into the Strategy.

36

The letters contain an exception solely for claims concerning execution of the underlying option transactions. Specifically, the letters state they do "not constitute a release with respect to the acts or omissions of Lehman Brothers in connection with the execution of Transactions." Relying on this language, the Lehman Defendants maintain Plaintiffs' asserted construction is nonsensical, because "actual execution" of the options transactions is the only conduct for which Plaintiffs *retained* the ability to sue; all other claims, including claims concerning "any tax liability, problem or issue" are barred.[5]

As noted above, Plaintiffs represent they are not bringing any claims related to the Lehman Defendants' performance in executing or implementing the "Transactions" (*i.e.*, the digital options themselves), but rather assert claims relating to the Lehman Defendants' actions in conspiring to defraud the Plaintiffs into participating in the Strategy. For example, the complaint alleges the following conduct on the part of the Lehman Defendants: (1) agreeing to act as a "Marketing Participant" "by introducing and recommending the [Strategy] to long-time clients who trusted them" (Compl. ¶¶ 32, 47); (2) accepting a $1.5 million fee from the Brooks Plaintiffs for the Lehman Defendants' "'investment' advice and analysis" in implementing the Strategy; (*Id.* ¶¶ 33, 57); (3) identifying "their clients, the Brooks Plaintiffs as a 'target'" (*Id.* ¶ 51); and (4) introducing and explaining the Strategy to the Brooks Plaintiffs. (*Id.* ¶ 58). This conduct relates to the Lehman Brothers' conduct in promoting, selling, and implementing the Strategy, conduct arguably broader than simply executing the Digital Options Contracts component of the Strategy.

The Court finds at this time the scope of the purported waiver is ambiguous. Based upon the

_____

[5] Lehman's reply at 5.

evidence currently before the Court, the Court is not convinced the language of the letters encompasses Plaintiffs' claims. This ambiguity creates a fact issue as to the parties' intent that is not capable of being resolved at this early stage of the litigation. *See, e.g., Alamo Title Co., Inc. v. Land Resources Corp.*, No. 04-02-00492-CV, 2003 WL 21010605 (Tex. App.– San Antonio 2003)(unpublished)(holding the language in the disclaimer was ambiguous, creating a fact issue as to the parties' intent). *Id.* at *2. The Lehman Defendants are not precluded from raising the issue at a later date, if so warranted.

The Lehman Defendants contend that even if the Court were to disregard Plaintiffs' waiver letters, the fact that Plaintiffs also disclaimed reliance on the Lehman Brothers for any financial, tax or legal advice warrants, at the very least, dismissal of their misrepresentation based claims for which reliance is an element." Aside from the fact that the complaint alleges that the Plaintiffs reasonably relied on the advice of the Lehman Defendants (Compl. ¶¶ 60, 61-62, 63), this "disclaimer," like the other provisions of the letters, is arguably limited and confined to financial, tax or legal advice "with respect to the Transactions." Again, there is an ambiguity as to whether this language extends to the allegations contained in this case.

Furthermore, the complaint alleges that the Lehman Defendants participated in a conspiracy to promote, sell, and implement the Strategy and that each of the conspirators acted pursuant to their scripted roles. (Compl. ¶¶ 47-55, 123-126). In furtherance of this alleged conspiracy, the Lehman Defendants allegedly provided direct advice and representations to Plaintiffs, and  they allegedly permitted the other defendants and Brown & Wood also to provide direct advice and representations to the Plaintiffs for the common goal of convincing Plaintiffs to participate in the Strategy.

Regardless of whether Plaintiffs disclaimed any reliance on the Lehman Defendants' direct advice and representations regarding the "Transactions," Plaintiffs assert the Lehman Defendants are accountable for all advice and representations provided to the Plaintiffs by any of the Lehman Defendants' co-conspirators. *Bentley v. Bunton*, 94 S.W.3d 561, 619 (Tex. 2002)(recognizing that "all members of a conspiracy are liable for their co-conspirators' wrongful acts...even if a co-conspirator's acts occurred before the conspiracy formed...[so] long as those acts are made in furtherance of the 'common goal' of the conspiracy").

The complaint alleges that Defendants and Brown & Wood provided tax and legal advice to Plaintiffs and that Plaintiffs repeatedly relied upon such advice to their detriment. This conduct is arguably attributable to the Lehman Defendants. Accordingly, assuming *arguendo* that Plaintiffs disclaimed reliance on the advice directly provided by the Lehman Defendants regarding the "Transactions," there is no basis to conclude at this time that the Plaintiffs disclaimed any reliance on the advice rendered by the other defendants and Brown & Wood.

For these reasons, the Court recommends this portion of the Lehman Defendants' motion be **DENIED WITHOUT PREJUDICE**.

