**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LESLIE J. LEFF and RONNIE H. LEFF, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO.: 08-CV-733 |
| | ) | |
| DEUTSCHE BANK AG, ET AL., | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendants Deutsche Bank AG and Deutsche Bank Securities Inc. have moved for a stay of this action pending arbitration [49]. The motion presents a challenging issue on which the parties have provided comprehensive briefing that very ably sets forth their positions. For the following reasons, the Court grants Defendants' motion.

**I.  Background**

Plaintiffs Leslie and Ronnie Leff sought to avoid tax liability over the course of several years by engaging in a series of tax strategies. According to the complaint, after Plaintiffs were approached by a financial advisor in Atlanta, they entered into a series of transactions that resulted in claimed tax losses for the 1998 tax year. The following year, the law firm of Jenkens & Gilchrist contacted Plaintiffs regarding another tax strategy involving foreign currency digital options (the "Currency Options Brings Rewards Alternative" or "COBRA" strategy).[1] Plaintiffs allege that Jenkens & Gilchrist, along with Deutsche Bank, represented to Plaintiffs that COBRA

---

[1] A digital foreign currency option is an "all-or-nothing option," which pays affixed amount when the optioned currency falls below (or exceeds) a preset strike price. See *Denney v. BDO Seidman, LLP*, 412 F.3d 58, 61 (2d Cir. 2005).

involved legitimate transactions that had a substantial economic purpose as well as potential tax benefits. Plaintiffs implemented the COBRA strategy in late 1999 and, after receiving opinion letters from Jenkens & Gilchrist confirming the propriety of the strategy, claimed losses generated from engaging in that strategy on their tax returns for the 1999 tax year.

In 2000, Plaintiffs again sought to reduce their tax obligations. Bricolage Capital LLC, Deutsche Bank, and Counterpoint Capital, LLC and Delta Currency Trading (affiliates of Bricolage) presented Plaintiffs with the Personal Investment Corporation strategy (the "PICO" strategy), in which Plaintiffs agreed to participate. The IRS eventually audited Plaintiffs and assessed taxes, interest, and penalties resulting from the losses claimed related to the COBRA and PICO strategies.

In February 2008, Plaintiffs filed this lawsuit against the Deutsche Bank Defendants. Plaintiffs allege that Deutsche Bank, along with Jenkens & Gilchrist, Bricolage, Counterpoint, and Delta, developed, marketed, and implemented the COBRA and PICO strategies for Plaintiffs and other taxpayers in order to generate fees. See Compl. ¶ 81 ("Deutsche Bank recruited other entities to assist in marketing tax shelters generally, and COBRA and PICO specifically, to wealthy clients and others (in return for a substantial volume of tax preparation business and undisclosed fees). In turn, other entities recruited others in marketing the tax shelters to other clients. As a result of these arrangements, Defendants, along with the other entities, generated millions of dollars.").

Plaintiffs claim that they were induced by Deutsche Bank and others into entering several agreements with Counterpoint and Delta as part of the PICO strategy. Plaintiffs each executed a

2

Strategic Consulting and Investment Advisory Agreement with Counterpoint ("Counterpoint Consulting Agreement"), an Investment Management Agreement with Counterpoint ("Counterpoint Investment Management Agreement"), a Currency Consulting and U.S. Government and Agency Securities Trading Agreement with Delta ("Delta Consulting Agreement"), and a Currency Management and U.S. Government Agency Securities Trading Authorization Agreement with Delta ("Delta Currency Management Agreement"). Pursuant to these agreements, Plaintiffs authorized Counterpoint and Delta to provide the services necessary to implement the PICO strategy.

As set forth by Plaintiffs in the complaint, "Deutsche Bank's responsibility was to execute trades and maintain accounts [and] was engaged to hold the custodial account for the S corporation." Compl. ¶ 76. Some of the agreements make reference to Deutsche Bank's role in implementing Plaintiffs' PICO strategies. For example, the Counterpoint Investment Management Agreement states that "the Client desires to retain the services of the Manager to provide currency and securities management and trading services in respect of all cash, securities, currencies and over the counter forward, swap and option contracts in the account ('Account') established by the Client in the custody of a broker-dealer or bank custodian selected by the Client." Similarly, the Delta Currency Management Agreement states that "the Client desires to retain the services of the Manager to provide currency, U.S. government and agency securities management and trading services in respect of all cash, securities, currencies and over-the-counter forward, swap and options contracts in the account ("Account") established by the Client in the custody of a broker-dealer or bank custodian selected by the Client."