## VIII.

### STANDING REGARDING BROOKS' PLAINTIFFS

A.    **Pertinent Facts**

On December 2, 1999, Jack Edwards Brooks, Kate Brooks Carroll, Kimberly Grace Brooks,

the JKK Trusts #1 and #2 and the Brooks' Children's Trust each executed, as Assignors, Assignment

and Novation Agreements, which assigned and transferred to Pinewood Trading Fund LP

("Pinewood"), their affiliated entity, all of their rights and obligations under the Option Contracts.

The Brooks' Assignment and Novation Agreements provided in pertinent part as follows:

> Each of Lehman, Assignor and Pinewood Trading Fund LP ("Assignee") agrees as
> follows:
>
> * * *
>
> 2. Assignor hereby transfers and assigns to Assignee all of Assignor's rights and
> obligations under the Options . . . and Assignee hereby accepts such transfer and
> assignment and assumes the obligations and is hereby substituted for Assignor under
> the Options in all respects. . . .
>
> 5. Completion of the aforementioned transfer and assignment and the assumption of
> the obligations by Assignee shall constitute a release of Assignor for the Obligations.

(Lehman Ex. 4).    On December 7, 2000, Pinewood entered into an identical Assignment and

Novation Agreement, Assignor, assigning and transferring to a non-party, AD Global FX Fund LLC

("AD Global"), all rights and obligations concerning the options that the Brooks Plaintiffs assigned

to Pinewood five days earlier.  (Lehman Ex. 5).  The options referenced in the Brooks Assignment

and Novation Agreements were governed by the Option Contracts with Lehman.  (Lehman Exs. 6-

7)("the following terms and conditions apply to all . . . option transactions in accounts with

Lehman.").

**B.      Discussion**

     The Lehman Defendants contend that Plaintiffs' claims against them should be dismissed

because Plaintiffs assigned all of their rights concerning the Options and therefore lack standing to

40

bring any of their claims against the Lehman Defendants.  As urged by Plaintiffs, the Assignment and Novation Agreements arguably assign only the Brooks Plaintiffs' rights with regard to the Digital Options Contracts (*i.e.* the "Transactions").  As discussed throughout the complaint, Plaintiffs' claims against the Lehman Defendants arise from the Lehman Defendants' role in conspiring to design, promote, sell, and implement the Strategy as a whole and not just the Digital Options Contracts and their related rights that were assigned to AD Global FX Fund LLC.  (Compl. ¶¶ 57-60, 111-121, 123-128, and 149-195).

Because the Brooks Plaintiffs' claims arguably arise from Defendants' acts and omissions separate and apart from the Digital Options Contracts, the Court cannot state to a certainty at this time that Plaintiffs do not have standing.  Therefore, the Court recommends Defendants' motions to dismiss Plaintiffs' claims for lack of standing be **DENIED WITHOUT PREJUDICE**.

## IX.

## LIMITATIONS

A.   **Pertinent Facts Alleged Relating to Brooks Plaintiffs**

On August 11, 1999, the Brooks Plaintiffs entered into a contract with the Lehman Defendants for the provision of "investment" advice and analysis. (Compl. ¶ 57).  In late November of 1999, the Individual Lehman Defendants flew to Texas and presented the Strategy to the Brooks Plaintiffs.  (*Id.* ¶ 58).  During this presentation, the Lehman Defendants insisted that (a) the Strategy was legal and (b) the Strategy was not a tax shelter for a number of reasons. (*Id.* ¶ 59).  The Brooks Plaintiffs agreed to implement the Strategy, and on November 29, 1999, these Plaintiffs entered into

the Digital Options Contracts with the Lehman Defendants. (*Id.* ¶ 78).

On December 27, 1999, the IRS issued Notice 1999-59, wherein the IRS stated that the purported losses arising from the Strategy wholly lacked economic substance. (*Id.* ¶ 94). Although the Brooks Plaintiffs had already begun their participation in the Strategy prior to this Notice, Defendants failed to advise the Brooks Plaintiffs about the significance of this Notice prior to their preparing and filing of their 1999 tax returns (*Id.* ¶ 112) filed in the Spring of 2000. Further, the Brown & Wood opinion letter on the alleged legality of the Strategy, received by the Brooks Plaintiffs in early 2000, failed to mention the existence of Notice 1999-59. (*Id.* ¶ 105).

In August of 2000, the IRS issued Notice 2000-44, specifically identifying the transaction marketed by the Lehman Defendants to the Brooks Plaintiffs. (*Id.* ¶¶ 96-97). Defendants failed to disclose this to the Brooks Plaintiffs. (*Id.* ¶¶ 98, 102).