3

The agreements into which Plaintiffs entered with Counterpoint and Delta contain the following arbitration provision:

> Any controversy arising out of or relating to this Agreement or the breach thereof, shall be settled by arbitration conducted in New York, New York in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any arbitration hereunder shall be before at least three arbitrators and a decision of a majority of them shall be final and binding. Any judgment upon the award rendered may be entered in any court, state or federal, having jurisdiction.

Counterpoint Consulting Agreements ¶ 8.7; Counterpoint Investment Management Agreements ¶ 17; Delta Consulting Agreements ¶ 7.8; Delta Currency Management Agreements ¶ 17. Deutsche Bank is not a party to these agreements.

On February 4, 2008, Plaintiffs brought their Complaint against Deutsche Bank in this Court. On April 28, 2008, Deutsche Bank filed a motion to dismiss Plaintiffs' complaint. After the parties exchanged initial disclosures pursuant to Rule 26(a) of the Federal Rules of Civil Procedure, Plaintiffs produced the Counterpoint and Delta agreements with the relevant arbitration provisions. According to Plaintiffs, they produced the agreements containing the arbitration provisions on June 17, 2008. Defendants filed the instant motion to compel arbitration on October 29, 2008.

**II.     Discussion**

Defendants contend that this Court should refer Plaintiffs' claims to arbitration under the Federal Arbitration Act ("FAA") because the Counterpoint and Delta agreements contain valid arbitration provisions, which bind Plaintiffs, and which Deutsche Bank, although a non-signatory, is entitled to enforce under principles of equitable estoppel and agency. In response, Plaintiffs argue that (i) Deutsche Bank has waived any potential right to arbitration by actively

4

participating in this litigation prior to demanding arbitration and (ii) Deutsche Bank has not met the standards to compel arbitration under equitable estoppel and/or agency law.

### A. Waiver

"[W]aiver is not lightly inferred; the strong federal policy favoring enforcement of arbitration agreements impresses upon a party asserting waiver a heavy burden." *Williams v. Katten, Muchin & Zavis*, 837 F. Supp. 1430, 1442 (N.D. Ill. 1993); see also *Dickinson v. Heinold Secs., Inc.*, 661 F.2d 638, 641 (7th Cir. 1981) ("a waiver of arbitration is not lightly to be inferred"). Plaintiffs contend that Deutsche Bank waived its right to seek arbitration by engaging in this litigation – specifically, by (i) filing a motion to dismiss and engaging in court proceedings, (ii) engaging in "extensive discovery," and (iii) failing to seek arbitration with sufficient alacrity.

Although it is a factor to consider in determining whether a party has waived its right to arbitration, "simply moving to dismiss a case does not waive one's right to arbitrate." *Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 562 (7th Cir. 2008); see also *Sharif v. Wellness Int'l Network, Ltd.*, 376 F.3d 720, 726 (7th Cir. 2004) ("it is well-established that a party does not waive its right to arbitrate merely by filing a motion to dismiss"). In this instance, Defendants moved to dismiss prior to receiving the discovery that alerted them to the arbitration agreements. It was not an unreasonable first step in this litigation to move to dismiss, particularly before Deutsche Bank knew that it had a basis on which to attempt to arbitrate.[2]

---

[2] Plaintiffs point to another tax shelter case filed in this district around the same time, in which Deutsche Bank expressly reserved its right to move to compel arbitration in the motion to dismiss filed in that case. See *Vadevoulis v. Deutsche Bank AG*, No. 08 C 1251 (N.D. Ill.). However, the arbitration agreements in *Vadevoulis* were contained in the agreements that the plaintiffs entered into with Deutsche Bank; thus, unlike the circumstances presented in this case, Deutsche Bank had possession of the agreements at the outset of the litigation.

Likewise, "[e]ngaging in discovery will not necessarily result in waiver of arbitration rights * * * * Where discovery is limited, causing a minimal financial outlay, or where the type of discovery will not materially affect the arbitration, prejudice has not been found." *Williams*, 837 F. Supp. at 1442 (citations omitted); see also *Wilson Sporting Goods Co. v. Penn Partners*, 2004 WL 2033063 (N.D. Ill. Aug. 31, 2004) (finding "limited discovery" not to be inconsistent with right to arbitrate, and only finding waiver where active participation in discovery was coupled with delay indicative of forum shopping). In this case, the discovery to date has consisted solely of written discovery that was initiated at Plaintiffs' request and over Deutsche Bank's initial objection. Deutsche Bank consistently has maintained that the threshold issues – such as its motion to dismiss and now its motion to compel arbitration – should be decided first, before the parties engage in discovery. Moreover, the parties would not be required to "start over again in arbitration," as suggested by Plaintiffs (see Pls. Resp. at 10); rather, it is likely that much of the discovery that has taken place will be as useful in arbitration as it would be in litigation, and thus it seems unlikely that the efforts expended to date in this suit will have been wasted.