In late 2001, the IRS offered the "Tax Amnesty Program" for those who had participated in tax strategies like the Strategy in this case. (*Id.* ¶ 117). On March 14, 2002, the Brown & Wood Defendants sent a letter to the Brooks Plaintiffs regarding the Amnesty Program. (*Id.* ¶ 118). Although the Lehman Defendants argue that the Brooks Plaintiffs had constructive notice at this point because of this offer of amnesty,[6] according to the complaint, the Brown & Wood letter did not tell the Plaintiffs to enroll in the Amnesty Program. (*Id.* ¶ 118). Brown & Wood stated they could not provide this advice and to seek such advice from the Plaintiffs' advisors. (*Id.*). Since the Lehman Defendants had previously told the Brooks Plaintiffs that the Strategy was legal and that the IRS had

---

[6] Lehman's mot. at 11.

previously ruled on its validity, the Brooks Plaintiffs did not believe the IRS Amnesty Program applied to them. "In any event, the Brooks Plaintiffs did as the Brown & Wood Defendants instructed," and sought the advice of their tax preparers who "confirmed their understanding" that the Strategy was, as previously reported by the Lehman Defendants and DGI, legal. (*Id.*). After this, the Brooks Plaintiffs did not participate in the Amnesty Program.

On August 19, 2003, the IRS sent a document request to the Brooks Plaintiffs. (*Id.* ¶ 120). Plaintiffs allege this letter was the Brooks Plaintiffs' first notice that Strategy they entered was of interest to the IRS. (*Id.*). The Brooks Plaintiffs immediately contacted the Lehman Defendants to inquire about the reason for this letter and for advice on how to respond. (*Id.*). The Lehman Defendants responded by giving a list of tax attorneys to the Plaintiffs as well as informing them that the DGI Defendants were fighting a Court order compelling DGI to disclose the names of their clients. (*Id.*). Following these disclosures, the Brooks Plaintiffs retained counsel to represent them with respect to the IRS documents request. (*Id.*).

On January 15, 2004, the Brooks Plaintiffs received Notices of Beginning of Administrative Proceedings from the IRS regarding their 1999 individual tax returns. (*Id.* ¶ 121). "This was the first notice that the Brooks Plaintiffs received that the Strategy they entered was being challenged by the IRS." (*Id.*). After retaining new tax and legal advisors and at substantial expense, the Brooks Plaintiffs discovered for the first time the fraudulent conduct by the Defendants and the illegality of the Strategy. (*Id.* ¶ 122). The Brooks Plaintiffs accepted a "settlement" offer put forth by the IRS in Notice 2000-46, issued on May 5, 2004. (*Id.* ¶ 136).

Plaintiffs assert, based on these events and the fraudulent concealment by the Defendants of

43

Notice 1999-59, Notice 2000-44, and the significance of the Amnesty Program, the earliest date of possible discovery by the Brooks Plaintiffs is January 15, 2004, when the Plaintiffs received the document request from the IRS. However, according to Plaintiffs, the earliest date of injury is not until after May 5, 2004, when the Brooks Plaintiffs "settled" with the IRS. Plaintiffs state because the Complaint was filed on August 19, 2005, both the earliest dates of discovery and injury are within the two-year period prior to suit being filed.

**B.    Pertinent Facts Alleged Relating to Morgan Plaintiffs**

It is alleged that unlike the Brooks Plaintiffs, Defendants actually promoted and implemented the Strategy for the Morgan Plaintiffs after Notices 1999-59 and 2000-44 were issued, stating that the Strategy was illegal, invalid, and an "abusive tax shelter."  (Compl. ¶ 101).  The Morgan Plaintiffs met with James Haber of DGI to discuss the Strategy in approximately October of 2000. (*Id.* ¶ 61).  During that meeting and in several subsequent meetings, Haber and the DGI Defendants told the Morgan Plaintiffs that the Strategy was legal, that the Strategy offered a "realistic" high possibility of profit, and that a major respected law firm, Brown & Wood, would provide them with an opinion on the legality of the Strategy under the Tax Code, which would provide absolute IRS penalty protection.  (*Id.*).  After the Morgan Plaintiffs agreed to implement the Strategy, the DGI Defendants referred these Plaintiffs to the Lehman Defendants, whom which the Morgan Plaintiffs entered into the Digital Options Contracts with on November 3, 2000. (*Id.* ¶ 89).