Finally, as mentioned above, Deutsche Bank maintains that it did not possess the agreements that contain the arbitration clauses until Plaintiffs produced them in this action in June of 2008 and that it did not realize that those agreements contained arbitration provisions until one of its attorneys discovered them during a document review in mid-October. Twelve days after Defendants became aware of the arbitration agreements, Deutsche Bank moved to compel arbitration.

Examining the circumstances of this particular case, the Court cannot find that Deutsche Bank engaged in the type of dilatory conduct that constitutes a waiver. See *St. Mary's Med. Ctr.*

*of Evansville, Inc. v. Disco Aluminum Prods. Co.*, 969 F.2d 585, 588 (7th Cir. 1992) (finding "[n]o rigid rule" in regard to what constitutes waiver of the right to arbitrate and directing courts to examine the circumstances of each particular case to determine whether the party seeking arbitration has acted inconsistently with the right to arbitrate). Although Plaintiffs have cited several cases in which courts have found that parties waived the right to arbitrate, the circumstances supporting such a result are not present here. To be sure, ideally Deutsche Bank would have raised the arbitration issue earlier in the case. Nevertheless, in contrast to the cases on which Plaintiffs rely, Deutsche Bank did not have in its possession copies of the Agreements containing the arbitration provisions at the time that Plaintiffs' complaint was filed; Defendants have not filed an answer failing to raise a defense of arbitration; no imminent pre-trial or trial dates (or any other dates governing the litigation) have been set by this Court; and Deutsche Bank has not engaged in forum shopping by moving to compel arbitration only after an adverse ruling on its motion to dismiss. Because a finding of waiver in this case is not warranted, the Court will address the merits of Defendants' motion to compel arbitration.

### B. Equitable Estoppel

In determining whether a dispute is arbitrable, a court first must decide whether a valid arbitration agreement exists between the parties, and, if so, whether the dispute falls within the scope of the arbitration agreement. See, *e.g.*, *Affymax, Inc. v. Johnson & Johnson*, 420 F. Supp. 2d 876, 879 (N.D. Ill. 2006). Defendants contend that Plaintiffs' claims are referable to arbitration under the Federal Arbitration Act because (i) the Counterpoint and Delta Agreements contain valid agreements to arbitrate, which bind Plaintiffs, and which Deutsche Bank, a non-signatory, is entitled to enforce under principles of equitable estoppel and agency, and (ii) Plaintiffs' claims fall within the scope of those arbitration clauses.

7

There is no dispute that Plaintiffs Leslie and Ronnie Leff both entered into and signed the Counterpoint Consulting Agreement. As signatories, Plaintiffs are bound by the Agreement's mandatory arbitration provisions. Additionally, although Plaintiffs did not personally sign the Counterpoint Investment Management Agreement and the Delta Consulting and Currency Management Agreements, Plaintiffs entered into those agreements in the names of entities that Plaintiffs created to implement the PICO strategy. A non-signatory is estopped from denying its obligation to arbitrate when it receives a direct benefit from a contract containing an arbitration clause. See *Int'l Ins. Agency Servs., LLC v. Revios Reinsurance U.S., Inc.*, 2007 WL 951943, at *3 (N.D. Ill. Mar. 27, 2007). Here, Plaintiffs entered into the agreements in order to enjoy purported tax benefits resulting from implementing the PICO strategy, which required Plaintiffs to form the S corporations and enter into the agreements with Counterpoint and Delta. Because Plaintiffs were to benefit personally from the Counterpoint and Delta agreements, principles of equitable estoppel dictate that Plaintiffs should be bound by the arbitration provisions in those same agreements.

However, the question remains whether non-signatory Deutsche Bank can compel arbitration based on those same provisions. Non-signatories to an arbitration agreement may enforce the agreement's arbitration provisions in certain circumstances under the doctrine of equitable estoppel. As other courts in this district have held:

> equitable estoppel allows a non-signatory to compel arbitration in two distinct circumstances. First, equitable estoppel applies when the signatory "must rely on the terms of the written agreement in asserting its claim" against a non-signatory. Thus, "[w]hen each of a signatory's claims against a non-signatory 'makes reference to' or 'presumes the existence of' the written agreement, the signatory's claims arise out of and relate directly to the written agreement and arbitration is appropriate." Second, equitable estoppel also applies "when the signatory raises allegations of * * * substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract."