Although the IRS issued Notice 1999-59 (issued on December 27, 1999) and Notice 2000-44 (issued in August 2000) prior to the Morgan Plaintiffs engaging in the Strategy, none of the Defendants explained the significance of these Notices to the Plaintiffs. (*Id.* ¶¶ 94-95, 97).  The

Brown & Wood opinion letter, sent to the Morgan Plaintiffs in early 2001, states that both of the Notices do not apply to the Strategy and would not provide the IRS with any basis for denying the deductions of the loss sustained from the Strategy. (*Id.* ¶¶ 94, 97). The DGI Defendants failed to tell the Morgan Plaintiffs that the IRS had launched an investigation of DGI and requested DGI to disclose the identity of their clients that executed a Digital Options Strategy – all of which occurred before the Brown & Wood Defendants issued the legal opinion to the Morgan Plaintiffs, and before the Morgan Plaintiffs filed their tax return. (*Id.* ¶ 101). "Defendants did not disclose this important information to the Plaintiffs because the Defendants knew this information would result in the Plaintiffs refusing to participate in the Strategy." (*Id.*).

In late 2001, the IRS offered the "Tax Amnesty Program" for those who had participated in tax strategies like the Strategy in this case. (*Id.* ¶ 117). Defendants failed to advise the Morgan Plaintiffs to enter into the Amnesty Program. (*Id.* ¶ 119).     The Morgan Plaintiffs allege it was not until after they hired new tax and legal advisors that they discovered that the Defendants had induced them into a bogus tax transaction. (*Id.* ¶ 122).

Again, Plaintiffs assert the earliest date of injury is not until after May 5, 2004, when the Morgan Plaintiffs "settled" with the IRS. (*Id.* ¶ 136). Plaintiffs again assert because the Complaint was filed on August 19, 2005, the earliest date of injury is within the two-year period prior to suit being filed. Finally, Plaintiffs assert when exactly the Brooks Plaintiffs and the Morgan Plaintiffs "discovered" their injury, or even when that injury actually occurred, is a fact issue which should be resolved at trial and not in a motion to dismiss.

**C.     Discussion**

45

The Lehman Defendants argue that the Plaintiffs' claims for unjust enrichment, negligence, negligent misrepresentation, breach of contract, and civil conspiracy are time-barred by the applicable statute of limitations and, accordingly, should be dismissed.  In general, the Lehman Defendants assert, if Plaintiffs had a claim, they were well aware of it long before they settled with the IRS on May 5, 2004.

Texas law governs the timeliness of Plaintiffs' claims.  *See Metro. Life Ins. Co. v. Dent*, 2003 WL 292161, *1 (N.D. Tex. 2003)(Texas applies its own statute of limitations, regardless of what state's substantive law applies.).  In Texas, claims for unjust enrichment, negligence, negligent misrepresentation, and civil conspiracy are subject to a two year statute of limitations.  *See Cont'l Cas. Co. v. Dr. Pepper Bottling Co. of Texas, Inc.*, 2005 WL 440395, *3 (N.D. Tex. 2005)(unjust enrichment); *Internet Corporativo S.A. de C.V. v. Bus. Software Alliance, Inc.*, 2004 WL 3331843, *11 (S.D. Tex. 2004)(negligence); *Kansa Reinsurance Co., Ltd. v. Cong. Mortgage Corp. of Texas*, 20 F.3d 1362, 1369-71 (5th Cir. 1994)(negligent misrepresentation); *Jackson v. W. Telemarketing Corp. Outbound*, 245 F.3d 518, 523 (5th Cir. 2001)(civil conspiracy).  Claims for breach of the duty of good faith and fair dealing, fraud, and breach of fiduciary duty are subject to a four year statute of limitations.  *See Kansa*, 20 F.3d at 1369-71 (breach of contract and fraud); *Yazdchi v. Wash. Mut.*, 2005 WL 2276886, *2 (Tex. App. – Houston [14th Dist.] 2005, no pet.)(breach of fiduciary duty).

Absent special circumstances, "a cause of action accrues when a wrongful act causes some legal injury, even if the fact of injury or the extent of actual damage is not discovered until later." *Cont'l Cas. Co.*, 2005 WL 440395 at *3.  As a general matter, in considering a Rule 12(b)(6) motion to dismiss, where the issue of limitations requires a determination of when a claim begins to accrue,

the complaint should be dismissed only if the evidence is so clear that there is no genuine factual issue and the determination can be made as a matter of law. *Askanese v. Fatjo*, 828 F. Supp. 465, 469 (S.D. Tex. 1993).