*Hoffman v. Deloitte & Touche LLP*, 143 F. Supp. 2d 995, 1004-05 (N.D. Ill. 2001) (citations omitted); see also *Holden v. Deloitte & Touche LLP*, 390 F. Supp. 2d 752, 764-65 (N.D. Ill. 2005); *Affymax*, 420 F. Supp. 2d at 881-82; *Johnston v. Arrow Fin. Servs., LLC*, 2006 WL 2710663, at *5 (N.D. Ill. Sept. 15, 2006). In this case, only the second prong of the test is at issue.[3]

Based on the Court's review of the complaint, Plaintiffs' claims are premised on the theory that Deutsche Bank and others, including Counterpoint and Delta, entered into a conspiracy and/or engaged in a scheme to develop and market "illegal" tax strategies to Plaintiffs for the express purpose of generating fees. Compl. ¶ 1; see also *id*. ¶ 81. Plaintiffs allege the following misconduct on the part of Deutsche Bank and their co-conspirators:

> "In 1999, on the advice of Defendants and their co-conspirators, the Leffs engaged in a so-called COBRA foreign options trading strategy." *Id*. ¶ 5.
>
> "Defendants developed COBRA with Jenkens and other entities for the express purpose of generating fees. Indeed, Defendants, along with Jenkens and other entities, developed a fee sharing arrangement that remained undisclosed to the Leffs throughout the transactions. Defendants entered into a similar fee sharing

---

[3] The standard adopted by the courts in *Hoffman* and *Holden* arises from the Eleventh Circuit's decision in *MS Dealer Service Corp v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999), which set forth the "substantially interdependent and concerted misconduct" test. See also *Becker v. Davis*, 491 F.3d 1292, 1303 (11th Cir. 2007) (relying on *MS Dealer* in accepting non-signatory defendants' argument that "since the complaint alleges a conspiracy between signatory defendants and nonsignatory defendants, equitable estoppel allows a nonsignatory to compel arbitration"). Plaintiffs argue that, in citing to the test set forth in *Hoffman*, Deutsche Bank is urging the Court to apply the wrong legal test. According to Plaintiffs, the case law in this area has developed significantly since *Hoffman*. However, as noted above, courts in this district have continued to apply the estoppel standard set forth in *Hoffman*. While the cases cited by Plaintiffs show that other jurisdictions have articulated a slightly different estoppel standard, the Court is not persuaded to depart the standard employed by courts within this jurisdiction. Moreover, the standard articulated by *Hoffman* appears to be in line with the Seventh Circuit's most recent pertinent decision, *Hughes Masonry Co. v. Greater Clark County School Building Corp.*, 659 F.2d 836, 838-41& n.9 (7th Cir. 1981), in which the court held that a signatory was equitably estopped from denying arbitration where the signatory sought to recover against the non-signatory amounts allegedly owed to the signatory by the other party to the arbitration agreement. In *Hughes*, the Seventh Circuit specifically found that estoppel applied to claims that were "intimately founded in and intertwined with" the underlying contract obligations. In view of the case law in this district and circuit, the Court declines to adopt the standard urged by Plaintiffs.

arrangement with Proskauer Rose LLP * * * and Bricolage Capital, LLC, and its principals and affiliates, regarding the PICO transactions." *Id*. ¶ 10.

"The Leffs each entered into tax shelters under Defendants' and their co-conspirators' guidance." *Id*. ¶ 27.

"Defendants and their collaborators needed a new tax shelter to market or they would lose the enormous fees they had been making with COBRA. Therefore, Defendants assisted in creating new tax shelters – essentially modified versions of COBRA – intended to circumvent Notice 2000-44 and (it was hoped) avoid IRS notice." *Id*. ¶ 58.

"Defendants worked with Bricolage Capital and its subsidiaries Counterpoint Capital, LLC ('Counterpoint'), Delta Currency Trading ('Delta'), as well as E & Y to create a new strategy, entitled 'Personal Investment Corporation' or 'Personal Investment Company.'" *Id*. ¶ 59.

"Defendants were involved in the creation of the PICO strategy and were responsible for acting as custodian for each of the entities created to engage in the sham PICO transactions, and as counter-parties to the Bricolage entities for the foreign currency straddles involved in those transactions that Bricolage and Defendants marketed as the new PICO strategy to the Leffs." *Id*. ¶ 62.

"Defendants and their co-conspirators failed to disclose to the Leffs that the S corporation [created pursuant to the services provided through the Counterpoint Consulting Agreement] had no legitimate purpose other than as a medium for tax avoidance and therefore the IRS would deem the losses generated within the S corporation as illegitimate tax shelter losses." *Id*. ¶ 71.

"The PICO transactions, similar to the COBRA transactions, were pre-packaged collaborations between Defendants and others." *Id*. ¶ 77.