The Lehman Defendants contend that the Plaintiffs' claims accrued when the Plaintiffs executed their Digital Options Contract, namely "on or about November 29, 1999." The Lehman Defendants rely on, among other cases, *Hillcrest Equities, Inc. v. Thornton*, 1999 WL 621994 (Tex. App. – Dallas 1999)(unpublished). In *Hillcrest*, Hillcrest asserted the trial court erred in granting summary judgment to appellees on all of Hillcrest's claims. The court of appeals affirmed the trial court's judgment with respect to Hillcrest's claims for negligence, DTPA Violations, breach of contract, and breach of fiduciary duty, concluding those claims were time barred. *Id.* at *1. Although Hillcrest plead the discovery rule in response to the motion for summary judgment, Hillcrest did not specifically address the discovery rule on appeal. The appeals court, in a footnote, assumed the discovery rule applied and concluded as follows:

> summary judgment evidence conclusively established Hillcrest should have discovered Grant Thornton's allegedly wrongful conduct approximately seven years before it filed this suit. The 1985 draft petition indicates that Hillcrest was aware that the trades it relied on Grant Thornton to verify may not have occurred. It also establishes that Hillcrest was aware that it had a cause of action against Grant Thornton for not verifying the trades. The petition further recognizes that Hillcrest may sustain 'substantial monetary damages in an amount not presently determined.' There is no requirement that Hillcrest's damages be finally established or the inevitable consequence of the wrongful conduct exist before a cause of action accrues. *See Zidell*, 692 S.W.2d at 557. The summary judgment record is clear that Hillcrest was on notice of facts at least by May of 1985 that would cause a reasonably prudent person to make inquiry that would lead to the discovery of the cause of action. *See Hoover*, 835 S.W.2d at 671. The record is devoid of any evidence suggesting that Hillcrest exercised due diligence in determining whether the trades did in fact take place or whether Grant Thornton properly verified the trades.

*Hillcrest*, 1999 WL 621994 at *6, n.4.

Here, unlike the situation in *Hillcrest*, the Lehman Defendants have not moved for summary judgment based on limitations. Rather, the Lehman Defendants have filed a motion to dismiss in the early stages of this litigation. The discovery deadline is not until February 16, 2007. The issue of whether certain claims are time-barred is best considered in the context of a motion for summary judgment with the benefit of evidence. In sum, Defendants have not convinced the Court at this time that Plaintiffs' claims for unjust enrichment, negligence, negligent misrepresentation, breach of contract, and civil conspiracy are time-barred by the applicable statute of limitations. The Court recommends this portion of the Lehman Defendants' motion be **DENIED WITHOUT PREJUDICE**.

## X.

### FAILURE TO PLEAD WITH SPECIFICITY

Claims three (breach of fiduciary duty), four (fraud), six (negligent misrepresentation) of Plaintiffs' complaint are fraud or fraud-like. Therefore, Plaintiffs face a heightened pleading requirement under FED. R. CIV. P. 9(b) for these claims. Rule 9(b) is to read in harmony with the simplified notice pleading provisions of Rule 8. *See Cayman Exploration Corp. v. United Gas Pipe Line*, 873 F.2d 1357, 1362 (10th Cir. 1989). To plead a fraud claim, a plaintiff must describe the "time, place and content of the false representations as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." *Williams v. WMX Tech., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997). Plaintiffs must set forth the "who, what, where, and when" of the alleged fraud in order to satisfy Rule 9(b). *See VNA Plus, Inc. v. Apria Healthcare Group, Inc.*, 29 F.Supp.2d

48

1253, 1258 (D. Kan. 1998).

Plaintiffs allege Defendants owed a duty to disclose information to Plaintiffs. Plaintiffs further allege Defendants failed to inform the Plaintiffs of material facts of which they were aware and on which the Plaintiffs would rely in making their decision on whether to engage in the Strategy and on how to subsequently deal with the ramifications of their participation in the Strategy. (Compl. ¶¶ 36, 64, 94-95, 97-98, 101-02, 111, 113, 115, 117, 119, 156 (fraud) & 174 (negligent misrepresentation). In addition, Plaintiffs allege Defendants made numerous knowingly false affirmative representations in order to induce them into paying them substantial fees. (*Id.* ¶ 156).

Additionally, Plaintiffs allege in their complaint numerous misrepresentations and omissions made by the other defendants and Brown & Wood in furtherance of the alleged conspiracy. Plaintiffs contend the Lehman Defendants are liable for any actions taken by its co-conspirators (Brown & Wood, DGI, and Alpha) in furtherance of the conspiracy, including the numerous misrepresentations and omissions made by these defendants and other participants as alleged throughout the complaint. (Compl. ¶¶ 36, 61-62, 64-65, 69, 71-73, 94-95, 97-102, 104-05, 107-08, 111, 113, 115, 117, 119, 156 & 174). Examples of these misrepresentations include the DGI Defendants stating that the Strategy was legal, that there was a chance of making a substantial profit, and that the Brown & Wood opinion letter would protect the Plaintiffs from IRS penalties. (*Id.* ¶61). Brown & Wood allegedly made numerous misrepresentations and omissions in their opinion letter to the Morgan Plaintiffs, including that Notices 1999-59 and 2000-44 did not apply to the Morgan Plaintiffs' Strategy. (*Id.* ¶¶ 108, 156 & 174). As a co-conspirator of these participants, Plaintiffs assert the Lehman Defendants are responsible for these alleged misrepresentations and omissions.