"Deutsche Bank recruited other entities to assist in marketing tax shelters generally, and COBRA and PICO specifically, to wealthy clients and others (in return for a substantial volume of tax preparation business and undisclosed fees). In turn, other entities recruited others in marketing the tax shelters to other clients. As a result of these arrangements. Defendants, along with the other entities, generated millions of dollars." *Id*. ¶ 81.

"Bricolage and Defendants also made similar presentations regarding the PICO transaction as those made regarding COBRA." *Id*. ¶ 90.

"Defendants * * * conspired with and participated in, either directly or indirectly, Bricolage, Proskauer and others' efforts to solicit the Leffs and market the PICO scheme to them." *Id*. ¶ 147.

> "As a result of Notice 99-59, Defendants knew or should have known that the IRS would assert that the purported losses arising from both COBRA and PICO were improper and not allowed for tax purposes. Defendants and their co-conspirators, however, intentionally did not disclose this information to the Leffs and, indeed, told them the opposite." *Id*. ¶ 150.

Plaintiffs also assert a conspiracy claim, alleging that Deutsche Bank "knowingly conspired with Jenkins, Daugerdas and Bricolage [which is defined to include, among others, Counterpoint and Delta (see *id*. ¶ 59)] to (1) obtain money by means of false pretenses, representations or promises; (2) defraud Plaintiffs and implement fraudulent and illegal tax shelter transactions; and (3) violate the Illinois Consumer Fraud and Deceptive Trade Practices Act in promoting the transaction." *Id*. ¶ 221. Factual and legal allegations such as these support the conclusion that Plaintiffs' complaint relies on substantially interdependent and concerted misconduct by the non-signatory and at least one of the signatories to the contract. See *Hoffman*, 143 F. Supp. 2d at 1005 ("Additionally, plaintiffs claim that all the defendants conspired to induce them to participate in the roll-up. Indeed, both complaints contain civil conspiracy counts. The claims thus raise allegations of substantially interdependent and concerted misconduct by both the signatory * * * and the non-signatories. Therefore, plaintiffs are equitably estopped from avoiding arbitration."); *Holden*, 390 F. Supp. 2d at 765 (referring to the plaintiffs' conspiracy allegations and holding that "[i]n raising such allegations, the [plaintiffs] cannot 'have it both ways' and advance claims alleging concerted misconduct with signatory defendants while simultaneously seeking to ignore an arbitration agreement that they have made with the signatory").

Plaintiffs are suing Deutsche Bank to recover, among other demands, the fees that they paid to Bricolage and the benefit of the bargain of those contracts containing the arbitration provisions. If Plaintiffs directly sued Bricolage seeking that same relief, their claims clearly

11

would be subject to arbitration. In seeking to hold Deutsche Bank liable for allegedly scheming with Counterpoint, Delta, and others to develop, market, and implement the COBRA and PICO strategies to Plaintiffs' detriment, Plaintiffs cannot escape the consequences of those allegations by arguing that Deutsche Bank lacks the requisite close relationship, or that their claims are not intimately connected to Deutsche Bank's relationship with Bricolage and others. Because Plaintiffs' complaint alleges substantially interdependent and concerted misconduct between Deutsche Bank and signatories to the contracts containing the arbitration provisions, all of Plaintiffs' claims in this suit are appropriate for arbitration.[4] See *Holden*, 390 F. Supp. 2d at 765.[5]

### III. Conclusion

For the reasons stated above, the Court grants Defendants' motion [49] for a stay of this action pending arbitration of Plaintiffs' claims pursuant to Section 3 of the Federal Arbitration Act.

Dated: May 14, 2009

Robert M. Dow, Jr.
United States District Judge

---

[4] Plaintiffs contend that even if their claims related to the PICO strategy are referable to arbitration, there is "no conceivable basis to compel arbitration of the Leffs' claims relating to * * * COBRA." See Pls. Resp. at 24. However, all of Plaintiffs' claim relate to what Plaintiffs allege was a unified scheme to design, market, and implement fraudulent tax strategies. Each of the six counts of Plaintiffs' complaint alleges conduct relating to both the COBRA and PICO strategies. See, e.g., Compl. ¶¶ 184-237. And the agreements contain broad arbitration provisions that require arbitration of "[a]ny controversy arising out of or relating to" the agreements. Accordingly, the Court concludes that all of Plaintiffs' claims arise out of or at least relate to the Bricolage agreements and thus fall within the scope of the arbitration provisions.

[5] In view of the resolution of the motion on equitable estoppel grounds, the Court need not reach the agency arguments that the parties also have briefed.