The Lehman Defendants contend Plaintiffs have failed to meet the pleading requirements of FED. R. CIV. P. 9(b). The Court, having reviewed the complaint, agrees Plaintiffs have failed to make the fraud and fraud-like allegations with the required level of particularity. For example, in ¶ 150, regarding breach of fiduciary duty, ¶ 156, regarding fraud, and ¶¶ 173-74, regarding negligent misrepresentation, Plaintiffs fail to specify what alleged affirmative misrepresentations are attributed to which Defendants. Throughout the complaint, Plaintiffs lump the Lehman Defendants together with non-parties and the other defendants against whom Plaintiffs assert various claims. (Compl. ¶¶ 64-65, 69, 71-73, 83,94-95, 97-99, 100-01, 105, 108, 111-119). Throughout these claims, Plaintiffs broadly refer to "Defendants." Plaintiffs should avoid attributing actions to Defendants collectively. When not possible, Plaintiffs should offer an explanation as to why that is the case.[7]

"General allegations, which lump all defendants together failing to segregate the alleged wrongdoing of one from those of another, do not meet the requirements of Rule 9(b)." *Kunzweiler v. Zero.Net, Inc.*, 2002 WL 1461732, *15, n. 17 (N.D. Tex. 2002)(unpublished). In order for the Lehman Defendants to be able to frame a responsive pleading, Plaintiffs must allege particular facts against a particular defendant or group of defendants. Every defendant cannot have committed every action in the complaint. There is no page limitation for complaints in federal court for a reason. The Lehman Defendants need more specificity in order to know what exactly is being asserted against them individually. The Court recommends this portion of the Lehman Defendants' motion be **DENIED WITHOUT PREJUDICE**. If this portion of the Report and Recommendation is ultimately adopted by the District Judge, Plaintiffs shall replead with specificity claims three (breach

---

[7] The Court appreciates Plaintiffs' assertion that they cannot specify the specific location or time of occurrence of alleged material omissions.

of fiduciary duty), four (fraud), and six (negligent misrepresentation) of Plaintiffs' complaint. This shall be done within thirty days from the date of the Order Adopting this Report and Recommendation.

## XI.

## FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

### A.     Applicable Standards

FED. R. CIV. P. 12(b)(6) authorizes a dismissal of a complaint for "failure to state a claim upon which relief can be granted." A 12(b)(6) motion should be granted only if it appears beyond doubt that the plaintiff could prove no set of facts in support of his claim that would entitle him to relief. *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Before dismissal is granted, the court must accept all well-pleaded facts as true and view them in the light most favorable to the nonmovant. *Capital Parks, Inc. v. Southeastern Advertising and Sales Sys., Inc.*, 30 F.3d 627, 629 (5th Cir.1994). A court need not, however, accept as true allegations that are conclusory in nature. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir.1982).

Rule 12(b)(6) "must be read in conjunction with Rule 8(a), which sets forth the requirements for pleading a claim in federal court and calls for 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Buerger*, 982 F.Supp. at 1250 (quoting 5A Charles A. Wright & Arthus R. Miller, Federal Practice And Procedure § 1356 (1969)). "A plaintiff's complaint ordinarily need only be a short and plain statement that gives the defendant notice of what the claim is and the grounds upon which it rests." *Colle v. Brazos County*, 981 F.2d 237, 243 (5th Cir.1993). "However, 'the complaint must contain either direct allegations on every material point necessary

to sustain a recovery . . . or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial.'" *Campbell v. City of San Antonio*, 43 F.3d 873, 975 (5th Cir. 1995)(quoting 3 Charles Alan Wright & Arthur R. Miller, Federal Practice And Procedure: Civil 2d § 1216 at 156-159). The central purpose of Rule 8(a) is to give the defendant fair notice of what claim is being asserted against him so he can make an adequate response.

**B.     Discussion**

As for Plaintiffs' remaining claims, the majority of the Lehman Defendants' arguments generally relate to the lack of essential allegations to support the claims. Because the Court will allow Plaintiffs to replead if they so desire, the Court will not address at this time the Lehman Defendants' arguments concerning insufficient pleading. The Court recommends the Lehman Defendants' motions to dismiss for failure to state a claim upon which relief can be granted be **DENIED WITHOUT PREJUDICE**.

**XII.**

**RECOMMENDATIONS**

Based on the foregoing, it is

**RECOMMENDED** that the DGI Defendants' Motion to Dismiss for Lack of Jurisdiction, Stay Proceedings and Compel Arbitration, or, in the Alternative, Dismiss the Complaint for Failure to State a Claim Upon Which Relief May be Granted (Docket Entry # 12) be **GRANTED**. It is

further

**RECOMMENDED** that Plaintiffs be ordered to arbitrate their claims against the DGI Defendants. It is further

**RECOMMENDED** that Plaintiffs' above-entitled and numbered cause of action against the DGI Defendants be stayed.  It is further

**RECOMMENDED** that the Lehman Defendants' Motion to Dismiss (Docket Entry # 7) be **GRANTED** as to the Morgan Plaintiffs' claims against the Individual Lehman Defendants and **DENIED WITHOUT PREJUDICE** as to the remainder of Lehman's motion.  It is further

**RECOMMENDED** that the Morgan Plaintiffs' claims against Bruce Brier, Kevin Connor, Kevin Kemp, and Mark Stevenson be **DISMISSED WITHOUT PREJUDICE**. It is further

**RECOMMENDED** Plaintiffs  replead with specificity claims three (breach of fiduciary duty), four (fraud), and six (negligent misrepresentation) of Plaintiffs' complaint. The amended complaint shall be filed within 30 days of the filing date of the Order Adopting, if any, of this Report and Recommendation.

The parties shall file any objections to this Report and Recommendation on or before September 15, 2006.  The Court will not consider any extensions of time in which to file objections.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual

findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**SIGNED this 24th day of August, 2006.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 2

2 of 2 DOCUMENTS

Copyright 2000 Factiva, a Dow Jones and Reuters Company
All Rights Reserved

# Dow Jones Factiva

(Copyright (c) 2000, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL.

The Wall Street Journal

August 11, 2000 Friday

**SECTION:** ECONOMY; Pg. A2

**LENGTH:** 669 words

**HEADLINE:** Treasury Moves to Squash Tax-Shelter Schemes

**BYLINE:** By John D. McKinnon, Staff Reporter of The Wall Street Journal

**BODY:**

WASHINGTON -- Less than a year after shutting down a highly aggressive tax shelter known as "BOSS," the Treasury Department is taking emergency action against a similar scheme officials are calling "Son of BOSS."

The department also is taking steps to broaden its existing campaign against abusive tax-shelter schemes. In new rules, it will require promoters to start keeping lists of individual wealthy clients they sell schemes to so Internal Revenue Service agents can check up on their use. Both actions are expected to be taken today.

Like the original BOSS -- an acronym for "bond and option sales strategy" -- the new shelter scheme involves a series of highly contrived financial transactions aimed at generating a big capital loss for high net worth individuals.

Specifically, the new transaction depends on manipulation of tax rules to inflate an asset's cost for tax purposes, known as its "basis." Then the taxpayer can sell the asset at a big loss, without actually taking a financial hit. BOSS -- shut down by a Treasury announcement in December -- was itself a spinoff of an earlier scheme that worked on the same principle.

Treasury Secretary Lawrence Summers said the newest variant shows the need for comprehensive antishelter legislation that the Clinton administration has proposed -- so far unsuccessfully.

"This particular shelter points up the need for more comprehensive approaches, so we're in a position to act preventively rather than -- as in this case -- after the fact," Mr. Summers said in a conference call with reporters.

Thanks to lax enforcement and other causes, tax shelters have become a huge business for professional advisers, including Big Five accounting firms. The shelters the government already has closed in the past few years would have cost the Treasury $50 billion to $60 billion over 10 years, officials estimate. Even with the government's recent attacks on the problem, some experts reckon the shelter industry might be costing as much as $10 billion a year, although some spokesmen for accounting firms say that figure is exaggerated.

Treasury Moves to Squash Tax-Shelter Schemes The Wall Street Journal August 11, 2000 Friday

Treasury officials said they believe the latest schemes were being marketed by "one or two Big Five firms and others." They declined to identify the firms they think are involved, though, saying their information was incomplete. Variations on the BOSS transaction have been marketed by several firms. Its marketing materials were leaked to the Treasury late last year.

The newest shelters rely on an anomaly in the tax rules for partnerships.

In one version, a taxpayer takes out a loan for, say, $3,000. Under terms of the loan, the taxpayer has to pay back only $2,000, but at a very high interest rate, so the taxpayer is still effectively paying back just as much as under a normal loan.

The taxpayer takes the $3,000 in cash, plus the $2,000 liability, and puts them both in a partnership. Under the partnership basis rules, the taxpayer claims to have a $1,000 basis in the partnership. Then, when the taxpayer sells the partnership interest for next to nothing, the taxpayer claims a loss.

Treasury's announcement will say that the losses are artificial and won't be allowed.

For the first time, Treasury officials also are threatening criminal penalties for a strategy they suspect is being used in conjunction with the latest shelter: a scheme to launder tax-shelter benefits through so-called grantor trusts.

Grantor trusts, unlike many other types of trusts, continue to be controlled by their individual creators. Taxpayers who use them are supposed to provide detailed disclosure on their tax returns of the transactions that take place in them. Instead, Treasury officials say, some shelter promoters are advising clients to use the trusts to conduct shelter transactions, without disclosing specifics.

"This is clearly contrary" to the rules, one Treasury official said. Taxpayers who willfully conceal use of shelters through grantor trusts "might be subject to criminal penalties, as well as their advisers," the official said.

**NOTES:**
PUBLISHER: Dow Jones & Company

**LOAD-DATE:** December 5, 2004

# EXHIBIT 3

1 of 1 DOCUMENT

Copyright 2000 Crain Communications Inc.
Investment News

September 25, 2000, Monday

**SECTION:** Pg. 16

**LENGTH:** 724 words

**HEADLINE:** TAX WATCH: The IRS attacks more tax shelters

**BYLINE:** Mark Battersby

**BODY:**

The Internal Revenue Service is continuing its offensive against tax shelters.

Last year it attacked arrangements applying the rules concerning corporate distributions of encumbered property to create artificially high bases in the corporate stock that, in turn, produced deductible losses on the later disposition of the stock by shareholders.

Now the IRS has identified similar arrangements, involving partnership interests, which create artificially high bases resulting in deductible losses on the later disposition of the interests by the partners.

In one version of the partnership variation of the corporate tax shelter, a taxpayer borrows at a premium and contributes the cash to a partnership, and the partnership assumes liability for the debt.

To illustrate, the taxpayer may receive $3,000 in cash under a loan agreement that provides an inflated stated rate of interest and a stated principal of only $2,000. The taxpayer contributes the $3,000 to a partnership, and the partnership assumes the debt. The taxpayer later sells the partnership interest.

The partner takes the position that his basis in the partnership interest is $1,000. To support that position, he argues that the amount of the liability that the partnership has assumed is $2,000 so that, under the tax rules, his basis in his partnership interest should be reduced by $1,000.

The partner can sell his partnership interest for a nominal amount and claim a $1,000 capital loss.

In another variation, offsetting assets and liabilities also are present, but the taxpayer takes the position that the partnership has not assumed any liability.

The taxpayer purchases a call option and simultaneously writes an offsetting call option. The taxpayer then contributes both options to a partnership. The partner takes the position that his basis in the partnership interest is the same as his positive basis in the purchased call option, unreduced by the liability associated with the written call option. That is, the partner takes the position that the partnership did not assume any liability when it took responsibility for the written call option. The partner uses this artificially high basis to claim a capital loss on the sale of his partnership interest.

The IRS emphasizes that the purported losses do not represent bona fide losses reflecting actual economic

TAX WATCH: The IRS attacks more tax shelters Investment News September 25, 2000, Monday

consequences as required for a deduction.

The agency says that penalties may be imposed on participants in that type of transaction - or on those that promote or report them. And, also according to the IRS, those transactions are considered "listed" transactions for purposes of the tax shelter registration requirements.

The IRS also notes that some persons who have promoted that type of transaction have encouraged individuals to participate in them as a way to avoid reporting large capital gains from unrelated transactions. The promoters have apparently recommended that the individuals use grantor trusts to participate and to use the same grantor trusts to realize the capital gains.

Notice 2000-44

IRS takes a stance

on slavery claims

Internal Revenue Service centers across the country have reportedly received a number of refund claims involving "slavery reparation" credits.

Some African-Americans have apparently been misled to believe that they could file tax claims with the IRS for such reparations.

Compounding the misunderstanding, the IRS seemingly has been making refunds based on these unfounded claims.

In a recent service center advisory, the IRS concludes that when a tax credit is claimed for reparations and a refund is not made, the credit should be reversed on the grounds that the deemed-paid provisions do not apply.

If a refund is made, the overstated credit should be summarily assessed under the assessment authority rules (Section 6201).

Citing the congressional committee reports that accompanied Section 6201 when it was enacted, the IRS notes that it already has the authority to administratively reverse overstated withholding credits except when it has made a refund or applied a credit.

Thus, the IRS concludes, it does not need to resort to a summary assessment when a refund has not been made. Rather, reversal is the preferred remedy as it is the most efficient in terms of resources.

SCA 200034028

**LOAD-DATE:** September 29, 2000